**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105
(415) 568-2555
Attorneys for Plaintiff Bonier

[Additional Counsel on Signature Page]


### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| IN RE PET FOODS PRODUCTS | ) | MDL No. 1850 |
| LIABILITY LITIGATION | ) | Master Docket: 07 CV 2867 (NLH)(AMD) |
| | ) | ALL CASES |

---

### MEMORANDUM OF LAW IN SUPPORT OF
### NATIONAL PLAINTIFFS' MOTION FOR
### <u>APPOINTMENT OF CO-LEAD COUNSEL</u>

Dockets.Justia.com

**TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

        A.    THE PROPOSED LEADERSHIP OF THE CONSUMER
              COUNSEL GROUP SATISFIES EACH OF THE SPECIFIC
              FACTORS REGARDING THE DESIGNATION OF INTERIM
              LEAD COUNSEL ENUMERATED BY FEDERAL RULE 23 . . . . . .5

              1.    The Consumer Counsel Group Has Done Extensive
                    Work Investigating the Potential Claims in the Instant
                    Action -- Work That Demonstrates its Superior
                    Understanding of the Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

              2.    The Proposed Lead Counsel Have  Substantial Experience
                    Litigating Complex Consumer
                    Class Actions and Mass Tort Actions . . . . . . . . . . . . . . . . . . . .10

                    A.    William A. Audet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                    B.    Jay Edelson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                    C.    Scott A. Kamber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

              3.    The Consumer Counsel Group Have Extensive
                    Knowledge of the Applicable Laws . . . . . . . . . . . . . . . . . . . . . .15

              4.    Proposed Lead Counsel Represent a Significant
                    Number of Injured Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . .15

        B.    SELECTION OF LEAD COUNSEL BY WAY OF
              A POPULARITY CONTEST LEADS TO ABUSE . . . . . . . . . . . . . .17

              1.    The Court Should Discount the "Repeat"
                    Filings of Identical Class Actions by Members of
                    Other Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              2.    The Proposed Leadership Structure is Streamlined
                    and Efficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

# TABLE OF AUTHORITIES

## CASES

*In re Aon ERISA Litigation,* No. 04 CV 6875 (N.D. Illinois) . . . . . . . . . . . . . . . . . . . . . .20

*In re Milestone Sci. Sec. Litig.,* 187 F.R.D. 165 (D.N.J. 1999) . . . . . . . . . . . . . . . . . . . 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
MDL No. 05-1720, 2006 U.S.Dist. LEXIS 45727 (E.D.N.Y. Feb. 24, 2006) . . . . . . . . 15

*In re Razorfish, Inc. Secs. Litig.,* 143 F.Supp.2d 304 (S.D.N.Y. 2001) . . . . . . . . . . .17 n. 6

*In re Scrap Metal Antitrust Litig.,* No. 1:02-CV-0844
2002 WL 31988203 (N.D. Ohio Aug. 5, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vincelli v. National Home Health Care Corp.,*
112 F.Supp. 2d 1309 (M.D. Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

## STATUTES

Fed. R. Civ. P. 23(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## OTHER AUTHORITIES

*Manual for Complex Litigation* (4th) § 10.221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Manual for Complex Litigation* (4th) § 10.224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

*Newberg on Class Actions* § 9.35 (3d ed. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

The undersigned plaintiffs (collectively, the "National Plaintiffs") respectfully request that this Court appoint William M. Audet, Audet & Partners, LLP, Jay Edelson, Blim & Edelson, LLC, and Scott A. Kamber, Kamber & Associates, LLC as Co-Lead Counsel. [1]

# I
## INTRODUCTION

In re Pet Food Products Liability Litigation is not a typical class action, but a unique hybrid of consumer litigation, mass torts and animal law.  Maybe the most distinguishing characteristic of the case is that even though the case is predicated on product contamination that seems to be undisputed, complex issues such as causation, measure of damages and recoverability must be well-understood before resolution.  This is all the more complicated by constant pressure from a class of individuals whose household companions were wrongfully hurt or killed after being fed contaminated food and who demand prompt closure to their tragedy.  It is a case that is depicted as simple in the media but poses a minefield of legal and extrajudicial issues.  The Consumer Counsel Group understands this and has demonstrated this understanding in their collective

---

[1]  The Audet, Edelson, and Kamber firms collectively and together with the law firms King & Ferlauto, LLP, Seeger Weiss, LLP, Milberg Weiss & Bershad, The Ferrara Law Firm, LLC, Lundy & Davis, LLP, Kirtland & Packard, LLP, Helmer Friedman, LLP, Schonbrun De Simone Seplow Harris & Hoffman, LLP, Robert Pierce & Associates, P.C., Law Offices of Peter N. Wasylyk, Law Office of Andrew S. Kierstead, Stanley, Mandel & Iola, LLP, and Parisi & Havens, LLP, represent the National Plaintiffs and are referred to herein as the "Consumer Counsel Group" or the "Group". Along with the Notice of Motion and this Memorandum, the undersigned have also submitted to the Court: (1) the Declaration of William M. Audet ("Audet Decl."); (2) the Declaration of Scott A. Kamber ("Kamber Decl."); (3) the Declaration of Jay Edelson ("Edelson Decl."); and (4) the Declaration of Jason Hatfield ("Hatfield Decl.").

actions to date. The law firms proposed to this Court by the National Plaintiffs to serve as interim Lead Counsel are not only well-suited to manage this litigation, but uniquely understand the putative class based, in part, from their collective representation of over 1500 clients.

