AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Attorneys for Plaintiff Bonier

[Additional Counsel on Signature Page]


**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

| | | |
|---|---|---|
| IN RE PET FOODS PRODUCTS | ) | MDL No. 1850 |
| LIABILITY LITIGATION | ) | Master Docket: 07 CV 2867 (NLH)(AMD) |
| | ) | ALL CASES |
| | ) | |

---

**NATIONAL PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE
APPLICATIONS FOR LEAD COUNSEL SUBMITED BY THE
BERGER/WEXLER GROUP AND MCLAUGHLIN**

Dockets.Justia.com

**TABLE OF CONTENTS**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    A.  The *Manual for Complex Litigation* Makes Clear That So-Called "Private Ordering" Is Not Appropriate In This Case . . . . . . . . . . . . .5

    B.  Any Claim For "Majority" Requires Disclosure Of Any "Deals" or Promises of Work or Positions By The Proposed Lead Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  The Firms Proposed As Lead By The Berger/Wexler Group Have Not Equally Made A Real Contribution To The Litigation . . . . . . . . . . . .9

    D.  The Berger/Wexler Group's "Contributions" Are Significantly Overstated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

        1.  The Peninsula Meeting Was Imprudent . . . . . . . . . . . . . . . . . .11

        2.  The Motion For a Protective Order Only Conferred a Benefit Upon The Class Once The Consumer Counsel Group and the Berger/Wexler Group Worked Together . . . .12

        3.  Discussions With Defendants Were Initiated By The Consumer Counsel Group Which Worked To Include Both Groups In The Discussions . . . . . . . . . . . . . . . . . . . . . . .13

    E.  McLaughlin Movants Have Not Contributed Meaningfully To This Case Nor Have They Shown Any Inclination To Work With Other Plaintiffs' Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

# TABLE OF AUTHORITIES

## CASES

*In re Air Cargo Shipping Services Antitrust Litigation*,
240 F.R.D. 56 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Auction Houses Antitrust Litig*.
2001 WL 210697, at *4 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*In re Cendant Corp. Securities Litigation*, 404 F.3d 173 (3rd Cir. 2005) . . . . . . . . . . . . .7

## OTHER AUTHORITIES

***Manual for Complex Litigation*** **(4th) § 10.224** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. .8

***Manual for Complex Litigation*** **(4th) § 21.272** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. 5

*Manual for Complex Litigation,* (4th) § 22.62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Third Circuit Task Force Report: *Selection of Class Counsel*,
208 F.R.D. 340 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

**I**

**INTRODUCTION**

As outlined in our opening submission to this Court, the undersigned counsel and their proposed three-way lead of William M. Audet, Scott A. Kamber and Jay Edelson not only have significant case and client support for their proposed leadership structure, but are unfettered by any 'side deals' and promises of significant 'make work.' The proposed leads of the Consumer Counsel Group have earned support through high quality work, open communication and promises of a fair opportunity for work to all who are willing and able to contribute to the case. Period. Beyond this unfettered and unencumbered approach to the litigation, the Consumer Counsel Group appears to represent a majority of retained individual clients at this point in the litigation.

In contrast, the so called Berger/Wexler four-way lead assert that they are the 'sole heirs' to the leadership because they 'have the votes' and 'earned' the position based on 'significant' contributions by certain members of the Berger/Wexler Group to this litigation. But the factual and legal foundation for these assertions is particularly weak, and therefore the Court should seriously consider a more equitable approach to the leadership appointment than that propounded by the four-way lead of the Berger/Wexler Group. As the record makes clear, once stripped of the duplicative filings of identical class actions, and only allowing one vote per case filed to date, the so-called Berger/Wexler Group has a very small margin of more 'votes' than the Consumer Counsel Group. More importantly, only a limited number of attorneys from the Berger/Wexler Group have in fact contributed to the prosecution of the case so far. While the Lerach Coughlin and Hagens Berman firms stake claims to two of the four leadership seats sought by the Berger/Wexler Group, their own declarations confirm that

they have thus far contributed their lengthy firm resumes and little more to the prosecution of this case. The rationale for their inclusion remains unexplained.

