UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: PET FOOD PRODUCTS LIABILITY LITIGATION | Civil Action No. 07-2867 (NLH) |
| | MDL Docket No. 1850 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CASES | **MAJORITY PLAINTIFFS' RESPONSE TO CERTAIN MOTIONS FOR APPOINTMENT OF INTERIM LEAD COUNSEL**<br><br>Date:   September 26, 2007<br>Time:  11:00 a.m.<br>Courtroom:   3A<br><br>The Honorable Noel L. Hillman |

Dockets.Justia.com

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................ 1

II.   SUPPLEMENTAL FACTS ........................................................................ 3

    A.    Vigorous Prosecution of the Litigation, Not "Contrived" "Momentum" .............. 4

    B.    The Chicago Meeting ........................................................................ 5

    C.    The Proposed Co-Lead Counsel Group is Purposefully Formed
        in the Interests of the Class ................................................................ 7

III.  ARGUMENT ............................................................................................. 7

    A.    Proposed Lead Counsel Have the Support of Counsel for the Majority
        of the Named Plaintiffs and the Majority of the Consolidated Cases.................... 8

    B.    Proposed Lead Counsel Have Taken the Most Significant Action to
        Advance This Litigation ..................................................................... 9

        1.    Early and continued investigation of claims ............................... 9

        2.    Evidence preservation orders and stipulations to stay proceedings .......... 12

        3.    Initiative to address improper class-wide communications –
            "plaintiffs' most significant victory so far in this case" ........................... 13

        4.    Communications with defendants ............................................. 14

        5.    The actions of the other factions are not comparable ............................... 15

    C.    The Attorneys and Firms in the Proposed Lead Co-Counsel Not Only
        Have Impeccable Qualifications, But They Have First-Hand Experience
        Leading Similar Cases ....................................................................... 16

        1.    It is undisputed that Proposed Co-Lead Counsel possess impeccable
            qualifications .................................................................... 17

            a.    Wexler Toriseva Wallace LLP ("WTW") ...................................... 19

            b.    Berger & Montague ........................................................ 20

            c.    Coughlin Stoia ............................................................. 20

            d.    Hagens Berman Sobol Shapiro LLP ........................................... 21

2.    Proposed Co-Lead Counsel's credentials are unmatched .......................... 21

a.    The Kamber Group ...................................................... 22

b.    The Stern Group.......................................................... 24

D.    Proposed Co-Lead Counsel Group Have Ample Human and
Financial Resources and the Class Will Benefit From the Combined
Resources of this Four-Firm Structure.................................................. 25

1.    Ample human and financial resources..................................... 25

2.    A four-firm leadership structure is appropriate for a case
of this size and magnitude......................................................... 26

E.    Proposed Co-Lead Counsel Has Shown Its an Inclusive and Cooperative
Management Style That Invites the Participation of Co-Counsel
and Welcomes the Diverse Voices of all Plaintiffs ............................. 26

IV.    CONCLUSION.............................................................................................. 27

# TABLE OF AUTHORITIES

## CASES

*Coleman v. General Motors Acceptance Corp.*,
    220 F.R.D. 64 (M.D. Tenn. 2004) ....................................................................7

*Cook v. Rockwell Int'l Corp.*,
    907 F. Supp. 1460 (D. Colo. 1995)..................................................................20

*Kehoe v. Fidelity Fed. Bank & Trust*,
    421 F.3d 1209 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1612 (2006)..............21

## I.    INTRODUCTION

On September 5, 2007, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the law firms of Wexler Toriseva Wallace LLP, Berger & Montague, P.C., Coughlin Stoia Geller Rudman & Robbins LLP, and Hagens Berman Sobol Shapiro LLP (collectively "Proposed Co-Lead Counsel") filed a joint motion to be appointed interim co-lead counsel for the class in this consolidated multidistrict litigation.[1]  The appointment is supported by three-quarters of the named plaintiffs in these consolidated cases (collectively the "Majority Plaintiffs").[2]  Three firms jointly filed an independent motion in support of the appointment of this leadership structure.[3]  Two groups filed their own motions seeking appointment as lead counsel:  (1) Scott Kamber of Kamber & Associates LLC, Jay Edelson of Blim & Edelson, LLC and Audet & Partners, LLP (collectively the "Kamber Group"); and (2) McLaughlin & Stern LLP and Abbey Spanier Rodd & Abrams, LLP (collectively the "Stern Group").[4]  Now, the vital question for the Court is to determine who will ***best*** represent the interests of this class and who will ***best*** be able to accomplish the goals of efficiency and economy in doing so.  For the following important reasons, Proposed Co-Lead Counsel is the best choice.

---

[1] *See* Memorandum of Law in Support of Majority Plaintiffs' Motion for Appointment of Interim Co-Lead and Liaison Counsel Pursuant to Fed. R. Civ. P. 23(g) (Dkt. No. 32) and related submissions ("Majority Pls. Mot.").

[2] Approximately 204 of 270 named plaintiffs representing 71 of the 116 pending Pet Food Products Liability Litigation plaintiffs support the appointment of the Proposed Co-Lead Counsel Group.  A detailed chart listing all plaintiff firms and corresponding cases supporting the appointment is attached as Exhibit A to the Appendix of Exhibits in Support of Majority Pls. Mot. for Appointment of Interim and Liaison Counsel.  (Dkt. No. 32-12).

[3] *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Appointment of Interim Counsel (filed Sept. 5, 2007) (Dkt. No. 30) (submitted by Wolf Haldenstein Adler Freeman & Herz LLP, Larry D. Drury Ltd., and the Progressive Law Group, LLC).

[4] The Kamber Group's motion will be referred to as the "Kamber Mot."; the Stern Group motion will be referred to as "Stern Motion" or "Stern Mot."

*First, the Proposed Co-Lead Counsel Group has the support of counsel for the majority of the cases.* The majority of the named plaintiffs and a majority of the consolidated cases support the appointment of this group as interim co-lead counsel. Over the past few months, attorneys for the Proposed Co-Lead Counsel Group have repeatedly reached out to counsel for *all* of the pet owner plaintiffs, including those filing competing motions for appointment as interim lead counsel, working to build consensus and to form an inclusive and productive leadership structure. The support of co-counsel is an important factor in selecting class counsel and is critical to the effective litigation of this case, particularly where, as here, pet owners/plaintiffs nationwide are actively participating in the prosecution of this action. In sharp contrast, the firms who have filed separate motions do not have a comparable consensus among the named plaintiffs or the significant support represented by this group.

