UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE PET FOOD PRODUCTS
LIABILITY LITIGATION

MDL Docket No. 1850 (All Cases)

Case No. 07-2867 (NLH)

The Honorable Noel L. Hillman

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT**

Dockets.Justia.com

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND.................................................................................................... 3
   A. Summary Of The Litigation ............................................................................... 2
   B. The Settlement ................................................................................................... 5
   C. Preliminary Approval Granted .......................................................................... 8
   D. The Notice Program .......................................................................................... 8

III. THE SETTLEMENT IS ENTITLED TO AN INITIAL PRESUMPTION OF FAIRNESS
AND SATISFIES THE REQUIREMENTS OF RULE 23(e).................................... 9
   A. The Settlement is Entitled to an Initial Presumption of Fairness ....................... 10
   B. The Proposed Settlement Is Fair, Reasonable And Adequate According To The *Girsh*
Factors ...................................................................................................................... 12
      1. The Complexity, Expense, and Likely Duration of the Litigation .................. 16
      2. Reaction of the Class to the Settlement......................................................... 16
      3. The Stage of The Proceedings and The Amount of Discovery Completed.................... 19
      4. Risk of Establishing Causation, Damages and Liability ................................ 21
      5. Risks of Maintaining a Class through Trial ................................................... 24
      6. Defendants' Ability to Withstand Greater Judgment and Enforceability of Judgment... 26
      7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible
Recovery and in Light of All the Attendant Risks of Litigation ......................................... 28
         a. The Settlement is Far More Generous Than The Only Other Settlement Arising From
A Pet Food Recall ............................................................................................................. 30

IV. CLASS COUNSEL BELIEVES THIS SETTLEMENT IS IN THE BEST INTEREST OF
THE CLASS .............................................................................................................. 31

V. THE OBJECTIONS SHOULD BE OVERRULED .............................................. 32
   A. Objections Regarding the Lack of Criminal Liability and Punitive Measures in the
Settlement................................................................................................................. 33
   B. Objections Regarding Testing and Regulatory Enforcement.............................. 33
   C. Objections Regarding the Inadequacy of Notice ............................................... 34
   D. Objections Regarding Emotional Distress Damages.......................................... 35
   E. Objections Regarding Payment of Future Expenses........................................... 37
   F. Objections Filed By Counsel ............................................................................. 38
      1. Weinstein Objection ..................................................................................... 39
      2. The Objections to the Scope of the Release are Meritless ............................. 39
         a. The Scope of the Release is Appropriate ................................................... 40
         b. The Kaffer/Picus Objection Is Without Merit ........................................... 41
         c. The Blaszkowski Objection is Without Merit............................................. 45
      3. The Kaffer/Picus Objection Is Incorrect That The Class Is Inadequately Represented
And That The Amount Allocated For Purchase Claims Is Insufficient .............................. 48
         a. The Class Is Adequately Represented......................................................... 48

      i. Key Cases Relied Upon By Kaffer/Picus Objectors Are Not To
        The Contrary ................................................................................................ 49
           1. Amchem.................................................................................................. 49
           2. Community Bank..................................................................................... 51
      b. The Amount for Purchase Claims Is Reasonable, Fair and Adequate ...................... 52

VI. THE CLASS SHOULD BE CERTIFIED ............................................................................. 52
   A. The Requirements of Fed. R. Civ. P. 23(a) are Satisfied ...................................................... 53
      1. The Class is so Numerous that Joinder of All Members is Impracticable ..................... 54
      2. Questions of Law and Fact are Common to the Members of the Classes ...................... 54
      3. Plaintiffs' Claims are Typical of the Classes' Claims.................................................... 56
      4. Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the
      Classes ....................................................................................................................... 56
   B. This Litigation Meets the Requirements of Fed. R. Civ. P. 23(b)( 3) ................................ 58
      1. Common Questions of Law and Fact Predominate ......................................................... 58
      2. A Class Action is Superior to Numerous Individual Actions.......................................... 59

VII. CONCLUSION ...................................................................................................................... 60

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 25, 50, 53, 57

*Anco Indus. Diamond Corp. v. DB. Invs., Inc.*,
    Civ. No. 01-4463 (D.N.J. Sept. 23, 2003) ...................................................................53

*Austin v. Penn. Dep't of Corrs.*, 876 F. Supp. 1437 (E.D. Pa. 1995) ........................................... 32

*Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994 ................................................ 11,55

*Bass v. Schell & Kampeter, Inc.*, No. 3:05-cv-586 (E.D. Tenn. Apr. 16, 2008).................... 30, 31

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993)...................................................... 11, 12, 16

*Blaszkowski, et al. v. Mars Inc., et al.*,
    Case No. 1:07-cv-21221-CMA, ................................................ 17, 18, 45, 46, 47, 48

*Bryan v. Pittsburgh Plate Glass Co. (PPG Industries, Inc.)*, 494 F.2d 799 (3d Cir. 1974) ......... 10

*Candeliere v. U.S.A,* 816 F. Supp. 994 (D.N.J. 1992) .................................................................. 10

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).................................................... 13

*Detroit v. Grinnell Corp.* 495 F.2d 448 (2d Cir. 1984) ................................................................ 29

*Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir.1995) .................................................................... 13

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)............................................................... 53, 54

*Elkins v. Equitable Life Ins. Co. of Iowa*,
    No. Civ. A. 96-296-Civ.-T-17B, 1998 WL 133741, 15 (M.D. Fla. Jan. 27, 1998) ................ 49

*Erie County Retirees Ass'n v. County of Erie*, 192 F. Supp. 2d 369 (W.D. Pa. 2002)................. 29

*First State Orthopedics v. Concentra, Inc.*,
    No. 05-4951, 2007 U.S. Dist. LEXIS 77557, 51 (E.D. Pa. Oct. 16, 2007)............................. 25

*Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493 (E.D. Pa. 1985)................................. 37

*Fowler v. Town of Ticonderoga*, 516 N.Y.S.2d 368 (N.Y. App. Div. 1987) ................................ 36

*Gates v. Rohm & Haas Co.*,
    No. 06-1743, 2008 U.S. Dist. LEXIS 65501, 17 (E.D. Pa. Aug. 26, 2008)............................ 26

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).................................................................... 10, 13, 36

*Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553 (3d Cir. 1994)............................................ 41

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998 ) ..................................................... 32, 40

*Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988)...................................................................... 55, 56

*In re AremisSoft Corp. Sec. Litig.*, 10 F.R.D. 109 (D.N.J. 2002) .................................................. 59

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001) ...................................... 53

*In re Cendant Corp. Litig., 264 F.3d 201 (*3d Cir. 2001*) ...................................................... passim

*In re Cigna Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 51089, 12 (E.D. Pa. July 13, 2007)......... 11

*In re Community Bank of Northern Virginia* 418 F.3d 277 (3d Cir. 2005) ................................. 51

*In re Corrugated Container Antitrust Litig.*, 643 F.3d 195 (5th Cir. 1981) ........................... 12, 40

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 S.D.N.Y. 2004) ...................... 12,57

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)......... passim

*In re Honeywell Int'l Inc. Sec. Litig.*, 211 F. R. D. 255 (D.N.J. 2002) ......................................... 60

*In re Ikon Office Solutions*, 194 F.R.D. 181 ................................................................................ 49

*In re Ins. Brokerage Antitrust Litig.*, Civ. No. 04-5184, 2007 WL 5422227, 10
(D.N.J. Feb. 16, 2007)............................................................................................................. 41, 55

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D 180, (D.N.J. 2003).......................................... 59

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
  962 F. Supp. 450 (D.N.J. 1997) ........................................................................................... passim

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283 (3d Cir. 1998)........... passim

*In re Remeron Direct Purchaser Antitrust Litig.*, Civil No. 03-0085 (FSH), 2005 U.S. Dist.
  LEXIS 27013, 24 (D.N.J. Nov. 9, 2005).................................................................................. 29

*In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001)...................... 29

*In re Sch. Asbestos Litig.*, 921 F.2d 1330 (3d Cir. 1990)............................................................ 10

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)....................................... passim

*Kennedy v. Natural Balance*, Case No. 07-CV-1082  (S.D. Cal.)................................. 9,42, 43, 44

*La Porte v. Associated Independents, Inc.*, 163 So. 2d 267 (Fla. 1964)........................................ 36

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) ......................................................... 22

*Lake v. First Nationwide Bank,* 900 F. Supp. 726 (E.D. Pa. 1995) ........................................ 10,31

*Lazy Oil Co. v. Witco*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) ................................................. 22, 28

*Lenahan v. Sears, Roebuck Col.,* Civ No. 02-0045, 2006, U.S. Dist. Lexis 60307,
(D.N.J July 24, 2006)....................................................................................................................... 29

*Lessard v. Met. Life Ins. Co.*, 103 F.R.D. 608 (D. Me 1984) ....................................................... 53

*Mars v. Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987)............ 11

*McAdams v. Mass. Mut. Life Ins. Co.*,
   No 99-30284-FHF, 2002 U.S. Dist. LEXIS 9944, 7 (D. Mass. May 15, 2002)....................... 53

*McClendon v. Cont'l Group*, 802 F. Supp. 1216 (D.N.J. 1992) ............................................. 10, 37

*McCoy v. Health Net, Inc.*, Civ. No. 03-1801 (FSH), 2008 U.S. Dist. LEXIS 60446
(D.N.J. Aug. 8, 2008)...................................................................................................................... 28

*Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 1997) ........................................... 55

*Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615(9th Cir. 1982) .................................. 29

*Perez v. Asurion Corp., et al.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ........................................ 32

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005)........................................... 22, 55

*Petrvoic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ................................................. 49

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................................. 60

*Picus v. Wal-Mart Stores, et al.*, Case No. 2:07-CV-00682- PMP-LRL ................................. 41, 43

*Pozzi v. Smith, et al.*, 952 F. Supp. 218 (E.D. Pa. 1997)............................................................... 32

*Seidman v. Am. Mobile Sys., et al.*, 965 F. Supp. 612 (E.D. Pa. 1997)......................................... 32

*Stoetzner v. United States Steel Corp.*, 897 F.2d 115 (3d Cir. 1990) ............................... 10, 16, 17

*Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005) ....................... 28, 30, 31, 40

*W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710 (S.D.N.Y. 1970) ................................................ 22

*Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196 (D.N.J. 2004) ............................................... 60

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................ 40

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1983) .................................................................. 54, 55

*Welch v. Bd. of Dirs. of Wildwood Golf Club*, 146 F.R.D. 131 (W.D. Pa. 1993)......................... 54

*Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397 (D.N.J. 1990) ............................................. 54, 56

## STATE CASES

*Bistricer v. Bistricer, 231 N.J. Super. 143* (Ch. Div. 1987).................................................... 10,16

*Brown v. Crocker, 139 So. 2d 779 (*La. Ct. App. 1962*)* ................................................................ 36

*Burgess v. Taylor*, 44 S.W.3d 806 (Ky. Ct. App. 2001) .............................................................. 36

*Gill v. Brown, 107 Idaho 1137 (*Idaho Ct. App. 1985*)*.................................................................. 37

*Harabes v. Barkery, Inc.*, 348 N.J. Super. 366 (N.J. Super. Ct. App. Div. 2001) ....................... 36

*Konaurov v. Kerdasha*, 271 Va. 646 (Va. 2006) ................................................................... 35, 36

*Strawser v. Wright*, 80 Ohio App. 3d 751 (Ohio Ct. App. 1992) ................................................ 36

## STATUTES

28 U.S.C. § 1407.................................................................................................................... 4

## FEDERAL RULES

Fed. R. Civ. P. 23(a) ................................................................. 1,3,8, 54, 55, 56, 57

Fed. R. Civ. P. 23(b)( 3).................................................................3,8, 54, 58, 59, 60

Fed. R. Civ. P. 23(e) ................................................................. 9, 10, 13, 53

# MISCELLANEOUS AUTHORITIES

2 Herbert Newberg & Alba Conte,
   *Newberg on Class Actions*, § 11.41 (4th ed. 2002) ................................................... 11

Elizabeth Paek, Fido Seeks Full Membership In The Family: Dismantling The Property
   Classification of Companion Animals By Statute, 25 U. HAW. L. REV. 481 (2003) ............... 19

Manual for Complex Litigation 2d § 30.44 .............................................................. 29

Margit Livingston, *The Calculus of Animal Valuation: Crafting a Viable Remedy*,
   82 NEB. L. REV. 783 (2004) ......................................................................... 20

R. Scott Nolen, *Lawmakers target manufactureres, producers and distrbutors*,
   J. Am Veterinary Med. Ass'n, July 15, 2007 ......................................................... 36

TILA and the Home Ownership and Equity Protection Act ....................................... 51

## I.    INTRODUCTION

Plaintiffs respectfully submit for final approval a proposed settlement (the "Settlement") that will end litigation brought on behalf of consumers in the United States and Canada who purchased, or whose pets consumed, pet food and/or treat products that were recalled (the "Recall") because they allegedly contained contaminated wheat gluten and/or rice protein concentrate ("Recalled Pet Food Products"). The Settlement was preliminarily approved by this Court on May 30, 2008, and satisfies the requirements for final approval under Federal Rule of Civil Procedure 23(e) ("Rule 23(e)").

The significant work of Plaintiffs' Co-Lead Counsel in negotiating this Settlement warrants an initial presumption of fairness. The terms of this Settlement are a product of over seven months of hard-fought, arm's-length negotiations between some of the nation's most well-respected and highly-qualified complex litigation attorneys. All Co-Lead Counsel have been as vigorously involved in developing this litigation as they have in crafting its resolution. The result is a comprehensive Settlement that provides overdue relief to pet owners – many of whom have been relying upon this litigation to advance their rights since the Recall was announced on March 16, 2007.

The response to the Settlement has been extraordinarily favorable. With more than a month to go before the end of the claims period, over 9,357 claims have been submitted by members of the Settlement Class.[1] Only 114 individuals have requested to be excluded from the Settlement,[2] and a mere 28 objections have been filed – a remarkable outcome considering the number of people receiving notice of the Settlement, the broad Notice Program that included widespread publication and individual notice, the number of claims submitted, the national print and broadcast coverage of the Recall and Settlement, and the understandably strong feelings of pet owners whose pets became ill or died. In no way can this Settlement alleviate the pain and

---

[1] 8,968 of the claims received thus far submitted are from U.S. residents. The remaining 389 claims are from Canadian residents.
[2] 89 of the exclusions have been submitted by U.S. residents. The remaining 25 exclusions have been by Canadian residents.

sorrow that comes with the loss or acute sickness of a pet, more often than not considered a member of the family. The Settlement does not pretend to do what it cannot – which is to make people fully whole for their incomprehensible losses. The Settlement is, however, a reflection of strenuous efforts to secure the maximum economic relief available under existing law and in light of the strengths, weaknesses and risks of this litigation. To be sure, the limited number of objections in an action of this complexity and magnitude demonstrates that, while it cannot restore lives that were lost, this Settlement provides meaningful and comprehensive relief to pet owners.

The proposed Settlement is more than fair, reasonable and adequate. The complexity and number of parties in this litigation make its continuance extremely arduous and costly, and a successful result risky. In the approximately 17 months since the largest pet food recall in U.S. history began, over 100 class action lawsuits were filed against over 20 defendants on behalf of over 200 named plaintiffs. Through dedicated negotiations the parties crafted an extraordinary Settlement that has received relatively few objections compared to the sizeable number of claims submitted. Given the substantial risks, costs and complexity of this litigation, the Settlement proffered by Co-Lead Counsel provides substantial benefits to the Class as a whole and should be finally approved.

In addition, plaintiffs move that this Court certify the proposed Settlement Class under Federal Rule of Civil Procedure 23(a) and (b)(3). The Settlement Class meets all criteria for certification and should be certified for purposes of effectuating this Settlement.