The dozen or so cases which have been filed by members of the National Plaintiffs against Menu Foods, Inc., and other defendants in this Court (or whose cases have been transferred to this Court pursuant to JPML Transfer Order for Docket No. 1850) were all filed independently of each other and were in no way coordinated or conceived as a contrivance to create a superficial momentum for the appointment of lead counsel. *Audet Decl.* at ¶ 12.  Rather, the law firms in the Consumer Counsel Group were driven to each other by certain mutual concerns and goals regarding the prosecution of these cases and the best way to organize the participating law firms. *Audet Decl.* at ¶ 13, 14.

Immediately following the initial announcement of the Menu Foods recall, each member of the Consumer Counsel Group independently began screening inquiries from clients and initiated intensive research on the factual and legal history of such recalls and compiled detailed information on Menu Foods business practices and corporate structures. *Audet Decl.* at ¶ 8.  The Edelson firm filed its complaint on March 20, 2007 and was one of the first complaints filed.  *Edelson Decl.* at ¶ 8.  The Audet firm filed the *Bonier* case in the District of New Jersey on March 29, 2007.  Immediately thereafter, the Edelson firm began to closely work with congressional offices, bar associations and animal rights groups in order to exchange information and help develop an initial extrajudicial strategy to deal with the unfolding tragedy. *Edelson Decl.* at ¶ 9.  During

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

this period, Edelson forged working relationships with several other law firms including the Kamber Firm. *Edelson Decl.* at ¶ 10.

These efforts were interrupted in early April by a mass of filings of identical class actions that seem to have been in large measure coordinated by a four firm group.[2] *Edelson Decl.* at ¶ 11.  This spate of filings was capped off by an invitation to counsel in all of the filed cases to an "organizational meeting" in Chicago at the ballroom of the Peninsula Hotel (the "Peninsula Meeting"). *Audet Decl.* at ¶ 15.  This meeting was hosted by the firms that now comprise the proposed leadership identified herein as the Berger/Wexler Group.  *Id.*  Billed as an opportunity to coordinate activities and share work, it instead became a meeting that was nearly identical to the initial meetings seen in many of the larger securities and antitrust cases—an expensive effort to create layers of committees and working groups that form the "leadership by patronage" method of organization that is expressly rejected by the Manual for Complex Litigation. *Audet Decl.* at ¶17.

In the wake of the Peninsula Meeting, the core of the Consumer Counsel Group was formed. *Audet Decl.* at ¶ 16.  The firms of the Consumer Counsel Group were brought together by a fundamental belief that this type of organization strategy was inefficient, contrary to the intentions of Rule 23 and not appropriate. *Audet Decl.* at ¶ 16. The Consumer Counsel Group perceived that there would be limited resources for recovery and thus efficiency by counsel was critical. *Kamber Decl.* at ¶  10.  Further, most of the Consumer Counsel Group had spent hours each day on the phone with pet

---

[2] The four firms: Wexler, Toriseva, Wallace, LLP, Berger & Montague, P.C., Hagens Berman Sobol Shapiro, LLP, and Lerach Coughlin Stoia Geller Rudman & Robbins, LLP are hereinafter referred to as the Berger/Wexler Group.

owners who were dealing with an intense personal tragedy and it simply struck them as wrong that 100 lawyers from all over the country should fly to Chicago to meet in a luxury ballroom to discuss patronage. *Kamber Decl.* at ¶ 10.

Throughout this case, many of the firms that now comprise the Consumer Counsel Group have worked together to better understand the case, develop legal theories, further investigate substantive claims and develop the plaintiffs' definitive damage analysis—all without the additional expense of an "organizational" meeting.[3] Further, the Consumer Counsel Group played a key role in opening up a productive dialogue with defense counsel in order to deal with a broad range of issues, including spoliation of evidence and storage of evidence. *Kamber Decl.* at ¶ 12.  These meetings planted the seeds for the ongoing productive dialogue that now includes members of the Berger/Wexler Group as well. *Audet Decl.* at ¶ 18.

The bottom line is that the Consumer Counsel Group is a cohesive group of uniquely experienced attorneys that recognize that this case needs a leadership who understand all the issues from the ground up in order to conduct the case efficiently and expeditiously.  The proposed leadership of the Consumer Counsel Group has made *no* promises of work to other law firms, *no* promises of committee assignments, *no* promises of an attorney fee division and *no* quid pro quo agreements of any kind in order to obtain the support of any of the attorneys that comprise the Consumer Counsel Group. *Kamber Decl.* at ¶ 9.  Instead, its support was pledged based on a common vision that this case is best run by lawyers with relevant experience in consumer and mass tort cases who will

---

[3] Further, even though no members of the Consumer Counsel Group were ever appropriately served with papers or otherwise informed of certain efforts in the *Workman* and *Sokolwski* cases, Kamber, Edelson, Audet (and others) were still able to play a critical role in the results obtained before this Court.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

not act, organize or operate like this case is indistinguishable from the behemoth antitrust and securities cases that form the backbone of experience of other groups seeking appointment as lead counsel. *Audet Decl.* at ¶ 7.