As outlined in the initial submission of the Consumer Counsel Group, Jay Edelson, Scott Kamber and William Audet have all made significant contributions — each in unique and important ways — to the overall prosecution of the cases. As noted in the prior submissions, members of the Consumer Counsel Group held early meetings with defendants, but later expanded the meetings to include equal representation of the other group. Similarly, the damage analysis, significant support for the injunction against Menu Foods, the 'destruction' of evidence claims and other meaningful contributions were done for the benefit of the class — not for the benefit of 'show and tell' at a later date during a leadership application. Most importantly, at the end of the day, the proposed Consumer Counsel Group's leadership structure is free and clear of any undisclosed promises of make work, committee assignments and the like, which is apparently the gravaman for the 'majority' support enjoyed by the Berger/Wexler group. The application of the law to the factual record before the Court should preclude this Court's carte blanche adoption of the four-way lead proposed by the Berger/Wexler Group.[1]

## II
## ARGUMENT

Reduced to its core, the Berger/Wexler Group advances two arguments in support of its self-selected lead counsel application. First, they contend that the Court should defer to their "private ordering" (*i.e.*, the process by which all the respective plaintiffs'

---

[1] As set forth in the opening papers, the Consumer Counsel Group does not oppose the appointment of Lisa Rodriguez of Trujillo Rodriguez & Richards, LLC as Liaison Counsel.

attorneys self-select and uniformly present a leadership structure to the Court). Second, they claim that because they have made "significant contributions" to this case, they have already proven themselves competent and effective leaders.

While the Consumer Counsel Group enjoys a positive working relationship with the Berger/Wexler Group, the Consumer Counsel Group believes the arguments made in favor of the appointment of the Berger/Wexler Group lack legal merit and factual support. First, private ordering is limited to circumstances of unanimity. The relevant authorities recognize that, in the absence of complete unanimity, acceptance of the "private ordering" mechanism propounded to this Court by the Berger/Wexler Group would lead to an easily manipulated system, because it tends to transform the Court's role from that of a qualitative evaluator to a vote-counter looking only at which group has managed to file the most cases and recruit the largest number of supporting firms. Under such a regime, a firm could all too easily "stuff the ballot box" by filing numerous redundant lawsuits and soliciting the efforts of friendly firms in order to create the appearance of spontaneous, "democratic" support.

Second, while the contribution of certain attorneys at the Berger/Wexler Group to date has been commendable, that work does not seem truly to be the result of equal effort by all of the group's "four-member" lead firms. Rather, two of those firms appear to have borne the brunt of the labor, while the roles played by the other two have been, at best, significantly less visible. Further, the work of the Berger/Wexler Group has not risen to the level of that of the Consumer Counsel Group.

If the Consumer Counsel Group is appointed lead, it will remain committed to including the appropriate members of the Berger/Wexler Group in substantive roles (and

it has already so informed them). However, the Berger/Wexler Group itself should not be in a position superior to those firms that have contributed the most to the case thus far and that have the ability to continue to do so in the future. With a leadership structure already burdened by two large firms that have thus far made only a very limited contribution, it is difficult to see how the appointment of the Berger/Wexler Group would leave room for a continuing contribution by the Consumer Counsel Group, or, for that matter, any other firms.

A.    **The *Manual For Complex Litigation* Makes Clear That So-Called "Private Ordering" Is Not Appropriate In This Case.**

Citing to the *Manual for Complex Litigation*, the Berger/Wexler Group claims that the Court must "defer" to the private ordering by their group. (Wexler Brf., at 5-6). The *Manual,* however, supports no such result. Indeed, as the *Manual,* a recent *Third Circuit Task Force Report*, and logic make clear, private "ordering" should only be adopted when <u>unanimous</u> consent emerges among all the plaintiffs' firms. *Manual for Complex Litigation, Fourth,* § 21.272 (private ordering is appropriate when "the lawyers agree who should be lead class counsel," but when the lawyers "are unable to agree on a lead counsel . . . [the court should choose the lawyers] best able to represent the class's interests"); *accord* Third Circuit Task Force Report: *Selection of Class Counsel*, 208 F.R.D. 340, 345 (3rd Cir. 2002) ("Much of the time they work out among themselves a voluntary plan to allocate responsibility, often referred to as 'private ordering.' In other cases, however, judges must decide who should speak for the plaintiffs and serve as lead counsel.") Indeed, as the Task Force Report cautioned:

> [V]oluntary agreements among lawyers may create cartel-
> like groupings that favor some lawyers and disfavor others
> on the basis of factors that have little to do with ability or

> fees, and such agreements may also result in overstaffing and padded hours.  In order to reach a "deal", lead counsel may have to "cut in" so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated."

*Id*., at 348.

Moreover, the quantitative claims by the Berger/Wexler Group are the triumph of form over substance. While a broad base of support may indicate confidence in a particular group, and this may be considered by the Court, the significance of such support should not be allowed to overshadow the ultimate question of leadership appointment.  *See, In re Air Cargo Shipping Services Antitrust Litigation*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006) (although support from other attorneys may serve as "some measure of the respect [candidates] command," the "appointment is not supposed to be a popularity contest").  Adding up "raw numbers" can be more than a little misleading, and in some instances, inappropriate.

The so-called popularity contest carefully orchestrated by the Berger/Wexler Group does not support its appointment as lead.  Instead, this raises serious questions as to the judgment of the four proposed leads, and whether they can be counted upon to act in the best interests of the class.

First, the Berger/Wexler Group claims the support of "seventy-five percent" of the named plaintiffs and that its members filed "sixty-one percent" of the federal cases. These claims do not reflect anything more than the fact that the members of the Berger/Wexler Group chose to file numerous duplicative (and identical) actions.[2]  If filing cases was tantamount to legitimate accomplishment, the Consumer Counsel Group

_____

[2] For example, the Hagens-Berman firm has filed no fewer than nine almost identical class action complaints.  The Kaplan Fox firm has filed at least four.

could have reversed these numbers by filing duplicative complaints on behalf of some of
its 1500 clients.  The Consumer Counsel Group believes such duplicative filings are
wasteful and not in best interest of the class.

Second, the Berger/Wexler Group also claims the support of fifty-seven percent
of the plaintiffs' firms.  Yet, with multiple firms on each of the groups numerous
duplicative filings, such numbers threaten to take on a very different, less positive
meaning than ascribed to them by the Berger/Wexler Group.[3]

Third, without any explanation (or citation to the record), the Berger/Wexler
Group claims the support of the "majority" of represented pet owners (indeed, it does so
without even informing the Court how many clients have retained each of its lead firms).
The undersigned counsel has a significant number of individual clients as "retained"
clients.[4]

Beyond the questionable basis of these dubious statistical representations, the
more fundamental question is whether the Berger/Wexler Group should be rewarded for
filing duplicative cases in an attempt to create the appearance of an advantage of votes in
a lead counsel contest in this case.  Duplicative filings with redundant representation, by
the same firm or group of firms, in no way serves the interest of the class or judicial
economy; rather, they were simply a maneuver meant to serve the interests of certain

---

[3] The Consumer Counsel Group actually took affirmative steps to weed out superfluous
supporters.  For example, Blim & Edelson, LLC worked with several firms at the
beginning of the case that would have supported its petition.  However, since those firms
are not seeking to contribute to the case on a going forward basis, the Group did not seek
their support.

[4]  At the time the Berger/Wexler Group claimed majority support, it did not even know
specifically how many clients had retained the Consumer Counsel Group.  In sum, the
Berger/Wexler Group could not have legitimately believed in the certainty of its claim
when filing its petition, and it cannot do so now.

attorneys. Such actions, in conjunction with the "organizational meeting" at the Peninsula Ballroom, show a counterproductive pattern of conduct by the Berger/Wexler Group that has as its sole purpose the award of lead counsel. The cases make clear that such procedural devices should not be rewarded by the Court. *See In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 181 (3rd Cir. 2005) (explaining that because duplicative complaints do not confer a benefit upon a class, "[t]here is no reason to compensate such piling on, much less create an economic incentive to repeat it."); *In re Auction Houses Antitrust Litig*. 2001 WL 210697, at *4 (S.D.N.Y. 2001) ("the filing of scores of duplicative class action complaints served no useful purpose. It simply multiplied the number of individual plaintiffs and their respective individual lawyers without benefiting the class.")