*Second, the Proposed Co-Lead Counsel Group has taken the most significant steps to advance this litigation and protect aggrieved pet owners' rights.* In addition to being among the first to investigate the contaminated pet food recall, Proposed Lead Counsel were at the forefront of bringing suit against all potentially responsible defendants, not just Menu Foods. They were the first to identify two of defendants' communications with putative class members as abusing the stays of litigation pending resolution of the MDL proceeding and promptly acted on that threat to resolve the issue for all class members. Importantly, they cooperated with other plaintiffs' counsel, defense counsel and the Court in resolving these issues. In addition, Proposed Co-Lead Counsel continues its productive dialogue with defendants and has taken other steps to advance the litigation.

*Third, the attorneys and firms in the Proposed Co-Lead Counsel Group that will work on the Pet Food Products Litigation not only have impeccable qualifications, but they have*

- 2 -

***first-hand experience leading similarly large and complex cases.*** While the competing firms pay lip service to their experience and knowledge, ***only*** the Proposed Co-Lead Counsel Group have actually lead large and complex multi-party cases through all phases of litigation for decades, including through trial.

 ***Fourth, the firms in the Proposed Co-Lead Counsel Group have already begun to commit their human and financial resources to prosecute this case, and the class can only benefit from the combined resources of the proposed leadership structure.*** Together, Proposed Co-Lead Counsel have over 200 experienced attorneys around the country supported by highly-qualified staff. They are knowledgeable about every phase of class action litigation of this type, including electronic discovery, managing multiple defendants, all aspects of briefing, and how best to organize a large case like this one. They also have the financial capability to support and sustain this case. Proposed Co-Lead Counsel's combined and unmatched resources are especially important in a case of this size, where the over 50 defendants are represented by dozens of qualified firms.

 ***Finally, the Proposed Lead Co-Counsel Group has shown that it has an inclusive and cooperative management style that invites the participation of co-counsel and welcomes the diverse voices of all plaintiffs.***

## II. SUPPLEMENTAL FACTS

 Proposed Co-Lead Counsel substantially set forth the facts relevant to the appointment of lead counsel in its opening brief. *See* Majority Pls. Mot. *passim*. Counsel provide supplemental facts here to rectify the factual record which was clouded by the Kamber and Stern Groups' motions.

A.    **Vigorous Prosecution of the Litigation, Not "Contrived" "Momentum"**

As the Kamber Group should know, momentum does not – and should not – drive the appointment of lead counsel. Here, there has been no "coordination" to "contrive" "momentum" among Proposed Co-Lead Counsel and its supporters, as the Kamber Group alleges. Kamber Mot. at 2-3. However, unlike the Kamber Group, Proposed Co-Lead Counsel, individually and collectively, have not waited for this Court's lead counsel appointment before acting to protect the interests of the putative class as a whole.

Proposed Co-Lead Counsel have acted and achieved results as leaders, while the Kamber Group has alternately taken potshots at Proposed Lead Counsel's efforts or jumped on the bandwagon when it was apparent that such efforts were bearing fruit. The Stern Group, on the other hand, stated it supported Proposed Co-Lead Counsel's structure and accepted work assignments on relevant issues, only to file separate leadership papers without so much as a phone call "heads up." This conduct is neither inclusive nor demonstrable of any leadership qualities that are needed to bring this case to a successful conclusion.

Beginning within one week of the initial Menu Foods recall, the first individual and class action lawsuits were filed in various jurisdictions across the country.[5] Some of the earliest cases were filed by the four firms represented here. The filings continued over the next two months, as additional plaintiffs came forward and issues arose – including, importantly, Proposed Co-Lead Counsel's identification of additional defendants. Because of the scope of the pet food

---

[5] Proposed Co-Lead Counsel have been unable to identify a single complaint in this litigation in which The Kamber firm appears as counsel of record. Mr. Kamber appears to only be counsel for plaintiffs in the action entitled *Bonier v. Menu Foods, Inc.* (No. 07-cv-01477-NLH, D.N.J.). In this action filed by the Audet Firm, Mr. Kamber was admitted *pro hac vice* in connection with his unannounced appearance at the hearing on Proposed Co-Lead Counsel's motion concerning Menu Foods' communications with class members.

- 4 -

contamination and distribution of the tainted product, more than one hundred lawsuits were eventually filed on behalf of aggrieved pet owners, each of which alleged pet owners suffered terrible losses or damages. There was no "mass of filings" coordinated by this group (Kamber Mot. at 3) – or any other group for that matter.[6] There is also no evidence that any firm "coordinated" or "contrived" cases to "create a superficial momentum for the appointment of lead counsel," as the Kamber motion alleges.[7] Rather, as pet owners cried out more and more for justice for their pets, additional lawsuits were filed, some by Proposed Co-Lead Counsel, some by firms within the Kamber Group, and many by other law firms who now comprise the majority support of Proposed Co-Lead Counsel.

**B.     The Chicago Meeting**

In April 2007, certain members of the Proposed Co-Lead Counsel Group convened a meeting in Chicago. Counsel attended in-person and by telephone. The goals of the meeting, which were outlined for everyone in advance, were to: (1) to share all information compiled to date on cases filed, relevant law, claims made, facts known about the Recall, including specific medical findings concerning the consumption of recalled pet food, and potential defendants; (2) inform all counsel of discussions with Menu Foods counsel to date, including a meeting with Menu Foods counsel hours before the Chicago meeting; and (3) to discuss potential MDL transferee forums. While it was an initial goal to discuss the organization of counsel, the hosting attorneys directed the discussion to the substance of the case and an exchange of ideas on how to exchange information and to set up working groups to prosecute the case effectively and efficiently. All of this was accomplished in the three hour meeting. The organizers believed –

---

[6] The Edelson Declaration entirely fails to substantiate this claim.

[7] The Edelson Declaration also fails to provide any facts that substantiate this claim.

and continue to believe – that in a case of this magnitude and complexity, early organization and
coordination conserves resources by eliminating duplication of effort.