## II.    BACKGROUND

### A.    Summary Of The Litigation

This Settlement encompasses approximately 120 cases. The Recall began in March 2007 with Menu Foods announcing the recall of more than 50 brands of dog food and over 40 brands of cat food manufactured between November 8, 2006 and March 6, 2007. Within a month after Menu Foods' initial recall, four other pet food manufacturers initiated recalls of their own pet food and treat products that may have been contaminated – Hill's Pet Nutrition, Del Monte Pet

Products, Nestlé Purina PetCare Co. and Sunshine Mills, Inc. The Recall expanded to cover approximately 180 brands of pet food and pet treats produced by 12 different manufacturers and distributed, marketed and sold by dozens of retailers. Joint Declaration In Support Of Final Approval of the Proposed Settlement and the Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Decl.") ¶ 2.

It was later determined that wheat gluten and rice protein concentrate imported from China and supplied to multiple pet food manufacturers by ChemNutra, Inc. and Wilbur Ellis, may have been contaminated. It was discovered that these pet food ingredients were adulterated with both melamine and cyanuric acid, the combination of which can lead to acute renal failure in small animals if ingested. The two Chinese supply companies – Xuzhou Anying Biologic Technology Development Co., Ltd. ("XAC") and Binzhou Futian Biological Technology – inserted melamine into wheat gluten and rice protein to boost their protein content to meet the protein levels required under industry standards.[3]

Two Chinese companies – XAC and Suzhou Textiles, Silk, Light Industrial Products, Arts and Crafts, Suzhou Textiles, Silk, Light Industrial Products, Arts and Crafts, a Chinese export firm – were indicted on February 6, 2008 on "charges of intentionally defrauding and misleading American manufacturers about poisonous ingredients used in pet foods last year."[4] According to the indictment against XAC and its owner, "[w]hen the XAC-manufactured wheat gluten was exported to the United States it was deliberately labeled and coded so that the product

---

[3] See, e.g., Diminished Capacity: Can the FDA Assure the Safety and Security of the Nation's Food Supply? Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce, 110th Cong. 8 (2007) (statement of Paul K. Henderson) ("[T]he inclusion of melamine into the wheat gluten would make substandard wheat gluten appear to meet industry standards for protein content.").

[4] Louise Story, Pet Food Indictments for 3 Firms, N.Y. TIMES, Feb. 7, 2008, available at http://www.nytimes.com/2008/02/07/business/worldbusiness/07pet.html?_r=1&oref=slogin. A separate indictment charged ChemNutra, Inc., the American importer of the XAC-manufactured wheat gluten, of being aware that the wheat gluten was not coded correctly on expert certificates, but not of being aware that the wheat gluten contained melamine. Id. The XAC Indictment, handed down by a federal grand jury in the United States District Court for the Western District of Missouri, is available at http://www2.lasvegasnow.com/docs/xuzhou_indictment.pdf.

would not be subject to" compulsory and mandatory inspection by Chinese food authorities.[5] XAC exported at least 13 shipments of wheat gluten to the United States during the period covered by the Recall.

Altogether, Defendants, consisting of Menu Foods, other pet food manufacturers, several ingredient suppliers, and virtually every other entity in the chain of distribution, recalled over 60 million containers of pet food products. Pet owners commenced over 100 class actions against pet food manufacturers, ingredient suppliers, distributors, repackagers and retailers. Joint Decl. ¶ 3. Plaintiffs brought claims on behalf of all persons who purchased, used or obtained, or whose pets consumed, any cat or dog food or treats that allegedly contained contaminated wheat gluten and/or rice protein concentrate. Each complaint alleged violations of state consumer protection and deceptive trade practice statutes, product liability, warranty and negligence claims. Following motion practice under 28 U.S.C. § 1407, during which several different potential transferee forums were proposed, the Judicial Panel on Multidistrict Litigation (the "Panel") consolidated the actions and transferred them to this Court for pretrial proceedings on June 19, 2007. Joint Decl. ¶¶ 4, 9.

Both before and during transfer of the many cases to this Court, Plaintiffs aggressively worked to manage the complex issues that marked the Recall. This involved understanding the relevant veterinary issues related to small animal renal systems and researching all plausible legal theories concerning harm to and the loss of pets and sources of liability. It also involved coordinating nationwide litigation involving over 100 plaintiffs' law firms. Joint Decl. ¶ 5.

Several plaintiffs represented by Co-Lead Counsel also engaged in motion practice to protect the rights of absent class members and made numerous appearances before this Court on behalf of the putative class concerning communications with them by certain defendants. Joint Decl. ¶ 51. For instance, on May 7, 2007, certain of Co- Lead Counsel filed a motion to limit

---

[5] Indictment, *supra*, ¶¶ 31-33.

Menu Foods' communications with putative class members[6] and appeared before the Court on three separate occasions in support of their motion.[7] Plaintiffs' Co-Lead Counsel filed a similar motion on June 18, 2007 with respect to The Iams Company's communications with putative class members,[8] appearing before this Court on this motion on June 27, 2007[9] and again by telephone on July 6, 2007.[10]

In addition, during the pendency of the stay issued by this Court on September 26, 2007, Plaintiffs' Co- Lead Counsel engaged in extensive negotiations with several defendants on complex evidence preservation and destruction issues posed by the substantial amount of rapidly deteriorating Recalled Pet Food Products stored by defendants.[11] Plaintiffs consulted with an expert to reach an agreed retention and sampling plan of the stored pet food and deposed the expert retained by defendants on this issue. The agreed plans were ultimately presented to the Court for approval. Joint Decl. ¶ 52.

Plaintiffs' Co-Lead Counsel engaged in a number of exploratory talks with the Defendants on the prospect of achieving an early resolution to what promised to be expensive, emotional, protracted, and risky litigation. Starting in late September 2007, parties commenced what would be several months of intense settlement negotiations, both independently and under the auspices of Professor Eric D. Green, a highly experienced and well-respected mediator of the dispute resolution firm Resolutions, LLC. Joint Decl. ¶¶ 15-16.

### B.     The Settlement

The Settlement was reached after over seven months of cross-country and cross-border negotiations between the parties, including Canadian plaintiffs and their counsel. These

---

[6] *See Workman et al. v. Menu Foods Ltd. et al.*, No. 1:07-CV-01338-NLD-AMD, United States District Court for the District of New Jersey, filed on March 23, 2007. [*Workman* Dkt. No. 10].
[7] *Id.*, Motion Hearing held on May 18, 2007 [Dkt. No. 15], Motion Hearing held on May 23, 2007 [*Workman* Dkt. No. 26], Motion Hearing Held on May 24, 2007. [*Workman* Dkt. No. 27].
[8] *See Sokolowski v. Menu Foods, Inc. et al.*, No. 1:07-CV-01709-NLH-AMD, United States District Court for the District of New Jersey, filed on April 9, 2007. [*Sokolowski* Dkt. No. 7].
[9] *Id.* [*Sokolowski* Dkt. No. 16].
[10] *Id.* [*Sokolowski* Dkt. No. 23].
[11] *See* Dec. 18, 2007 Order granting Motion for Discovery. [Dkt. No. 106].

negotiations included more than 10 days of formal mediation facilitated by Professor Green and many additional hours of in-person and telephonic negotiations with representatives of plaintiffs and over 20 defendants. Joint Decl. ¶¶ 16-17.

The result is a fair, reasonable and adequate Settlement that provides for a $24 million cash Settlement Fund *on top of* the approximately $8 million in Historic Payments already paid to pet owners by certain defendants or their insurers as a result of claims programs.[12] The proposed Settlement allows Settlement Class Members to potentially recover up to 100% of all reasonable economic damages incurred. As a result, pet owners have the potential to recover all costs that were related to their purchase of Recalled Pet Food Products, including those for health screenings and illness or death of their pet.

The Claims Administrator will consider a wide array of documentation to determine reimbursement amounts. For instance, Settlement Class Members may submit veterinarian bills, veterinary records, cancelled checks, receipts, credit card receipts, and/or credit card statements to support their claims for reimbursement. Settlement Class Members may also provide statements from veterinarians to support their claims. For reimbursement for the cost of a pet, Settlement Class Members may submit AKC registrations or Cat Fancier's Association Certificates. Copies of product labels or other forms of proof of purchase may be provided for reimbursement of Recalled Pet Food Product purchases. In addition, the Claims Administrator has been provided with the guidelines attached as Exhibit 7 to the Settlement Agreement to assist in assessing the costs of various types of economic damages, such as necropsy/autopsy, euthanasia, cremation, burial/Specialty Services, costs of new pets, and the number of Healthy Pet Screenings that are presumptively reasonable based on nationwide data.

There are several additional, and exceptional, features of the Settlement including that: 1)

---

[12] The significance of the $8 Million in Historic Payments cannot be overstated. Co-Lead Counsel increased the potential recoveries of those Class Members who may have participated in the Historic Payment programs and signed releases, because, under the Settlement, those Class Members have the right to seek recovery of those economic damages not compensated by the Historic Payments.

economic expense claims that are unsupported by documentation remain eligible for payment up to a maximum of $900 for that undocumented part of the claim; 2) the Settlement allows claims on behalf of healthy pets that received veterinary attention and testing to ensure they were not harmed by Recalled Pet Food Products; and 3) a pet owners may be reimbursed the fair market value of a deceased pet, including pets that were specially trained as service animals. It is at least speculative whether Class Members could make such a recovery had this case gone to trial.

The payments described above will be subject to pro rata reduction only if the total amount of valid claims exceeds the Settlement Fund, which sets aside certain amounts for product reimbursements and health screenings. The amount of $250,000 is available for reimbursement of product purchases. The Settlement further provides $400,000 for health screenings. If the total value of claims for all other types of economic damages exceeds the amount of the Settlement Fund, the claims will be pro-rated based on the ratio of the claim to the total amount of claims for these other damages.

A charitable distribution comprised of any funds remaining after the administration of the Settlement and payment of all valid claims will be timely made to animal welfare-related organizations. This charitable distribution would be made to organizations in both the United States and Canada. Settlement Agreement, § V.F.

Furthermore, the Settlement includes an agreement for the further testing of pet food ingredients. Defendants that manufactured the Recalled Pet Food Products agree to continue to administer their Quality Assurance Programs to regularly test shipments of raw wheat gluten and rice protein concentrate imported from China for the presence of melamine and cyanuric acid until May 30, 2009.

In sum, and as set forth more fully below and in the accompanying Joint Declaration of Plaintiffs' Co-Lead Counsel In Support of Final Approval of Class Action Settlement, the Settlement offers extraordinary, comprehensive and timely relief to Settlement Class Members. It provides potentially complete restitution for all economic harm suffered as a result of the Recall, a result that is exceedingly rare, if not unprecedented.

## C.    Preliminary Approval Granted

On May 22, 2008, the parties jointly moved this Court for preliminary approval of the proposed Settlement, and on May 30, 2008 this Court held a preliminary approval hearing. The Court found that the "proposed settlement is fair, reasonable and adequate and that the proposed Settlement Class meets all of the applicable requirements under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure." May 30, 2008 Order at 2. [Dkt. No. 153]. The Court also ordered the dissemination of Notice.

## D.    The Notice Program

The notice plan has been fully executed in accordance with the plan approved by this Court. Declaration of Edward J. Sincavage ("Sincavage Decl."), ¶ 2. The Court approved the proposed form and manner of notice and ordered its dissemination, finding the notice was the "best notice practicable under the circumstances, constitute sufficient notice to all persons entitled to notice, and satisfy the Constitutional due process requirements of notice." May 30, 2008 Order at 8.

Notice of this Settlement has reached an extremely broad audience. Notice was published extensively in newspapers, magazines and periodicals throughout the United States and Canada. Sincavage Decl. ¶ 10, Ex. B (listing of publications). In addition, pet owners who were paid as part of a Historic Payment programs received direct Individual Notice. *Id.* at ¶¶ 3-8. Long form notice was also sent to the American Veterinarian Medical Association. *Id.* at ¶ 9. Through September 30, 2008, a total of 28,955 notices were directly mailed to potential class members. *Id.* at ¶ 8. Also, as of September 30, 2008 the Settlement website had received over 38,039 visits, and over 8,150 calls were placed to the toll-free Settlement telephone number, of which over 4,607 callers received live assistance. Sincavage Decl. ¶ 12. In addition to what was effectuated through the Court-approved plan, Notice of the Settlement has been trumpeted across North America by print, television and internet media.

To date, over 9,357 pet owners have submitted claim forms to the Claims Administrator. Of those 9,357 Settlement Class Members participating in the Settlement, only 114 have

excluded themselves,[13] and there are just 28 objections. Joint Decl. ¶¶ 21-22. The subjects of the objections are addressed in full below. It is worth noting, however, that in many of the letters that contain negative comment, Class Members offer understandable expressions of immense grief over the injury or loss of their pets, events that led to the Recall, and lack of criminal prosecution or severe enough punishment for the defendants generally. *Id.* at ¶ 22.

Through the diligent efforts of Co-Lead and defense counsel in this litigation, the Parties have devised a comprehensive and fair Settlement that has generated extraordinary participation and support by Settlement Class Members. Accordingly, Plaintiffs' Co-Lead Counsel respectfully move for an order granting final approval of the Settlement and certifying the Settlement Class.

## III.    THE SETTLEMENT IS ENTITLED TO AN INITIAL PRESUMPTION OF FAIRNESS AND SATISFIES THE REQUIREMENTS OF RULE 23(e)

Courts have repeatedly held that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (*"Warfarin"*) (citing *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (*"GM Trucks"*) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting the Court's policy of "encouraging settlement of complex litigation that otherwise could linger for years"); *see also Candeliere v. U.S.A,* 816 F. Supp. 994, 1003 (D.N.J. 1992) (indicating there is a strong public policy supporting the enforcement of settlements and that settlements are contracts "'which a court, absent a demonstration of fraud or other compelling circumstances' shall honor and enforce as it does other contract.'") (quoting *Bistricer v. Bistricer*, 231 N.J. Super. 143 (Ch. Div. 1987)).

The applicable standard of review that a district court must apply in evaluating a class

---

[13] Defendants had reserved the right to terminate the Settlement if there were 2,000 or more opt-outs, a result not remotely close to materializing.

action settlement is whether the settlement is "fair, reasonable and adequate." FED. R. CIV. P. 23(e)(2); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990); *McClendon v. Cont'l Group*, 802 F. Supp. 1216, 1218 (D.N.J. 1992) (holding that the interests of the class as a whole must be considered in deciding final approval of a class settlement and that "the settlement must be fair, reasonable, and adequate under the circumstances."). District courts have broad discretion in determining whether to approve a proposed class action settlement. *See, e.g., Warfarin*, 391 F.3d at 535; *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 801 (3d Cir. 1974) (holding that the district court has discretion in determining whether a settlement is fair and reasonable). However, despite the broad discretion afforded district courts, "significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450 (D.N.J. 1997) (quoting *Lake v. First Nationwide Bank,* 900 F. Supp. 726, 731 (E.D. Pa. 1995)).

Courts recognize that settlements are the product of negotiations and judgments made by parties to the litigation. *See, e.g., GM Trucks,* 55 F.3d at 806 ("[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.") (citation omitted). Accordingly, the purpose of reviewing a proposed settlement is not to revise the agreement reached by the parties or to try issues not covered or resolved by the settlement. *Bryan,* 494 F.2d 799, 804 (3d Cir. 1974). "The temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1315 (3d Cir. 1993) (quoting *Mars v. Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987) (Posner, J.)).

## A. The Settlement is Entitled to an Initial Presumption of Fairness

The Third Circuit has directed district courts to "apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Warfarin*, 391 F.3d at 535

(quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001) ("*Cendant*")); *see also* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 11.41, at 11-91 (4th ed. 2002).