As detailed herein, the Consumer Counsel Group not only satisfies the requirements of the Federal Rules and *Manual for Complex Litigation* (4th), but has contributed to every substantive development, led the way in building constructive relationships between counsel for plaintiffs and defendants, and has consistently shown an ability to work with other plaintiffs counsel without regard to alliances and without promises of patronage. The proposed structure is not bloated, but complete with three firms that each bring unique strengths to the leadership of this case.

## II
## ARGUMENT

**A.    THE PROPOSED LEADERSHIP OF THE CONSUMER COUNSEL GROUP SATISFIES EACH OF THE SPECIFIC FACTORS REGARDING THE DESIGNATION OF INTERIM LEAD COUNSEL ENUMERATED BY FEDERAL RULE 23.**

Courts look to the strictures of Rule 23(g) of the Federal Rules of Civil Procedure when designating lead counsel for a proposed class of plaintiffs. Fed. R. Civ. P. 23(g) Advisory Committee Notes 2003 ("Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made."). The Federal Rules enumerate the following factors that inform designation of lead counsel: (i) "the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; and (iii) counsel's knowledge of

the applicable law; and (iv) the resources counsel will commit to representing the class."

Fed. R. Civ. P. 23(g)(1)(C)(i).

>    **1.    The Consumer Counsel Group Has Done Extensive Work Investigating the Potential Claims in The Instant Action -- Work That Demonstrates its Superior Understanding of the Cases**

The Consumer Counsel Group's single focus has been on advancing the interests of the class.  That reality has been borne out at each and every phase of this litigation.  Indeed, within the first three days following Menu Foods' March 16, 2007 recall including a holiday weekend before the press took particular notice of that event – the Group screened inquiries from approximately a half-dozen consumers, investigated the few publicly-available facts concerning the recall, researched the factual and legal history of such recalls, and compiled information on Menu Foods business practices and corporate structure. *Edelson Decl.* at ¶ 8.  On the fourth day after the recall, March 20, 2007, the Group filed one of the first class action lawsuits against Menu Foods.  *Id.*

Over the next two weeks, the Group continued its extensive factual investigation, speaking to hundreds of affected consumers and working in coordination with congressional offices, bar associations, animal rights public interest groups, web blogs devoted to tracking the recall, academics focusing on animal law, and animal rights' practitioners. *Edelson Decl.* at ¶ 9.  Because certain members of the Group became the leading voices in the governmental arenas, they began to amass a comprehensive database of reports. *Edelson Decl.* at ¶ 18.  From those initial days they learned from a congressional office in New York that recalled pet food was still being sold in stores. *Edelson Decl.* at ¶ 20.  From Canadian sources they learned that Paul Henderson, Menu Foods' CEO had admitted that Menu Foods was systematically destroying the pet food it

6

was receiving from consumers (without allowing any independent testing of that food). *Edelson Decl.* at ¶ 20, 28.  From animal rights organizations and web blogs, the Group learned that the defendants' initial recall was not broad enough.  And, from members of the public, they learned that defendants had started fielding complaints about the pet food as early as December 2006.

The Group also did a comprehensive analysis of the law, consulting with academics and animal rights practitioners from California, Illinois, and Florida.  From those discussions, the Group realized the manner in which companion animals are treated by the law is in a state of evolution.  Although for decades animals were considered nothing more than property, that is no longer the case.  More and more, the statutory and common laws are recognizing the special value Americans place on their pets.  Courts have started recognizing that pet owners may be entitled to emotional damages from losing their pets.  Others have accepted similar propositions, like the notion that a pet owner can recover the "intrinsic" or subjective value of a lost pet.[4]

The Group also realized that issues of causation were going to form the primary defense – both on certification and trial – in these cases.  As in similar situations in the past, Defendants were going to argue that the most pressing issue in these cases were whether a particular dog or cat died or was sickened as a result of eating the contaminated pet food.  They were going to claim that unless a particular plaintiff could establish – through autopsies that people didn't know ought to be performed or through the testing of

---

[4] The example many courts and commentators point to is that of a family heirloom that gets destroyed.  The law has been increasingly willing to accept that a plaintiff is not limited to recovering the fair market value of that heirloom (which might be zero), but rather can recover an amount more closely tied to the value a reasonable person would give it under the same circumstances.

partially consumed pet food that people didn't know needed to be tested – no case could succeed.  *Kamber Decl.* at ¶

Immediately understanding this landscape, on April 3, 2007, a mere two weeks after the first recalls were announced, the Group filed an amended complaint alleging fraud claims based on the fact that Menu Foods knew about the problems with its pet food weeks if not months before issuing its first recall. *Edelson Decl.* at ¶ 13.  They further brought claims of spoliation of evidence based on defendants' coordinated scheme to collect and then destroy the claimed contaminated food.  *Id.*

The Group's amended complaint significantly advanced the interests of the class in a number of concrete ways.  By alleging claims of intentional delay of the recall and spoliation of evidence, plaintiffs will have the opportunity to seriously undermine two of defendants' primary potential arguments: namely, issues of causation will both defeat class certification and be fatal to plaintiffs' claims on the merits.  *Edelson Decl.* at ¶ 13. If plaintiffs can show that defendants intentionally delayed issuing the recall and then destroyed critical evidence thereafter, they will be able to argue that the normal burden of proof will shift onto defendants. *Edelson Decl.* at ¶ 13.  That is, defendants will have to come forward with evidence negating an inference of causation.  Further, by alleging intentional conduct, plaintiffs will have the potential to recover punitive damages, which, under the current facts, could be significant.[5]