In contrast, the members of the Consumer Counsel Group minimized duplicative filings and costs to the class. As such, appointment of the Consumer Counsel Group will be the best means to ensure that such wastefulness will not continue going forward.

**B.    Any Claim For "Majority" Requires Disclosure Of Any "Deals" or Promises of Work or Positions by the Proposed Lead Counsel**

As the *Manual* also notes, any "arrangements between counsel should be part of the Court's overall analysis of any leadership proposals. As stated, the *Manual* points out that the Court should "assess" among other factors "whether there has been full disclosure of all agreements and understandings among counsel." *Manual for Complex Litigation, Fourth,* § 10.224. The concern expressed by the *Manual* is the fact that such agreements could potentially impact the proposed leaders' ability to in fact serve as lead for all the cases and all the attorneys with cases. Indeed, without Court examination of

such agreements (and other factors) it: "invites problems down the road if designated counsel turn out to be unwilling or unable to discharge their responsibilities satisfactorily or if they incur expensive costs." *Manual* for Complex Litigation, Fourth, § 10.224. *See also Manual for Complex Litigation, Fourth,* § 22.62 (the Court "must be satisfied that counsel can perform the assigned roles and that they have not entered into improper arrangements to secure such positions"). As the *Manual* pointed out: "While it may be appropriate and possibly beneficial for several firms to divide work among themselves, such an arrangement should be necessary, not simply the result of a bargaining among the attorneys." *Id.*

In the present case, the effort to obtain "popular" support by the Berger/Wexler Group was apparently accomplished, at least in part, through a variety of "assurances," committee assignments, and "commitments." These implicit and explicit "promises" must be fully disclosed to this Court before any leadership appointment of their group. The Consumer Class Counsel Group affirmatively set out in its initial papers that it:

> …has made no promises of work to other law firms, no promises of committee assignments, no promises of an attorney fee division and no quid pro quo agreements of any kind in order to obtain the support of any attorney.

Kamber Decl. at 9. Such full disclosure should be required of each group that seeks appointment as lead.

### C.    The Firms Proposed As Lead By The Berger/Wexler Group Have Not Equally Made A Real Contribution To The Litigation.

While certain members of the Berger/Wexler Group have done some good work, it is important to note that in reality, few of its members have contributed equally to that work. Among the leadership applicants, only the Wexler Firm and the Berger Firm have

joined the Consumer Counsel Group in playing a substantive role in this litigation. The

remaining two firms – Hagens Berman Sobol Shapiro, LLP and Lerach Coughlin Sotia

Geller Rudman & Robbins, LLP — seem to offer little more than their resumes and

"promises" to contribute in the future.

The Third Circuit Task force made clear that such unexplained proposed

leadership structures should be carefully scrutinized:

> In passing on the propriety of multiple counsel, the court
> should not be content with conclusory assertions that
> multiple counsel is necessary to assure input from more
> class members or to avoid disputes among counsel for
> various plaintiffs. As the SEC has put it, "lead counsel
> should be able to explain to the court why and how the use
> of additional law firms promotes the effective, efficient
> prosecution of the litigation, rather than serving the
> interests of the law firms.

Task Force, at 417. Here, there is simply no explanation for how the inclusion of Hagens

Berman or Lerach Coughlin promotes efficiency or in any way benefits the class. Having

made a limited contribution to the litigation, the question is posed as to why are they

included as equals with two firms that have made some contribution. It is not

unreasonable to conclude that absent their inclusion as "co-leads," the Berger Firm and

the Wexler Firm would have been unable to retain their support. Simply put, the Wexler

Firm and the Berger Firm have thus far lacked the leadership to say no to their two most

powerful supporters.