　　*Notably the Kamber Group and a significant majority of the firms it lists as supportive
of its leadership participated in the meeting the Kamber Group now criticizes.*[8] Mr. Kamber
claims in his declaration that he thought that the meeting was "wrong" and "inefficient;" Kamber
Decl. at ¶ 10, *but then he and an associate flew from New York City to Chicago to attend*.
Similarly, Mr. Audet now states that he "declined the invitation," yet at least one of his
supporters – attorney Jonathan Shub of Seeger Weiss LLP – participated on his behalf. Nearly
all the other firms aligned with the Kamber Group also participated in Chicago. Although the
Kamber Group now charges that such meetings were ill-motivated, during the same week,
attorneys within the Kamber Group convened at least two similar conference calls less inclusive
than the meeting in Chicago to discuss "mutually advantageous strategies."

　　Regardless of their now-stated views of the meeting, the Kamber Group fails to articulate
precisely what was wrong with attempting to bring together scores of lawyers with the ultimate
goal of co-coordinating efforts to successfully prosecute a complex class action against the
defendants. This is especially so when the declarations of Messrs. Kamber, Edelson and Audet
reflect their belief that "it would be in the best interests of all involved to coordinate, as much as
reasonably practical, the efforts of all cases pending around the country, so as to avoid
duplication effort." *See* Audet Decl. ¶ 14. The difference between the Proposed Co-Lead
Counsel Group and the Kamber Group is that the former took steps to actually coordinate

---

[8] The suggestions that the meeting was expensive, decadent or even staged in a "ballroom"
are puffery readily rebutted by those who attended. The meeting was held in an ordinary hotel
conference room.

001958-14 195033 V1

counsel, while the most the Kamber Group did was talk about it with a few unidentified firms, attend the meeting in Chicago, and then reject its premise after the fact, showing no leadership at all.

**C.    The Proposed Co-Lead Counsel Group is Purposefully Formed in the Interests of the Class**

The sole motivation of Proposed Co-Lead Counsel was, and remains, to form a proposed leadership group in this case to prosecute this case efficiently and aggressively. Any assertions to the contrary are unfounded. The group came together to form the broadest coalition of plaintiffs and plaintiffs' attorneys as possible, to avoid duplication of efforts, to directly encompass as many affected pet owners as possible, and to effectively and forcefully litigate the case with the greatest combination of talent and collection of resources possible. Proposed Co-Lead Counsel have consistently worked together smoothly and efficiently and the Kamber and Stern Groups have made no showing that any duplicative work has been performed within the organization.

### III.    ARGUMENT

The Court's goal in considering competing motions for appointment of lead class counsel is to determine who will ***best*** represent the interests of the class, and who will ***best*** be able to accomplish the goals of efficiency and economy in doing so. *See Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64, 100 (M.D. Tenn. 2004); *see also* Fed. R. Civ. P. 23(g)(2)(B); MANUAL § 21.279 at 270. The Advisory Committee Notes to Rule 23(g)(2)(B) add:

> [I]n the multiple applicant situation the court is to go beyond
> scrutinizing the adequacy of counsel and make a comparison of the
> strengths of the various applicants ....[N]o single factor should be
> dispositive.

Here, when all factors are considered, there is no question that Proposed Lead Counsel can best represent the interests of the class and can most efficiently and economically do so.

**A.    Proposed Lead Counsel Have the Support of Counsel for the Majority of the Named Plaintiffs and the Majority of the Consolidated Cases**

"Private ordering," that is, achieving a consensus among the various attorneys as to who should serve as lead counsel is the most common method for selecting class counsel. MANUAL, § 21.272. Under the "private ordering" approach, lawyers agree among themselves on who would best serve as lead counsel and the court reviews the selection to "ensure that counsel selected is adequate to represent the class interests." *Id.* Courts recognize that where large numbers of experienced counsel agree to be represented by a proposed group of firms, as is the case here, this agreement is a measure of the respect the proposed group commands and the confidence of their peers that they will serve well in this role. *See* MANUAL, § 10.224 ("the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court" is important factor is selecting counsel).

Over the months since the initial cases were filed, Proposed Lead Co-Counsel have reached out to counsel representing *all* plaintiffs – through emails, phone calls, or in-person discussions – to build consensus and to form an inclusive and productive leadership structure for the case. As a result, approximately 204 of 270 (75%) of the named plaintiffs representing 71 of the 116 consolidated cases support this group's leadership.[9] Any discussion concerning future roles in the case have been based on the skills and experience of the lawyers involved, a far cry from the "patronage" claimed by the Kamber Group. Kamber Mot. at 4.

---

[9] Sixty law firms support Proposed Co-Lead Counsel's motion.

**B.    Proposed Lead Counsel Have Taken the Most Significant Action to Advance This Litigation**

**1.    Early and continued investigation of claims**

Proposed Co-lead Counsel were among the first to investigate the Menu Foods contaminated pet food recall *and* the recalls of other pet food manufacturers, packagers, distributors, retailers and others in the product distribution chain. They have performed substantial work in investigating the merits and have taken significant steps to advance the litigation. *Id.* Of course, simple plaintiff interviews and claims investigation are the minimum that any responsible counsel would undertake. Here, however, the group went beyond the bare minimum. Immediately after their cases were filed, for example, the Proposed Co-Lead Counsel began coordinating with other plaintiffs' counsel to organize and streamline what was to become this MDL proceeding.[10]

Investigative measures taken by Proposed Co-Lead Counsel:

- Fact interviews with thousands of aggrieved pet owners and investigations of their claims including, in some cases, interviews of their veterinarians;

- Collection of records and compilation of databases of all consumer contacts, not just named plaintiffs;

- Discovery and factual investigation of potentially improper communications with putative class members by Menu Foods and Procter & Gamble and their agents, along with related

---

[10] Notably, the four firms that comprise the group have not always agreed on the approach to the case. Initially, for instance, Hagens Berman on behalf of its plaintiffs asked the MDL panel to consolidate the cases in the Western District of Washington. Wexler Toriseva initially advocated for the Central District of California as the appropriate transferee forum. Coughlin Stoia originally proposed that this litigation be consolidated and transferred to the Southern District of Florida. Through discussions and collaborating with many other counsel, Proposed Co-Lead Counsel recognized New Jersey's nexus to this litigation and the advantages to be obtained by working together.

investigation into communications of other defendants with putative class members;

- Forensic accounting analysis of the financial status of Menu Foods;

- Factual investigation into the roles of entities other than Menu Foods in the distribution of the contaminated pet food, including not only Chem-Nutra but approximately 50 additional companies who have been named as defendants in the majority cases supporting the Proposed Co-Lead Counsel group;

- Contacts with the United States Food and Drug Administration in connection with their investigation of the pet food recall;

- Contact with Congressional offices investigating the claims;

- Consultations with veterinarians, veterinarian groups and other experts to determine proper evidence handling and preservation techniques;

- Consultations with experts on product preservation for testing for litigation purposes;

- Consultations with leading experts, including academics specializing in the pathology and toxicology of dog and cat renal systems;

- Consultations with and retention of experts on all aspects of the recall, including damages; and

- Lead role in creating a comprehensive damage analysis (NOTE: this confidential work product, and its underlying data, was shared with the Kamber Group at that Group's request. Thereafter, the Kamber Group completed their own analysis which has since been shared.)