The settlement negotiations occurred at arm's length and were largely overseen or facilitated by a well-known, experienced and respected mediator, Professor Green. Joint Decl. ¶ 16. *See, e.g., In re Cigna Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 51089, at *12 (E.D. Pa. July 13, 2007) ("Concerning the presumption of fairness, it is clear that the settlement negotiations occurred at arm's length, as the parties were assisted by a . . . mediator."). For over seven months, and including over ten mediation sessions, settlement negotiations were hard-fought and – at times – contentious. Joint Decl. ¶ 16. On a number of occasions, meetings between the parties ended in stalemate or in unraveling previous agreements, only to make incremental headway in later sessions. *Id.* at ¶ 17. The Settlement before the Court is truly a product of compromise reached only after parties tenaciously advocated for their respective interests. *Id.* at 18.

Plaintiffs developed a broad and extensive understanding of the legal and factual issues implicated in the litigation. Plaintiffs consulted experts and several members of the veterinary community to develop a deeper understanding of the diagnosis and treatment recommendations provided to pet owners during the Recall. Joint Decl. ¶¶ 24-29. *See, e.g., Cendant*, 264 F.3d at 235 (indicating that courts are interested in the amount of case development that has occurred and whether counsel understood the merits of the litigation before negotiating rather than how much formal discovery was taken); *GM Trucks*, 55 F.3d at 813 (same); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.3d 195, 211 (5th Cir. 1981)).

Plaintiffs retained Dr. John L. Robertson, an expert on the toxicology and pathology of small animal renal systems, and consulted with numerous veterinarians throughout the country. Such research was instrumental in helping counsel understand the emergent symptoms in pet dogs and cats as well as the treatment regimen used to respond to such symptoms. Joint Decl. ¶ 28. In

addition, Plaintiffs retained a biostatistician, Dr. Nicholas Jewell, to assist in reaching an agreed sampling plan with defendants that would allow the parties to preserve evidence in defendants' possession for later testing as well as allow defendants to dispose of rapidly deteriorating pet food products. Joint Decl. ¶¶ 28, 52. Evidence preservation issues were refined even more by Plaintiffs' deposition of defendants' expert statistician, Dr. George McCabe. Joint Decl. ¶ 28.

Furthermore, Co-Lead Counsel is comprised of some of the most reputable and experienced firms in the plaintiffs' bar. The firms making up Plaintiffs' Co-Lead Counsel have vast, well-recognized experience representing plaintiffs in class actions, complex litigation, and litigating consumer protection claims. Together, Co-Lead Counsel's experience has been invaluable to the efficient management of these numerous actions and in stewarding this litigation to its current state – a fair, adequate and reasonable Settlement that will provide timely relief to pet owners and bring this litigation to a close. Joint Decl. ¶ 19.

Lastly, against the backdrop of 9,357 claims, only 28 objections were submitted. The majority of the negative commentary from consumers express outrage and their extreme upset related to the death or injury of their pet. Three objections were filed by attorneys, one of whom is a known professional objector who has filed the identical objection in other class actions and who does not appear to the interests of the Class at heart. The remaining two attorney objections are by counsel who misapprehend the scope of the release and make meritless objections as to whether the class is adequately represented and reimbursement amounts for purchase claims are sufficient, as fully discussed below.

For these reasons, this Settlement is not only entitled to a presumption of fairness; it is clearly fair.

**B.    The Proposed Settlement Is Fair, Reasonable And Adequate According To The *Girsh* Factors**

The Third Circuit has evaluated whether a proposed settlement is fair, reasonable and adequate under Rule 23(e) according to nine factors articulated in *Girsh*, 521 F.2d at 156-57. According to *Girsh*, whether a settlement is fair, reasonable and adequate is determined by

analyzing:

> (1) The complexity, expense, and likely duration of the litigation;
>
> (2) The reaction of the class to the settlement;
>
> (3) The stage of the proceedings and the amount of discovery completed;
>
> (4) The risks of establishing liability;
>
> (5) The risks of establishing damages;
>
> (6) The risks of maintaining the class action through the trial;
>
> (7) The ability of the defendants to withstand a greater judgment;
>
> (8) The range of reasonableness of the settlement fund in light of the best possible recovery; and
>
> (9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See id.* at 157 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)); *see also Warfarin*, 391 F.3d at 534; *Eichenholtz v. Brennan*, 52 F.3d 478, 488 (3d Cir.1995) ("In *Girsh*, [the Third Circuit] set forth several factors a district court must consider when evaluating the adequacy, fairness and reasonableness of a settlement"). A detailed analysis of the *Girsh* factors further demonstrates that the proposed Settlement is fair, reasonable and adequate.

### 1. The Complexity, Expense, and Likely Duration of the Litigation

The first *Girsh* factor requires an analysis of "'the probable costs, in both time and money, of continued litigation.'" *Warfarin*, 391 F.3d at 535-36 (quoting *Cendant*, 264 F.3d 201, 233 (3d Cir. 2001)); *GM Trucks*, 55 F.3d at 812. The costs of continued litigation are informed, in part, by the case's complexity, whether it will require protracted discovery, whether trial preparation will be extensive and the difficulty of the legal and factual issues. *See, e.g., Cendant*, 264 F.3d at 233. Moreover, a case's complexity is increased based, in part, on the number of defendants and the reliance on expert review and testimony. *Id.*

The size and complexity of this litigation weighs heavily in favor of approving the proposed Settlement. As mentioned above, this litigation was initiated following the largest pet food recall in U.S. history. In only a matter of weeks, over 60 million containers of pet food

were recalled by some of the world's largest manufacturers and suppliers of pet food products. The initial recall covered over 50 brands of dog food and over 40 brands of cat food. Joint Decl. ¶ 2. In response, approximately 115 nationwide class action lawsuits were filed on behalf of over 250 named plaintiffs. Similar class actions were filed in the provinces of Canada. Over 20 defendants were named in the litigation, including entities in Canada and China. Joint Decl. ¶¶ 3, 17.

The core issues in the lawsuit involve the contamination of wheat gluten and rice protein concentrate supplied by a Chinese company to numerous pet food ingredient suppliers. Pets that consumed contaminated Recalled Pet Food Products in many cases suffered acute renal failure and became ill or died. Joint Decl. ¶ 31. Estimates of the number of dogs and cats affected by the contaminated pet food have varied widely. Joint Decl. ¶ 32. The Food and Drug Administration (FDA) has only confirmed that 16 animals died after consuming Recalled Pet Food Products.[14] According to Barbara Powers, past president of the American Association of Veterinary Laboratory Diagnosticians (AAVLD), "*[t]here's no way to guess how many pets were affected.*"[15]

The complex medical and toxicological issues in this litigation alone satisfy the first *Girsh* factor. This litigation demands a comprehensive analysis of the combined impact of melamine and cyanuric acid, the contaminants found in wheat gluten and rice protein used to manufacturer recalled pet foods, on small animal renal systems. Such an analysis requires multiple experts in the fields of veterinary medicine, toxicology, and pathology with particular attention to feline and canine renal systems. Joint Decl. ¶ 32. The toxicity of melamine and/or cyanuric acid on cats and dogs is an emergent issue. Little is currently known about the effects

---

[14] *See* FDA's Ongoing Pet Food Investigation, *available at* http://www.fda.gov/consumer/updates/petfoodrecallup.html ("FDA recognizes that there may be many more pet illnesses and deaths than the 16 deaths it has confirmed so far").

[15] AVMA, www.avma.org, *Researchers examine contaminants in pet food, deaths of pets*, Dec. 1 2007, *at* http://www.avma.org/onlnews/javma/dec07/071201c.asp (last viewed Sept. 10, 2008) (emphasis added).

of melamine on the health of dogs and cats.[16] As a result, the nascence of such research could hinder an expert's ability to produce determinative findings. Reliance on expert research in this case would be substantial and carry with it enormous cost throughout the litigation and through trial.

A sophisticated analysis of the pet food itself may also be necessary. As mentioned above, the parties retained experts to determine what amount of stored pet food products would be necessary to maintain in order to test the extent to which pet food products were contaminated. Were litigation to continue, additional experts would be required to perform the actual testing. With many units of stored pet food located in locations across the nation, as well as the potential degeneration of pet food recalled over a year ago, such testing would be necessarily complicated, costly and time consuming. Joint Decl. ¶¶ 33-34.

Discovery in this litigation would be extensive and require significant resources. For example, Parties would have to expend substantial resources taking discovery of the over 20 Defendants named in this litigation. Such discovery would entail international and cross-country travel. Defendants would also seek to depose many of the 250 named plaintiffs in this litigation, who reside throughout the country. Joint Decl. ¶ 33.

Finally, while the Parties have engaged in vigorous motion practice before this Court, this litigation is still in a pretrial posture. None of the Defendants have filed motions to dismiss or motions for summary judgment. Plaintiffs have not filed a consolidated complaint or moved for class certification. Pursuing these actions through pretrial motion practice, formal discovery and trial would require the parties and this Court to dedicate potentially several additional years to this litigation. Even worse, positioning this litigation for trial would deprive pet owners of relief that is already long overdue. Joint Decl. ¶ 43.

The complexity, expenses, and likely duration of this litigation favor the approval of the

---

[16] Michigan Veterinary Medical Association, *at* http://www.michvma.org/documents/enewsletter%20docs/Pet%20Food%20Recall%20Summary%204-28-07.doc (last viewed on Sept. 9, 2008) ("There is a scarcity of research in the published literature on melamine exposure in dogs and cats.").

proposed Settlement.

## 2. Reaction of the Class to the Settlement

This analysis "'attempts to gauge whether members of the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quotation omitted). The Third Circuit has repeatedly recognized that low numbers of objectors and opt-outs are compelling when assessing the fairness, adequacy, and reasonableness of a settlement. *See, e.g., id.*; *Bell Atl. Corp.*, 2 F.3d at 1313-14 (holding that the "small proportion of objectors does not favor derailing settlement."); *see also Stoetzner*, 897 F.2d at 118-19 (holding that 29 objections out of 281 class members strongly favored settlement).

In accordance with the Court's Order of May 30, 2008, the Court-appointed Settlement Administrator, Heffler, Radetich & Saitta, LLP published a summary notice of the Settlement and hearing in newspapers and periodicals throughout the U.S. and Canada, mailed Notice to all the Class Members who received Historic Payments from defendants or their insurance carriers, all persons who completed and returned a claim form to Crawford & Company and whose names and addresses are in a readily accessible database,[17] the persons who were the subject of this Court's Order to Show Cause dated August 28, 2007, as well as posted relevant documents on the Settlement website. The Notice informed potential Class Members of their right to object to any aspect of the Settlement. Joint Decl. ¶¶ 12-14.

The response to the Settlement has been overwhelmingly positive. To date, over 9,357 claims have been received by the Settlement Administrator.[18] There have been only 89 exclusion requests from U.S. residents, and 25 from Canadian residents. Only 28 objections were submitted, constituting less than 1% of claimants. The miniscule number of dissatisfied Class

---

[17] Crawford & Company was retained on behalf of Menu Foods shortly after the announcement of the Recall to intake and adjust claims presented to Menu Foods. This program was terminated following proceedings before this Court concerning communications with potential class members.
[18] 8,968, or 96%, of those claims are from United States residents. 389, or 4%, are from Canadian residents.

Members weighs heavily in favor of Settlement. Joint Decl. ¶ 23. Courts have found this factor weighs in favor of settlement where even higher percentages of objections have been filed. *See, e.g.*, *Stoetzner*, 897 F.2d at 118-19 (holding that a settlement where 29 out of 281 class members filed objections satisfied the *Girsh* test). In addition to the potential support for the Settlement by nearly 9,357 claimants, pet owners have written to the Court to express favorable views of the Settlement. *See*, *e.g.*, Gohla Letter [Dkt. No. 246] ("I want to take this opportunity to speak in favor of the proposed settlement, for those who do not take the time to speak.").

Many of the objections express general dismay, grief or anger over the injury or death of a pet. Others discuss their frustration over the lack of non-economic damages, the inability to recover future expenses and the lack of regulation over the pet food industry. Joint Decl. ¶ 22. These objections, as more fully discussed below, are squarely addressed by the parameters of the litigation, current state of the law and the need to prevent speculative or fraudulent claims. Furthermore, objections filed by attorneys are unfounded, misapprehend the scope of the release and make meritless objections as to whether the class is adequately represented and reimbursement amounts for purchase claims are sufficient, as fully addressed below.

One of the objections expressing grief and anger of the death of a pet was filed by Deborah Hock ("Hock Objection"), [Dkt. No. 214]. Ms. Hock was a named plaintiff in *Blaszkowski, et al. v. Mars Inc., et al.*, Case No. 1:07-cv-21221-CMA, United States District Court for the Southern District of Florida, filed on May 9, 2007. Plaintiffs in *Blaszkowski* alleged broad claims against virtually the entire pet food industry, asserting that the pet food industry misrepresents its products as being "quality" products when they actually consists of "non-edible garbage, by-products and waste that is unfit for human consumption." *See* *Blaszkowski* Complaint at ¶¶ 26-27. [*Blaszkowski* Dkt. No. 1]. On September 12, 2008, Ms. Hock voluntarily dismissed her claims in *Blaszkowski* with prejudice. [*Blaszkowski* Dkt. Nos. 482-83]. The Hock Objection refers to "corporate greed," that pet food products are mislabeled as being healthy when they contain harmful chemicals and waste products, that pet food companies have underreported the number of animals that became sick or died, and

describes the "damage done to the caregivers of innocents who were left in the dark watching helplessly as our companions suffered and died in a traumatic way." Hock Objection at 1-2. The Hock Objection also manifests some misunderstanding of the Settlement, including that "[m]ore than half of the proposed 24 million [*sic*] will go to attorney's [*sic*], [n]ot to those of us who spent countless dollars trying to save our fur children." Hock Objection at 2. This particular comment grossly exaggerates the attorneys' fees applied for by Co-Lead Counsel, which was set forth in the Notice, and also fails to recognize that this Settlement provides payment for up to 100% of all reasonably incurred economic damages.

The Hock Objection is also unique in that it attaches a number of signatures on a petition that Ms. Hock generated, distributed and solicited. Indeed, the number of signatures appearing on the petition is a clear indication of the extreme interest and emotion generated by the litigation and Settlement. However, it is unknown what any given signer of the petition read, relied upon or understood about the Settlement when signing the petition. It is further unknown what the signer's goal or motivation was in signing the petition. The vast majority of signers do not state a particularized concern or grievance regarding the Settlement, if any comment accompanies their signature at all. The petition website Ms. Hock used to solicit and gather electronic signatures does not appear to provide any statement concerning the Settlement or its terms. Hock Objection at 11. Moreover, although Ms. Hock attaches signed petitions to her objection, it is also unclear which or how many of the 16 various statements appearing on her objection, including those that misapprehend terms of the Settlement, are being supported by the signer. The only statement on the form petition is a general message urging the Court to "review, and make changes to the proposed Pet Food settlement agreement, and initiate changes." Hock Objection at 20-49. Only a handful of signers of this form petition provide specific remarks on the Settlement. However, the inability to decipher precisely what changes to the Settlement are being requested by signers in no way diminishes the petition's importance as a general and certain statement of grief over the loss or injury of their pets.