The Group's research and added allegations have colored each and every issue to date.  For example, when Menu Foods was attempting to obtain plaintiffs' consent to destroy certain recalled product it was storing, the Consumer Counsel Group asked for an

---

[5] Legal commentators, including the National Law Journal, have commended the Group for advancing these theories.

accounting on previously destroyed product.   And after Menu Foods' attorneys

proclaimed that all recalled food had been scrupulously preserved and implied that the

Consumer Counsel Group's allegations were based on mere "rumor," Menu Foods was

forced to back down after being sent articles quoting its own CEO on the subject.

Similarly, the Consumer Counsel Group (working collaboratively with a member of

the Berger/Wexler Group) has taken the lead on developing an extensive damages

analysis of this case, which has become the lens through which internal strategy

discussions are viewed.

The Consumer Counsel Group's unique understanding of this case is, however, by no

means limited to the legal and factual aspects of this case.  By far the most complicated

and important part of this case is understanding the viewpoint from the clients'

perspective.  Within hours of the recall being announced, members of the Consumer

Counsel Group began to receive phone calls from members of the public who had lost

companion animals as a result of eating the contaminated pet food. As these extremely

emotional conservations bore out, the Group soon realized that this case was far from the

typical product recall case (let alone a securities case), where people might be frustrated

or angry that they bought a potentially dangerous product or primarily fixed on getting

monetary compensation.  Rather, from the point of view of the plaintiffs, the defendants'

misconduct robbed them of the companionship of their loved ones.

Although monetary compensation will, of course, be a key to any successful

resolution, these real life conversations with hundreds of victims have made the

Consumer Counsel Group understand the need for more.  The putative class needs and

deserves an accounting of what happened, including when the defendants first learned of

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

the problems with their food and why they acted so slowly in alerting the public. The putative class needs to hear that defendants and the judicial system recognize the pain that has been caused and the damage done. And the class needs to know that their pets did not die or get sick in vain; in short that this disaster will at least ensure that there will be no similar mass poisonings in the future.

      **2.**     **The Proposed Lead Counsel Have Substantial Experience Litigating Complex Consumer Class Actions and Mass Tort Actions.**

The three proposed lead attorneys — William M. Audet of Audet & Partners, LLP, Scott A. Kamber of Kamber & Associates, LLC, and Jay Edelson of Blim & Edelson, LLC — are uniquely qualified to serve as lead counsel in these actions. *See Audet Decl., Ex. 1, Kamber Decl., Ex. 1, and Edelson Decl., Ex. 1.* In addition to their significant contribution to these cases thus far, each attorney brings to the case significant consumer, class and other related litigation experience.

      **A.**     **William M. Audet**

One of the proposed leads, William M. Audet, has served not only as class counsel in dozens of consumer and other similar class actions, but also is one of the few attorneys before this Court with significant "mass tort" experience. *See Audet Decl., Ex. 1.* Among other appointments, Mr. Audet has been appointed to leadership positions in some of the largest mass tort cases in the United States: *In re Zyprexa,* MDL No. 1596 (Executive Committee); *In re Bextra,* MDL No. 1699 (Plaintiffs Steering Committee); *In re Baycol,* MDL No. 1431 (Plaintiffs Steering Committee). Mr. Audet also has significant experience in litigating (and resolving) on a class-wide basis emotional distress claims. *Audet Decl.* at ¶ 6. Among other cases, Mr. Audet served as class counsel in the *Sconce/Lamb California* JCCP cases involving allegations of commingled

crematorial remains. *Id.* Mr. Audet successfully obtained a significant recovery by way of settlement for the distressed relatives.

In addition, Mr. Audet served as class counsel in a multi-national, multimillion dollar settlement (U.S.A. and Canada) before Judge Chesler of this District. *Audet Decl.* at ¶ 5.

Audet & Partners, LLP has also been on the forefront of the plaintiffs bar with respect to pursuing claims against China-based companies. Audet & Partners, LLP has filed a first of its kind class action case against a Chinese entity for violation of Chinese consumer protection laws. *See Quintana v. Binzhou Futian Biol. Tech. Co., Ltd. et al.*, San Francisco, California Superior Court No. C07-465924.

Since April of this year, Mr. Audet and his firm have been almost daily involved with the Menu Foods cases. *See Audet Decl.* at ¶ 8. In addition to filing papers arguing for New Jersey District Court as the appropriate venue, Mr. Audet has been contacted by over 1,000 individuals with potential claims against the defendants. *Id.* Mr. Audet has made appearances on regional television and radio stories about the recall. Mr. Audet's firm currently represents in excess of five hundred (500) clients, with a database of hundreds more contacts. *Id.* Beyond speaking to potential witnesses and meeting with other counsel on the case, Mr. Audet was invited early on by Defendants to discuss a host of issues related to this litigation. *Id.*

### B.    Jay Edelson

Jay Edelson is a partner at the nationally recognized plaintiff's class action firm, Blim & Edelson, LLC. *Edelson Decl.* at ¶ 1. Mr. Edelson has extensive experience leading complex consumer class actions and mass tort cases. *Edelson Decl.* at ¶ 3, 4.