**D.      The Berger/Wexler Group's "Contributions" Are Significantly Overstated.**

The Consumer Counsel Group recognizes and appreciates the work that certain

members of the Berger/Wexler Group have done on this case. Further, the Consumer

Counsel Group notes that, to avoid disclosing work product and other confidential

information to the defendants, both it and the Berger/Wexler Group have refrained from detailing all of the useful work done to date, including working with experts, case evaluation, facilitating early resolution, and other sensitive issues.  However, the Consumer Counsel Group respectfully takes issue with certain statements in the moving papers of the Berger/Wexler Group regarding the conference of benefit on the class. While a "who did what" argument is counter-productive and would not assist the court in reaching a decision on leadership, it is the intention of the Consumer Counsel Group to simply correct certain misimpressions that may have been created in the Berger/Wexler moving papers. These points are not intended to take away from the substantive contributions of the Berger Firm and the Wexler Firm that have been previously recognized by the Consumer Counsel Group.  As set forth below, some of these "accomplishments" have advanced (or sought to advance) the ambitions of the Berger/Wexler Group far more than they have benefited the class.

1.    ***The Peninsula Meeting* Was Imprudent**

The first accomplishment the Berger/Wexler Group points to is the Peninsula Hotel meeting in Chicago.[5]  However, the Consumer Counsel Group believes that no consensus or collective working structure was sought or created at the Peninsula meeting. Further, the workbook circulated by the Berger/Wexler Group suffered from significant deficiencies and led to confusion among some of the firms with regard to the operative

---

[5] The Berger/Wexler Group's discussion of some of the substance of this meeting is surprising, given its insistence at the time of the meeting that every participant sign a confidentiality pledge.  Because the Consumer Counsel Group believes that it is in the best interests of the putative class members to avoid, as much as possible, divulging confidences, it will not go into all of the issues that would otherwise merit discussion here.  Suffice it to say, the understanding of the case demonstrated by the amended complaint filed by the Edelson Firm was far greater than that displayed by the workbook.

facts and the law.

As the Consumer Counsel Group noted in its lead counsel motion, the meeting was, at least by appearance, little more than a show of force: that is, the Berger/Wexler Group all but announced that it had decided on a leadership structure (*i.e.*, itself) and attempted to render the instant process moot. The initial group of "first filers" were already working together, and in the end, many of the smaller firms (including those concentrating on animal rights law) left feeling intimidated by the process and effectively abandoned these cases. It is relevant that the entire leadership structure now proposed by the Berger/Wexler Group was already in place in early April. Its four-way leadership was not created to be representative but because these firms all came into this case together.

This so-called organizational meeting did not in fact advance the interests of the putative class members, but only served to increase the costs of this litigation while serving as a coming-out party for the four proposed leads of the Berger/Wexler Group.

> **2. The Motion For a Protective Order Only Conferred a Benefit Upon The Class Once The Consumer Counsel Group and the Berger/Wexler Group Worked Together**

The Berger/Wexler Group also claims sole credit for initiating the motions to halt improper communications by various defendants. However, the final results were due to the <u>combined</u> efforts of members of the Berger/Wexler Group and the Consumer Counsel Group. Initially, the Berger/Wexler Group did not seek the input of other firms (both inside and outside its "coalition"), and in fact did not serve all counsel in these cases. The failure of the Berger/Wexler Group to seek input from any firm outside of their proposed structure was a failure of leadership that could have been harmful to the

interests of the Class because, as demonstrated below, it was the experiences of clients of the Consumer Counsel Group that proved to be most persuasive to the Court.

The Berger/Wexler Group went forward on an incomplete understanding of the facts, omitting the single most important one — that Menu Foods was repeatedly contacting people whom it knew to be represented by counsel.  Rather, it was the Consumer Counsel Group  that was able to gather evidentiary support and present the full picture (a fact acknowledged by the Court).  See Transcript, Workman *et al* v. Menu Foods *et al*., 1:2007cv01338, Docket No. 29 (reading Consumer Counsel Group's client affidavits into the record and explaining that they directly contradicted representations to the Court by Menu Foods).