Legal investigative work undertaken by Proposed Co-Lead Counsel to advance the litigation includes:

- Legal research into the respective liabilities of all defendants and other potentially responsible parties;

- Legal research concerning the effect of indemnity agreements between and among defendants and other potentially responsible parties;

- Legal research regarding the effects of Menu Foods' potential bankruptcy on co-defendant liability within the distribution chain;

- Fifty state survey of relevant law (including the law of special damages) prepared with the input of scores of separate firms practicing regularly in the jurisdictions surveyed, including the Stern Group; and

- Tracking and analyzing pending legislation relating to the availability of special damages for harm to pets and challenging the characterization of pets as property.

Proposed Co-Lead Counsel also conducted extensive work to develop a model for individual claim valuation and to calculate class-wide damages by collecting data from numerous sources and working with experts. As part of its investigation, Proposed Co-Lead Counsel and the Majority Plaintiffs' Group has also reached out to several veterinary societies and a large veterinary group for purposes of determining the extent of the class' overall damages. Specifically, the Majority Plaintiffs' Group has been in contact with the Veterinary Information Network and the American Association of Veterinary Laboratory Diagnosticians. These organizations have conducted extensive surveys of their veterinary members for purposes of determining the number of animals that may have become sick or died as a result of the release of contaminated pet food. Attorneys from the Majority Plaintiffs' Group have been in contact with the general counsel for Banfield, the largest veterinary group in the country because of the data they have collected concerning the number of pets that became ill or died as a result of the recall and the amount of veterinary bills that would have been incurred by the typical class member.

As part of their factual and legal investigations, Proposed Co-Lead Counsel also affiliated with the Animal Law Offices of Adam P. Karp, which supports the Group's leadership. *See* Majority Pls. Mot. at 23; Berman Decl. in Support of Majority Pls. Mot. at ¶ 6 [Dkt. No. 32]. Mr. Karp is one of the nation's leading animal law lawyers. *Id.* He filed one of the first class action cases against Menu Foods and the Procter & Gamble defendants arising out of the distribution of the contaminated pet food, *Suggett v. Menu Foods, Iams Co. & Eukanuba*, CV 07-00457 RSM (W.D. Wash.). *Id.* For nearly a decade, Mr. Karp has been at the forefront of developing animal law jurisprudence, including pets and pet loss and their economic valuation in lawsuits. Berman Decl. Ex. B. Mr. Karp's practice is dedicated exclusively to cases involving animals, has tried numerous animal law cases and has taken several cases through Washington State appellate courts. In addition to a law degree from the University of Washington, Mr. Karp has a Masters Degree in statistics. He has been associated with both legal and non-legal organizations devoted to the protection of animals. *Id.* Mr. Karp is a popular lecturer and writer on topics related to animal law. *Id.*

## 2.    Evidence preservation orders and stipulations to stay proceedings

Proposed Co-Lead Counsel took the lead in negotiating directly with Menu Foods to develop evidence preservation orders and stipulations to stay proceedings. During the pendency of the MDL motion, Proposed Co-Lead Counsel adopted language directly from the MANUAL FOR COMPLEX LITIGATION FOURTH ("MANUAL") (2004) to draft these orders and proposed the language to Menu Foods' counsel. These stipulations and orders staying all proceedings and for preservation of evidence served as a model for similar orders entered in other cases in this litigation, where plaintiffs' counsel were urging transfer of their case from a given jurisdiction to the District of New Jersey. They were also entered in the following cases:

**3.    Initiative to address improper class-wide communications – "plaintiffs' most significant victory so far in this case"**

As even the Kamber Group describes it, the consent decree that resulted from Proposed Co-Lead Counsel's efforts is *"plaintiffs' most significant victory so far in this case*." Kamber Group Mot. at 12 (emphasis added).

With Menu Foods having obtained a stay of the litigation while it attempted to settle the claims unilaterally, the gravity of the circumstances demanded swift, decisive action. Although no lead counsel had emerged – and in fact the MDL panel had not even heard the motions to transfer and consolidate – the Proposed Co-Lead Counsel understood that they had to move the Court for emergency regulation of the communications *to protect the interests of all pet owner plaintiffs.*[11] It would have been irresponsible to engage in a time-consuming poll of all other counsel or wait for the appointment of lead counsel before seeking relief from the Court. There was a real danger that in the breach pet owners would have compromised their claims without their interests being fully protected.

The steps that the firms took to raise and resolve the issues on an emergency basis are outlined fully in the Proposed Co-Lead Counsel's opening brief. Majority Pls. Mot. at 9-14. The Court witnessed firsthand the Proposed Co-Lead Counsel's command of the legal issues, knowledge of the facts of the case and their tenacity in advancing the interests of the class. The outcome was possible through Proposed Co-Lead Counsel's cooperative work with defense counsel to reach agreement on the proper scope of communications and to negotiate and draft acceptable language for the company's communications with pet owners. As part of the

---

[11] Notably, at the time, the four firms did not even share consensus on where the cases should be venued. Proposed Co-Lead Counsel set aside all differences to raise and resolve the defendants' communications issues.

negotiation and drafting, members of the Proposed Co-Lead Counsel Group met directly with

Menu Foods' then lead counsel and initiated numerous drafting sessions via telephone

conferences. After the necessary groundwork was laid, the members of the Proposed Lead

Counsel Group spearheading the emergency communications effort reached out to plaintiffs'

counsel – *including counsel that affirmatively dismissed the emergency motion and efforts to*

*regulate defendants' communications as unnecessary* – and welcomed their input. Maj. Pls.

Mot. at 11-12. The Proposed Co-Lead Counsel Group believed the broadest support ensured the

best result for all plaintiffs. As a result of this inclusion, the slate of lawyers who participated in

the eventual drafting of the curative communications represented the broadest base of plaintiffs

possible.