Plaintiffs' counsel are of course mindful that the emotional suffering endured by the

class is beyond description for many. While the Settlement provides a significant recovery based on minimal proof, class members whose pets were injured or died will not be made entirely whole. Nor can they be. Where a pet has died, there is no payment that can compensate for the loss of what many feel is a family member. Plaintiffs' counsel have been mindful of this fact from the beginning of the case, and have vigorously fought through these negotiations to bring about the best possible recovery for devastated pet owners. Through these efforts, Plaintiffs have been able to achieve a Settlement that provides potential individual recovery that approximates (and likely exceeds) what a consumer may achieve *at trial*. Unfortunately, the emotional pain felt by consumers whose pets were injured and/or died is not adequately addressed by the state of American law, which generally treats pets as property, and harm to which does not generally include emotional distress damages. *See, e.g.*, Elizabeth Paek, *Fido Seeks Full Membership In The Family: Dismantling The Property Classification of Companion Animals By Statute*, 25 U. HAW. L. REV. 481, 483 (2003) ("[T]he law fails to reflect the special relationship shared between animal guardians and their companion animals as such animals are legally classified as property."); Margit Livingston, *The Calculus of Animal Valuation: Crafting a Viable Remedy*, 82 NEB. L. REV. 783, 784 (2004) ("Most American jurisdictions allow the human owner of an injured or destroyed animal to recover no more than the reasonable fair market value of the animal."). Under the current legal landscape, however, as regrettable as it is for many, the Settlement represents a complete victory. In fact, it is the circumstances which gave rise to this case which continue to be a rallying point for many who find the existing law equating pets with chattel to be antiquated and inadequate.

The reaction of the Settlement Class has, on the whole, been extraordinarily positive. As a result, this *Girsh* factor is satisfied.

### 3. The Stage of The Proceedings and The Amount of Discovery Completed

The third *Girsh* factor "'captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had

an adequate appreciation of the merits of the case before negotiating.'" *Cendant*, 264 F.3d at

235 (quoting *GM Trucks*, 55 F.3d at 813). Courts often look to what informal and formal

discovery was taken before counsel decided they could "'fairly, safely and appropriately decide

to settle the action with [defendants]." *Cendant*, 264 F.3d at 235 (quoting *In re Cendant Corp.*

*Sec. Litig.*, 109 F. Supp. 2d 235, 259 (D.N.J. 2000) (internal quotation marks and citation

omitted)).

Although formal discovery was stayed (save for the deposition of defendants'

biostatistician), the parties to this litigation have engaged in extensive case development and

acquired a thorough understanding of the merits of this litigation. Plaintiffs' Co-Lead Counsel

did not conduct settlement negotiations in a vacuum, but with as great a command of the facts

and law as possible and from a position of strength. The strengths, weaknesses and risks

associated with this litigation became clear to the parties through informal discovery, extensive

consultation with experts, considerable hours of factual and legal research and after many

meetings and conversations between counsel.

Plaintiffs retained and consulted a well-respected toxicologist and pathologist specializing

in small animal renal systems at the outset of the case. This expert helped illuminate the

relationship between the consumption of melamine and cyanuric acid and renal failure in dogs

and cats and provided detailed information on how renal disorders are commonly identified and

treated by veterinarians. Joint Decl. ¶ 28. Plaintiffs also consulted with and reviewed reports

produced by numerous veterinarians, veterinary medical associations and advocacy

organizations, including: the American Veterinary Medical Association (AVMA), American

College of Veterinary Internal Medicine (ACVIM), American Society for the Prevention of

Cruelty to Animals (ASPCA), the American Animal Hospital Association (AAHA), the

Veterinary Information Network (VIN) and the American Association of Veterinary Laboratory

Diagnosticians (AAVLD). Moreover, Plaintiffs monitored the constant news reports covering

the pet food Recall as well as the numerous updates provided by the U.S. Food and Drug

Administration (FDA). Joint Decl. ¶ 25.

Plaintiffs also retained a biostatistician, Dr. Nicholas Jewell, to assist them in reaching agreement with defendants on a sampling plan that would help determine what amount of evidence in the form of stored, and rapidly deteriorating, pet food product should be maintained to assess levels of contamination. Joint Decl. ¶ 52. Plaintiffs deepened their understanding of such evidence preservation and destruction issues and worked to protect the interests of the putative class through the deposition of Defendants' statistician, Dr. George McCabe, on whom some of the Defendants were relying in their effort to dispose of evidence. Joint Decl. ¶ 28.

In addition, Plaintiffs performed an extensive analysis of the legal claims available under common law and applicable state statutes, assessing available legal theories and damages that could be pursued on behalf of pet owners. This analysis of the companies included in the pet food distribution chain, their relationship to one another and their ability to contribute to class relief. Plaintiffs also tracked legislation in various states to determine whether the relevant legal landscape would change during the course of the litigation. Moreover, Plaintiffs conducted damages analyses by contacting close to 50 pet hospitals throughout the nation, including Banfield, The Pet Hospital and pet hospitals in the VCA Animal Hospital network, to determine typical costs for treatment, diagnosis and death-related expenses such as necropsy, cremation and burial. Joint Decl. ¶ 26. This analysis was in addition to the extensive surveying of class member databases maintained by various plaintiffs' counsel. Joint Decl. ¶ 28.

The mediation process and ongoing dialogue between the parties also provided crucial information throughout the litigation that helped both Plaintiffs and Defendants assess the merits of this litigation. Joint Decl. ¶ 29. Together, the intensive and comprehensive approach to this litigation allowed the parties to acquire an objective understanding of the strengths, weaknesses and risks attendant to the litigation. As a result, this factor weighs heavily in favor of approving the proposed Settlement.

### 4. Risk of Establishing Causation, Damages and Liability

The fourth *Girsh* factor is analyzed "in order to 'examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather

than settle them.'" *Cendant*, 264 F.3d at 237 (quoting *GM Trucks*, 55 F.3d at 814). In doing so, the Court need not analyze in detail "the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)). Also, the fifth *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238 (quoting *GM Trucks*, 55 F.3d at 816).

Plaintiffs are confident that they would prevail at trial, but recognize that cases such as this one, like all complex litigation against large companies with highly talented defense counsel, have inherent risks. Joint Decl. ¶¶ 35-38. "Here, as in every case, Plaintiffs face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues." *Lazy Oil Co. v. Witco*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997); *see also W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), *aff'd*, 440 F.2d 1079 (2d Cir. 1971). Moreover, the trial of this case against the pet food industry would have involved a "major battle" between the parties' respective experts, creating "risks of convincing the jury which expert to believe." *Id.*; *see also Lazy Oil*, 95 F. Supp. 2d at 311 ("In light of the conflicting and ambiguous evidence, and the sharply differing opinions of the parties' experts, Plaintiffs' likelihood of prevailing at trial was far from assured."). Plaintiffs likely face significant risks on the issue of causation, damages and liability. Joint Decl. ¶¶ 35-38.

Toxicity studies involving the combination of melamine and cyanuric acid, both chemicals that were found in the adulterated wheat gluten and rice protein concentrate used to manufacture pet food,[19] have demonstrated a strong relationship to acute renal failure. For

---

[19] AVMA, www.avma.org, *Researchers examine contaminants in pet food, deaths of pets*, Dec. 1 2007, *at* http://www.avma.org/onlnews/javma/dec07/071201c.asp (last viewed Sept. 10, 2008)

instance, the FDA has stated that "[t]he combination of melamine and cyanuric acid appears to be more toxic than either compound alone. When these two substances interact, they form crystals in urine and kidney tissue, which can lead to kidney failure."[20]

However, relatively few such studies have been conducted and these studies have been inconclusive in that it is unclear precisely how many pets became ill or died as a result of eating Recalled Pet Food Products. Joint Decl. ¶ 36. The AAVLD conducted one of the most definitive nephrotoxicity studies in the months following the Recall. Of the 347 cases that met the AAVLD's diagnostic criteria for "'pet food-induced nephrotoxicity' 61 percent of the cats and 74 percent of the dogs [] died."[21] Yet, the AAVLD also admitted that the mortality rate was not entirely representative and was "only a percentage of the actual cases."[22] In addition, results varied between cats and dogs, as well as between larger and smaller dogs. "[M]ore cats than dogs might have become ill because of cats' relatively small sizes. 'Even among dogs, small- to medium-size dogs were affected the most.'"[23] Consequently, consumption of Recalled Pet Food Products had varying results even in the most conclusive study performed after the Recall.

Whether Recalled Pet Food Products caused pets to die or become ill is further complicated by the age and health of the pet at the time contaminated food was consumed. Joint Decl. ¶ 35. Oftentimes, pet death or illness could not be explicitly tied to the consumption of contaminated food; pets could have suffered from other known or undetected illnesses and/or could have been of a particularly old or young age at the time of consumption. For instance, one pet owner whose three dogs died wrote that one of her dogs had cancer, that another was a "rescue dog," and that their third dog was "tied to a fence outside an abandoned truck yard that

---

("According to the FDA, melamine and cyanuric acid were present together in wheat flour from China that went into pet food in the United States.").
[20] FDA, *Pet Food Recall/Contaminated Feed Frequently Asked Questions*, *at* http://www.fda.gov/cvm/menufoodrecallfaq.htm (last viewed Sept. 10, 2008).
[21] AVMA, www.avma.org, *Researchers examine contaminants in pet food, deaths of pets*, Dec. 1 2007, *at* http://www.avma.org/onlnews/javma/dec07/071201c.asp (last viewed Sept. 10, 2008).
[22] *Id.*
[23] *Id.*

was ready to collapse and die [*sic*]" when they first brought the dog home. *See* Patsalos Letter. [Dkt. No. 236].

Although Plaintiffs believe that causation can be shown through class-wide evidence, there can be no question that this would be a major battleground with the outcome unknown. Joint Decl. ¶ 37. Plaintiffs candidly recognize that this litigation would be vulnerable if it were to go to trial and that the issue of causation could hinder Plaintiffs' success. Also, without knowing definitively how many pets became ill or died as a result of consuming Recalled Pet Food Products, it is uncertain what damages Plaintiffs could ultimately obtain on behalf of pet owners.

Lastly, liability would be hotly contested because the adulteration of wheat gluten and rice protein concentrate with melamine was a criminal act by Chinese companies that occurred in China, and its presence was reasonably unexpected, had never been tested for nor was previously detected. One AVMA veterinarian stated at a June 2007 conference of experts on the pet food recall, "The problem is you can only test for what you know to look for. This was nothing that anybody would have ever considered testing for."[24] Also, varying degrees of liability would exist between manufacturers, private labelers and entities that were strictly retailers. Joint Decl. ¶ 32.

This Settlement avoids the foregoing risks and provides certain resolution to these actions, ensuring that pet owners are provided fair and reasonable relief. Joint Decl. ¶ 38. As a result, the fourth *Girsh* factor weighs in favor of approving this Settlement.

### 5. Risks of Maintaining a Class through Trial

Another *Girsh* factor to be considered is the "risk of maintaining the class action through the trial," which "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 535, 537. The value of a class action in

---

[24] American College of Veterinary Internal Medicine (ACVIM) Forum in Seattle, Washington, *Pet Food Recall*, June 9, 2007 at 12, *available at* http://www.acvim.org/uploadedFiles/pet_food_Transcript_final.pdf.

terms of the range of recovery one can expect depends largely on the certification of the class and the ability to sustain that class through trial. *See, e.g.*, *GM Trucks*, 55 F.3d at 817. Decertification of a class is always one of the risks of maintaining the class action through the trial. A district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable. *See, e.g.*, *Cendant*, 264 F.3d at 239. Yet, when certifying a settlement class, a court need not consider the issue of manageability. *See, e.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

Courts generally find that this factor weighs in favor of settlement because "[t]here would always entail the risk, even if slight, of decertification." *Cendant*, 264 F.3d at 239. In fact, the *Cendant* court held that where objectors argued that the risk of decertification was "extremely slight," the court agreed with the objector and found this factor to be, at worst, "neutral." *Id.* Other courts have also noted the risk that a class certified for settlement purposes might "create intractable management problems if it were to become a litigation class," thus finding that this factor weighs in favor of settlement approval. *First State Orthopedics v. Concentra, Inc.*, No. 05-4951, 2007 U.S. Dist. LEXIS 77557, at *51 (E.D. Pa. Oct. 16, 2007) (citation and internal quotations omitted).

Here, the risk of decertification is more than "extremely slight." There are significant risks in this litigation for issues to arise during discovery that could jeopardize class certification. Defendants may, for instance, argue that science concerning the etiology of renal failure is not susceptible to class-wide proof of plaintiffs' claims. Defendants will likely seek to establish that individual issues such as pet breed, amount or type of food consumed, health history, and age, among other issues, predominate. For example, as discussed above, the most definitive study to date on the link between consuming Recalled Pet Food Products and acute renal failure, found that sickness and mortality varied widely between cats and dogs and based on the size of the animal. This type of information is illustrative of that which can be used to undermine or modify any class certification order.

Were the litigation to proceed, Plaintiffs would be prepared to present a compelling case for certification. However, the Court has the ability to "'decertify or modify a class at any time during the litigation if it proves to be unmanageable.'" *Cendant*, 264 F.3d at 239 (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 321 (3d Cir. 1998) ("*Prudential II*")). Also, the risk of decertification are significant given the varying preexisting conditions of animals that consumed contaminated pet food and the difference in the rates of death and sickness in cats and dogs and smaller and larger animals. Accordingly, this factor favors approval of the proposed Settlement.

### 6. Defendants' Ability to Withstand Greater Judgment and Enforceability of Judgment

Another factor courts consider is "'whether the defendants could withstand a judgment for an amount significantly greater than the settlement.'" *Warfarin*, 391 F.3d at 537-38 (quoting *Cendant*, 264 F.3d at 240). Where the defendant has incurred substantial financial losses, the Court may consider this factor to be "neutral or weighs in favor of approval of the Settlement." *Gates v. Rohm & Haas Co.*, No. 06-1743, 2008 U.S. Dist. LEXIS 65501, at *17 (E.D. Pa. Aug. 26, 2008).

Before arriving at the Settlement Agreement, parties engaged in extensive negotiations and Plaintiffs' Co-Lead Counsel believed that defendants were unwilling or potentially unable to settle for a greater amount. Joint Decl. ¶ 42. Here, Menu Foods, a major defendant in this litigation in that it manufactured a large quantity of the recalled food for distribution by various companies under numerous brand names, suffered substantial financial losses as a result of the pet food Recall. Joint Decl. ¶ 40. The Recall itself cost Menu Foods approximately $55 million in Canadian dollars exclusive of any Historic Payments and the Settlement Fund, C$10 million more than originally anticipated.[25] Moreover, Menu Foods reportedly lost approximately 80% of

---

[25] Kevin Bell, Bloomberg.com, *Menu Foods Pet Food Recall Costs Rise to C$55 Million (Update 3)*, Oct. 10 2007, *at* http://www.bloomberg.com/apps/news?pid=20601082&sid=a.dt12.pYQ.g&refer=canada (last viewed Sept. 10, 2008).

its contract business with some of the most well-known pet food brands and pet food retailers in the United States, representing approximately 45% of Menu Foods' total volume.[26] The Iams Company, which sells under the Iams and Eukanuba brands, "accounted for over 20 per cent [*sic*] of Menu's business [and] said . . . that it would no longer buy canned food from Menu Foods."[27] Mars, Inc. also indicated that it would stop contracting manufacturing work out to Menu Foods.[28] "Retailers and foodmakers who accounted for 37 percent of the company's pet food sales . . . halted orders."[29] Joint Decl. ¶ 41.

In the months following the Recall, Menu Foods stock plummeted by, according to at least one report, 69%.[30] "Its shares, which once topped $7, [were] trading at just over $2 [as of September 2007]. . . . the company said its second quarter sales were down to $47.2 million, compared to $84.3 million in the same period last year -- a 44 per cent plunge."[31] Furthermore, the company reduced its workforce by reportedly 10-15%.[32] Joint Decl. ¶ 41.

Simply put, the Recall was devastating to Menu Foods. Indeed, throughout this litigation and during negotiation of this Settlement, Menu Foods' financial viability was uncertain. Joint Decl. ¶ 40.

Moreover, the "built-in limitations" of analyzing a company's ability to withstand a greater judgment moderates the weight of this factor. *See In re Cendant Corp.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002). Such a determination inevitably involves a "measure of speculation." *Cendant*, 264 F.3d at 241.