Edelson's firm was one of the first to bring one of the instant class actions; interviewing witnesses and investigating the relevant factual and legal issues within days of the recall. *Edelson Decl.* at ¶ 8.

Additionally, Blim & Edelson, LLC was asked to be involved in federal and state legislative efforts to enact laws that would help avoid future pet food contamination crises. *Edelson Decl.* at ¶ 26. To that end, Blim & Edelson, LLC contributed drafts of model legislation to the office of the United States Senator Richard Durbin and has provided consultation to numerous individuals and public interest groups around the country working on similar legislative efforts. *Id.* Edelson provided testimony for the hearing of the U.S. Senate Subcommittee on Agriculture Appropriations on "Pet Food Contamination." *Id.*

Mr. Edelson has also taken a leadership role in developing this case in the courts. Based on information he was provided by governmental agencies, animal rights groups, and members of the public, as well as his own research, he filed an amended complaint two weeks after the recall was announced, alleging that Menu Foods knew of the problems with its food perhaps as early as December of 2006. *Edelson Decl.* at ¶ 13. He also was the first attorney to bring claims of spoliation of evidence against Menu Foods based on a little known admission by Menu Foods' CEO that it was systematically destroying evidence. *Id.*

Edelson has taken on a central role in every phase of this litigation. In addition to briefing the various MDL motions, Edelson provided key affidavits and arguments leading to the plaintiffs' most significant victory so far in this case – the consent decree entered into by Menu Foods. *Edelson Decl.* at ¶ 21. He and his experts have worked up

a comprehensive damage model, which he shared with his group as well as the

Berger/Wexler Group.  He also has taken the lead in negotiating a proposed order dealing

with the recalled product currently being stored by Defendants.  *Edelson Decl.* at ¶ 24.

Mr. Edelson currently represents approximately 700 clients in this litigation.

*Edelson Decl.* at ¶ 5.  In addition to pet owners, Mr. Edelson also represents clients who

run animal sanctuaries, breed animals, and rely on trained working dogs.  *Edelson Decl.*

at ¶ 7.

### C.    Scott A. Kamber

Mr. Kamber has considerable experience in class action litigation, and has a

proven track record in obtaining substantial settlements for a variety of classes.  In

several high profile cases Kamber was able to secure very successful early settlements

that were promptly approved by the Court.  Key to Mr. Kamber's practice is his

experience as a defense attorney before joining the plaintiffs' bar.  Mr. Kamber prides

himself on building solid working relationships based on trust and respect between

plaintiff and defense counsel whenever possible.  This philosophy has yielded many

successful results for the class, including as lead counsel for the matter *In re Sony BMG*

*CD Technologies,* which last year settled promptly in a model settlement that was widely

praised in the media and by public interest groups.  In many other areas of consumer law

Kamber has litigated (and continues to litigate) legal claims of first impression that have

required fresh approaches to litigation and resolution such as *Wormley v. Geocities*

(believed to be the earliest internet privacy case to reach class resolution almost ten years

ago); *Johnson v. Microsoft* (ongoing litigation regarding rights to update software)*; and*

---

*In re ATI Tech HDCP Litig.*(one of first cases to address the interpretation of standards for high definition in computers as presented in advertisements).

Here, Mr. Kamber has worked closely with other members of the Consumer Counsel Group in developing the initial theories of the case and by directing his offices contact with many hundreds of plaintiffs. From late April, Kamber has engaged in in-person and telephonic discussions with defense counsel on a variety of subjects. These contacts have been particularly productive in building a rapport between opposing counsel. In the last month and one-half these discussions have included representatives from the Berger/Wexler Group as well. In June, Kamber, along with Mr. Audet, began a dialogue to coordinate efforts with several of the firms leading the Canadian class actions. These efforts included a joint meeting with Canadian Counsel and the in-house and outside counsel for Menu Foods.

Mr. Kamber also showed his ability to work constructively with other plaintiffs' counsel outside of the Consumer Counsel Group. Kamber worked to broaden the above-described discussions between the Consumer Counsel Group and Menu Foods through the inclusion of representatives of the Berger/Wexler Group and since July there have been several productive meetings between the Consumer Counsel Group, the Berger/Wexler Group and defendants. Further, immediately upon learning of the pending motions by the Berger/Wexler Group in the *Workman* and *Sokolwksi* matters, Kamber worked diligently to achieve the favorable results obtained before this Court. Kamber's efforts in support of the Berger/Wexler Group's motion included providing the Court with supporting affidavits from clients of the Consumer Counsel Group, arguing plaintiffs' positions before the Court, and being involved with Mr. Paul in each phase of

negotiation with defendants regarding the terms of the consent orders and letters that resulted from the Court appearances.  By working productively in this context, Mr. Kamber helped assure that the resulting consent order and letters had the broadest possible support among plaintiffs, not always an easy task when over 100 firms are involved and no leadership structure had yet been appointed.