Rather than seeking to halt Menu Foods' communications with putative class members, the Berger/Wexler Group's motion instead asked for the Court's imprimatur on a thinly-disguised solicitation letter bearing the names of the current leaders of the Berger/Wexler Group.  As explained in the Consumer Counsel Group's filings with the Court, that letter was replete with dangerous misstatements, which if disseminated could have profoundly hurt the interest of the putative class and created more confusion.  See letter, Workman *et al* v. Menu Foods *et al*, 1:2007cv01338, Docket No. 25 (detailing numerous misstatements); see also Transcript, Workman *et al* v. Menu Foods *et al*., 1:2007cv01338, Docket No. 29 (Court explaining, "I have to say that Mr. Edelson's letter has given me pause, and he seems to have made some sensible suggestions and raised some issues that I think we'll need to address as well.").  It was only when the Berger/Wexler Group and the Consumer Counsel Group worked together that the proper results for the class were attained.

### 3. Discussions With Defendants Were Initiated By The Consumer Counsel Group Which Worked To Include Both Groups In The Discussions.

Finally, the Berger/Wexler Group seemingly takes "sole" credit, once again, for all "ongoing" discussions with the defendants. As set out in the Consumer Counsel Group's opening brief, the Berger/Wexler Group has it backwards. The Consumer Counsel Group was engaged in a series of meetings with certain key defendants early on. Once those began developing, with the blessing of Defendants, the Consumer Counsel Group invited the Berger/Wexler Group into those discussions. From that time on, both members of the Group have been taking equal roles in addressing issues such as the preservation of evidence, demands for certain documents and other important matters. This version of events is proven by several meetings that the Berger/Wexler Group did not attend, including meetings in Minnesota and Toronto.

The Consumer Counsel Group has high regard for the work done by certain members of the Berger/Wexler Group. Nonetheless, the Consumer Counsel Group questions whether the Berger/Wexler Group will be able to lead in a manner that distributes work in a manner that best serves the class rather than conforms to its leadership structure. The promises of participation and "assignments" made to secure support for the Berger/Wexler Group and the inclusion of noncontributing members in their lead structure is potentially wasteful. While points of disagreement necessarily come to the fore in papers such as these, the Consumer Counsel Group has been working constructively and positively with members of the Berger/Wexler Group, recognizes the high caliber of its work and shares its commitment to the class members. If appointed lead counsel by the Court, it is hard to imagine the circumstances under which the

Consumer Counsel Group would not continue to invite the participation of the Wexler Firm and the Berger Firm in significant substantive aspects of the case.

>   **E.  McLaughlin Movants Have Not Contributed Meaningfully To This Case Nor Have They Shown Any Inclination To Work With Other Plaintiffs' Counsel.**

The McLauglin Movants' motion suffers from the same infirmity as that of Lerach Caughlin and Hagens Berman in that their contribution thus far ranks far below Kamber, Edelson, Audet, Wexler and Berger.  Their attorneys have done nothing recognizable to advance the interests of the putative class members.  Indeed, these attorneys were initially members of the Berger/Wexler Group and seem to have defected from it, not in the interests of the classes, but in their own.  The McLaughlin Movants have made no effort to identify themselves as an independent group, let alone to participate in any collaborative efforts.  In short, their contribution to this case has been negligible.  Even worse, the McLaughlin Movants have made no effort to work constructively with any other group to advance the interest of this case, and seem to freelance so as to serve their own self-interest.

A particular illustration is that the McLaughlin Movants submitted their leadership application without having any discussions with either group, have not had any participation in discussions with Defense Counsel, have made no effort to contribute to the questions that have thus far come before this Court, and, perhaps most telling, submitted a proposed agenda to this Court without any attempt to contact the other proposed leadership groups regarding the submission of a joint-letter proposing an agenda.  In fact, by working in such an isolated manner, the McLaughlin Movants' submission actually undermines certain discussions that have taken place between Menu

Foods, the Consumer Counsel Group, and the Berger and Wexler Firms. By thus far

refusing to exhibit traits of leadership, the McLaughlin Movants should not be awarded a

leadership position.