### 4.  Communications with defendants

Courts have held that the counsel's ability to work cooperatively with opposing counsel

and the court is a consideration for appointing interim class counsel. *See*, *e.g.*, MANUAL

§ 10.224. Proposed Co-Lead Counsel has been communicating with Menu Foods' lead counsel

since very early in the case meeting with them on April 11, 2007 in advance of the global

meeting with plaintiffs' attorneys. Since bringing Menu Foods' and Procter & Gamble's

problematic communications to the attention of this court, the Proposed Co-Lead Counsel Group

has been in regular communications with Menu Foods and its co-defendants on a number of

topics to ensure both that the consolidated cases will proceed efficiently and economically *and*

that the interests of *all* plaintiffs will be protected through early action. The collaboration on the

curative communications established a productive foundation for further communication. Most

recently, Proposed Co-Lead Counsel Group has been cooperating with defendants and other

plaintiffs to address the dilemma of evidence preservation in light of the very real tension

- 14 -

between the requirements of litigation and the demands placed on the defendant companies by storing millions of units of subject product. The Proposed Co-Lead Counsel Group recognizes this as an important issue that will affect its clients and others regardless of whom is appointed lead counsel and thus welcomed defendants' overtures to form a group to work on the matter.

### 5.    The actions of the other factions are not comparable

Kamber Group's own submission in support of its appointment of lead counsel demonstrates that their efforts are not comparable to those of Proposed Co-Lead Counsel. The Kamber Group makes much of the behind-the-scenes work it has performed in conducting an extensive factual evaluation, compiling databases, conducting legal analyses, analyzing damages and metaphorically holding the hands of aggrieved pet owners whose beloved pets were sickened or killed by the contaminated pet food. Such efforts are the bare minimum for any law firm representing aggrieved pet owners in these cases. To be sure, the Majority Plaintiffs' Group and presumably *all* law firms involved have engaged in the same internal efforts.

Moreover, the Kamber Group is not distinguished by their representation of approximately 1,500 pet owners. Proposed Co-Lead Counsel and the Majority Plaintiffs that support them have been retained by well over 1,500 consumers and have received thousands of contacts.[12] The Majority Plaintiffs' Group has also collectively spoken at length to thousands of pet owners, collected records, and compiled databases of consumer contacts.

The Stern Group's consultation with its clients likewise does not evince actual leadership of this case. With all due respect to its efforts in the "Greenies" dog biscuit case, the Stern

---

[12] The firms of Berding & Weil and The Progressive Law Group, who support the leadership structure of Proposed Co-Lead Counsel Group, together represent over 1,000 consumers. While significant in terms of insuring broad representation by class counsel, even the Kamber Group has been forced to acknowledge that a "head count" is not the relevant inquiry under Federal Rule 23(g), and more particularly so in a consumer class action. Kamber Mot. at 16.

- 15 -

Group has simply not been engaged in moving this matter other than for completing an assignment given to it by the Proposed Co-Lead Counsel Group.[13] Moreover, work performed on a case concerning a similar product, yet consisting of distinguishable facts and circumstances does not assist the Stern Group in meeting the requirements demanded under Rule 23(g). Nonetheless, whatever benefits for this litigation that can be obtained from relevant work in the Stern Group's "Greenies" dog biscuit case will be brought to bear through the collaborative process.

**C.    The Attorneys and Firms in the Proposed Lead Co-Counsel Not Only Have Impeccable Qualifications, But They Have First-Hand Experience Leading Similar Cases**

The firm resumes of Proposed Co-Lead Counsel unequivocally show that they are not exclusively securities and antitrust class action attorneys, sharing "near-identical expertise and abilities" (Kamber Mot. at 18) as the Kamber Group would have this Court believe. Together, Proposed Co-Lead Counsel bring an unparalleled wealth of experience in ***all phases of consumer protection and mass tort litigation*** that is unmatched by any other group seeking appointment, including the Kamber Group.[14]

---

[13] The Stern Group, along with Majority Plaintiffs, submitted research on a project spearheaded by Proposed Co-Lead Counsel to determine the availability of special damages for harm to pets and the characterization of pets as property under the laws of all fifty states.

[14] What is perhaps most ironic about the Kamber Group's characterization of Proposed Co-Lead Counsel as primarily securities and antitrust lawyers is that Mr. Kamber himself has spent a large part of his career litigating securities and shareholder class actions for the New York law firm of Wechsler Harwood LLP (now known as Harwood Feffer LLP), a firm that "specializes in complex, multi-party litigation with an emphasis on securities class actions, shareholder derivative suits, and securities arbitrations." *See http://www.hfesq.com/*. In fact, a search of Mr. Kamber's name on Westlaw® reveals that every one of the seven class action cases he has been involved in were securities/shareholder claims (6) or antitrust claims (1).

1.    **It is undisputed that Proposed Co-Lead Counsel possess impeccable qualifications**

Proposed Co-Lead Counsel has a proven track record of incredible success in some of the largest class actions and complex litigation in American history. Attorneys for these firms include pioneers of the class action bar who have not only negotiated billions of dollars in settlements on behalf of plaintiff classes, but also have litigated numerous cases ***through trial.***

For example, Wexler Toriseva and Hagens Berman recently successfully completed a nine-week class action trial, against some of the largest pharmaceutical companies in the world, before United States District Court Judge Patti Saris in *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456 (D. Mass.). The firms succeeded in making the case that the government insurers and patients around the country were victimized by violations of consumer protection laws and overpaid for potentially life-saving areas. On February 14, 2006, Berger & Montague won a jury verdict of $554 million in an environmental mass tort class action on behalf of thousands of property owners against the former operators of the Rocky Flats nuclear weapons plant, located about 17 miles northeast of Denver, Colorado, in (Civ. No. 90-K-181) (D. Colo.). In addition, Coughlin Stoia attorneys spent two weeks in trial in 2007 in *In re AT&T Corp. Secs. Litig.*, MDL No. 1399 (D.N.J.), before the case settled for $100 million.[15]

Moreover, putting aside Proposed Co-Lead Counsel's trial experience, these attorneys are skilled at managing and coordinating massive discovery against multiple defendants (domestic and foreign), electronic discovery, coordinating discovery with other plaintiff groups, briefing class certification and summary judgment, working with economic and damages experts, and

---

[15] Lawyers at Berger & Montague and Coughlin Stoia also served as counsel for plaintiffs in *In re Exxon Valdez Oil Spill Litig.*, No. A89-0095-CVCHRH (D. Alaska), where a jury trial of several months duration resulted in a record punitive damages award of $5 billion against the Exxon defendants as a consequence of one of the largest oil spills in U.S. history.

working cooperatively with defense counsel – all with the least amount of burden on the court.