---

[26] Colin Campbell, *In critical condition – After last spring's pet food scandal, Canada's Menu Foods fights for its life*, MACLEANS, Sept. 3, 2007, *available at* http://www.macleans.ca/business/companies/article.jsp?content=20070903_109055_109055&page=1 (last viewed Sept. 11, 2008).
[27] *Id.*
[28] Bell, *supra.*
[29] *Id.*
[30] *Id.*
[31] Campbell, *supra.* As of the date of filing, the stock was trading at $1.25. *See* www.marketwirecanada.com (last viewed Sept. 24, 2008).
[32] Campbell, *supra.*

Courts approve proposed settlements even where it is found defendants have the ability to pay more than the settlement, *McCoy v. Health Net, Inc.*, Civ. No. 03-1801 (FSH), 2008 U.S. Dist. LEXIS 60446, at *38 (D.N.J. Aug. 8, 2008) (citations omitted), particularly where damages are uncertain. *See, e.g., Lazy Oil Co.*, 95 F. Supp. 2d at 318 ("[I]n light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."). As discussed above, the risks of maintaining class certification and prevailing at trial are significant in this case. The substantial uncertainty in proving causation, damages and uniformity of death and sickness in pets that consumed Recalled Pet Food Products greatly diminish the importance of Defendants' ability to withstand a greater judgment.

Finally, the ability of Defendants to withstand a greater judgment is not compelling because this Settlement potentially provides payment for 100% of all reasonably incurred economic damages. In other words, Class Members could likely not obtain greater individual relief even were Defendants forced to pay more. Courts have held that such full recovery makes defendants' ability to withstand greater judgment a neutral factor. *See, e.g., Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 239 (D.N.J. 2005) (holding that despite Defendants' ability to withstand a greater judgment "Class Members will have the opportunity to obtain a full-recovery under this Settlement, so its not clear to what degree a greater judgment would recompense Class Members.").

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation

*Girsh* factors 8 and 9 are generally analyzed in combination, as most courts have recognized that these factors test "two sides of the same coin," together evaluating "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. Courts have termed the analysis the "economic valuation of the proposed settlement." *Erie County Retirees Ass'n v. County of Erie*, 192 F. Supp. 2d 369, 376 (W.D. Pa. 2002) (quoting *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 92 (D.N.J.

2001)).

In this case, Plaintiffs believe a jury could find Defendants committed the violations of law that Plaintiffs allege, and that the class suffered millions of dollars in damages. They key will be establishing causation, damages and liability. Joint Decl. ¶ 43. The proposed Settlement represents a significant recovery, particularly in light of the attendant risks of litigation. Even a cash settlement amounting to only a fraction of the potential recovery – which is not the case here – is not per se inadequate or unfair. *See, e.g., Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Particularly in cases seeking primarily monetary relief, a court should compare "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing'" with "'the amount of the proposed settlement.'" *GM Trucks*, 55 F.3d at 806 (quoting MANUAL FOR COMPLEX LITIGATION 2d § 30.44). Thus, a "class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors, such as the risk of no recovery." *In re Remeron Direct Purchaser Antitrust Litig.*, Civil No. 03-0085 (FSH), 2005 U.S. Dist. LEXIS 27013, at *24 (D.N.J. Nov. 9, 2005); *Lenahan v. Sears, Roebuck Co.*, Civ. No. 02-0045, 2006 U.S. Dist. LEXIS 60307, at *48 (D.N.J. July 24, 2006) (citing *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 628 (9th Cir. 1982) ("[T]here is no reason, at least in theory why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery").

Here, the Settlement allows Class Members to obtain up to 100% of their economic damages. And, in addition to this extraordinary result, Class Members avoid all litigation risk and obtain payment after submitting a valid claim. The Settlement stands out as one *above* the range of reasonableness because it presents a certain payment of up to a 100% cash recovery of economic damages, which is quite obviously preferable to the very real possibility of a smaller

recovery (or no recovery at all). Joint Decl. ¶ 44. *See, e.g., Varacallo*, 226 F.R.D. at 240 (holding that the last two *Girsh* factors were satisfied, in part, because it was doubtful individual recoveries would exceed that provided by a settlement that provided *up to complete monetary relief*).

### a. The Settlement is Far More Generous Than The Only Other Settlement Arising From A Pet Food Recall

The reasonableness of the Settlement is also demonstrably clear when comparing it to the only other settlement of class action litigation involving pet food contamination, *Bass v. Schell & Kampeter, Inc.*, No. 3:05-cv-586 (E.D. Tenn. Apr. 16, 2008) (hereinafter "*Bass* Final Judgment"). The proposed Settlement is far more generous in the amount and categories of relief provided to pet owners.

Following a recall of Diamond Pet Food products in December 2005, class members in *Bass* alleged that the products were contaminated with aflatoxin. Class members asserted claims against Diamond Pet Foods for breach of warranties, negligence and violations of state unfair or deceptive business practices statutes. Aside from the difference in the face amount of the settlement – the settlement fund in *Bass* was only $3.1 million – the terms of the proposed Settlement here are far more substantial than the settlement in *Bass* in several respects.

First, with respect to the cost of a deceased pet, the Settlement provides recovery for the fair market value or cost, whichever is higher, of the deceased pet, or the reasonable purchase price for a new pet. In *Bass*, the *maximum* recovery for a deceased pet of a mixed breed or non-officially recognized breed was a mere $200, and recovery for a purebred was *capped* at $1,000. *Bass* Final Judgment at 4-5, 12. By contrast, this Settlement does not cap recovery for replacement of a pet.

Second, this Settlement permits recovery for necropsy, euthanasia, burial, cremation "or a combination thereof." However, in *Bass*, such death-related expenses were expressly excluded from the settlement, as the settlement did not provide compensation for "the costs of burial or cremation." *Bass* Final Judgment at 5.

Third, this Settlement provides compensation for property damages, transportation, lost time from work and other costs. The settlement in *Bass* provides no such recovery.

Fourth, the Settlement permits full recovery for all veterinary bills related to the diagnosis and treatment of injuries related to the consumption of Recalled Pet Food Products. The settlement in *Bass* included similar recovery, but capped recovery at $200 for pets that tested negative for aflatoxin-related problems, and imposed a maximum recovery of $1,000 for pets that were treated for aflatoxin-related symptoms. *Bass* Final Judgment at 10-11.

A comparison to the *Bass* settlement confirms that the proposed Settlement not only exceeds the standard for a reasonable, fair and adequate settlement, but that it stands alone without any precedent. Plaintiffs are not aware of any other settlement of litigation of this type that approaches the significant benefits achieved here. This Settlement provides certain, immediate and extraordinary benefits to the class while avoiding the risks, weaknesses and uncertainties of this litigation. In sum, each of the *Girsh* factors is fully satisfied and the Settlement warrants final approval by this Court.

## IV. CLASS COUNSEL BELIEVES THIS SETTLEMENT IS IN THE BEST INTEREST OF THE CLASS

Many courts give significant weight to whether experienced class counsel approves of the Settlement. *See, e.g.*, *Varacallo*, 226 F.R.D. at 240 ("Class Counsel's approval of the Settlement also weighs in favor of the Settlement's fairness.") (citing *Prudential*, 962 F. Supp. at 543); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed 'to the belief of experienced counsel that settlement is in the best interest of the class.'") (quoting *Austin v. Penn. Dep't of Corrs.*, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995)); *Seidman v. Am. Mobile Sys.*, 965 F. Supp. 612, 618-19 (E.D. Pa. 1997); *Pozzi v. Smith, et al.*, 952 F. Supp. 218, 222 (E.D. Pa. 1997); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (indicating that the "assessing a settlement proposal requires the district court to balance" several factors including the "experience and views of counsel"); *Perez v. Asurion Corp., et al.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) ("A district court properly considers

the judgment of experienced counsel when asked to approve a class action settlement.") (citation omitted).

As mentioned above, Co-Lead Counsel are among the most experienced and well-respected counsel in the nation. Co-Lead Counsel have been intensely involved in every aspect of this case, from the time the initial complaints were filed in this litigation to negotiating the terms of its settlement. Joint Decl. ¶¶ 46-48. As the case progressed, Co-Lead Counsel developed an acute understanding of the strengths and weaknesses of plaintiffs' claims, as well as defendants' defenses to those claims. *Id.* Consequently, Co-Lead Counsel are well-positioned to assess the benefits of this Settlement in light of the risks, delay and expenses of continued litigation, including class certification proceedings and summary judgment, trial, post-trial motion, and inevitable appeals. *Id.*

Co-Lead Counsel firmly believe that the compromise embodied in the Settlement represents a significant achievement and beneficial resolution of this highly complex litigation. The benefits achieved for Class Members are both rare and extraordinary. As such, Co-Lead Counsel strongly recommend that the Court approve the Settlement. Joint Decl. ¶ 48.

## V. THE OBJECTIONS SHOULD BE OVERRULED

A number of different communications have been sent to the Court and counsel regarding the Settlement. When sorted out, it appears that a total of 28 written objections have been submitted. Some of them contest the fact that Settlement does not provide for criminal penalties or is not punitive enough, and that stricter testing and screening measures should be implemented throughout the pet food industry. Still other pet owners express frustration over the lack of emotional distress damages and that future expenses cannot be recovered. Indeed, one pet owner wrote,

> The unbearable thoughts and memories of the sickness and passing of our companions have left us with mental, physical, and emotional damage that will never surpass [*sic*]. . . . These companies fully deceived the public with cruel intensions [*sic*]. I ask that you view these crimes with criminal prosecution to the fullest extent by law.

Elliot Letter at 1-2. [Dkt. No. 213].

Unfortunately, the scope of the litigation, current state of the law and the potential for speculative or fraudulent claims prevent this Settlement from being one that can fully satisfy all pet owners. Indeed, a settlement is fundamentally a compromise and cannot encompass the highest hopes of any of party. *See, e.g., GM Trucks*, 55 F.3d at 806. Objections relating to emotional distress and future expense damages will be addressed in detail below. Other objections are addressed by provisions contained in the Settlement.

### A.    Objections Regarding the Lack of Criminal Liability and Punitive Measures in the Settlement

With regard to letters that express frustration that the Settlement does not contain criminal charges against the Defendants, criminal prosecution has never been a component of this litigation. To the extent pet owners simply believe that the Settlement is not "punitive" enough,[33] the agreement reached with the Defendants was negotiated with the primary objective of providing the greatest relief possible to Class Members, which it accomplishes. As described above, the financial viability of Menu Foods, a major defendant in the litigation, was uncertain throughout settlement negotiations. Consequently, the upper limits of damages were unclear and pursuing greater damages without compromise could very well have jeopardized the relief the putative class could have obtained. Furthermore, one could hardly expect the defendants, who still deny liability, to accept additional punitive measures as part of the overall resolution. This is not a criminal proceeding, but a civil one. Plaintiffs achieved the maximum financial consideration they could through this Settlement.

### B.    Objections Regarding Testing and Regulatory Enforcement

In addition, some letters suggest that the Settlement does not adequately enhance pet food

---

[33] *See, e.g.*, Keating Objection [Dkt. No. 183] ("I further fell [*sic*] that the criminal neglect that caused the death of my beloved Pet requires punitive action.").

inspection standards or regulations, nor require enforcement of existing food safety regulations.[34] However, as part of this Settlement, Defendants that manufactured the Recalled Pet Food Products have agreed to administer their Quality Assurance Programs ("QAPs") to address the very dangers that led to this litigation, *i.e.*, they now regularly test shipments of raw wheat gluten and rice protein concentrate imported from China for the presence of melamine and cyanuric acid and will continue such testing throughout the following year, until May 30, 2009. Settlement Agreement § VI.A. In addition, this particular Settlement and litigation are inappropriate vehicles for enforcing existing statutes and regulations governing the pet food industry. Rather, such regulations are primarily under the purview of Congress and the FDA, which were not parties to the litigation.

### C. Objections Regarding the Inadequacy of Notice

Two letters submitted by pet owners seem to address the adequacy of notice, suggesting they were unaware of the Settlement or unable to obtain information about the Settlement. This is a curious objection, as both pet owners knew enough to timely comment on the Settlement and still have time under the Settlement Agreement in which to make a claim. Neither pet owner complains that they missed any deadline. Their submissions simply belie the content of their objections.

Moreover, the Claims Administrator has fully complied with the Notice Program approved by this Court. Sincavage Decl. ¶ 2. The Notice Program was comprehensive and reached an expansive audience, with notice of the Settlement published in some of the most widely-read publications in the United States and Canada. This litigation and its Settlement were also extensively covered in the media. Several national and international news articles reported the details of the Settlement and referred readers to the Settlement website and the toll-free

---

[34] *See, e.g.*, Carrington Letter [Dkt No. 180] ("I joined this lawsuit in hopes that Menu Foods would be held accountable for . . . stricter testing and laws governing what is going into our pets' food, . . . .").

telephone number for the Claims Administrator.[35]  In addition, Notice was directly provided to pet owners who were paid as part of a Historic Payment program, individuals who previously submitted claim forms to Crawford & Company and whose names and addresses are in a readily accessible database, the persons who were the subject of this Court's Order to Show Cause dated August 28, 2007, and clients of various plaintiffs' counsel, as well as national veterinary organizations, including the AVMA and the Canadian Veterinary Medical Association.  Finally, Plaintiffs' Co-Lead Counsel promptly referred these two letters to the Claims Administrator for individual treatment in time for the pet owners to make a claim.

### D.  Objections Regarding Emotional Distress Damages

Pet owners have expressed frustration that this Settlement does not provide compensation for pain and suffering related to the loss of a pet or recognize pets as being more than property. Plaintiffs' Co-Lead Counsel understand these sentiments and anticipated them early in the litigation.  Plaintiffs' Co-Lead Counsel brought claims involving emotional distress and special value damages in the first few weeks after the Recall was announced.  However, counsel knew that success on these claims on a nationwide basis would require an extension of existing law, as the statutes and court decisions in the fifty states provide, with few exceptions, that such damages are generally unavailable for the loss of a pet.

For example, in *Konaurov v. Kerdasha*, 271 Va. 646 (Va. 2006), the Virginia Supreme Court indicated that the only type of damages available for injuries to a pet are economic damages.  *Id.* at 657.  The Court acknowledged that "It is beyond debate that animals, particularly dogs and cats, when kept as pets and companions, occupy a position in human affections . . . ."  *Id.*  However, the court held that "[t]he fact remains, however, that the law in Virginia, *as in most states that have decided this question*, regards animals, however beloved, as

---

[35] *See, e.g.*, Julie Schmit, *Pet-food recall leads to 6,000 claims and counting*, USA TODAY, Aug. 27, 2008, *available at* http://www.usatoday.com/money/industries/manufacturing/2008-08-25-pet-food-recall_N.htm; Reuters.com, *Menu Foods Income Fund:  Settlement Agreement in U.S. Pet Food Multi-District Litigation Receives Preliminary Approval*, May 30, 2008, *at* http://www.reuters.com/article/pressRelease/idUS202417+30-May-2008+MW20080530.

personal property." *Id.* (emphasis added). The court also indicated that allowing recovery of emotional distress damages for the injury or death of a pet would constitute a "sweeping change in the law of damages, a subject properly left to legislative consideration." *Id.* The *Konaurov* opinion cites to a number of other state court decisions that support the proposition that emotional distress damages are unavailable for the loss of a pet, including *Harabes v. Barkery, Inc.*, 348 N.J. Super. 366 (N.J. Super. Ct. App. Div. 2001), *Fowler v. Town of Ticonderoga*, 516 N.Y.S.2d 368 (N.Y. App. Div. 1987), and *Strawser v. Wright*, 80 Ohio App. 3d 751 (Ohio Ct. App. 1992). *Konaurov*, 271 Va. at 657 n.4 (describing decisions in nearly 20 jurisdictions where pets are considered personal property and where emotional distress damages are unavailable for the loss of a pet).