**3.  The Consumer Counsel Group Have Extensive Knowledge of The Applicable Laws.**

**As the resumes submitted herewith establish, the Consumer Counsel Group have the background and qualifications to serve as co-lead in this unique case.  As is clear from the claims asserted in the complaint before this Court, this case needs attorneys who have significant consumer litigation experience, along with the ability to work with Canadian plaintiffs counsel and deal with complicated issues of litigation against a China-based company.  The needs of this are unique and are well matched with the unique and broad consumer, multinational litigation experience found in the proposed lead attorneys, William M. Audet, Scott A. Kamber and Jay Edelson.  Their respective past experience in similar class action cases, along with their unique experience in mass torts, multinational settlements, claims against China-based companies and past experience with insurance policy cases promise a perfect fit with this case.**

**4.  Proposed Lead Counsel Represent a Significant Number of Injured Plaintiffs**

In cases of this nature, in addition to broad experience (and other factors), the number of clients the proposed leadership actually represents is also a factor.  *Newberg on Class Actions* § 9.35, *see also In re Payment Card Interchange Fee & Merch. Disc.*

---

15

*Antitrust Litig.*, MDL No. 05-1720, 2006 U.S.Dist. LEXIS 45727, at 30-32 (E.D.N.Y. Feb. 24, 2006).  Absent the active participation in the leadership by the attorneys who have a significant stake in the litigation, an end game to the litigation will never be obtained.  In *In re Vioxx, Phen-Phen,* and other major mass tort/class action cases, the Court appointed firms with class cases <u>and</u> significant individual cases.  These courts recognize that the litigation cannot simply focus on one or two class representatives (as in securities litigation); it must consider the interests of all potential claimants and injured parties.

In the instant case, any litigation and any broad solution requires the input of attorneys with pending class cases <u>and</u> significant individual clients.  Here, the Consumer Counsel Group represents over 2000 clients and the three firms that are herein put forward for leadership represent approximately 1500 clients by themselves.  These numbers are actual clients and not simply "contacts." The Court should appoint the attorneys proposed by the Consumer Counsel Group — otherwise, the "class" case may never be properly litigated (or resolved).

To the extent that <u>any</u> candidate for Lead Counsel suggests a "head count" is the primary factor for selection by the Court, such a position is misplaced and without support.  Under the aptly named "Private Ordering" approach, all lawyers must agree amongst themselves who should be lead class counsel, subject to court review to confirm that such counsel is adequate to represent the interests of the class.  *Manual for Complex Litigation* (4th), § 21.272.  Here, <u>no</u> agreement among all plaintiffs' counsel has been

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

created concerning the selection of Lead Counsel.  Under such circumstances, the Court

should select Lead Counsel considering all the relevant criteria.[6]

**B.    SELECTION OF LEAD COUNSEL BY WAY OF A POPULARITY
          CONTEST LEADS TO ABUSE.**

The *Manual for Complex Litigation* (4th) specifically cautions against simply

"[d]eferring to proposals by counsel without independent examination, even those that

seem to have the concurrence of the majority of those affected…."  *Manual for Complex*

*Litigation*, Fourth, § 10.224 (2004).  *See also In re Scrap Metal Antitrust Litig.,* No. 1:02-

CV-0844 2002 WL 31988203, at * 1 (N.D. Ohio Aug. 5, 2002)(rejecting the "negotiated

deal among counsel," noting that "the Manual warns the Court against accepting deals of

counsel at face value without making an independent evaluation.").

The purpose of the 2003 amendments to Rule 23 was to provide (by the

enactment of Rule 23(g)) a mechanism for choosing class counsel who would best

represent the interests of the class *without regard* to *negotiated deals* or *political*

*arrangements* among plaintiffs' proposed class counsel.

**1.    The Court Should Discount the "Repeat" Filings of
          Identical Class Actions by Members of Other Groups**

The number of cases that comprise this MDL is not an accurate reflection of the

number of firms involved, indeed it appears that there are far fewer firms involved in this

case than meets the eye.  For example, the Hagens-Berman firm has filed no less than

nine (9) almost identical class action complaints.  The Kaplan Fox firm has filed at least

---

[6] The selection of lead counsel should not simply be a matter of which competing group
represents more plaintiffs or consists of more attorneys.  Such a numbers game would
only result in plaintiff firms encouraging other firms to file cases in order to garner votes
for their leadership structure, a practice that should not be condoned by the Court.  *In re*
*Razorfish, Inc. Secs. Litig.,* 143 F.Supp.2d 304, 308 (S.D.N.Y. 2001).

17

four (4). The same "mirage" of supporting counsel has been created by the Berger/Wexler Group's use of one plaintiff with multiple counsel. For example, one complaint from the Berger/Wexler Group has over six (6) firms listed (*Pittsonberger,* 2007 CV 01561), and another set of complaints has three (3) firms. *See Bullock,* 2007 CV 1646 and *Carter,* 2007 CV 1562. Support by these cases for any firm seeking appointment as lead must be appropriately discounted, especially since such multiple filings can easily give the appearance of a "majority" when, in fact, it is an artificial construct serving no purpose but to increase leverage and power when choosing lead counsel.

As the drafters of the revised Rule 23 made clear, the reforms to the class action rules were to avoid this type of wasteful and unnecessary filing gamesmanship by plaintiffs attorneys. The so-called "majority" of the Berger/Wexler Group is really a house of cards — essentially based on multiple and duplicative filings.