### III
### CONCLUSION

For the reasons set forth above, the Consumer Counsel Group, on behalf of the

National Plaintiffs, respectfully oppose the Berman/Wexler Group's and McLaughlin

Movants' Motions for Appointment of Lead Counsel. The National Plaintiffs reiterate

their support for the leadership of the Consumer Counsel Group and the appointment of

William M. Audet, Scott A. Kamber and Jay Edelson as co-lead counsel.



Dated: September 12, 2007                  By:____/s_authorized for ECF filing_____
                                                    William M. Audet
                                           **AUDET & PARTNERS, LLP**
                                           221 Main Street, Suite 1460
                                           San Francisco, CA 94105
                                           Telephone: (415) 568-2555
                                           Facsimile: (415) 568-2556
                                           waudet@audetlaw.com


                                           By: /s_authorized for ECF filing_____
                                                    Scott A. Kamber
                                           **KAMBER & ASSOCIATES, LLC**
                                           11 Broadway, 22d Floor
                                           New York, NY 10004
                                           Telephone: (212) 920-3072
                                           Fax: (212) 202-6364
                                           skamber@kolaw.com


/continued

---

**NATIONAL PLAINTIFFS' OPPOSITION TO THE
BERGER/WEXLER AND MCLAUGHLIN LEAD COUNSEL MOTIONS**

By:___/s  authorized for ECF filing_____
Jay Edelson
**BLIM & EDELSON, LLC**
53 West Jackson Blvd., Suite 1642
Chicago, IL 60604
Telephone: (312) 913-9400
Facsimile: (312) 913-9401
jay@blimlaw.com

**[Proposed] Lead Counsel**

| | Joined by: |
|---|---|
| Kelly Finestone, C.D. Cal., 07-cv-2338 | Thomas Ferlauto<br>**KING & FERLAUTO, LLP**<br>1880 Century Park East, Suite 820<br>Los Angeles, CA 90067-1627<br>Telephone: (310) 552-3366<br>Facsimile:  (310) 552-3289<br>tmf@kingferlauto.com |
| | |
| James Conner, D.N.J., 07-cv-1623 | Jonathan Shub<br>**SEEGER WEISS, LLP**<br>1515 Market Street, Suite 1380<br>Philadelphia, PA 19102<br>Telephone: (215) 564-2300<br>Facsimile: (215) 851-8029<br>jshub@sheller.com |
| | |
| James Conner, D.N.J., 07-cv-1623 | Christopher A. Seeger<br>Scott Alan George<br>**SEEGER WEISS, LLP**<br>550 Broad Street<br>Suite 920<br>Newark, NJ 07102<br>Telephone: (973) 639-9100<br>Facsimile: (973) 639-9393<br>cseeger@seegerweiss.com<br>sgeorge@seegerweiss.com |
| | |