An important component of each firm's leadership is the recognition that the best interest of the

class is served by giving all counsel a voice and a role in the case.

The respective abilities of these firms to lead have repeatedly been recognized by courts

across the country for decades.  In granting approval of the mid-trial settlement of *In re AT&T*

*Corp. Secs. Litig.*, the Court stated the following about Coughlin Stoia:

> Lead Counsel are highly skilled attorneys with great experience in
> prosecuting complex securities action[s], and their professionalism
> and diligence displayed during litigation substantiates this
> characterization.  The Court notes that Lead Counsel displayed
> excellent lawyering skills through their consistent preparedness
> during court proceedings, arguments and the trial, and their well-
> written and thoroughly researched submissions to the Court.
> Undoubtedly, the attentive and persistent effort of Lead Counsel
> was integral in achieving the excellent result for the Class.

Judge Stewart Dalzell, of the U.S. District Court for the Eastern District of Pennsylvania, has

said about Berger Montague and Sherrie Savett, counsel in this case:

> "The quality of lawyering on both sides, but I am going to stress
> now on the plaintiffs' side, simply has not been exceeded in any
> case, and we have had some marvelous counsel, appear before us
> and make superb arguments, but they really don't come any better
> than Mrs. Savett . . . , and the arguments we had on the motion to
> dismiss [Mrs. Savett argued the motion], both sides were fabulous,
> but plaintiffs' counsel were as good as they come."

*In re U.S. Bioscience Sec. Litig.*, Civil Action No. 92-0678, hearing held April 4, 1994 (E.D. Pa.

1994).

Last month, Judge Phyllis J. Hamilton, of the U.S. District Court for the Northern District

of California, recognized the conduct of counsel in the *In re Dynamic Random Access Memory*

*Antitrust Litigation* (MDL 02-1486 PJH), for which the Court had appointed Hagens Berman co-

lead counsel:

- 18 -

[I]t's been very satisfying to watch the litigation, to be involved in it. You all – and I'm speaking to defense counsel as well, you all have done an exceptionally good job in coordinating management and litigation the case. As I've said, I think that you have been very respectful of my time. You have been very careful to not bring me a lot of unnecessary matters to deal with. . . . So I just wanted to take the opportunity to tell you that even in a typical class approval, final approval motion I hear this . . . how hard fought the litigation was, and able your adversary was and the kind of exceptional results that you achieved, but this time I have to say that I think that the language that appears in your motion is deserved. It's not just mere puffery. I think both have done an incredible job. And I just wanted to thank you all for your courtesy to the Court and to each other, which has been obvious.

*In re Dynamic Random Access Memory Antitrust Litig.*,MDL 02-1486 PJH, hearing held

August 15, 2007 (N.D. Calif. 2007).

Put simply, the expertise of Proposed Co-Lead Counsel and their attorneys dwarfs that of

the Kamber Group and rebuts their claim that the Kamber Group is best capable of representing

the class of aggrieved pet owners in this litigation.

The expertise of these firms and their attorneys is laid out in detail in the Proposed Co-

Lead Plaintiffs' opening brief and the resumes attached thereto. Nevertheless, some highlights

are set forth below.

### a.    Wexler Toriseva Wallace LLP ("WTW")

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*, D. Mass. No. 05-11148-PBS: WTW serves as co-lead counsel in this consumer protection litigation concerning drug pricing. WTW, with co-counsel, recently achieved certification of the consumer class against McKesson – the largest drug distributor in North America in what many say could be one of the largest legal battles concerning drug pricing, with damages potentially in the billions.

*In re: AOL Spin-Off SubAccounts Litig.*, MDL No. 1581. WTW attorneys served as co-lead counsel in this nationally coordinated consumer litigation concerning on-line deceptive sale of goods and services through pop-up advertising. The litigation resolved following extensive litigation, providing complete relief to AOL customers, including up to $25 million in cash.

### b.    Berger & Montague P.C.

*In re Exxon Valdez Oil Spill Litig.*: On September 16, 1994, a jury trial of several months duration resulted in a record punitive damages award of $5 billion against the Exxon defendants as a consequence of one of the largest oil spills in U.S. history.  Berger & Montague was co-chair of the Plaintiffs' Discovery Committee (appointed by both the federal and state courts) and was specifically appointed by the federal court as one of the three designated trial counsel.  Berger & Montague shared (with the entire trial team) in the 1995 "Trial Lawyer of the Year Award" given by the Trial Lawyers for Public Justice.  (No. A89-0095-CVCHRH (D. Alaska 1996)).

*In re School Asbestos Litig.*:  As co-lead counsel, Berger & Montague successfully litigated a case in which a nationwide class of elementary and secondary schools and school districts suffering property damage as a result of asbestos in their buildings were provided relief.  Pursuant to an approved settlement, the class received $70 million in cash and $145 million in discounts toward replacement building materials. (No. 83-0268 (E.D. Pa. 1986)).

In the ***Rocky Flats Nuclear Weapons Plant*** class action, where Berger & Montague is lead counsel, the Court held the United States Department of Energy in contempt of court after a one week trial in November, 1995 (reported at *Cook v. Rockwell Int'l Corp.*, 907 F. Supp. 1460 (D. Colo. 1995)).  In 2005-2006, this environmental/mass tort class action on behalf of thousands of property owners finally went to trial (with Berger & Montague as lead trial counsel) and, in February 2006, the jury returned a special verdict for the plaintiffs for $554 million, the largest property damage class action jury verdict ever.  The verdict was the third-largest jury verdict of 2006 in the United States, according to *The National Law Journal*.  The Berger & Montague Rocky Flats trial team was also one of seven finalists for the 2006 "Trial Lawyer of the Year" award from the non-profit foundation Trial Lawyers for Public Justice (Civ. No. 1:90-181).

### c.    Coughlin Stoia Geller Rudman & Robbins LLP

*Schwartz v. Visa Int'l.*, Case No. 822404-4 (Cal. Super. Ct., Alameda County).  After years of litigation and a six month trial, Coughlin Stoia attorneys won one of the largest consumer protection verdicts ever awarded in the United States.  Coughlin Stoia attorneys represented California consumers who sued Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders.  The Court ordered Visa and MasterCard to return $800,000,000 in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest.  In addition, the Court ordered full disclosure of the hidden fee.