The Virginia Supreme Court also stated that in the rare instances where jurisdictions do provide emotional distress damages for the loss of a pet, such damages are only awarded in "cases of animals injured or killed by willful, intentional, or outrageous torts." *Id.* (citing *La Porte v. Associated Indeps., Inc.*, 163 So. 2d 267 (Fla. 1964); *Gill v. Brown*, 107 Idaho 1137 (Idaho Ct. App. 1985); *Burgess v. Taylor*, 44 S.W.3d 806 (Ky. Ct. App. 2001); and *Brown v. Crocker*, 139 So. 2d 779 (La. Ct. App. 1962)). However, willful and intentional conduct is not readily apparent in this litigation.

In addition, Co-Lead Counsel tracked legislation in several states to determine whether the relevant legal landscape was beginning to shift. For instance, Plaintiffs' Co-Lead Counsel researched A.B. 4217, a bill introduced in the New Jersey State Legislature that would, in part, provide noneconomic damages for the loss of a pet. "If the bill were enacted, New Jersey would join Illinois and Tennessee as the only states allowing such lawsuits, in limited circumstances." R. Scott Nolen, *Lawmakers target manufacturers, producers and distributors*, J. Am. Veterinary Med. Ass'n, July 15, 2007, *available at* http://www.avma.org/onlnews/javma/jul07/070715a.asp. The legislation is still pending in the Assembly.

With regard to the two states that currently do provide for emotional distress damages, Plaintiffs' Co-Lead Counsel were mindful of their fiduciary obligation to seek the best result

possible for the nationwide Class as a whole, without favoritism to any particular class members. *See, e.g., McClendon v. Cont'l Group*, 802 F. Supp. 1216, 1218 (D.N.J. 1992) (considering, in part, the interests of the class as a whole in determining whether to approve the proposed settlement); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (granting final approval of the settlement, in part, because the settlement was in the interest of the class as a whole).

Taking into consideration the type of conduct at issue here, as well as the risks related to causation and class certification discussed above, the Settlement achieves maximum economic relief for the class in its entirety. Indeed, given Menu Foods' precarious financial condition and the risks and expense attendant to full-blown litigation, Plaintiffs' Co-Lead Counsel believe the Settlement would warrant approval even if emotional distress damages *were* available nationwide.

The fact is, however, that current law rarely provides for noneconomic damages for the loss of a pet. While Co-Lead Counsel understand the frustrations pet owners feel over this issue, they are also constrained by existing statutes and case law from advocating for noneconomic damages on behalf of pet owners.

E.    **Objections Regarding Payment of Future Expenses**

Several pet owners have also voiced their objection that the Settlement does not provide reimbursement for ongoing or future expenses. The Settlement Agreement states that: "Settlement class members have the ability to recover up to 100% of the reasonable economic damages they *incurred* due to the illness or injury of their pets . . . " Settlement Agreement § V (emphasis added). The claim form also indicates that "eligible payments" include reimbursement for "'economic damage' that you *incurred* . . . ." Claim Form at 2 (emphasis added). The Settlement contemplates reimbursing pet owners for those economic damages already sustained, not those arising in the future.

Future expenses beyond November 24, 2008 are excluded because such expenses would be highly speculative, incapable of reasonable determination absent expert actuarial analysis, and

potentially require prolonged involvement by the Claims Administrator and the Court. For example, reimbursement for future expenses would require estimates of a pet's life expectancy, a determination of whether a pet's renal condition is improving or deteriorating and an analysis of the costs associated with treating the pet's renal condition over the course of the pet's life. It would also be difficult to limit treatment costs where a pet's existing renal condition may be complicated or worsened by other factors, such as compounding diseases or other health issues. The Claims Administrator, who is not an actuary, does not have the ability to make these determinations. Such conjectural damages would be difficult to contain and, if allowed under the current Settlement, could require expert treatment that would consume portions of the fund otherwise allocable to concrete, determinable expenses already incurred by pet owners.

Moreover, recovery for further expenses would expose the claims process to potential exaggeration and fraud. Although Co-Lead Counsel does not believe that fraudulent claims would be common, the difficulty of verifying such claims and the inability to predict future expenses with accuracy would make the Settlement vulnerable to abuse.

Co-Lead Counsel are sensitive to the ongoing expenses pet owners will face in continuing to care for their pets. However, reimbursement for such expenses beyond the claims period would undermine its administration and potentially reduce payments for identifiable damages that pet owners have already suffered.[36]

**F.    Objections Filed By Counsel**

Three other objections were filed by attorneys not previously participating in this case. One of these objections, filed by Jeffrey Weinstein on behalf of Jim Johnson and Dustin Turner ("the Weinstein Objection"), is an objection submitted by a professional objector. The Weinstein Objection constitutes a "cut and paste" objection and was filed for questionable motives. The other two objections – one filed by Blumenthal & Nordehaug ("the Kaffer/Picus

---

[36] Individuals who wished to pursue future expenses were free to opt out of the Settlement, and individuals who had contacted the Claim Administrator regarding future expenses or submitted claims seeking or referring to them were provided an extended opportunity to do so. *See* [Dkt. No. 210].

Objection") and the other by Keegan & Baker, LLP (the Blaszkowski Objection") – are also unfounded in that they misapprehend the scope of the release. In addition, the Kaffer/Picus Objection incorrectly argues that Co-Lead Counsel and putative Class Representatives are inadequate to represent the Class and that the $250,000 allocated in the Settlement for purchases of Recalled Pet Food Products is insufficient.

### 1. Weinstein Objection

The objection filed by Messrs. Jeffrey Weinstein and Robert Margulies on behalf of Jim Johnson and Dustin Turner are separately addressed in the accompanying Plaintiffs' Co-Lead Counsel's Response to Objection Filed By Jeffrey L. Weinstein and Robert E. Margulies, filed concurrently herewith.

### 2. The Objections to the Scope of the Release are Meritless

Two groups of individuals who pursued, or claim an interest in, separate lawsuits outside the Pet Food Recall MDL – Picus and Kaffer ("the Kaffer/Picus Objectors") and six *Blaszkowski* plaintiffs (collectively, the "Blaszkowski Objectors") – object to the Settlement Agreement based on a distortion of the Release. These objections misread the scope of the Release in two critical ways: (1) they ignore the Release's relevant time period (which is limited to the period affected by the Recall beginning in March 2007) and (2) they ignore the fact that the Release is limited to certain relevant pet food products (which are limited to Recalled Pet Food Products; *i.e.*, only those specific pet food products that were recalled in or after March 2007 because of alleged contamination with melamine and/or cyanuric acid). Based on these mischaracterizations, the Kaffer/Picus and Blaszkowski Objectors argue that the Release is impermissibly overbroad and encompasses claims that have nothing to do with the Pet Food Recall Litigation. But the fact is, the express terms of the Release are consistent with black letter law on federal class action releases and limits Released Claims to claims based on "facts, acts, events . . . or other matters referenced in any claim raised . . . in the Pet Food Recall Litigation." Settlement Agreement, § III.A. Accordingly, this Court should reject the objections based on the scope of the Release.

### a. The Scope of the Release is Appropriate

In light of the substantial commitments made by each side as part of the Settlement Agreement, the parties agreed that it was "an essential element of the Agreement" that the Released Entities obtain "the fullest possible release from further liability to anyone relating to the Released Claims," and that the parties intended "that the Agreement eliminate all further risk and liability of the Released Entities relating to the Released Claims." Settlement Agreement, § III.C. The Release accordingly encompasses all claims "that have been brought or could have been brought, are currently pending or were pending or are ever brought in the future . . . whether known or unknown, asserted or unasserted, under or pursuant to any statute, regulation, common law or equity, that relate in any way, directly or indirectly, to facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances, or other matters referenced in any claim raised . . . in the Pet Food Recall Litigation." *Id.*, § III.A.

There can be no dispute that the scope of the Release is fair, appropriate and consistent with established law that class action settlement releases may include all claims, including unpleaded claims, that arise out of, or are related to, the allegations at issue in the litigation. *See Prudential II*, 148 F.3d at 326 ("releases may include all claims, including unpleaded claims that arise out of the same conduct alleged in the case"); *Varacallo*, 226 F.R.D. at 244 ("in class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint."). *See also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (class action settlement may bar the assertion of claims "relating to any conduct that was alleged in the [class action] complaint or was, or could have been, asserted in [the class action] litigation"). Indeed, the Release's operative phrases – *e.g.*, "related to," "referenced in," and "were or could have been asserted in" – are consistent with release language approved in this Circuit and elsewhere. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 367 (3d Cir. 2001) (affirming settlement where release encompassed "[a]ll causes of action, claims . . . or rights, of any kind . . . that have been, could have been, may be or could be alleged or asserted now or in the future . . . on the basis of, connected with, arising out of, or related to,

in whole or in part, the Released Transactions and servicing relating to the Released Transactions"); *Hanlon*, 150 F.3d at 1025 (approving release of claims "arising out of or related to" the claims certified for settlement "that were or could have been asserted by" the members of the settlement class); *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 221 ("a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason or in connection with any matter or fact set forth or referred to in' the complaint").

This rule that parties may enter into comprehensive settlements that "prevent relitigation of settled questions at the core of a class action" serves the important policy interest of encouraging swift and efficient settlements. If the rule were otherwise, and defendants in class actions were not able to secure global peace through a complete release of claims, they would have little incentive to settle. *See Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994); *In re Ins. Brokerage Antitrust Litig.*, Civ. No. 04-5184, 2007 WL 5422227, at *10 (D.N.J. Feb. 16, 2007).

### b. The Kaffer/Picus Objection Is Without Merit

The Kaffer and Picus Objectors bring their objections through the same attorneys: Blumenthal & Nordehaug. Both Picus and Kaffer seek to intervene in this litigation to object to this Settlement and to conduct discovery here on matters relating to the Settlement and matters relevant to their non-MDL litigation.

Picus is the named plaintiff in a putative class action that expressly and purposefully *excludes the claims being settled in this action*. *See Picus v. Wal-Mart Stores, et al.*, Case No. 2:07-CV-00682- PMP-LRL ("*Picus*"), currently pending in the United States District Court for the District of Nevada. The *Picus* action alleges that Ol' Roy brand pet food sold by Wal-Mart Stores, Inc. was mislabeled as being "Made in the USA" because the pet food contained imported ingredients. *See Picus* Complaint at ¶¶ 1-10. Plaintiffs in *Picus* assert that such conduct was fraudulent, violated the federal standard for the designation "Made in the USA," and violated state deceptive and unfair business practices laws. *Id.* at ¶¶ 9, 12-16. After

vehemently objecting to the inclusion of her action in this MDL last year and facing a motion to deny class certification in her case, Picus amended her broad class definition to specifically exclude putative class members with claims in the Pet Food Recall MDL. *See* [*Picus*, Dkt. No. 56, 12/28/07 Amd. to Compl. The putative *Picus* class is defined as:

> **All individuals in the United States who purchased one or more Ol' Roy brand pet food products designated as made in USA prior to March 16, 2007** and beginning on the date to be discovered when the Ol' Roy brand pet food was first mislabeled as made in USA. Excluded from this class are those persons who have received a full refund of their purchases of Ol' Roy pet food and those persons who have asserted a legal action in MDL 1850 or otherwise claim injury to their pet as a result of consumption of Ol' Roy brand pet food.

*Id.* (emphasis added). Discovery in the *Picus* case is stayed pending the District Court's decision regarding class certification. *Picus*, Dkt. No. 55, Stipulation and Order.

Kaffer claims to be a former member of a putative class alleged in a case that has been dismissed and is under appeal entitled *Kennedy v. Natural Balance*, Case No. 07-CV-1082 (S.D. Cal.) ("*Kennedy*"). Like the *Picus* action, the *Kennedy* action alleged various causes of action against pet food manufacturer Natural Balance based on its alleged mislabeling of certain of pet food products containing imported ingredients as being "Made in the USA." *Kennedy* was brought on behalf of a putative class of "[a]ll individuals in the United States who purchased one or more of [four] Natural Balance brand pet food products labeled as 'Made in the USA' since May 3, 2003." *Kennedy* , Doc. No. 60, 6/12/2008 Order Denying Class Cert.[37]

The Kaffer/Picus Objectors contend that the Settlement impermissibly releases all of their "mislabeling" claims in the *Picus* and *Kennedy* actions, arguing that "the release in the MDL settlement applies to <u>all</u> [mislabeling] claims, even those . . . . [claims arising from] sales . . . which occurred years before the contamination," and "claims [arising from] mislabeled pet food that was not recalled." Not so. Even a cursory reading of the terms of the Settlement

---

[37] Kaffer was neither a named plaintiff in *Kennedy* nor an appointed representative of the class or any subclass. Because class certification was denied in *Kennedy*, Kaffer's rights are unaffected by that action. This renders *Kennedy* and any orders in that case (which Objectors note is currently on appeal) immaterial here.

Agreement demonstrates that the Release, both in terms of the time period and products involved, does not implicate the vast majority of their claims. In fact, only a small subset of those claims relating to Recalled Pet Food Products are affected by the Release.[38]

The Release applies only to claims by any "Settlement Class Member" that relate to "matters referenced in any claim raised . . . in the Pet Food Recall Litigation." *See* Settlement Agreement, § III.A. At its core, the Pet Food Recall Litigation involved claims based on recall-related events and Recalled Pet Food Products. *See id.*, Recitals. Members of the "Settlement Class" are "all persons and entities who purchased, used or obtained, or whose pets used or consumed Recalled Pet Food Product(s)" who have not opted out. *Id.*, § I.VV; §I.WW. Thus, by its terms, the Settlement Agreement does not extend beyond persons who purchased or whose pets consumed "Recalled Pet Food Product(s)," which is defined to mean:

> ***any pet food product*** and/or treat products or any ingredient thereof that were ***recalled by any Released Entity between March 16, 2007, and the present*** because of allegedly contaminated wheat gluten and/or rice protein concentrate, and purchased, obtained or used by, or were made available to, or intended to be purchased or obtained by Class Members in the United States or Canada, and are the subject of the Pet Food Recall Litigation.

*Id.*, § I.PP (emphasis added). The Recalled Pet Food Products are those identified on the List of Recalled Pet Food available from the Claims Administrator. Consequently, persons that did not purchase or whose pets did not consume Recalled Pet Food Products are not Settlement Class Members, and their claims are necessarily outside the scope of the Settlement Agreement.

Thus, contrary to the Kaffer/Picus Objections, this Settlement does not release those claims asserted in the *Picus* and *Kennedy* actions that have nothing to do with the Recall of certain products in March 2007. Picus' and Kaffer's claims are based on their alleged purchase of allegedly mislabeled products over a period of more than *four years*, beginning in April 2003 through 2007 or 2008. [Obj. at 5, 7]. Moreover, the *Picus* and *Kennedy* actions assert "Made in the USA" claims for various pet food products and varieties that were outside the scope of the

---

[38] *See Prudential II*, 148 F.3d at 326 (all claims, including unpleaded claims, based on conduct at issue in underlying litigation may be released by class action settlement).

pet food recalls (*i.e.*, all Ol' Roy products labeled "Made in USA," including unrecalled varieties). These claims have nothing to do with Recalled Pet Food Products, were not the subject of the Pet Food Recall MDL and are clearly are not released by the Settlement.