### 2. The Proposed Leadership Structure is Streamlined and Efficient.

The *Manual* specifically warns against unwieldy and superfluous leadership structures, emphasizing that "[c]ommittees of counsel can sometimes lead to substantially increased costs, and … unnecessary duplication of efforts." *Manual for Complex Litigation,* § 10.221. Here, the National Plaintiffs propose a streamlined and efficient leadership structure consistent with applicable case law.

The Berger/Wexler Group makes no attempt to justify the appointment of four law firms with near-identical expertise and abilities as lead counsel, and the countless firms promised committee appointments and assignments. One must question the wisdom of such structures, in view of the potential for duplication of effort (and fees),

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

improper patronage rewarding, and inefficiency. *Vincelli v. National Home Health Care Corp.,* 112 F.Supp. 2d 1309, 1319 (M.D. Fla. 2000) (rejecting proposal for five member executive committee, nothing that "Lead Plaintiffs have not demonstrated how the possible benefits derived from appointing several lead counsel outweigh the complications and increased costs and expenses associated with the litigation by committee approach); *In re Milestone Sci. Sec. Litig.,* 187 F.R.D. 165, 178-181 (D.N.J. 1999) (rejecting the executive committee: "approval of several lead counsel may precipitate friction and a lack of coordination among counsel" and concluding that "there is no reason to burden the Plaintiff Class with additional counsel fees, delay or confusion which would result from the appointment of multiple counsel."). The warnings of *Vincelli* and *In re Milestone Sci. Sec. Litig.* have been well-heeded here.

The Consumer Counsel Group is comprised of three unique firms each with its own area of specialization. The proposed co-leads of the Consumer Counsel Group each draw on their wealth of experience in various areas of consumer, mass tort and animal law to compliment each other and work as a team. For example, Mr. Audet has significant mass tort experience, including *In re Baycol* and *In re Bextra*, and has resolved multinational class action cases. Mr. Kamber has been involved in numerous complex litigation matters, and has obtained significant settlements in cases presenting novel legal issues such as *In re Sony BMG CD Technologies* and *Wormley v. GeoCities*. Mr. Edelson has represented plaintiffs in a variety of class actions, including such areas as consumer protection (*Zurakov v. Register.com*), insurance (*Holloway v. J.C. Penney*) and mass tort actions (*Aaron v. Chicago Housing Authority*).

The *Manual* further states that "[w]hile it may be appropriate and possibly beneficial for several firms to divide work among themselves, such an arrangement should be necessary, not simply the result of a bargain among the attorneys." *Manual,* § 10.224. *See also In re Aon ERISA Litigation,* No. 04 CV 6875 (N.D. Illinois) (the Court rejected a multi-headed proposed leadership structure (including a four-way co-lead counsel team). The Consumer Counsel Group has already shown that it can work together without any complications or superfluous work. Indeed, the sum has been greater than the parts.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR APPOINTMENT OF CO-LEAD COUNSEL**

**III**
**CONCLUSION**

For the foregoing reasons, the National Plaintiffs respectfully request that this

Court appoint Audet & Partners, LLP, Blim & Edelson, LLC, and Kamber & Associates,

LLC as Interim Lead Counsel for the Class.


Dated: September 5, 2007

By:/s authorized for ECF filing
William M. Audet
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
waudet@audetlaw.com



By: /s authorized for ECF filing
Scott A. Kamber
**KAMBER & ASSOCIATES, LLC**
11 Broadway, 22d Floor
New York, NY 10004
Telephone: (212) 920-3072
Fax: (212) 202-6364
skamber@kolaw.com



By:/ s authorized for ECF filing
Jay Edelson
**BLIM & EDELSON, LLC**
53 West Jackson Blvd., Suite 1642
Chicago, IL 60604
Telephone: (312) 913-9400
Facsimile: (312) 913-9401
jay@blimlaw.com

**[Proposed] Lead Counsel**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR APPOINTMENT OF CO-LEAD COUNSEL**

|  |  |
|---|---|
| Kelly Finestone, C.D. Cal., 07-cv-2338 | **Joined by:**<br>Thomas Ferlauto<br>**KING & FERLAUTO, LLP**<br>1880 Century Park East, Suite 820<br>Los Angeles, CA 90067-1627<br>Telephone: (310) 552-3366<br>Facsimile:  (310) 552-3289<br>tmf@kingferlauto.com |
| James Conner, D.N.J., 07-cv-1623 | Jonathan Shub<br>**SEEGER WEISS, LLP**<br>1515 Market Street, Suite 1380<br>Philadelphia, PA 19102<br>Telephone: (215) 564-2300<br>Facsimile: (215) 851-8029<br>jshub@sheller.com |
| James Conner, D.N.J., 07-cv-1623 | Christopher A. Seeger<br>Scott Alan George<br>**SEEGER WEISS, LLP**<br>550 Broad Street<br>Suite 920<br>Newark, NJ 07102<br>Telephone: (973) 639-9100<br>Facsimile: (973) 639-9393<br>cseeger@seegerweiss.com<br>sgeorge@seegerweiss.com |
| Dawn Howe, C.D. Cal, 07-cv-2060<br>Dennis Lee Townsend and Glenna<br>Townsend, C.D. Cal, 07-cv-0398<br>Mark Golding, D.N.J., 07-cv-1521<br>Alexander Nunez,  D.N.J., 07-cv-1490<br>Richard Chamberlain, D.N.J., 07-cv-4064 | Jeff S. Westerman<br>Sabrina S. Kim<br>**MILBERG WEISS & BERSHAD, LLP**<br>One California Plaza<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA 90071<br>Telephone: (213) 617-1200<br>Facsimile: (213) 617-1975<br>jwesteman@milbergweiss.com<br>skim@milbergweiss.com |
| Janice Bonier, D.N.J., 07-cv-1477<br>Leslie Berndl, D.N.J., 07-cv-1553 | Michael A. Ferrara, Jr.<br>**THE FERRARA LAW FIRM, LLC**<br>601 Longwood Avenue at State Highway 38<br>Cherry Hill, NJ 08002<br>Telephone: (856) 779-9500<br>Facsimile:  (856) 661-0369<br>mferrara@ferraralawfirm.com |