| | |
|---|---|
| Dawn Howe, C.D. Cal, 07-cv-2060<br>Dennis Lee Townsend and Glenna<br>Townsend, C.D. Cal, 07-cv-0398<br>Mark Golding, D.N.J., 07-cv-1521<br>Alexander Nunez,  D.N.J., 07-cv-1490<br>Richard Chamberlain, D.N.J., 07-cv-4064 | Jeff S. Westerman<br>Sabrina S. Kim<br>**MILBERG WEISS & BERSHAD, LLP**<br>One California Plaza<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA 90071<br>Telephone: (213) 617-1200<br>Facsimile: (213) 617-1975<br>jwesteman@milbergweiss.com<br>skim@milbergweiss.com |
| Janice Bonier, D.N.J., 07-cv-1477<br>Leslie Berndl, D.N.J., 07-cv-1553 | Michael A. Ferrara, Jr.<br>**THE FERRARA LAW FIRM, LLC**<br>601 Longwood Avenue at State Highway 38<br>Cherry Hill, NJ 08002<br>Telephone: (856) 779-9500<br>Facsimile:  (856) 661-0369<br>mferrara@ferraralawfirm.com |
| Kirby Cooper, W.D. Ark., 07-cv-4036<br>Charles Ray Sims et al., D.N.J., 07-cv-3156<br>Schwinger, D.N.J, 07-cv-3435 | Jason M. Hatfield<br>**LUNDY & DAVIS, LLP**<br>300 N. College Avenue, Suite 309<br>Fayetteville, AR 72701<br>Telephone: (479) 527-3921<br>Facsimile: (479) 587-9196<br>jhatfield@lundydavis.com |
| Johnson, D.N.J., 07-cv-1610, (C.D. Cal.<br>07-cv-1987) | Michael L. Kelly<br>Behram V. Parekh<br>**KIRTLAND & PACKARD, LLP**<br>2361 Rosecrans Avenue, Fourth Floor<br>El Segundo, CA 90245<br>Telephone: 310-536-100<br>Facsimile: 310-536-1001<br>mlk@kirtlandpackard.com<br>bvp@kirtlandpackard.com |
| Lois Grady, Kaye Steinsapir, Barbara<br>Gonzales, Frank Bodeman, and Craig<br>Anderson, Individually and on Behalf of<br>All Others Similarly Situated,<br>D.N.J., 07-cv-4137 (C.D. Cal., 07-cv-2253) | Gregory D. Helmer<br>Andrew H. Friedman<br>**HELMER FRIEDMAN, LLP**<br>723 Ocean Front Walk<br>Venice, California 90291<br>Tel. 310-396-7714<br>Fax 310-396-9215<br>afriedman@helmerfriedman.com<br>ghelmer@helmerfriedman.com |

| | |
|---|---|
| Lois Grady, Kaye Steinsapir, Barbara Gonzales, Frank Bodeman, and Craig Anderson, Individually and on Behalf of All Others Similarly Situated, D.N.J., 07-cv-4137 (C.D. Cal., 07-cv-2253) | Paul L. Hoffman, SBN 071244<br>Michael D. Seplow, SBN 150183<br>Michael S. Morrison, SBN 205320<br>**SCHONBRUN DE SIMONE SEPLOW HARRIS & HOFFMAN, LLP**<br>723 Ocean Front Walk<br>Venice,  CA 90291<br>Telephone:  (310) 396-0731<br>Facsimile:  (310) 399-7040<br>hoffpaul@aol.com<br>mseplow@aol.com<br>lenbruce@yahoo.com |
| Mary DiCaprio, W.D. P.A., 07-cv-0734 | Robert N. Peirce III<br>D. Aaron Rihn<br>**ROBERT PEIRCE & ASSOCIATES, P.C.**<br>2500 Gulf Tower 707 Grant Street<br>Pittsburgh, PA 15219<br>Telephone: 1-800-543-9859<br>Facsimile: (412) 281-4229<br>rpeircejr@peircelaw.com<br>arihn@peircelaw.com |
| Carol Brown D.N.J., 07-cv-3423 | Peter N. Wasylyk<br>**LAW OFFICES OF PETER N. WASYLYK**<br>1307 Chalkstone Ave.<br>Providence, RI 02908<br>Telephone: (410) 831-7730<br>Facsimile: (401) 861-6064 |
| Carol Brown D.N.J., 07-cv-3423 | Andrew S. Kierstead<br>**LAW OFFICE OF ANDREW S. KIERSTEAD**<br>1001 SW Fifth Ave. Suite 1100<br>Portland, OR 97204<br>Telephone: (508) 224-6246<br>Facsimile: (508) 224-4356<br>ajkier@aol.com |

| Carol Brown D.N.J., 07-cv-3423 | Marc Stanley<br>**STANLEY, MANDEL & IOLA, LLP**<br>3100 Monticello Avenue, Suite 750<br>Telephone: (214) 443-4300<br>Facsimile: (214) 443-0358<br>mstanley@smi-law.com |
| --- | --- |
| | |
| Jayne Englander D.N.J., 07-cv-4062 | David C. Parisi<br>**PARISI & HAVENS, LLP**<br>15233 Valleyheart Drive<br>Sherman Oaks, CA 91403<br>Telephone: (818) 990-1299<br>Facsimile: (818) 501-7852<br>dparisi@parisihavens.com |