*Kehoe v. Fidelity Fed. Bank & Trust*, Case No. 03-80593-CIV-HURLEY/LYNCH (S.D. Fla.).  Coughlin Stoia attorneys Paul J. Geller and Stuart A. Davidson served as class counsel in a case in the Southern District of Florida involving significant privacy violations of over 500,000 Floridians by Fidelity Federal Bank & Trust.  After four years of hard-fought litigation, including appeals to the Eleventh Circuit and the U.S. Supreme Court, *see Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1612 (2006), the case was settled for $50 million.

- 20 -

*Newman v. Stringfellow (Stringfellow Dump Site Litig.)*, Case No. 165994 MF (Cal. **Super. Ct., Riverside County).** Coughlin Stoia attorneys represented more than 4,000 individuals suing for personal injury and property damage arising from their claims that contact with the Stringfellow Dump Site may have caused them toxic poisoning. Recovery totaled approximately $109 million.

### d.   Hagens Berman Sobol Shapiro LLP

*Enron Employee ERISA Litig.* The United States District Court for the District of Texas appointed Hagens Berman co-lead counsel on behalf of 24,000 Enron employees in connection with their claims against multiple defendants including the Enron companies, Arthur Anderson, LLP, various investment banks, a law firm and other corporate defendants as well as numerous individuals. The firm led all aspects of the prosecution, including extensive paper and electronic discovery, depositions, briefing and argument on substantive legal issues, negotiations with governmental entities, settlement negotiations and structures. Significant to this case, the Enron ERISA litigation involved bankrupt parties, intersected with government investigations of wrongdoing, and required allocations of settlement. Ultimately, the case recovered in excess of $350 million on behalf of the former employees.

*LP Siding Litig.* Firm consumer class action successes include cases on behalf of thousands of home owners affected by defective siding. As a result of the cases, more than 130,000 have been paid exceeding $500 million.

*Tobacco Litig.* The firm played a major national role in representing thirteen state Attorneys General and their states' citizens in the historic litigation against the tobacco industry. The firm led the thirteen cases through all phases of their prosecutions against multiple strongly-represented corporate defendants. In Washington State the firm was co-lead trial counsel. Washington was one of only two states that actually took their cases to trial. At the time, the trial was one of the largest ever conducted in the United States. The firm played a key role in the national settlement negotiations that led to the nationwide settlement of $206 billion.

### 2.   Proposed Co-Lead Counsel's credentials are unmatched

When multiple applicants seek appointment as lead counsel, a court must compare the

strengths of the various applicants in reaching a decision. Fed. R. Civ. P. 23(g)(2)(B). The

experience and credentials of the group proposed herein among the very best in the country. An

objective comparison demonstrates the superior ability of Proposed Co-Lead Counsel to lead and

manage a case of this magnitude.

### a.    The Kamber Group

The Kamber Group's own submission calls into question the thoroughness of its investigation and its intent to represent the whole class rather than those plaintiffs who meet its theory of the case. Significantly, Proposed Co-Lead Counsel have named 50 of the 60 defendants who are part of the consolidated cases. In contrast, the Kamber Group and the firms that support them have named only 22 of these 60 defendants. The Kamber Group has failed to sue a substantial number of pet food manufacturers who initiated recalls that are unrelated to Menu Foods. For example, the Kamber Group have failed to name several substantial pet food manufacturers who bought contaminated wheat gluten directly from the source and manufactured and sold their own pet food directly to the public: Del Monte, Hills Pet Nutrition, and Sunshine Mills. The Kamber Group has also failed to name any of the defendants who initiated recalls as a result of using contaminated rice protein concentrate in their product.

This is significant since the facts surrounding these rice protein cases have nothing to do with Menu Foods or wheat gluten and the cases are entirely separate and distinct from the majority of other cases pending in this Court, yet they are part of these proceedings. These above observations are significant because those appointed lead counsel should represent the broadest possible range of cases that are most inclusive of all defendants named in the litigation. These same observations can also be made of the Stern Group.

Mr. Edelson's firm, founded in 2001, consists of three attorneys. Mr. Edelson appears to have spent considerable time in the last six months in the media. While Mr. Edelson should not be faulted for drawing attention to this matter, such conduct is not relevant to whether one's firm possesses the most experience and resources to be appointed as interim lead counsel under Federal Rule 23(g).

Mr. Kamber's firm, founded in April 2005, has four lawyers (including Mr. Kamber as managing partner). Mr. Kamber's firm purports to specialize in technology law.[16] Mr. Kamber was not even counsel of record for any aggrieved pet owner in any of the over 100 pet food cases until Mr. Audet associated him into ***Bonier*** action, as previously mentioned, for involvement in the continuation of a hearing on Menu Foods' communications with pet owners (Tr., May 18, 2007, at 42). Again, the Kamber Group characterizes this motion as "***plaintiffs' most significant victory in this case so far***." (Kamber Mot. at 11).

Proposed Co-Lead Counsel certainly acknowledges and appreciates the input of the Kamber Group in assisting Mr. Paul in crafting the curative communication with Procter & Gamble in particular, which was ultimately accepted by this Court. Yet, one must observe that the Kamber Group ***never named Procter & Gamble as a defendant*** in any of their complaints, as observed by the Court at the June 26, 2007 hearing. The Kamber Group overstates its role when it describes it as "critical" (Kamber Mot. at 4 n.3), and contends that it "provided key affidavits and arguments." Kamber Mot. at 12.

While some of the affidavits supplied by the Kamber Group bolstered the arguments about Menu Foods' improper communications, it should not go unnoticed that the Kamber Group initially ***opposed*** Proposed Co-Lead Counsel's efforts with respect to both the Menu Foods and Procter & Gamble show cause motions.[17]

The experience of the Audet firm, a seven lawyer firm based in San Francisco, is considerable, and Proposed Co-Lead Counsel will continue to solicit Mr. Audet's involvement

---

[16] It is difficult to ascertain information concerning Mr. Kamber's firm because it does not have a Martindale-Hubbell listing, and its website, www.kolaw.com, is under construction.