Statements by plaintiffs in both *Picus* and *Kennedy* reveal that they fully appreciate these differences between those actions and the Pet Food Recall MDL. See *Kennedy*, Dkt. No. 43, Pl. Mem. In Support of Class Cert. at 3 ("***Each of the products in this case that were sold between May 3, 2003 and March 16, 2007 are, therefore, not recalled products by definition. Consequently, a large portion of this class are not class members of the MDL Settlement Class***...") (emphasis added); J.P.M.L., *Picus*, Mot. to Vacate CTO, at 8 ("the Picus Action involves a much longer class period (at least four years) and a much larger class than the MDL cases"). In fact, Picus successfully objected to the transfer of her case to this MDL on this basis. JPML, Picus Opposition to Conditional Transfer Order (filed 7/13/07), at 5.[39] Likewise, in *Kennedy*, Kaffer's putative class representative acknowledged the temporal difference when he opted out of the settlement, noting that "I . . . do not believe that I am a member of the settlement class as my claims have been excluded from the MDL . . . I am pursuing my own litigation

---

[39] *See also id.* at 2 (objecting to transfer to the Pet Food Recall MDL because "the questions of fact in this case are very different from those in the MDL actions and ... the legal issues in this case are also very different" because the claims asserted in the Pet Food Recall MDL are "based on the contamination of specific lots of pet food sold by many companies during a six month period in 2006 and 2007" while Picus "addresses Defendants' misrepresentations during the entire class period beginning in 2003, four years prior to the filing of this action" and also noting that "this case is brought on behalf of a very different, and much broader, class of consumers based on a uniform statutory and common law claim under Nevada law"); JPML, Picus Mem. in Support of Mot. to Vacate CTO, at 2 (while the claims in the Pet Food Recall MDL are "based on the contamination of specific lots of pet food sold by many companies during a four month period between December 2006 and March 2007," *Picus*, "on the other hand[,] addresses Defendants' misrepresentations during the entire class period beginning in 2003, four years prior to the filing of this action"); *id.* at 5-6 ("in looking at the MDL complaints, the products at issue are limited to specific lots of certain products sold between December 2006 and March 2007 which were recalled" but "[i]n contrast, the Picus Action involves all products deceptively represented to have been 'Made in the USA,' irrespective of whether such products were recalled or not. Further, the Picus class includes all products sold as 'Made in the USA' from at least April 20, 2003 through March 16, 2007").

against Natural Balance *for a much larger period of time* than just the recall." *Kennedy*, Dkt. No. 54, Opt Out ltr. to Claims Administrator.[40]  Thus, contrary to Kaffer/Picus Objectors' *current* assertions, this Settlement simply does not release claims based on the alleged mislabeling of pet food as "Made in the USA" that do not relate to Recalled Pet Food Products.[41]

### c.  The Blaszkowski Objection is Without Merit

The Blaszkowksi Objectors were named plaintiffs in a putative class action in the United States District Court for the Southern District of Florida, *Blaszkowski, et al. v. Mars Inc., et al.*, Case No. 1:07-cv-21221-CMA, filed on May 9, 2007.  They bring their objection to the Settlement through the same class counsel that represented them in the *Blaszkowski* action.  In *Blaszkowski*, the plaintiffs alleged broad and amorphous claims against virtually the entire pet food industry (including manufacturers or retailers that were not named defendants in the Pet Food Recall Litigation), based on a broad range of pet food products (most of which are not Recalled Pet Food Products), over a four-year time period beginning in May 2003 (considerably before the period affected by the Recall).  Among other things, plaintiffs in the *Blaszkowski*

---

[40] The Kaffer/Picus Objectors reliance on the JPML's decision last year not to consolidate *Picus* in the Pet Food Recall MDL to support their argument that the Release reaches claims beyond those in this MDL is unavailing.  The JPML's decision was focused on whether consolidation would promote discovery efficiencies.  After the representations by Picus that her claims were much broader in time and scope than the Recall, the Panel ruled that "transfer of this action ...would not necessarily serve the convenience of the parties and witnesses or further the just and efficient conduct of this litigation."  JPML, 10/9/07 Order Vacating CTO.  It determined that Picus's allegations "will likely *require unique discovery* and other pretrial proceedings."  *Id.* (emphasis added).  The Panel's determination concerning the inefficiency of transferring *Picus* due to its unique discovery issues did not adjudicate or purport to decide the substantive limits of any legal claims in *Picus* or the Pet Food Recall MDL actions.

[41] In denying class certification, the *Kennedy* court found that because the putative class in *Kennedy* was alleged to have purchased Natural Balance products that were "Recalled Pet Food Products" under the Settlement -- and had not opted out of the MDL Settlement -- they were Settlement Class Members bound by this Court's Preliminary Approval Order.  Accordingly, the Court found, no class action could be maintained on their behalf.  *Kennedy*, Doc. No. 60, 6/12/2008 Order, at 4-5.  In addition, the court also found that the putative class in *Kennedy* could not be certified because the plaintiff in *Kennedy* failed to establish the commonality and typicality required by Rule 23.  *Id.*, at 7.

action alleged that the defendants' marketing of their pet food products as healthy, premium or human grade was false and misleading because such pet food product allegedly contained "non-edible garbage, by-products and waste that is unfit for human consumption." *See Blaszkowski* Complaint at ¶¶ 26-27. The definition of the proposed class in *Blaszkowski* is broad and dissimilar to the Settlement Class sought here:

> All persons in the United States who have purchased pet food produced, manufactured, advertised, marketed, distributed and/or sold by any of the Defendants that (a) was marketed as having certain ingredients or benefits to cats and dogs when the pet food either contained ingredients and/or additives and/or contaminants and/or other matter that were not represented in the Defendants' marketing and/or (b) fails to contain the promised benefits based upon scientific valid research studies.

*Id.* at *. While the Pet Food Recall was mentioned in the *Blaszkowski* complaint, it was not an express basis of any of the claims in that action. *Id.* at ¶ 103. No party sought to consolidate the *Blaszkowski* case with the Pet Food Recall MDL.

After litigating that case for over a year (and several months after this Court preliminarily approved the Settlement Agreement), the *Blaszkowski* plaintiffs' counsel sought to stay the action pending final approval the Settlement Agreement on the grounds that the Settlement, if approved, would release *all* claims asserted in the *Blaszkowski* action, including those plaintiffs' claims relating to non-Recalled Pet Food Products. The defendants in *Blaszkowski*, which include many of the same Defendants here, opposed the motion on the grounds that the Release was not as broad as plaintiffs argued and did not cover all of the claims asserted in the *Blaszkowski* action. The district court denied the stay motion on July 21, 2008. *See Blaszkowski*, Doc. No. 424. The *Blaszkowski* plaintiffs then brought a renewed motion for stay, again arguing that all of the claims in the *Blaszkowski* action would be released by the Settlement. The Florida court was unpersuaded by the *Blaszkowski* plaintiffs' argument and denied the renewed stay motion on July 31, 2008. Shortly thereafter, virtually all the *Blaszkowski* plaintiffs chose not to continue to litigate but to voluntarily dismiss their claims with prejudice against all but one defendant (Natura, a manufacturer that did not produce any Recalled Pet Food Products and is

not a defendant in the Pet Food Recall MDL before this Court). *See Blaszkowski*, Doc. Nos. 480-483, Sept. 11-12, 2008 (stipulations and orders of dismissal).[42]

In objecting to the Settlement, the Blaszkowski Objectors now rehash the same arguments they made in support of their two unsuccessful motions for a stay, contending that the Release impermissibly encompasses *all* claims asserted in the *Blaszkowski* action, including those claims that arose prior to the Recall period or that do not in any way relate to the Recalled Pet Food Products or other "matters referenced in any claim made in the Pet Food Recall Litigation." For the reasons explained above with respect to the Kaffer/Picus Objection, this argument is flatly wrong.[43] The Release is appropriately tailored to the factual predicate in the underlying litigation; if the Blaszkowski Objectors wished to pursue Released as well as non-Released claims in the *Blaszkowski* action, they could have opted out of the Settlement Class.[44] In sum, the Blaszkowski Objectors' blatant misreading of the Settlement Agreement has already been rejected by the Florida court. The Blaszkowski Objection is based on the same misreading and should also be rejected by this Court.

---

[42] Pending the Florida court's ruling on plaintiffs' motion to substitute a named plaintiff to pursue claims against Natura, only the claims of one plaintiff remain against manufacturer defendants other than Natura. All claims against the retailer defendants have been dismissed with prejudice.

[43] Moreover, the Blaszkowski Objectors contention that they are unable to ascertain whether they are "Settlement Class Members" that purchased "Recalled Pet Food Products" from "Released Entities" (*see* Blaszkowski Obj. at 4) is completely baseless. There are a number of sources of information from which they could determine which pet food products are "Recalled Pet Food Products," including the List of Recalled Pet Food Products which sets forth the manufacturer, product name and variety type and other information about the products. Indeed, they even appear to acknowledge the existence of that List in their objection, but can only complain that it was not part of the "Settlement Agreement itself." *Id.* at n.1. Moreover, their attorneys were able to ascertain that pet food manufacturer Natura did not produce Recalled Pet Food Products and was not "Released Entity" and, on that basis, continue prosecuting the *Blaszkowski* action against Natura in the Florida court.

[44] The *Blaszkowski* plaintiffs were aware of the MDL Release well before the opt-out deadline of August 15, 2008, as evidenced by their Motion to Stay, which was filed on July 18, 2008. As a tactical matter, they decided to use the Settlement of the Pet Food Recall MDL to attempt to obtain a stay in the *Blaszkowski* action, rather than opting out of the Settlement. Even after their request for a stay was denied not once but twice, the *Blaszkowski* plaintiffs still had an opportunity to opt out and declined to do so.

### 3. The Kaffer/Picus Objection Is Incorrect That The Class Is Inadequately Represented And That The Amount Allocated For Purchase Claims Is Insufficient

#### a. The Class Is Adequately Represented

The Kaffer/Picus Objectors take issue with the fact that the proposed Settlement Class includes both persons who merely purchased Recalled Pet Food Products, as well as those whose pets were injured as a result of the Recalled Pet Food Products. *See* Kaffer/Picus Obj. at 10-14. They argue that these groups have such divergent interests that could not be adequately represented by the same Plaintiffs' Co-Lead Counsel and putative Class Representatives. *Id.* Simply put, the Kaffer/Picus Objectors are wrong.[45]

As a preliminary matter, their objection ignores the fact that "mere purchasers," as referenced by the Kaffer/Picus Objectors, were actually and adequately represented in the settlement negotiations. The MDL Litigation was brought on behalf of both product purchasers and those whose pets consumed Recalled Pet Food Products. Thus, contrary to the Kaffer's and Picus' assertions, Co-Lead Counsel indeed was designated to represent the entire Settlement Class, including "mere purchasers."

Further, the putative Class Representatives were also purchasers of the Recalled Pet Food Products, and their interests in maximizing recovery of such damages for the purchase of such products were therefore aligned with the interests of "mere purchasers" in maximizing recovery for such product purchase claims. The fact that the putative Class Representatives also had other claims or injuries in addition to their product purchase claims is not sufficient to negate a finding of adequate representation because the basis for all of their claims is the same – the alleged contamination of the Recalled Pet Food Products. *See Prudential II*, 148 F.3d at 312 (where an action challenges a common wrong, the named plaintiffs suffering one specific injury from the

---

[45] The Kaffer/Picus Objectors also complain that the Settlement Class includes persons that purchased products other than the Recalled Pet Food Products. As discussed in § V.F.ii.2., this argument is incorrect.

practice can adequately represent a class whose members may also suffer other injuries); *In re Ikon Office Solutions*, 194 F.R.D. at 181 (refusing to disapprove settlement or settlement class based on fact that certain plaintiffs had also had other potential causes of action based on same course of conduct).

Moreover, the fact that that the Settlement Fund allocates different amounts to different types of claims, including purchase, healthy screenings and injury and death claims does not demonstrate any structural unfairness warranting separate representation for the holders of each of these claims. *See Petrvoic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) (almost every settlement will involve different awards for various class members; simply because some class members receive greater compensation than others does not mean there is a conflict of interest requiring creation of subclasses); *Prudential II*, 148 F.3d at 294-97 (noting that different claims were weighted according to strength and given different benefits accordingly); *Elkins v. Equitable Life Ins. Co. of Iowa*, No. Civ. A. 96-296-Civ.-T-17B, 1998 WL 133741, at *15 (M.D. Fla. Jan. 27, 1998) (stating that "nor is an impermissible class conflict or antagonism created by [a] settlement that compensates class members based on the strength of their claim rather than trading off theoretical subgroup's interests "to the benefit of any other theoretical subgroup"). Thus, any complaints the Kaffer/Picus Objectors have with the allocation of the Settlement Fund to product purchase claims goes to the fairness of the Settlement, rather than to adequacy of representation, and, as discussed below in § V.F.iii.2, the amount allocated for product purchase claims is fair and appropriate.

### i. Key Cases Relied Upon By Kaffer/Picus Objectors Are Not To The Contrary

None of the cases relied upon by the Kaffer/Picus Objectors in support of their adequacy of representation arguments requires this Court to find that the Settlement Class, as proposed, cannot be certified.

### 1. *Amchem*

The Kaffer/Picus Objectors rely on the Supreme Court's decision in *Amchem*, 521 U.S.

591, rejecting a class action settlement that is clearly distinguishable from the Settlement here. The Weinstein Objection relies on this decision as well. In *Amchem*, the Supreme Court found that the proposed settlement class failed in part because of disabling class conflicts between (1) those members already suffering from asbestos-related illnesses who sought generous, immediate payments and (2) those class members merely exposed to asbestos (including those who might not even have known they were exposed) who sought an inflation-protected fund from which they could recover in the future once their asbestos-related injuries manifested. *Amchem*, 521 U.S. at 526. Noting that the bulk of the settlement funds would be directed to those that had already been injured and that only a few claimants per year would be allowed to opt out at the back end of the agreement, the Supreme Court found that the settling parties "achieved a global compromise with no assurance of fair and adequate representation" for those putative class members who had only been exposed to asbestos and not yet harmed. *Id.* Accordingly, it reversed the district court's certification of the settlement class and disapproved of the proposed settlement. *Id.*

This case, by contrast, does not present the intractable intra-class conflicts at issue in *Amchem*. Here, the putative Class Representatives' interests in establishing liability of the Defendants and maximizing immediate recovery of damages were closely aligned with the rest of the Settlement Class. Unlike the latent injuries at issue in *Amchem*, the injuries allegedly suffered by the putative Class Representatives and the Settlement Class here have already occurred; are known (*i.e.*, Settlement Class Members can easily determine whether they bought a Recalled Pet Food Product); and are similar (*i.e.*, the purchase price of Recalled Pet Food Products, the costs of veterinary treatment, and other economic damages associated with their pet's consumption of Recalled Pet Food Products). Moreover, because there is no problem with unknown or latent injuries as there was in *Amchem*, members of the instant Settlement Class had a meaningful opportunity to opt out if they were dissatisfied with the compensation provided under the Settlement Agreement.

## 2. *Community Bank*

The Kaffer/Picus Objectors' reliance on the Third Circuit's decision in *In re Community Bank of N. Va.* ("*Community Bank*"), 418 F.3d 277 (3d Cir. 2005) is also unavailing. In that case, the Third Circuit remanded for further analysis the issue of whether a proposed settlement class met the adequacy of representation requirement. The Third Circuit found that the district court had not sufficiently considered class certification in light of the fact that certain class members appeared to have additional "colorable" claims for violations of TILA and the Home Ownership and Equity Protection Act (HOEPA), which were not pursued by class counsel either in the complaint or during negotiations. *Id.* at 304-05. Such claims potentially gave rise to additional damages far in excess of the reimbursement to which settlement class members would be entitled under the Settlement. *Id.* The court of appeals concluded that if the district court "determines that the TILA and HOEPA claims are viable, there *may* be serious questions whether the named plaintiffs' interests are sufficiently aligned with those of absent class members." *Id.* at 306 (emphasis added). In remanding the case to the district court, the court of appeals "emphasize[]d that we do not preclude the possibility that the adequacy of class representation can be established on more developed record." *Id.* at 308. Indeed, after determining that the TILA and HOEPA claims were not viable, the district court on remand found that the adequacy of representation requirement was met and re-certified the settlement class. *In re Community Bank of N. Va.*, No. 03-0425, 2008 WL 3833271 (W.D. Pa. Aug. 15, 2008).