22

| | |
|---|---|
| Kirby Cooper, W.D. Ark., 07-cv-4036<br>Charles Ray Sims et al., D.N.J., 07-cv-3156<br>Schwinger, D.N.J, 07-cv-3435 | Jason M. Hatfield<br>**LUNDY & DAVIS, LLP**<br>300 N. College Avenue, Suite 309<br>Fayetteville, AR 72701<br>Telephone: (479) 527-3921<br>Facsimile: (479) 587-9196<br>jhatfield@lundydavis.com |
| Johnson, D.N.J., 07-cv-1610, (C.D. Cal.<br>07-cv-1987) | Michael L. Kelly<br>Behram V. Parekh<br>**KIRTLAND & PACKARD, LLP**<br>2361 Rosecrans Avenue, Fourth Floor<br>El Segundo, CA 90245<br>Telephone: 310-536-100<br>Facsimile: 310-536-1001<br>mlk@kirtlandpackard.com<br>bvp@kirtlandpackard.com |
| Lois Grady, Kaye Steinsapir, Barbara<br>Gonzales, Frank Bodeman, and Craig<br>Anderson, Individually and on Behalf of<br>All Others Similarly Situated,<br>D.N.J., 07-cv-4137 (C.D. Cal., 07-cv-2253) | Gregory D. Helmer<br>Andrew H. Friedman<br>**HELMER FRIEDMAN, LLP**<br>723 Ocean Front Walk<br>Venice, California 90291<br>Tel. 310-396-7714<br>Fax 310-396-9215<br>afriedman@helmerfriedman.com<br>ghelmer@helmerfriedman.com |
| Lois Grady, Kaye Steinsapir, Barbara<br>Gonzales, Frank Bodeman, and Craig<br>Anderson, Individually and on Behalf of<br>All Others Similarly Situated,<br>D.N.J., 07-cv-4137 (C.D. Cal., 07-cv-2253) | Paul L. Hoffman, SBN 071244<br>Michael D. Seplow, SBN 150183<br>Michael S. Morrison, SBN 205320<br>**SCHONBRUN DE SIMONE SEPLOW**<br>**HARRIS & HOFFMAN, LLP**<br>723 Ocean Front Walk<br>Venice,  CA 90291<br>Telephone:  (310) 396-0731<br>Facsimile:  (310) 399-7040<br>hoffpaul@aol.com<br>mseplow@aol.com<br>lenbruce@yahoo.com |

---

23

| | |
|---|---|
| Mary DiCaprio, W.D. P.A., 07-cv-0734 | Robert N. Peirce III<br>D. Aaron Rihn<br>**ROBERT PEIRCE & ASSOCIATES, P.C.**<br>2500 Gulf Tower 707 Grant Street<br>Pittsburgh, PA 15219<br>Telephone: 1-800-543-9859<br>Facsimile: (412) 281-4229<br>rpeircejr@peircelaw.com<br>arihn@peircelaw.com |
| Carol Brown D.N.J., 07-cv-3423 | Peter N. Wasylyk<br>**LAW OFFICES OF PETER N. WASYLYK**<br>1307 Chalkstone Ave.<br>Providence, RI 02908<br>Telephone: (410) 831-7730<br>Facsimile: (401) 861-6064 |
| Carol Brown D.N.J., 07-cv-3423 | Andrew S. Kierstead<br>**LAW OFFICE OF ANDREW S. KIERSTEAD**<br>1001 SW Fifth Ave. Suite 1100<br>Portland, OR 97204<br>Telephone: (508) 224-6246<br>Facsimile: (508) 224-4356<br>ajkier@aol.com |
| Carol Brown D.N.J., 07-cv-3423 | Marc Stanley<br>**STANLEY, MANDEL & IOLA, LLP**<br>3100 Monticello Avenue, Suite 750<br>Telephone: (214) 443-4300<br>Facsimile: (214) 443-0358<br>mstanley@smi-law.com |
| Jayne Englander D.N.J., 07-cv-4062 | David C. Parisi<br>**PARISI & HAVENS, LLP**<br>15233 Valleyheart Drive<br>Sherman Oaks, CA 91403<br>Telephone: (818) 990-1299<br>Facsimile: (818) 501-7852<br>dparisi@parisihavens.com |