[17] *See* Appendix of Exhibits in Support of Majority Plaintiffs' Motion for Appointment of Interim Co-Lead and Liaison Counsel (Dkt. No. 32-12) Exs. E and J.

and input, along with that of the Kamber Group and the Stern Group as a whole in the proper

exercise of leadership of the case. The record before the Court, however, establishes that

Proposed Co-Lead Counsel simply have done more substantive work, with the support of the

vast majority, and with demonstrated ability to manage and lead in litigation of this type and

magnitude.

### b.    The Stern Group

Abbey Spanier is a well-regarded 12-lawyer firm based in New York City. However, its

website references only one consumer protection class action, which was filed in 1997 on behalf

of certain Sears credit card accountholders regarding credit card interest rates. The only real

example of its fitness to lead that Abbey offers in its lead plaintiff papers is its current cases with

co-counsel McLaughlin & Stern, to recover the purchase price of "Greenies." While the cases

relate to a pet food product, they do not trump either the many years of experience of Proposed

Co-Lead Counsel litigating all phases of highly complex and ground-breaking consumer and

mass tort class actions, or the specific knowledge of animal law possessed by Proposed Co-Lead

Counsel and the firms that support them.

McLaughlin & Stern is a New York-based firm that is not dedicated to plaintiffs' class

action work, as are each of the four firms in the Proposed Co-Lead Counsel Group. Its website

does not list consumer protection or mass tort either as a focus of, or even part of, its practice.[18]

---

[18] http://www.mclaughlinstern.com/, accessed September 10, 2007.

**D.    Proposed Co-Lead Counsel Group Have Ample Human and Financial Resources and the Class Will Benefit From the Combined Resources of this Four-Firm Structure**

**1.    Ample human and financial resources**

Together, the four firms in the Proposed Lead Co-Counsel group have over 200 experienced attorneys supported by highly qualified and experienced support staff. These firms also have the geographic coverage to prosecute this litigation. Berger Montague is located in Philadelphia and can appear in court immediately to respond to issues that may arise. Hagens Berman has six offices around the country; Coughlin Stoia, with nine offices around the country, is the largest law firm in the world dedicated solely to plaintiffs' class action litigation; and Wexler Toriseva has three offices located on the West and East coasts and in Chicago. In addition, Wexler has a China-affiliate office with Lehman, Lee & Xu, one of the country's first and largest private law firms, with offices strategically located in all major investment cities in the People's Republic of China.

In addition, this consortium has associated with Lisa Rodriguez of Trujillo, Rodriguez & Richards LLC in Haddonfield, New Jersey because of unique talents and experience, her proven legal skills and her proximity to the Court. Ms. Rodriguez is currently the managing member of Trujillo Rodriguez's New Jersey office. *See* Rodriguez Decl. at ¶ 2 (Dkt. No. 32). Ms. Rodriguez has nearly twenty years experience litigating complex class actions. *Id.*

Further, Proposed Co-Lead Counsel's collective financial ability to support the consolidated cases is undisputed. Individually, the firms maintain either multiple offices nationwide and/or dozens of lawyers at their locations. Each of the recoveries these firms have achieved, on behalf of the classes or other parties they have represented as plaintiff reflects the firm's ability to support financially the complex cases in which they are involved. This is

- 25 -

evidence that these firms have the financial resources to support this litigation. The firms already demonstrated their willingness to commit those resources to the case by the work they have completed and expenses they have undertaken to date.

> **2.    A four-firm leadership structure is appropriate for a case of this size and magnitude**

A four-firm structure is not only reasonable here, but is critical for a case of this size and magnitude. The MANUAL recognizes the benefits of having multiple lead counsel. MANUAL, § 10.221. Likewise, the Third Circuit task force report on Selection of Class Counsel, 74 Temp. L. Rev. 685 (2001), specifically notes that a "court should be cognizant of the possibility that the class could benefit from the ***combined resources and expertise* of a number of counsel, especially in a complex case where defendants are represented by a number** of large and highly qualified firms." *Id.* 77 n.286 (footnote omitted) (emphasis added). The Pet Food Products Liability Litigation is just such a case, with many complex legal and factual issues and multiple defendants.

> **E.    Proposed Co-Lead Counsel Has Shown Its an Inclusive and Cooperative Management Style That Invites the Participation of Co-Counsel and Welcomes the Diverse Voices of all Plaintiffs**

Here, the plaintiffs represented by the Proposed Co-Lead Counsel Group and the firms who support them are a geographically diverse group representing claims against ***not just Menu Foods***, but nearly all of the other defendants named in the consolidated cases. The breadth or representation is significant in complex cases such as this one which includes defendants who may have competing interests in the litigation. Proposed Lead Counsel's early recognition of these factors led it to investigate and research liability and indemnity issues that will ultimately benefit all plaintiffs. This and other research has been shared with all interested plaintiffs'

- 26 -

counsel in various forms. All of the measures described above have been undertaken cooperatively – with the inclusion of all counsel, even those who would have disrupted the Group's collaborative efforts.

In sum, Proposed Co-Lead Counsel have an inclusive and cooperative management style, which has permitted them to achieve excellent results for class members for decades. The Group continues to devise a cooperative litigation strategy that will aggressively achieve the best interests of the class. While Proposed Co-Lead is the *best choice* to serve as co-lead counsel in this case and carries the support of the majority of the firms involved, there is an important role for all counsel to play in this organization structure and Proposed Co-Lead Counsel will continue to work to include firms representing all pet owners.

## IV.    CONCLUSION

For the foregoing reasons, the Court should appoint the law firms of Berger & Montague, P.C., Wexler Toriseva Wallace LLP, Coughlin Stoia Geller Rudman & Robins LLP, and Hagens Berman Sobol Shapiro LLP as interim co-lead counsel in this case.

DATED:  September 12, 2007          **TRUJILLO RODRIGUEZ & RICHARDS, LLC**


                                    By:    s/ Lisa J. Rodriguez
                                           Lisa J. Rodriguez
                                           8 Kings Highway West
                                           Haddonfield, NJ 08033
                                           Telephone:  (856) 795-9002
                                           Facsimile:  (856) 795-9887

                                    ***Proposed Liaison Counsel for Plaintiffs***

001958-14 195033 V1

Kenneth A. Wexler
Mark J. Tamblyn
WEXLER TORISEVA WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Sherrie R. Savett
Russell D. Paul
BERGER & MONTAGUE P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

Paul J. Geller
Stuart A. Davidson
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432-4809
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

Steve W. Berman
Jeniphr Breckenridge
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

***Proposed Interim Co-Lead Counsel for Plaintiffs***