No such conflicts exist here. In the course of litigation and settlement negotiations, Plaintiffs' Co-Lead Counsel sought to maximize damages for the purchase of Recalled Pet Food Products based on a number of causes of action set forth in the underlying litigation, including breach of warranty, consumer protection, false advertising and other causes of action potentially available to all Settlement Class Members. The addition of the "Made in the USA" theory of recovery therefore would have added nothing to Co-Lead Counsel's arsenal in negotiating maximum reimbursement for product purchase claims. Therefore, the viability of "Made in the

USA" causes of action with respect to the Recalled Pet Food Products raises no adequacy of representation issues precluding class certification or requiring the creation of subclasses.

**b. The Amount for Purchase Claims Is Reasonable, Fair and Adequate**

The allocation of $250,000 in the Settlement to claims for purchases of Recalled Pet Food Products is reasonable. The Recall involves a limited number of products manufactured over only a few months. Because the Settlement Agreement applies only to products recalled in or after March 2007, the contention by one objector that, after "extrapolat[ing] to a four year sales period," it applies to "more than $500 million of purchases" (by the so-called "purchase-only" group) is obviously false. Picus Objection at 14. Furthermore, the manufacturers and retailers have already provided compensation of over $8 million to purchasers of recalled products as part of the Recall. Settlement Agreement, § I.Z. Substantial additional amounts were provided as refunds or exchanges by retailers and manufacturers as part of the Recall, leaving few today who qualify for but have not received reimbursement. *See* Settlement Agreement, §I.Q (defining "Consumer Food Purchase Claims" as "claims solely for reimbursement of the costs associated with the purchase of a Recalled Pet Food Product by a Settlement Class Member who has not been reimbursed for such costs to date, including through return or exchange of the Recalled Pet Food Products") (emphasis added)). *See also* Preliminary Approval Order, at 12-13 ("Released Entities that have been reimbursing potential Class Members may continue to do so if necessary to complete claims and Released Entities also may encourage those persons to participate in the class settlement that is the subject of the Settlement Agreement.").

## VI. THE CLASS SHOULD BE CERTIFIED

A class action cannot be compromised or settled without the approval of the Court. FED. R. CIV. P. 23(e). Prior to addressing the adequacy of a proposed Settlement, the Court must determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement. *See Amchem*, 521 U.S. at 613. To receive certification, a proposed class must

satisfy a Federal Rule 23(a) and at least one Rule 23(b) prerequisite. *See, e.g., Warfarin*, 391

F.3d at 527; *Anco Indus. Diamond Corp. v. DB. Invs., Inc.*, Civ. No. 01-4463, slip op. (D.N.J.

Sept. 23, 2003) (Chesler, J.).

Class actions certified for the purposes of settlement are well recognized under Rule 23.

*See, e.g., Prudential*, 962 F. Supp. at 562. Class actions are an essential tool in adjudicating

complex claims for recoveries that may be too small to merit individual litigation. To that end,

when analyzing a motion to certify, "Rule 23(a) should be liberally construed in order not to

undermine the policies underlying the class action rule." *McAdams v. Mass. Mut. Life Ins. Co.*,

No 99-30284-FHF, 2002 U.S. Dist. LEXIS 9944, at *7 (D. Mass. May 15, 2002) (quoting

*Lessard v. Met. Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)). Consistent with this rule,

"when a court is in doubt as to whether to certify a class action, it should err in favor of allowing

a class." *Id.* at *8 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich.

2001); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice

require that in a doubtful case, any error, if there is to be one, should be committed in favor of

allowing a class action.").

The parties filed their Joint Motion for Preliminary Approval of the Settlement on May

22, 2008. This Court preliminarily certified the following Class for settlement purposes pursuant

to Rules 23(a) and 23(b)(3), which Co-Lead Counsel respectfully submit should be given final

approval:

> All persons and entities who purchased, used or obtained, or whose pets used or
> consumed Recalled Pet Foods Product(s), and excluding Defendants, Released
> Entities and the *Lum* Class.

The Settlement Class also will exclude those Settlement Class Members who have properly

opted out of the Settlement Class. As each of the requirements of FED. R. CIV. P. 23(a) and

23(b)(3) have been met, this Class should be certified for settlement purposes.

## A.     The Requirements of Fed. R. Civ. P. 23(a) are Satisfied

Under Rule 23(a), four threshold requirements must be met in all class actions: (1) the

class is so numerous that joinder of all members is impracticable; (2) there are questions of law

and fact common to the class; (3) the claims and defenses of the representative parties are typical

of the claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class. Rule 23(a); *see also Weiss v. York Hosp.*, 745 F.2d 786, 807 (3d

Cir. 1983).

In light of the proposed Settlement, as discussed below, Plaintiffs and the Class meet the

requirements of Rule 23(a), which are commonly referred to as numerosity, commonality,

typicality, and adequacy of representation. *See, e.g., Warfarin*, 391 F.3d at 527.

### 1. The Class is so Numerous that Joinder of All Members is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is

impracticable. Impracticability, however, does not mean impossibility. *See, e.g., Zinberg v.

Wash. Bancorp, Inc.*, 138 F.R.D. 397, 405 (D.N.J. 1990). The Third Circuit has found the

numerosity requirement satisfied where the proposed class consisted of "more than 90

geographically dispersed plaintiffs." *Eisenberg*, 766 F.2d at 785-86; *see also Welch v. Bd. of

Dirs. of Wildwood Golf Club*, 146 F.R.D. 131, 135 (W.D. Pa. 1993) (numerosity requirement

generally met if the proposed class exceeds 100 members).

In this case, the numerosity requirement is not in doubt. The proposed Settlement Class

includes thousands of consumers, which are geographically dispersed throughout the United

States and Canada. Indeed, approximately 9,357 class members have already submitted claim

forms to the Claims Administrator in this case. Accordingly, a class of this size makes joinder of

all members impracticable.

### 2. Questions of Law and Fact are Common to the Members of the Classes

Rule 23(a)(2) provides that a suit may be maintained as a class action if "there

are questions of law or fact common to the class." Rule 23(a)(2). Rule 23 does not require that

all members of the class be identically situated, so long as there are substantial common

questions of either law or fact. *See, e.g., Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988). In

fact, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). The Third Circuit has further held that "[c]ommonality does not require an identity of claims or facts among class members." *In re Brokerage Antitrust Litig.*, No. No. 04-5184 (GEB), 2007 U.S. Dist. LEXIS 65037, at *61 (D.N.J. Sept. 4, 2007) (citation and internal punctuation omitted). As satisfaction of this requirement necessitates nothing more than the mere presence of a single common issue, it is considered to be "easily met." *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 474 (E.D. Pa. 1997) (quoting *Weiss*, 745 F.2d at 808)).

In this matter, the commonality requirement is easily satisfied because common questions of law and fact exist concerning recalled pet food. *See, e.g., Perry*, 229 F.R.D. at 112 (holding the commonality requirement satisfied where the defendant allegedly "treated the class members in a standardized fashion"). Among the questions of law and fact common to the Class are:

(i)     Whether Defendants intentionally, recklessly or negligently authorized injurious pet food to enter the market;

(ii)    Whether Defendants failed to properly test their "cuts and gravy" style dog and cat food before market entry of such food;

(iii)   Whether Defendants intentionally, recklessly or negligently delayed instituting a recall of its "cuts and gravy" style dog and cat food;

(iv)    Whether Defendants' recall was adequate and properly notifies potentially affected consumers;

(v)     Whether Defendants' conduct constituted unlawful, unfair, or fraudulent business practices in violation of state consumer protection laws;

(vi)    Whether Defendants have been unjustly enriched as a result of their conduct;

(vii)   Whether members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages; and

(viii)  Whether the contaminated pet food injured dogs and cats.

Thus, since the claims of all Class Members arise from the same nucleus of operative facts and are pursuant to the same legal theories, commonality is satisfied. Furthermore, no objections concerning the satisfaction of this requirement have been made.

### 3. Plaintiffs' Claims are Typical of the Classes' Claims

Rule 23(a)(3) requires that "the claims ... of the representative parties [be] typical of the claims ... of the class." Rule 23(a)(3). The typicality requirement is satisfied as long as Representative Plaintiffs and the Class "point to the same broad course of alleged fraudulent conduct to support a claim for relief." *Zinberg*, 138 F.R.D. at 407. The Third Circuit has stated:

> Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'

*Hassine v. Jeffes*, 846 F. 2d 169, 177 (3d Cir. 1988). In addition, factual differences between the class representatives and other members of the class do not preclude a finding of typicality. *See, e.g., Varacallo*, 226 F.R.D. at 232.

Here, the claims of the class representatives are aligned with those of the class members. Plaintiffs' claims, as well as those of the Class, clearly arise out of the same conduct and core facts surrounding the Recall. It is evident that the interests of all Class Members are aligned. Therefore, the Plaintiffs' claims are typical of the Class' claims.

### 4. Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of the Classes

Rule 23 requires that the class representatives "will fairly and adequately protect the interests of the class." Rule 23(a)(4). The Third Circuit has held that the adequacy of representation is measured by two standards. First, the adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 651; *Prudential*, 148 F.3d at 308 (stating that "the key to *Amchem* appears to be the careful inquiry into the adequacy of representation"). Second, the

adequacy of representation inquiry "tests the qualifications of the counsel to represent the class." *GM Trucks*, 55 F.3d at 800.

Here, both prongs of the adequacy requirement of Rule 23(a)(4) are satisfied. First, there are no conflicts of interest between the Plaintiffs and the other members of the Class. As stated above, the representative Plaintiffs, like the other Class members, were damaged as a result of Defendants' allegedly unlawful conduct during the Class Period, and the Plaintiffs will have to prove the same wrongdoing as the absent Class members to establish Defendants' liability. Factual differences in the amount of damages, dates, size or manner of purchase, type of purchaser and other such variations will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class. *See, e.g.*, *Prudential*, 962 F. Supp. at 517. Quite simply, all Class Members share an overriding interest in obtaining substantial monetary and other relief. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (certifying settlement class and finding that "[t]here is no conflict between the class representatives and other class members. All share common goal of maximizing recovery."). Further, Plaintiffs have acted, and continue to act, as fiduciaries of the Class, and their interests are directly aligned with those of other members of the Class.

Second, Plaintiffs have retained attorneys who are highly qualified, experienced and able to conduct this litigation. As the Third Circuit has noted, the adequacy of the representation inquiry requires special attention for settlement classes. *See, e.g.*, *GM Trucks*, 55 F.3d at 801. As part of this inquiry, the Third Circuit considers whether counsel was highly competent and experienced class action attorneys, and had pursued the interests of the class vigorously.

Here, Co-Lead Counsel, consisting of Wexler Wallace LLP, Berger & Montague, P.C., Hagens Berman Sobol Shapiro LLP, Coughlin Stoia Geller Rudman & Robbins LLP, Audet & Partners LLP, and KamberEdelson, LLC, each have extensive histories of experience and success in complex class action litigation, and are among the most well-respected law firms in the plaintiffs' class action bar. *See* Joint Motion for Preliminary Approval of Class Action Settlement, Approval of Proposed Form of Notice, and Preliminary Certification of Class,

Exhibits 2-7 (individual Co-Lead Counsel firm biographies). [Dkt. No. 151]. The firms, individually and collectively, have dedicated substantial resources to this litigation and have aggressively pursued the interests of class members since its inception, as this Court has witnessed first-hand.

## B.     This Litigation Meets the Requirements of Fed. R. Civ. P. 23(b)( 3)

In addition to meeting the requirements of Rule 23(a), the Class also must satisfy Rule 23(b)( 3), which states:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . . (3) the court finds that the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)( 3) is satisfied in this action because (i) questions of law or fact common to the Class members predominate over any questions affecting only individual Class members, especially in light of the proposed Settlement, which eliminates any individual issues, and (ii) a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## 1.  Common Questions of Law and Fact Predominate

In determining whether common questions predominate, a court's inquiry is directed towards the issue of whether common questions predominate over individual issues. *See Prudential*, 962 F. Supp. at 510-11. Here, as set forth above, it is clear that for the purpose of certification of the Class for settlement, the same set of operative facts and a single proximate cause apply to each member of the Class. Each of the actions in this litigation concern consumers who purchased, used or obtained, or whose pets used or consumed, Recalled Pet Food Products. If Plaintiffs and Class members were to bring individual actions, they would each be required to prove the same wrongdoing by Defendants in order to establish liability. Therefore, common questions of law and fact predominate.

## 2. A Class Action is Superior to Numerous Individual Actions

Rule 23(b)( 3) sets forth certain factors that may be pertinent in considering whether a class action is a superior method by which to adjudicate a controversy. *See, e.g., In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D 180, 186 (D.N.J. 2003) ("The Rule sets forth a non-exhaustive list of factors to be weighed."). The Rule provides that these factors include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigations of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

*Id.* "As only a settlement class is at issue, the Court need not inquire into whether a class action would be manageable at trial." *In re AremisSoft Corp. Sec. Litig.*, 10 F.R.D. 109,122 (D.N.J. 2002). Moreover, "[f]or the purposes of settlement, concentrating litigation in one forum is desirable." *Varacallo*, 226 F.R.D. at 234.

A class action is superior to other available methods for the fair and efficient adjudication of this litigation within the meaning of Rule 23(b)(3) for the following reasons: (i) absent class action certification, the Court is faced with the potential burden of litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts alleged in each of the complaints comprising this MDL action; (ii) the resolution of common issues alleged in one action will both produce an efficient use of judicial resources and result in a single outcome that is binding on all Class Members; (iii) any administrative difficulties in handling potential individual issues under the class action device are less burdensome than the problems that are likely to arise in handling the same claims in numerous separate actions; and (iv) because of the expense of maintaining individual actions, denial of class certification here would effectively prevent certain individuals from asserting their claims against the Defendants. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (stating class action plaintiffs' claims were uneconomical to litigate individually); *Varacallo*, 226 F.R.D. at 234 ("Without question, class

adjudication of this matter will achieve an appreciable savings of effort, time and expense, and will promote uniformity of decision on the issues resolved and to which the parties will be bound.").

A class action settlement, with full opt-out rights, by contrast, will fully protect the interests of the Class. Those who wish to participate as unnamed Class Members may do so, while those who wish to pursue a private remedy may opt-out of the Class. The alternative to a class action leaves either no recourse for most of the Class, or the inefficient litigation of hundreds of individual actions, which will indisputably burden the judicial system. *See, e.g.*, *Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196, 209-10 (D.N.J. 2004) (when the alternative would involve "a great multiplicity of actions" which would result in re-litigation of same issues, prohibitive costs and preclude access to courts, class actions are superior); *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F. R. D. 255, 267 (D.N.J. 2002) (class actions are the most efficient and fairest method to resolve issues because individual adjudication would place an undue burden on the courts and parties). Accordingly, a class settlement is superior to other available methods for the fair and efficient adjudication of this controversy and the requirements of Rule 23( b)( 3) have been met.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs' Co-Lead Counsel respectfully request that the Court grant final approval of the proposed Settlement and grant final certification of the Settlement Class.

DATED:  October 3, 2008          Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By:     /s/ Lisa J. Rodriguez
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, New Jersey 08033
Telephone: (856) 795-9002
Facsimile: (856) 795-9887

*Liaison Counsel for Plaintiffs*

Kenneth A. Wexler
Mark J. Tamblyn
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222

Sherrie R. Savett
Russell D. Paul
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

William M. Audet
**AUDET & PARTNERS LLP**
221 Main Street, Suite 1460
San Francisco, California
Telephone: (415) 568-2555

Scott A. Kamber
Jay Edelson
**KAMBEREDELSON, LLC**
11 Broadway, 22nd Floor
New York, New York 10004
Telephone: (212) 920-3072

Stuart A. Davidson
**COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP**
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
Telephone: (561) 750-3000

Steve W. Berman
Jeniphr Breckenridge
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292

*Co-Lead Counsel for Plaintiffs*