**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: PET FOOD PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1850 (All Cases)<br><br>Civil Action No. 07-2867 (NLH)<br><br>**OPINION** |

## I.   INTRODUCTION

The Pet Food Products Liability Litigation involves litigation brought on behalf of consumers in the United States and Canada who purchased, or whose pets consumed, pet food and/or treat products that were recalled (the "Recall") because they allegedly contained contaminated wheat gluten and/or rice protein concentrate ("Recalled Pet Food Products").  The parties entered into a settlement agreement ("Settlement") that was preliminarily approved by this Court on May 30, 2008.  On October 14, 2008, the Court held a fairness hearing and heard argument on plaintiffs' motion to approve the Settlement and co-lead plaintiffs' counsels' motion for attorneys' fees.  The Court also heard argument on a motion to intervene in the Settlement and a separate motion for attorneys' fees filed by Newman, Creed & Associates.  For the reasons expressed below, the motion for Settlement and for attorneys' fees is granted, the motion to intervene is denied, and co-lead counsels' motion to strike the separate motion for attorneys' fees filed by Newman, Creed & Associates is granted.

## II.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

As described in the motion for Settlement, in March 2007, Menu Foods announced a recall of more than 50 brands of dog food and over 40 brands of cat food manufactured between November 8, 2006 and March 6, 2007.  Shortly thereafter, Hill's Pet Nutrition, Del Monte Pet Products, Nestlé Purina PetCare Co. and Sunshine Mills, Inc. also initiated recalls of their own pet food and treat products that may have been contaminated.  The Recall expanded and eventually covered approximately 180 brands of pet food and pet treats produced by twelve different manufacturers that were distributed, marketed and sold by dozens of retailers. The cause of the Recall was that wheat gluten and rice protein concentrate imported from China and supplied to multiple pet food manufacturers by ChemNutra, Inc. and Wilbur Ellis, appeared to have been contaminated.  It was discovered that these pet food ingredients were adulterated with both melamine and cyanuric acid, the combination of which can lead to acute renal failure in small animals if ingested.  The two Chinese supply companies — Xuzhou Anying Biologic Technology Development Co., Ltd. ("XAC") and Binzhou Futian Biological Technology — inserted melamine into wheat gluten and rice protein to boost their protein content to meet the protein levels required under industry standards.

On February 6, 2008, two Chinese companies — XAC and Suzhou Textiles, Silk, Light Industrial Products, Arts and Crafts — were indicted on "charges of intentionally defrauding and misleading American manufacturers about poisonous ingredients

2

used in pet foods." According to the indictment against XAC and its owner, "[w]hen the XAC-manufactured wheat gluten was exported to the United States it was deliberately labeled and coded so that the product would not be subject to" compulsory and mandatory inspection by Chinese food authorities. Altogether, defendants recalled over 60 million containers of pet food products.

Pet owners commenced over 100 class actions against pet food manufacturers, ingredient suppliers, distributors, repackagers and retailers. Plaintiffs brought claims on behalf of all persons who purchased, used or obtained, or whose pets consumed, any cat or dog food or treats that allegedly contained contaminated wheat gluten and/or rice protein concentrate. Each complaint alleged violations of state consumer protection and deceptive trade practice statutes, product liability, warranty and negligence claims. These class action cases were consolidated by the Judicial Panel on Multidistrict Litigation (the "Panel") and transferred to this Court.

Counsel then engaged in motion practice regarding communications with potential class members and also began negotiations on preserving evidence and spoilage issues, including consultation with and deposition of experts regarding the contaminated pet food. In September 2007, the parties commenced settlement negotiations, both independently and with Professor Eric D. Green of the dispute resolution firm Resolutions, LLC. Settlement negotiations continued for seven

months involving cross-country and cross-border negotiations
between the parties, including Canadian plaintiffs and their
counsel.  Negotiations included more than ten days of formal
mediation facilitated by Professor Green and many additional
hours of in-person and telephonic negotiations with
representatives of plaintiffs and over twenty defendants.

### A.    The Proposed Settlement

As stated in the motion to approve the Settlement, the
Settlement provides for a $24 million cash fund in addition to
the approximately $8 million in payments already paid to pet
owners by certain defendants or their insurers as a result of
reimbursement claims programs ("Historic Payments").  The
proposed Settlement provides reimbursement for reasonable
economic damages incurred.  The determination of what costs will
be reimbursed will be decided by a claims administrator who shall
consider various documentation to determine reimbursement
amounts.[1]  The Settlement contemplates economic damages that
could potentially be covered such as necropsy/autopsy,
euthanasia, cremation, burial/specialty services, costs of new

---

[1]  The Settlement provides examples of acceptable documents
such as veterinarian bills, veterinary records, cancelled checks,
receipts, credit card receipts, and/or credit card statements,
statements from veterinarians, AKC registrations or Cat Fancier's
Association Certificates, copies of product labels or other forms
of proof of purchase.

pets,[2] and healthy pet screenings.[3]  For economic expense claims that are unsupported by documentation, class members remain eligible for payment up to a maximum of $900 for the undocumented part of the claim.  Plaintiffs' co-lead counsel maintain that some of the potentially recoverable claims under the Settlement may not have been recoverable had this case gone to trial.

The payments described above will be subject to pro rata reduction if the total amount of valid claims exceeds the Settlement Fund, which sets aside certain amounts for product reimbursements and health screenings.  Of the $24 million, $250,000 is available for reimbursement of product purchases, and $400,000 is available for health screenings.  If the total value of claims for all other types of economic damages exceeds the amount of the Settlement Fund, the claims will be pro-rated based on the ratio of the claim to the total amount of claims for these other damages.  Also, a charitable distribution comprised of any funds remaining after the administration of the Settlement and payment of all valid claims will be timely made to animal welfare-related organizations in both the United States and Canada.

The Settlement also includes an agreement for the

---

[2]  Pet owners may be reimbursed for the fair market value of a deceased pet, including pets that were specially trained as service animals.

[3]  The Settlement allows claims on behalf of healthy pets that received veterinary attention and testing to ensure they were not harmed by Recalled Pet Food Products.

further testing of pet food ingredients.  Defendants that
manufactured the Recalled Pet Food Products agreed to continue to
administer their internal quality assurance programs to regularly
test shipments of raw wheat gluten and rice protein concentrate
imported from China for the presence of melamine and cyanuric
acid until May 30, 2009.

> **B.   Notice of Settlement**

After joint motion by the parties and after hearing on
the motion on May 22, 2008, the Court preliminarily approved the
Settlement by Order entered May 30, 2008.  The Court found that
the "proposed settlement is fair, reasonable and adequate and
that the proposed Settlement Class meets all of the applicable
requirements under Rule 23(a) and 23(b)(3) of the Federal Rules
of Civil Procedure."  The Order also approved the Notice Plan for
publishing class notice.  As stated in the motion for settlement,
notice was published extensively in newspapers, magazines and
periodicals throughout the United States and Canada.  Pet owners
who were paid as part of the Historic Payment programs received
direct individual notice, and long form notice was sent to the
American Veterinarian Medical Association.  As of September 30,
2008, a total of 28,955 notices were directly mailed to potential
class members, the Settlement website had received over 38,039
visits, and over 8,150 calls were placed to the toll-free
telephone number, of which over 4,607 callers received live
assistance.  In addition, the Settlement has been reported
nationally in print, television and internet media.

The class members are now before the Court and move to have the class certified for purposes of settlement and to have the settlement approved.  We first address whether the plaintiffs have met their burden under Rule 23 for class certification. Finding that class certification for settlement purposes is proper in this case, we then address the motion to intervene and the various objections to the settlement by class members. Concluding that the grounds for intervention and for objection lack merit, we then address whether the settlement should be approved by the Court pursuant to Rule 23(e).  Approving the settlement, we then turn to the motions to approve attorneys' fees and determine that plaintiffs' co-lead counsels' motion will be granted and the separate motion for attorney fees' filed by Newman, Creed & Associates will be stricken.

III.  **CLASS CERTIFICATION**

Federal Rule of Civil Procedure 23 governs the certification of class actions.  A party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met. See, e.g., Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  The legal requisites for class certification are: (1) under Rule 23(a), to satisfy all four requisites of numerosity, commonality, typicality, and appropriateness of class relief; (2) to fulfill at least one part of Rule 23(b); and (3) provide the Court with adequate information so that it can enter an Order defining the class and listing the claims, issues, or defenses subject to class

7

treatment pursuant to Rule 23(c)(1)(B).[4]  <u>Id.</u>; <u>Watchel v. Guardian Life Ins. Co.</u>, 453 F.3d 179, 184 (3d Cir. 2005).  Class actions certified for the purposes of settlement are well recognized under Rule 23.  <u>See</u> <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 962 F. Supp. 450, 508 (D.N.J. 1997) (stating that Rule 23 allows Court to certify class for settlement purposes only) (citing <u>In re General Motors Corp. Pick-Up Truck Fuel Tank</u>, 55 F.3d 768, 778 (3d Cir. 1995).  "A settlement class is 'a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification.'"  <u>Id.</u> (finding that a settlement class to be "an 'extremely valuable' device to dispose of major and complex class actions.").

The parties filed their joint motion for approval of the Settlement on May 22, 2008, and the Settlement was preliminarily approved by this Court by Order entered May 30, 2008.  This Court preliminarily certified the following class for settlement purposes pursuant to Rules 23(a) and 23(b)(3) ("Settlement Class"):

> All persons and entities who
> purchased, used or obtained, or

---

[4]  Rule 23(c)(1)(B) is easily satisfied in this matter as the class is certified for settlement purposes only and counsel have provided the Court with adequate information to define the class and list the claims, issues and defenses as discussed <u>infra</u>.

> whose pets used or consumed
> Recalled Pet Foods Product(s), and
> excluding Defendants, Released
> Entities and the Lum Class.

The Settlement Class excludes those members who properly opted out of the Settlement Class.  To determine whether this Class should be certified for settlement purposes, we address whether each element under Rule 23(a) and the requirements under Rule 23(b)(3) have been met.

### A.   **Rule 23(a)**

Under Rule 23(a), one or more of the plaintiffs may sue on behalf of all the members of the proposed class only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Baby Neal, 43 F.3d at 55.

### 1.   **Numerosity**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable.  The Third Circuit has ruled that the numerosity requirement is satisfied where the proposed class consists of "more than 90 geographically dispersed plaintiffs." Eisenberg v. Gagnon, 766 F.2d 770, 785-86 (3d Cir. 1985); see also Welch v. Bd. of Dirs. of Wildwood Golf Club, 146 F.R.D. 131, 135 (W.D. Pa. 1993) (finding numerosity met where proposed class exceeds 100 members).

Here, the proposed Settlement Class includes thousands of consumers that are geographically dispersed throughout the United States and Canada.  As of the end of September 2008, approximately 9,357 class members have submitted claim forms to the Claims Administrator in this case.  Thus, a class of this size makes joinder of all members impracticable and Rule 23(a)(1) is met.

### 2.   **Commonality**

The commonality prong of Rule 23(a) requires "questions of law or fact common to the class."  Fed.R.Civ.P. 23(a)(2).  This requirement is met if plaintiffs share "at least one question of fact or law with the grievances of the prospective class."  Baby Neal, 43 F.3d at 56.  This commonality requirement has been recognized as one that is easily met.  Id.  Also, class members can assert such a single common complaint if they demonstrate that all class members are subject to the same harm.  Id. (citing to Hassine v. Jeffes, 846 F.2d 169, 177-78 (3d Cir. 1988)).  The commonality prerequisite does not require that all members of the prospective class share identical claims.  Hassine, 846 F.2d at 176-77 (relying on Eisenberg, 766 F.2d at 786).  It requires only that the harm complained of be common to the class, not that plaintiffs are affected by the harm in the same way. Id. at 177; Baby Neal, 43 F.3d at 56 (rejecting the argument that the commonality requirement cannot be met because of individualized circumstances).

The particular questions of law and fact common to the

Class are:

(i) Whether defendants intentionally, recklessly or negligently authorized injurious pet food to enter the market;

(ii) Whether defendants failed to properly test their "cuts and gravy" style dog and cat food before market entry of such food;

(iii) Whether defendants intentionally, recklessly or negligently delayed instituting a recall of its "cuts and gravy" style dog and cat food;

(iv) Whether defendants' recall was adequate and properly notified potentially affected consumers;

(v) Whether defendants' conduct constituted unlawful, unfair, or fraudulent business practices in violation of state consumer protection laws;

(vi) Whether defendants have been unjustly enriched as a result of their conduct;

(vii) Whether members of the Class have sustained damages as a result of defendants' conduct, and, if so, the appropriate measure of damages; and

(viii) Whether the contaminated pet food injured dogs and cats.

Based on the above claims which arise from the same nucleus of operative facts and involve the same legal theories, the Court finds that the commonality prong under Rule 23(a)(2) is met.

### 3.    **Typicality**

It has been recognized that the requirements for commonality and typicality are broadly defined and tend to merge. See Baby Neal, 43 F.3d at 56.  Nevertheless, they are distinct requirements and we scrutinize them individually.  "The typicality inquiry is intended to assess whether the action can

be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Id.  "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Id.  Factual differences do not defeat typicality if "... the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Id., at 58.

In this case, the claims of the class representatives are aligned with those of the class members since the claims of the representatives arise out of the same conduct and core facts surrounding the Recall.  As such, the action can be efficiently maintained as a class and the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented. Therefore, the plaintiffs' claims are typical of the Class's claims and Rule 23(b)(3) is met.

### 4.    <u>**Adequacy of Representation**</u>

The final prerequisite under Rule 23(a) is a determination whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and

12

that there is no conflict between the individual's claims and those asserted on behalf of the class." Hassine, 846 F.2d 169 at 179 (citations omitted).  The two purposes for making such inquiry are: (1) the adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997); and (2) the adequacy of representation inquiry "tests the qualifications of the counsel to represent the class." In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768, 800 (3d Cir. 1995).

Here, the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent Class members to establish defendants' liability.  Thus, the representative plaintiffs' interests are directly aligned with those of other members of the Class.  In addition, plaintiffs have retained attorneys who are highly qualified, experienced and able to conduct this litigation.[5]  Thus, the Court finds that the requirements under Rule 23(a) have been met.

     **B.**     **Rule 23(b)(3)**

Plaintiffs state that they meet the requirements under Rule 23(b)(3) for class certification.  Under Rule 23(b)(3), the

---

[5] Co-Lead counsel consists of Wexler Wallace LLP, Berger & Montague, P.C., Hagens Berman Sobol Shapiro LLP, Coughlin Stoia Geller Rudman & Robbins LLP, Audet & Partners LLP, and KamberEdelson, LLC.  Each of these firms have extensive histories of experience in complex class action litigation, and are well-respected law firms in the plaintiffs' class action bar.

Court must determine whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is the superior method of adjudication. <u>See</u> Rule 23(b)(3); <u>Prudential</u>, 962 F. Supp. at 510-11.  To make this determination, the following factors are addressed:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Rule 23(b)(3); <u>see also</u> <u>In re Mercedes Benz Antitrust Litig.</u>, 213 F.R.D 180, 186 (D.N.J. 2003) (stating that "[t]he Rule sets forth a non-exhaustive list of factors to be weighed.").  Where, as in this case, the class certification is for purposes of settlement, "... the Court need not inquire into whether a class action would be manageable at trial." <u>In re AremisSoft Corp. Sec. Litig.</u>, 210 F.R.D. 109, 122 (D.N.J. 2002) (citing <u>In re Ikon Office Solutions, Inc., Sec. Litig.</u>, 194 F.R.D. 166, 178 n.14 (E.D.Pa. 2000); <u>Amchem Prods.</u>, 521 U.S. at 620.

For the purpose of certification of the Class for settlement, the same set of core operative facts and theory of proximate cause apply to each member of the class.  The actions

14

in this litigation concern consumers who purchased, used or obtained, or whose pets used or consumed, Recalled Pet Food Products.  If plaintiffs and potential class members were to bring individual actions, they would each be required to prove the same wrongdoing by defendants in order to establish liability.  Thus, common questions of law and fact predominate.

Also, a class action in this MDL is superior to other available methods for the fair and efficient adjudication of this litigation because absent class action certification, the Court may be faced with litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts.  By proceeding in a class action, the resolution of common issues alleged in one action will result in more efficient use of judicial resources and bring about a single outcome that is binding on all Class Members.  Also, a class action might allow certain individuals to participate who would otherwise be prevented from pursuing their claims because of the expense of maintaining individual actions.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) (concluding that it may be uneconomical to litigate class action plaintiffs' claims individually).

With regard to the four actors under Rule 23(b)(3), for those potential class members who were interested in individually controlling the prosecution or defense in a separate actions, they had the option to opt-out of this litigation and pursue their own claims individually.  With regard to the extent and

15

nature of any litigation concerning the controversy already begun by or against class members, cases involving allegations of contaminated pet food or recalled pet food merchandise were transferred as quickly as possible to this MDL last year before any substantive proceedings had occurred.  It is desirable to concentrate the litigation in this MDL and to have the plaintiffs operate as a class because of the common set of facts and claims that dominate this litigation for purposes of settlement.  And, finally, it would be administratively difficult to manage this litigation as individual claims rather than a class action due to the enormous number of plaintiffs.

Thus, the Court finds that Rule 23(b)(3) is satisfied in this action because questions of law or fact common to the class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  See In re Honeywell Intl Inc. Sec. Litig., 211 F. R. D. 255, 267 (D.N.J. 2002) (finding that class action to be fairest and most efficient means of resolving dispute given the size and geographical dispersion of the proposed class and likelihood that many purchasers sustained comparatively small losses and individual adjudication class members would place unnecessary burden on parties and courts).

## IV.  **MOTION TO INTERVENE/OBJECT**

Margaret Picus and Daniel Kaffer (collectively

16

"Proposed Intervenors")[6] filed a motion seeking leave to intervene on the ground that their interests were not adequately represented by the existing plaintiffs.  Proposed Intervenors allege that they purchased pet food that was falsely labeled as "Made in the United States" and have brought separate actions based on such mislabeling in California and Nevada state court. Proposed Intervenors' claims involve the mislabeling of pet food that was not contaminated and which was not recalled by defendants.  Proposed Intervenors argue that the Settlement is overly broad and purports to release their claims.  Proposed Intervenors also criticize the Settlement because only $250,000 out of the $24 million to be paid is allocated to pay product purchase claims.  Proposed Intervenors seek intervention to limit the scope of the Release to only the contaminated pet food products for which settlement consideration is being paid or, alternatively, to modify the settlement to include appropriate consideration for the release of the mislabeling claims for both the contaminated and non-contaminated pet food products.

---

[6] Margaret Picus is the named plaintiff in a putative class action pending in the United States District Court for the District of Nevada.  Picus v. Wal-Mart Stores, et al., Case No. 2:07-CV-00682-PMP-LRL.  The Picus has been stayed pending the Court's determination of class certification.  Daniel Kaffer states that he is a former member of a putative class in a case currently under appeal.  Kennedy v. Natural Balance, Case No. 07-CV-1082 (S.D. Cal.).  In both of these actions, the plaintiffs alleged various causes of action against pet food manufacturers based on their alleged mislabeling of certain of pet food products containing imported ingredients as being "Made in the USA."

As was discussed with counsel at the fairness hearing held on October 14, 2008, the Release is not as broad as Proposed Intervenors suggest. The Release applies only to claims by any "Settlement Class Member" that relate to "matters referenced in any claim raised . . . in the Pet Food Recall Litigation." Settlement Class Members are "all persons and entities who purchased, used or obtained, or whose pets used or consumed Recalled Pet Food Product(s)" who have not opted out. "Recalled Pet Food Product(s)," are defined as:

> Any pet food product and/or treat products or any ingredient thereof that were recalled by any Released Entity between March 16, 2007, and the present because of allegedly contaminated wheat gluten and/or rice protein concentrate, and purchased, obtained or used by, or were made available to, or intended to be purchased or obtained by Class Members in the United States or Canada, and are the subject of the Pet Food Recall Litigation.

The list of Recalled Pet Food is attached to the Court's Order approving the Settlement and lists all the manufacturers and products recalled. Consequently, persons that did not purchase or whose pets did not consume Recalled Pet Food Products are not Settlement Class Members, and their claims are outside the scope of the Settlement Agreement.

Picus's and Kaffer's claims are based on their alleged purchase of mislabeled products over a period of more than four years, beginning in April 2003 through 2007 or 2008, and their

18

lawsuits assert "Made in the USA" claims for various pet food products and varieties that were outside the scope of the pet food recalls (i.e., all Ol' Roy products labeled "Made in USA," including unrecalled varieties).  To the extent these claims relate to products other than the Recalled Pet Food Products, they are not the subject of this Pet Food Recall MDL.  Therefore, the Proposed Intervenors' claims in the state actions are not released by the Settlement and their motion to intervene will be denied.

The Proposed Intevenors also object to the Settlement on the ground that their interests as "mere purchasers," are not adequately represented by the Class representatives.  The Class representatives in this case were purchasers of pet food whose pets consumed the contaminated pet food.  Co-lead counsel asserts that they were designated to represent the entire Settlement Class, including "mere purchasers."  The Court does not find any conflict between the interests of the Proposed Intervenors and the Class representatives who purchased the Recalled Pet Food Products, as their interests in maximizing recovery of such damages for the purchase of such products are aligned with the interests of "mere purchasers" in maximizing recovery for such product purchase claims.

Finally, the Proposed Intervenors object to the Settlement on the ground that the allocation of $250,000 for purchases Recalled Pet Food Products is inadequate.  The Recall involves a defined number of products manufactured over only a

few months.  The Settlement Agreement applies only to products recalled in or after March 2007.  More importantly, it was represented to the Court during the fairness hearing by co-lead counsel and defense counsel - and it makes common sense - that manufacturers and retailers have already provided compensation to purchasers of recalled products through the Historical Payments or through point of sale refunds or a result of the Recall. Therefore, many purchasers of Recalled Pet Food Products have already compensated outside of the Settlement.  Therefore, the $250,000 amount allocated is adequate for payment for "Consumer Food Purchase Claims" defined as "claims solely for reimbursement of the costs associated with the purchase of a Recalled Pet Food Product by a Settlement Class Member who has not been reimbursed for such costs to date, including through return or exchange of the Recalled Pet Food Products."[7]

## V.   __BLASZKOWSKI OBJECTORS__

The Blaszkowksi Objectors were named plaintiffs in a putative class action in the United States District Court for the Southern District of Florida, __Blaszkowski, et al. v. Mars Inc., et al.__, Case No. 1:07-cv-21221-CMA, filed on May 9, 2007.  The __Blaszkowski__ case was not consolidated with this Pet Food Recall MDL.

---

[7]  During the fairness hearing, counsel for objectors Jim Jones and Dustin Turner appeared and also argued for removal of the $250,000 cap for reimbursement claims for owners whose pets suffered no injury.  For the reasons already discussed, the $250,000 is adequate and this objection is overruled.

In the Blaszkowski action, plaintiffs alleged that the defendants' marketing of their pet food products as healthy, premium or human grade was false and misleading because such pet food products allegedly contained "nonedible garbage, by-products and waste that is unfit for human consumption."

The proposed class in Blaszkowski is defined as follows:

> All persons in the United States who have purchased pet food produced, manufactured, advertised, marketed, distributed and/or sold by any of the Defendants that (a) was marketed as having certain ingredients or benefits to cats and dogs when the pet food either contained ingredients and/or additives and/or contaminants and/or other matter that were not represented in the Defendants' marketing and/or (b) fails to contain the promised benefits based upon scientific valid research studies.

The Blaszkowski Objectors contend that the Release in this MDL impermissibly encompasses all claims asserted in the Blaszkowski action.[8]  The Court is satisfied that the Release in

---

[8]  The Blaszowksi Objectors also made this argument in a motion to stay filed in the Florida action on the grounds that the Settlement in this MDL would release all claims asserted in the Blaszkowski action, including those plaintiffs' claims relating to non-Recalled Pet Food Products.  The District Court in Florida denied the stay motion on July 21, 2008.  The Blaszkowski plaintiffs filed a renewed motion for stay making the same arguments and the Florida Court denied the renewed stay motion on July 31, 2008.  Following this denial, many of the Blaszkowski plaintiffs voluntarily dismissed their claims with prejudice against all but one defendant (Natura, a manufacturer that did not produce any Recalled Pet Food Products and is not a

this MDL does not encompass all claims brought in the <u>Blaszkowski</u> action.  As discussed above regarding the motion to intervene, the Release only pertains to "Recalled Pet Food Product(s)."[9]

The Blaszkowski Objectors also object to the Settlement on the ground that they are unable to ascertain whether they are "Settlement Class Members" that purchased "Recalled Pet Food Products" from "Released Entities."  The List of Recalled Pet Food Products attached to this Court's Order approving the Settlement sets forth the manufacturer, product name and variety type and other information about the products in order for them to make such a determination.  It also appears that the remaining defendant in the <u>Blaszowski</u> action, pet food manufacturer Natura, did not produce Recalled Pet Food Products and was not "Released Entity."[10]  The objections raised by the Blaszowksi Objectors are overruled.[11]

## VI. <u>OBJECTIONS TO THE SETTLEMENT</u>

To date, over 9,357 pet owners have submitted claim

_____

defendant in the Pet Food Recall MDL before this Court).

[9]  The Blaszowski Objectors did not appear and argue their position before the Court during the fairness hearing.

[10]  The Blaszkowski plaintiffs also had the option of opting out of the Settlement but choose not to do so.

[11]  To be clear, to the extent that any claims brought in the <u>Pincus</u>, <u>Kennedy</u>, or <u>Blaszkowski</u> actions do overlap with the Release of claims in this MDL, the Release governs and those claims cannot be brought in a separate action.  As explained <u>supra</u>, however, it does not appear that the Release in this MDL encompasses the claims in those actions, except to the extent they extend to the Recalled Pet Food Products.

22

forms to the claims administrator.  Of those 9,357 Settlement
Class Members participating in the Settlement, 114 have opted-
out, and 28 have objected ("Objectors").  The Court has read each
letter filed on the docket by those objecting to, or in support
of, the settlement and notes the understandable expressions of
immense grief over the injury to or loss of their pets.  Rather
than discuss each individually, the objections are grouped into
the following categories.

### 1.   Criminal and Punitive Sanctions

Some of the Objectors contest the fact that the
Settlement does not provide for criminal penalties or is not
punitive enough, and that stricter testing and screening measures
should be implemented throughout the pet food industry.  While
the Court notes their desire to have certain wrongdoers held
criminally liable, this particular litigation involves a civil
class action lawsuit.  This Court does not have the jurisdiction
or the power to initiate criminal investigations or to impose
criminal penalties in this case.  As explained earlier in this
Opinion, indictments were handed down against certain
manufacturers by the United States Department of Justice ("DOJ").
Those criminal matters are being pursued by the DOJ in a separate
legal action and are not part of this litigation.

As for punitive measures, plaintiffs' co-lead counsel
negotiated with the intention of providing the greatest relief
possible to Class Members against a backdrop in which the
financial viability of Menu Foods, a major defendant in the

23

litigation, was uncertain.  Counsel felt that the upper limits of damages were unclear and pursuing punitive damages without compromise could very well have jeopardized the relief the putative class could have obtained.  To put it another way, an award of punitive damages would be a hollow victory against a bankrupt defendant.  Balancing such risks is part of any litigation and as we note elsewhere, the Settlement appears to have been carefully thought out, negotiated at arm's-length, and achieved a fair result despite the risks attendant to litigation. This objection is overruled.

### 2.   Testing of Pet Food and Enforcement of Regulations

Several Objectors voiced displeasure because the Settlement does not impose indefinite testing of pet foods or stronger enforcement of safety regulations.  As part of the Settlement, defendants that manufactured the Recalled Pet Food Products have agreed to regularly test shipments of raw wheat gluten and rice protein concentrate imported from China for the presence of melamine and cyanuric acid and will continue such testing until May 30, 2009.  This Court, however, does not have the jurisdiction or power in this particular litigation to impose stricter statutes and regulations governing the pet food industry.  Rather, such regulations are primarily under the purview of Congress and the FDA, which are not parties to the litigation.  The power to have stricter enforcement and tougher statutes lies with the Legislative and Executive branches of government.  See Northwest Airlines, Inc. v. Transport Workers

Union, 451 U.S. 77, 94 (1981) (stating, "... we consistently have emphasized that the federal lawmaking power is vested in the legislative, not the judicial, branch of government;").  For those Objectors who feel that stronger statutes or enforcement should be in place, their voice can be heard by contacting their respective legislators.  While the Court certainly sympathizes with the Objectors, this Court cannot make new laws; its purpose is to interpret the laws as written.  This objection is overruled.

### 3.  Emotional Damages

Some Objectors criticized the Settlement because it does not provide damages for emotional distress.  Although the complaints filed in this case generally sought emotional damages, in almost every state in the Union, the current state of the law is that emotional damages are not recognized as a recoverable damage for pets.  See Konaurov v. Kerdasha, 629 S.E.2d 181, 186-87 (Va. 2006) (stating that the law in most states regard dogs and cats as personal property and emotional distress damages are generally not recoverable for personal property).[12]  Courts that have addressed the issue of emotional distress damages for the injury or death of a pet found that it is a subject properly left to legislature. Id. [13]

------

[12]  Illinois and Tennessee appear to be the only states allowing such lawsuits in limited circumstances.  Id.

[13]  Plaintiffs' co-lead counsel states that they researched A.B. 4217, a bill introduced in the New Jersey State Legislature that would, in part, provide noneconomic damages for the loss of

The Court takes particular notice of the Objectors' emotional distress over the loss of their pets and understands their request to be compensated for their loss in this way.  The current law in most states, however, rarely provides relief for such damages.  Plaintiffs' co-lead counsel felt they were somewhat constrained by existing statutes and case law from advocating for noneconomic damages on behalf of pet owners and felt that the amount of recovery would still be adequate even if such damages were more widely recognized.  Given the backdrop of the current state of the law regarding emotional damages for injuries to pets, and co-lead counsels' consideration of the current law in negotiating settlement, this objection is overruled.

### 4.   Future Expenses

Future expenses beyond November 24, 2008 are excluded from the Settlement.  The reasons provided by counsel for excluding future expenses are that such expenses would be highly speculative, incapable of reasonable determination absent expert actuarial analysis, and potentially require prolonged involvement by the claims administrator and the Court.  For example, reimbursement for future expenses would require estimates of a pet's life expectancy, a determination of whether a pet's renal

---

a pet.  That Bill is pending in the New Jersey Assembly.  The perceived need for this legislation is additional evidence that the common law does not support recovery for emotional damages caused by the loss of a pet.

condition is improving or deteriorating and an analysis of the costs associated with treating the pet's renal condition over the course of the pet's life.  Counsel states that it would also be difficult to limit treatment costs where a pet's existing renal condition may be complicated or worsened by other factors, such as compounding diseases or other health issues.  They argue that the claims administrator cannot make these determinations and damages based on conjecture would be difficult to contain and, if allowed under the current Settlement, could require expert treatment that would consume portions of the fund otherwise allocable to concrete, determinable expenses already incurred by pet owners.  It also noted that recovery for further expenses could expose the claims process to potential exaggeration and fraud.  Although co-lead counsel does not believe that fraudulent claims would be common, they do feel that the difficulty of verifying such claims and the inability to predict future expenses with accuracy would make the Settlement vulnerable to abuse.

Taking into consideration the objections filed in this case, the Court concludes that the objections do not disturb the preliminary findings that the Settlement is fair, reasonable and adequate.  Some objections pertain to matters beyond the power of this Court and scope of this litigation and other objections either are not feasible or could jeopardize the Settlement as a whole.  In weighing the various issue in this matter, the Court must take into consideration not just the objections but the

27

entire settlement class and come to a resolution that benefits the Class as whole.  Although the Court understands that the Settlement cannot address every concern and provide the total relief sought or envisioned by every class member, and particularly sympathizes with those Objectors who suffered through emotional distress from this ordeal, the Court is satisfied that the Settlement provides adequate relief to the Class as a whole.

### VII.  **SETTLEMENT**

Settlement of class actions is governed by Rule 23(e) which provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  The Court finds that requirements of Rule 23(e) have been met.

### A.  Notice

As stated above, after the Settlement was preliminarily approved, notice was published in newspapers, magazines and periodicals in the United States and Canada.  Some pet owners received direct individual notice, and notice was sent to the American Veterinarian Medical Association.  As of September 30, 2008, a total of 28,955 notices were directly mailed to potential class members, the Settlement website had received over 38,039 visits, and over 8,150 calls were placed to the toll-free Settlement telephone number.  Also, the settlement has received attention from the media and been reported nationally in print, television and internet media.  Thus, notice has been provided in

a reasonable manner to potential class members.

## B.  **Fair, Reasonable, and Adequate**

The Settlement can be approved only after the Court conducts a hearing and finds that it is "fair, reasonable, and adequate."  In <u>Girsh v. Jepson</u>, 521 F.2d 153, 156-57 (3d Cir. 1975), the Third Circuit articulated nine factors to consider to evaluate whether a proposed settlement is fair, reasonable and adequate.  They are:

> (1)  The complexity, expense, and
>       likely duration of the
>       litigation;
>
> (2)  The reaction of the class to
>       the settlement;
>
> (3)  The stage of the proceedings
>       and the amount of discovery
>       completed;
>
> (4)  The risks of establishing
>       liability;
>
> (5)  The risks of establishing
>       damages;
>
> (6)  The risks of maintaining the
>       class action through the
>       trial;
>
> (7)  The ability of the defendants
>       to withstand a greater
>       judgment;
>
> (8)  The range of reasonableness of
>       the settlement fund in light
>       of the best
>       possible recovery; and
>
> (9)  The range of reasonableness of
>       the settlement fund to a
>       possible
>       recovery in light of all
>       the attendant risks of

litigation.

See id. at 157 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)).

### (1) The Complexity, Expense, and Likely Duration of the Litigation

This litigation was initiated following the largest pet food recall in U.S. history.  Over 60 million containers of pet food were recalled and covered over 90 brands of dog food and cat food.  Approximately 115 nationwide class action lawsuits were filed on behalf of approximately 250 plaintiffs.  Similar class actions were filed in the provinces of Canada.

There are complex medical and toxicological issues in this litigation, which would have likely required undertaking a comprehensive analysis into the combined impact of melamine and cyanuric acid, the contaminants found in the wheat gluten and rice protein in the Recalled Pet Foods, on small animal renal systems.  Such an analysis would have likely required multiple experts in the fields of veterinary medicine, toxicology, and pathology with particular attention to feline and canine renal systems.  This analysis would have likely delved into somewhat new territory involving the effects of these toxins on cats and dogs.[14]  Counsel has represented that reliance on expert research in this case would be substantial and carry with it enormous cost throughout the litigation and through trial.

---

[14]   See "FDA's Ongoing Pet Food Investigation," available at
http://www.fda.gov/consumer/updates/petfoodrecallup.html

In addition, an analysis of the pet food itself may have been necessary to test the extent to which pet food products were contaminated.  Counsel has represented that were litigation to continue, additional experts would be required to perform the actual testing of many units of stored pet food located in locations across the nation.  Given the potential degeneration of pet food recalled over a year ago, such testing could be complicated, costly and time consuming.

It also appears that discovery in this litigation would be extensive and require significant resources.  Counsel has stated that the parties would have to expend substantial resources taking discovery of the over 20 defendants named in this litigation, involving international and cross-country travel.  Defendants would also likely seek to depose many of the 250 named plaintiffs in this litigation, who reside throughout the country.

Finally, although the parties have engaged in motion practice and some discovery as well as settlement negotiations, the procedural posture of this case is not beyond the discovery stage.  No motions to dismiss or motions for summary judgment have been filed.  Although the class has been certified for settlement purposes, plaintiffs have not moved for class certification for litigation or trial purposes and have not filed a consolidated complaint.  Counsel represents that pursuing these actions through pretrial motion practice, formal discovery and trial would involve potentially several additional years to this

31

litigation and could deprive pet owners of relief.

Thus, for the above reasons the Court finds that the complexity, expenses, and likely duration of this litigation favor the approval of the proposed Settlement.  See Warfarin, 391 F.3d at 535-36 (stating that the first Girsh factor "captures the probable costs, in both time and money, of continued litigation.") (quoting Cendant, 264 F.3d 201, 233 (3d Cir. 2001)).

### (2) Reaction of the Class to the Settlement

It has been represented to the Court that the Court-appointed settlement administrator published a summary notice of the Settlement and hearing in newspapers and periodicals throughout the U.S. and Canada; mailed Notice to all the Class Members who received Historic Payments from defendants or their insurance carriers; mailed notice to all persons who completed and returned a claim form and whose names and addresses are in a readily accessible database; and posted relevant documents on the Settlement website.  The Notice informed potential Class Members of their right to object to any aspect of the Settlement.  In response, as of the date of the fairness hearing, over 9,357 claims have been received by the settlement administrator, 89 exclusion requests from U.S. residents, and 25 from Canadian residents.  Twenty-eight objections have been received.

Given the wide distribution of notice and the small percentage of objections received, this factor weighs heavily in

favor of settlement.  See Bell Atlantic Corp. v. Bolger, 2 F.3d
1304, 1314 (3d Cir. 1993) (holding that a "small proportion of
objectors does not favor derailing settlement."); Stoetzner v.
U.S. Steel Corp., 897 F.2d 115, 118-19 (3d Cir. 1990) (holding
that a settlement where 29 out of 281 class members filed
objections satisfied the Girsh test).  Also, as explained above,
many of the objections pertain to matters outside the scope of
this litigation or jurisdiction of this Court; or, the objections
are due to an overly broad reading of the Release.  Thus, the
reaction of the large majority of the class has been positive and
satisfies the second Girsh factor.

### (3)   The Stage of The Proceedings and The Amount of Discovery Completed

Since this case was stayed, formal discovery was not
conducted except for the deposition of defendants'
biostatistician.  Plaintiffs' co-lead counsel represents that
even though formal discovery did not occur, they still needed to
know the facts and law to be able to effectively weigh the
strengths, weaknesses and risks in this case to participate in
settlement negotiations.  They state that they conducted informal
discovery, including extensive consultation with experts, and
spent considerable time doing factual and legal research as well
as having many meetings and conversations between counsel.
Particularly, plaintiffs state that they retained and consulted a
well-respected toxicologist and pathologist specializing in small
animal renal systems at the outset of the case, and consulted

with and reviewed reports produced by numerous veterinarians, veterinary medical associations and advocacy organizations, including: the American Veterinary Medical Association (AVMA), American College of Veterinary Internal Medicine (AC VIM), American Society for the Prevention of Cruelty to Animals (ASPCA), the American Animal Hospital Association (AAHA), the Veterinary Information Network (VIN) and the American Association of Veterinary Laboratory Diagnosticians (AAVLD). Plaintiffs state that they retained a biostatistician, Dr. Nicholas Jewell, to assist them in reaching an agreement with defendants on a sampling plan that would help determine what amount of evidence in the form of stored, and rapidly deteriorating, pet food product should be maintained to assess levels of contamination. Plaintiffs also deposed defendants' statistician, Dr. George McCabe, on the issue of disposal of the pet food.

Plaintiffs further state that they performed an extensive analysis of the legal claims available under common law and applicable state statutes in order to analyze the relationship of the companies in the pet food distribution chain and determine their ability to contribute to class relief. Plaintiffs also state that they tracked legislation in various states to determine whether the relevant legal landscape would change during the course of the litigation. They further state that they conducted damages analyses by contacting close to 50 pet hospitals throughout the nation to determine typical costs for treatment, diagnosis and death-related expenses such as

34

necropsy, cremation and burial.

In assessing the third <u>Girsh</u> factor, courts look at the amount of case development that has occurred prior to settlement. <u>See</u> <u>Cendant</u>, 264 F.3d at 235 (quoting <u>GM Trucks</u>, 55 F.3d at 813) (stating that the third <u>Girsh</u> factor "captures the degree of case development that class counsel have accomplished prior to settlement."). Here, counsel has shown that adequate informal discovery was conducted as well as some formal discovery in order for counsel to gain an appreciation of the merits of the case as well as the legal theories and risks. <u>Id.</u> (finding that the district court took note of the formal and informal discovery conducted). Thus, the Court finds that the third <u>Girsh</u> factor weighs in favor of settlement. <u>Id.</u> at 236 (approving settlement even though litigation was at an early stage because of the nature of the case and because counsel had an excellent idea of the merits of its case at the time of the settlement).

**(4 & 5)   Risks of Establishing Damages and Liability**

In assessing the risks under the fourth and fifth <u>Girsh</u> factors, plaintiffs state that although they are confident they would prevail at trial, they recognize that complex litigation cases such as this against large companies have inherent risks. They state that trial in this case against the pet food industry would have involved a "major battle" between the parties' respective experts and would have opened them to the risk of convincing the jury to believe their expert. Plaintiffs also felt they would likely face significant risks on the issue of

causation, damages and liability.

Plaintiffs state that research on toxicity showed that the melamine and cyanuric acid, compounds found in the adulterated wheat gluten and rice protein concentrate used to manufacture pet food, demonstrated a strong relationship to acute renal failure, and that the combination of melamine and cyanuric acid seems to be more toxic than either compound alone.[15] Plaintiffs noted, however, that relatively few studies have been conducted, and of those conducted, it is unclear precisely how many pets became ill or died as a result of eating Recalled Pet Food Products.  Plaintiffs also noted that the age and health of the pet at the time contaminated food was consumed complicates causation because oftentimes, pet death or illness could not be explicitly tied to the consumption of contaminated food; pets could have suffered from other known or undetected illnesses and/or could have been of a particularly old or young age at the time of consumption.

Plaintiffs further state that liability would be hotly contested because the adulteration of wheat gluten and rice protein concentrate with melamine was a criminal act by Chinese companies that occurred in China, and its presence was reasonably unexpected, had never been tested for nor was previously detected.  Indeed, the criminal prosecution itself and the nature of the alleged scheme suggests the contamination was calculated

_____

[15]  See http://www.fda.gov/cvm/menufoodrecallfaq.htm.

36

as a deception designed to fool regulators and end users. Plaintiffs further note as the product moved through the manufacturing and distribution process that varying degrees of liability would exist between manufacturers, private labelers and entities that were strictly retailers.

Although plaintiffs state that they believe that causation could be shown at trial, they admit that the issue of causation would be a major battleground with the outcome unknown. Plaintiffs have also admitted that they do not know definitively how many pets became ill or died as a result of consuming Recalled Pet Food Products which creates uncertainty as to what damages plaintiffs could ultimately obtain on behalf of pet owners. Therefore, there is some risk to plaintiffs in being able to establish causation, damages and liability if this case were to go to trial thereby satisfying the fourth and fifth <u>Girsh</u> factors.

### (6) Risks of Maintaining a Class through Trial

Plaintiffs argue that even if the class is certified for litigation, there are risks of decertification. As an example, plaintiffs state that defendants could argue that the science concerning the etiology of renal failure is not susceptible to class-wide proof of plaintiffs' claims, or that defendants will seek to establish that individual issues such as pet breed, amount or type of food consumed, health history, and age, among other issues, predominate. Plaintiffs point out that the studies found that sickness and mortality varied widely

37

between cats and dogs and on the size of the animal, and that various preexisting conditions may contribute to the rates of death and sickness in cats and dogs and smaller and larger animals.

Even assuming that the Court would certify the class for litigation purposes under Fed.R.Civ.P. 23(a), it has the ability to "decertify or modify a class at any time during the litigation if it proves to be unmanageable." Cendant, 264 F.3d at 239 (citing lower court case, In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 235, 262 (D.N.J. 2000), quoting In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 321 (3d Cir. 1998)). In Cendant, the Third Circuit found the potential for a court to decertify or modify a class at any time if unmanageable only creates a slight risk of decertification and is not enough alone to weigh in favor of settlement. Id. Here, however, given the potential differences as to the health of the pet and the size of the pet, there exists more than a slight risk of modification or decertification enough for this factor to weigh in favor of settlement.

### (7) Defendants' Ability to Withstand Greater Judgment and Enforceability of Judgment

Plaintiffs' co-lead counsel states that after engaging in settlement negotiations, they believed that defendants were unwilling or potentially unable to settle for a greater amount. Plaintiffs note that Menu Foods, a major defendant in this litigation in that it manufactured a large quantity of the

recalled food for distribution by various companies under
numerous brand names, spent approximately $55 million in Canadian
dollars exclusive of any Historic Payments and the Settlement
Fund, C$10 million more than originally anticipated.  Plaintiffs
also report that Menu Foods lost approximately 80% of its
contract business representing approximately 45% of Menu Foods'
total volume.  Plaintiffs also state that following the Recall,
it was reported that Menu Foods stock fell by 69%, and the
company has reduced its workforce by reportedly 10-15%.
Plaintiffs state that the financial viability of Menu Foods was
uncertain during the settlement negotiations.

        The Court acknowledges the fact that Menu Foods has
incurred substantial cost in recalling the contaminated pet food,
costs incurred outside of this litigation yet nonetheless
factored into the financial viability of Menu Foods' ability to
pay the settlement.  The amount of settlement, coupled with the
expectation that some pet owners will be able to recover most if
not all of their costs, weigh in favor of settlement.  See McCoy
v. Health Net, Inc., 569 F.Supp.2d 448, 462-63 (D.N.J. 2008)
(even assuming Health Net could afford to pay more than the
settlement it is not a basis for rejecting the settlement and
noting that "many settlements have been approved where a settling
defendant has had the ability to pay greater amounts."), citing
In re Remeron Direct Purchaser Antitrust Litig., No. Civ.03-0085
(FSH), 2005 WL 3008808, at *9 (D.N.J.  Nov. 9, 2005), citing In
re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 538 (3d Cir.

2004)).  There is also the consideration that if this case did proceed to trial, that plaintiffs would not be able to recover much more than they are able to recover through the Settlement. See Lazy Oil Co. v. Wotco Corp., 95 F.Supp.2d 290, 318 (W.D.Pa. 1997) (stating "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."); Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 239 (D.N.J. 2005) (finding that "Class Members will have the opportunity to obtain a full-recovery under this Settlement, so its not clear to what degree a greater judgment would recompense Class Members.").

> **(8 & 9)   The range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.**

The eight and ninth Girsh factors are often analyzed together.  See Warfarin, 391 F.3d at 538 (stating that factors eight and nine "... test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." ).  In this case, plaintiffs state that the Settlement allows Class Members to have the potential to obtain up to 100% of their economic damages after submitting a valid claim while avoiding the risk of litigation.  Plaintiffs argue that since the Class Members could potentially recover up

to 100% of their economic damages, it is preferable to the very real possibility of a smaller recovery or no recovery at all. Plaintiffs also state that the proposed Settlement represents a significant recovery in light of the attendant risks of litigation of proving causation, damages and liability.

The Court finds that the range of reasonableness under the eighth and ninth <u>Girsh</u> factors weigh in favor of settlement. Although some Class Members may not be reimbursed fully for their economic damages depending upon whether the fund can support the number of claims ultimately submitted, it does have the potential to allow most Class Members to be reimbursed fully. The Court also notes that by settling, the Class Members will receive money now at present value, rather than later, assuming they would be successful in litigation. <u>See</u> <u>GM Trucks</u>, 55 F.3d at 806 (comparing "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing" with "the amount of the proposed settlement.") (quoting MANUAL FOR COMPLEX LITIGATION 2d § 30.44 at 252).

Overall, settlement of litigation is favored by the courts and particularly so in class action litigation. <u>See</u>, <u>e.g.</u>, <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004) (finding that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged.") (quoting <u>In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 784 (3d Cir. 1995)

(stating that "the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"). District courts exercise discretion in determining whether to approve a proposed class action settlement.  See Warfarin, 391 F.3d at 535; Girsh, 521 F.2d at 156; Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir. 1974) (holding that the district court has discretion in determining whether a settlement is fair and reasonable).  In this case, the Settlement meets the requirements under Rule 23(e), and in particular is found to be fair, reasonable and adequate under Rule 23(e)(2) pursuant to the Girsh factors.

## VIII.    ATTORNEYS' FEES

In conjunction with their motion for settlement, plaintiffs' co-lead counsel also move for an award of attorneys' fees equal to 25% of the $24 million Settlement Fund, or $6 million, plus reimbursement of expenses in the amount of $394,403.09.[16]  This percentage of recovery was included in the Settlement preliminarily approved by the Court on May 30, 2008. Following entry of that Order, co-lead counsel has represented that more than 28,950 Notices of Proposed Class Action Settlement and Final Fairness Hearing ("Notice") were mailed to Class

---

[16]  The May 22, 2008 Settlement Agreement also allowed plaintiffs' Canadian counsel to apply for attorneys' fees in the amount of up to 6% of the Settlement Fund, or $1,440,000.  That application is not before this Court.  Nonetheless, if approved, the combined applications for attorneys' fees would equal $7,440,000, or 31% of the Settlement Fund.

members.  The Notice advised Class members that plaintiffs'
co-lead counsel planned to request an award of attorneys' fees
not to exceed 25% of the Settlement Fund, and for reimbursement
of their expenses.  Of the twenty-eight objections received, two
objected to the anticipated fee and expense request.  This is a
de minimis number as compared with the 9,357 claims filed through
September 30, 2008.  The Notice also advised Class members that
counsel for plaintiffs in the Canadian actions would seek an
award for their attorneys' fees not to exceed 6% of the
Settlement Fund and for reimbursement of expenses.

It has long been recognized that an attorney who
prosecutes an action on a contingent fee basis that results in
the creation of a fund or benefit for his or her clients may
obtain fees from that common fund.  See Boeing Co. v. Van Gemert,
444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a
common fund for the benefit of persons other than himself or his
client is entitled to a reasonable attorney's fee from the fund
as a whole.") (citations omitted); In re AremisSoft Corp. Sec.
Litig., 210 F.R.D. 109, 128 (D.N.J. 2002) ("Attorneys who
represent a class and aid in the creation of a settlement fund
are entitled to compensation for legal services offered to the
settlement fund under the common fund doctrine.") (citing In re
GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 820
n.39 (3d Cir. 1995)).  The amount of attorneys' fees to be
awarded rests within the discretion of the court.  See Gunter v.
Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000)).

43

The award of counsel fees based on a percentage of the common fund created for the benefit of a class has been recognized as the appropriate method for determining compensation. <u>See</u>, <u>e.g.</u>, <u>Boeing</u>, 444 U.S. at 479 (stating "[a]lthough the full value of the benefit to each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of the litigation to each absentee in the exact proportion that the value of his claim bears to the total recovery."). This "percentage of recovery" or percentage of the fund method of awarding fees in common fund cases has been approved by the Third Circuit and applied by District Courts in this Circuit. <u>See</u> <u>In re AT&T Corp.</u>, 455 F.3d 160, 164 (3d Cir. 2006) ("In common fund cases such as this one, the percentage-of-recovery method is generally favored "); <u>Cendant</u>, 264 F.3d at 220 (Counsel fees are generally been fixed on a percentage basis rather than the lodestar method,[17] or hourly fee method); <u>In re Prudential Ins.</u>

---

[17]   For the lodestar method, the number of hours spent on the case is multiplied by each attorney's reasonable hourly rate and then adjusted (by applying a multiplier) to reflect such factors as risk, the contingent nature of the litigation, the result obtained, and the quality of the attorney's work. <u>See</u> <u>Hahnemann University Hosp. v. All Shore, Inc.</u>, 514 F.3d 300, 310 (3d Cir. 2008); <u>Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.</u>, 540 F.2d 102, 116-18 (3d Cir. 1976). This method is disfavored and the percentage of recovery method is commonly used.  <u>See</u> <u>Third Circuit Task Force Report, Selection of Class Counsel</u>, 208 F.R.D. 340 (Jan. 15, 2002); <u>Third Circuit Task Force Report, Selection of Class Counsel</u>, 108 F.R.D. 237, 238 (Oct. 8, 1985); MANUAL FOR COMPLEX LITIGATION §14.121 (4th ed.).

<u>Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 333
(3d Cir. 1998)("The percentage-of-recovery method is generally
favored in cases involving a common fund, and is designed to
allow courts to award fees from the fund 'in a manner that
rewards counsel for success and penalizes it for
failure.'")(quoting <u>GMC Trucks</u>, 55 F.3d at 821).

### A. <u>Gunter</u> Factors

Under Third Circuit law, plaintiffs' requested fee
enjoys a presumption of reasonableness which can be rebutted only
by a showing that it is, prima facie, clearly excessive. <u>See</u>
<u>Cendant</u>, 264 F.3d at 283; <u>AT&T</u>, 455 F.3d at 167-68. To determine
whether the fee is reasonable or "clearly excessive," the Court
is guided by seven factors listed in <u>Gunter v. Ridgewood Energy</u>
<u>Corp.</u>, 223 F.3d 190, 195 n.1 (3d Cir. 2000). <u>See</u> <u>Cendant</u>, 264
F.3d at 283. The <u>Gunter</u> factors to be considered are:

> 1. The size of the fund created
>    and the number of persons
>    benefitted;
>
> 2. The presence or absence of
>    substantial objections by
>    members of the class to the
>    settlement terms and/or fees
>    requested by counsel;
>
> 3. The skill and efficiency of
>    the attorneys involved;
>
> 4. The complexity and duration of
>    the litigation;
>
> 5. The risk of nonpayment;
>
> 6. The amount of time devoted to
>    the case by plaintiffs'
>    counsel; and

7.   Awards in similar cases.

Applying each of the <u>Gunter</u> factors, the Court finds that the percentage of fee requested is reasonable.

### (1)   The Result Achieved and the Number of Persons Benefitted by the Settlement

Plaintiffs' co-lead counsel maintains that the Settlement provides Class members with the opportunity to recover up to 100% of their reasonable economic damages, and up to $900 per pet for economic damages that Class members are unable to prove with documentation.  The economic damages that are designated as recoverable include healthy screening, veterinary testing and treatment, death-related expenses, pet cost reimbursement and cost of recalled pet food.  Other types of economic damages may also be recovered as long as they are "reasonable and set forth by the claimant on the Claim Form under 'Additional Expenses.'"[18]   Plaintiffs' co-lead counsel states that after much intense negotiation, they achieved a cash settlement fund that roughly equals the full amount of Menu Foods' $24 million insurance policy despite the fact that some defendants had potential claims against that policy for their portion of the $8 million of Historic Payments.  Plaintiffs' co-lead counsel also states that the Settlement was reached even though the defendants denied (and continue to deny) any liability, and had to be negotiated against a background in which

---

[18]   Examples include travel and transportation expenses, property damage and lost wages.

46

a Menu Foods faced possible bankruptcy.

The Court finds that the total amount of recovery has the potential to award economic damages to all of the Class members and potentially, in some cases, the full recovery of their economic damages across a broad range of categories. Therefore, given the amount of settlement, its possibility of high recovery for the Class members, and the thoughtfulness of the settlement claim procedure in terms of the types of damages recoverable, the Court finds that the first factor has been met. See Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) (stating that the "most critical factor is the degree of success obtained.").

**(2) The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms And/or Fees Requested by Counsel**

As previously stated, copies of the Notice were sent to over 28,950 potential Class members pursuant to the Court's May 30, 2008 Preliminary Approval Order.  The Notice provided that Plaintiffs' co-lead counsel would be applying for an award of attorneys' fees in an amount of up to 25% of the Settlement Fund and for reimbursement of expenses.  The Notice also expressly advised Class members that they could object to any aspect of the Settlement and explained the procedure for doing so.  In addition, notice was published in 50 publications located throughout the United States and Canada, and many of the relevant documents were posted on the claims administrator's website.  Out of the more than 28,955 persons to whom Notice was mailed, 28 Class members objected to the Settlement and of those 28, only

47

two objected to the attorneys' fees.

Given the adequacy of the Notice provided to potential Class members compared with the number of objections to the attorneys' fees, the Court finds an absence of substantial objections to the request for fees and costs by plaintiffs' co-lead counsel.  See In re Rite Aid Sec. Litig., 396 F.3d 294, 305 (3rd Cir. 2005) (finding that district court did not abuse its discretion by finding that the absence of substantial objections by class members to fee request weighed in favor of approval.); see also In re Relafen Antitrust Liigt., 231 F.R.D. 52, 79-80, 82  (D. Mass. 2005) (approving fee request despite four objections);  In re Fleet/Norstar Securities Litig., 935 F. Supp. 99, 107 (D.R.I. 1999) ("the lack of objections to the proposed settlement must be taken into account").  Thus, the second Gunter factor has been met.

### (3) The Skill and Efficiency of the Attorneys Involved

Plaintiffs' co-lead counsel maintain that they spent numerous hours in over 10 mediation sessions and many more informal meetings, as well as numerous telephone conferences, over the course of seven straight months negotiating with numerous defense counsel.  They state that at times more than 30 defense counsel sat at the mediation table, representing more than 20 defendants who were not a homogenous group but represented different stops along the pet food supply chain with varying levels of potential liability.

Plaintiffs' co-lead counsel describe themselves as

among the most experienced lawyers in the prosecution of complex consumer class actions and mass tort actions who have reputations as attorneys who zealously pursue meritorious cases through trial and appeals, as well as have the ability to vigorously develop the evidence and prepare a case for trial. They state that these skills and experience enabled them to negotiate the recovery for the benefit of the Class.

The Court is satisfied with the skill and quality of the work performed by counsel in this litigation.  As described more fully in the discussion on the motion for settlement, counsel engaged in motion practice, initial discovery, including expert discovery, and extensive settlement negotiations.  They also orchestrated the Notice to the Class members and oversaw the administration of claims.  Given the complexity of this case coupled with the relatively quick resolution of this litigation on behalf of the Class members, the Court has no reservations regarding plaintiffs' co-lead counsels' skill and efficiency in this matter.  See Gunter, 223 F.3d at 198 (recognizing "the stated goal in percentage fee-award cases of ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation.").  In addition, plaintiffs' co-lead counsel also points to the skill and quality of the attorneys representing the defendants in this case as evidence that they had to face formidable opponents in this matter while representing their clients.  The quality of defense counsel is a factor taken into consideration by some courts in determining

whether counsel were skillful in reaching settlement. See In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 357-58 (S.D.N.Y. 2005)(finding counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country."); In re Warner Comm. Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work.") (citations omitted), affd, 798 F.2d 35 (2d Cir. 1986)).  Here, we find that plaintiff's co-lead counsel faced highly skilled defense counsel in this matter which weighs in favor of finding that they were skillful and efficient in reaching settlement in this litigation.

### (4) The Complexity and Duration of the Litigation

Plaintiffs' co-lead counsel argues that this case was complex and represented many challenges.  Some the challenges included issues related to communications with putative class members, preservation of the contaminated pet food, certifying the class and organizing all of the plaintiffs' counsel in the United States and in Canada.  They also argue that the case was complex due various issues such as whether there would be any recovery for the emotional distress of owners of the pets that were affected given the current status under state law in which emotional distress damages are generally not recoverable; whether the tainted pet food was the proximate cause of the injuries to and the death of the affected pets, and the extent of injuries in each affected pet; whether all manufacturing and distribution

defendants would be liable since, aside from the intentional act
by the Chinese company that added melamine and cyanuric acid to
the wheat gluten and rice protein concentrate, the defendants
denied liability for these criminal acts and argued that they had
no obligation to test the wheat gluten for an obscure ingredient
that should not have been present; whether some the private label
and retail defendants who were several steps removed from the
manufacturing process would be liable; and whether the individual
medical history, diets and veterinary treatment of the pets would
defeat class certification.  Plaintiffs' co-lead counsel also
recounts the problems associated with certain defendants'
communications with putative Class members offering to settle
claims, and seeking releases from liability from some Class
members without providing information about ongoing litigation
related to the Recall which ultimately got resolved after
plaintiffs' co-lead counsel filed two motions to halt the
communications.

     Plaintiffs' co-lead counsel also notes the problems
associated with storing the tainted pet food by defendants, some
of which had rotted and attracted vermin in storage locations.
Plaintiffs' co-lead counsel state that they worked on a discovery
and a sampling plan, traveled to several of defendants' storage
sites in Kansas and New Jersey and negotiated an agreement that
allowed defendants to destroy a vast amount of tainted pet food
since the Recall began, while retaining a statistically relevant
sampling for evidentiary purposes in this litigation.  Both sides

engaged experts and plaintiffs' co-lead counsel deposed defendants' expert regarding his proposed evidence.

As the above list illustrates, there were many complex issues in this litigation that were satisfactorily resolved in a skillful and efficient manner.  The complexity of this case were it to go to trial rather than settle weighs in favor of the fourth Gunter factor.  With regard to the duration of the litigation, this case commenced on June 22, 2007 and the parties are seeking approval of their settlement agreement roughly sixteen months later.  The relatively short duration of the litigation to this point weighs in favor of settlement because the Class members would be able to recover now rather than possibly years later.  As plaintiffs' co-lead counsel has described, many Class members were unexpectedly faced with unbudgeted and sometimes extraordinary expenses to save their pets.  Many were retired or on fixed incomes, or had to dip into their savings or borrow the necessary funds.  For these Class members, protracted litigation with an uncertain outcome that could take years to resolve is not in their best interest.  Therefore, the complexity and the duration of the litigation weigh in favor of settlement and satisfy the fourth Gunter factor.

**(5)  The Risk of Non-Payment**

Plaintiffs' co-lead counsel state that they undertook this action on an entirely contingent fee basis, assuming a substantial risk that they would have to devote a significant

amount of time and incur substantial expenses in prosecuting this action without any assurance of being compensated for their efforts.  In addition to the risk of non-payment, plaintiffs' co-lead counsel argue they faced additional risks due to defendants denying any wrongdoing and plaintiffs' need to prove at trial the liability of defendants, who were each various degrees removed from the source of the contamination in China. They also argue they faced the possibility that a jury would have sided with defendants' experts and found that injuries or deaths to Class members' pets were not caused by defendants' conduct, or that the class certification could not be maintained.

Although this litigation reached settlement, the risk of non-payment is generally assessed when the attorneys' time is committed to the case.  See Skelton v. Gen. Motors Corp., 860 F.2d 250, 258 (7th Cir. 1988) (stating that "[t]he point at which plaintiffs settle with defendants (or win a judgment against defendants) is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them.") (citation omitted).  At the time that plaintiff's counsel undertook representation, they faced significant hurdles and the possibility of non-recovery.  Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. See In re Warner Communications Sec. Litig., 618 F.Supp. 735, 747 (D.C.N.Y. 1985)(citations omitted).  Therefore, the fifth Gunter factor has been met.

### (6)   The Time Devoted to This Case by Plaintiffs Co-Lead Counsel Was Significant

Plaintiffs' co-lead counsel and plaintiffs' liaison counsel have reported that they worked more than 12,511 hours in this litigation.  Multiplying the number of hours by the hourly rate, the total "lodestar" is $5,113,954.15.[19]  See In re Rite Aid Corp. Securities Litigation, 396 F.3d 294, 300 (3d Cir. 2005) (finding that it is sensible for a court to cross-check its initial fee calculation with a second method of calculation). Plaintiffs' co-lead counsel state that the work performed by them and plaintiffs' liaison counsel was done without duplication of effort and in fact made tremendous efforts to eliminate duplicative work.  They state that a core group of two attorneys were assigned to attend and lead the multiple mediation sessions; another group of several attorneys handled the issues surrounding certain defendants' communications with putative class members; a separate contingency was assigned to deal with the evidence

---

[19]  Counsel submitted separate affidavits detailing the number of hours worked times each attorney's or legal professional's rate.  See Rite Aid, 396 F.3d at 306 (stating that "[i]n performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter.").  This comports with the Third Circuit's instruction to apply a "blended rate" rather than just the hourly rate of the most senior attorneys with the highest billing rate.  Id. at 306 n.15 (quoting THE MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.724 (2004) (stating that "a statement of the hourly rates for all attorneys and paralegals who worked on the litigation .... can serve as a 'cross-check' on the determination of the percentage of the common fund that should be awarded to counsel").

preservation issues; others were assigned to negotiate with defendants' counsel concerning the preservation of electronic data and records, communicate with counsel for plaintiffs in the Canadian actions, and finalize with defendants' counsel the substantive terms of the Settlement.

Attached to counsels' motion is an appendix of attorney declarations containing the declarations from each of plaintiffs' co-lead counsel and liaison counsel, computing the lodestars, at current rates, for each attorney at their respective law firms, (Exhibits B through H), and a summary of the lodestars (Exhibit A).

Plaintiffs' co-lead counsel requests a lodestar multiplier of 1.17. See Fanning v. Acromed Corp., No. 97-381., 2000 WL 1622741, at *8 (E.D.Pa. Oct. 23, 2000) (stating that court may apply multiplier to the lodestar, adjusting the lodestar either upward or downward) (citation omitted). Counsel argues that their request is at the low end of the range of multipliers typically awarded in comparable cases in this Circuit and across the United States.

Given the magnitude and complexity of the litigation as well as the significant time and effort invested by plaintiffs' counsel, the Court finds that the requested percentage fee of 25% of the cash Settlement Fund, with a lodestar multiplier of less than 1.2, is reasonable. See Cendant 243 F.3d at 737 n.22 (citing to a list of cases where the lodestar multiplier of 1.5, 3.25, 1.2, 2, and 1.25 to 1.75, were applied respectively)

(citations omitted); <u>In re Corel Corp. Inc. Sec. Litig.</u>, 293
F.Supp.2d 484, 497 (E.D.Pa. 2003) (finding that multiples between
lodestars and fee requests range between 1 and 4, so that the
multiple requested of 1.7 was at the lower end, a factor which
militated in favor of approval).  Thus, the sixth <u>Gunter</u> factosr
is satisfied.

### 7. Awards in Similar Cases

The final factor to consider is a comparison of the
requested fee to fees awarded in similar cases.  Although there
is no rule as to what percentage of the common fund should be
awarded, the Third Circuit has noted that fee awards range from
19% to 45% of the settlement fund.  <u>See</u> <u>In re General Motors</u>, 55
F.3d at 822; <u>Ikon</u>, 194 F.R.D. at 194 ("Percentages awarded have
varied considerably, but most fees appear to fall in the range of
nineteen to forty five percent."); <u>In re Computron Software,
Inc.</u>, 6 F.Supp.2d 313, 322-23 ("Awards utilizing the
percentage-of-recovery method can reasonably range from nineteen
percent to forty-five percent of a settlement fund").

Within the Third Circuit, courts have awarded fees
greater than 25% of the cash Settlement Fund requested here, and
also greater than the maximum combined U.S. and Canadian fees of
31% of the Settlement Fund.  <u>See</u> In re Datatec Systems, Inc.
Securities Litigation, No. , 2007 WL 4225828, at * (D.N.J. Nov.
28, 2007)(approving requested fee award of 30% and noting that
"[c]ourts within the Third Circuit often award fees of 25% to 33
1/3% of the recovery."); <u>In re Ravisent Techs., Inc. Sec. Litig.</u>,

No. 00-CV-1014, 2005 WL 906361, at *15 (E.D.Pa. Apr. 18, 2005)
(awarding 33% of the $7 million settlement fund); In re Corel,
293 F.Supp.2d at 497 (observing that awards in the district
frequently range between nineteen and forty-five percent of the
common fund and finding that the 33 1/3% fee request in a complex
case to be within the reasonable range) (citing In re SmithKline
Beckman Corp. Secur. Litig., 751 F.Supp. 525, 533 (E.D.Pa.
1990).[20]

The 25% fee requested by plaintiff's co-lead counsel
is appropriate in this case given the complexity and amount of
work expended to resolve the matter.  Even adding the 6%
requested by Canadian counsel, the percentage of fee requested is
within the accepted reasonable range in this District and
satisfies the final Gunter factor.

**B.   Prudential Factors**

In In re AT&T Corporation Securities Litigation, 455
F.3d 160, 166 (3d Cir. 2006), the Third Circuit held that when
"reviewing an attorneys' fees award in a class action settlement,
a district court should consider the Gunter factors, the
Prudential factors, and any other factors that are useful and
relevant with respect to the particular facts of the case."  In
In re Prudential Ins. Co. Am. Sales Prac. Litig., 148 F.3d 283,
338-39 (3d Cir. 1998), the Third Circuit found that district

---

[20]   In their motion, counsel supplied an extensive list of
cases in which the fee awarded was greater than 30% of the
settlement or award).

courts should consider other potentially relevant and appropriate factors, such as:

> [T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id., at 323; see At&T, 455 F.3d at 165. The Gunter factors and Prudential are substantially similar to the factors provided in Girsh. See At&T, 455 F.3d at 165; Desantis v. Snap-On Tools Co., LLC, No. 06-2231 (DMC), 2006 WL 3068584, at *9 (D.N.J. Oct. 27, 2006) (to avoid redundancy court incorporated its discussion of the Girsh factors to decide reasonableness of fee under Gunter and Prudential).

In assessing the Prudential factors, plaintiffs request that the Court take into consideration the value of benefits that accrued to the Class members through the efforts of plaintiffs'

counsel rather than the efforts of any government investigation. For instance, after Menu Foods reported illnesses and deaths in cats and dogs, the FDA investigated the claims but did not pursue litigation against Menu Foods or any of the other settling defendants. Plaintiffs' co-lead counsel states that there was no government investigation exposing a fraud or a defective product that plaintiffs' relied on in bringing suit against the defendants. Rather, the litigation followed the nationwide recall of the tainted food. Plaintiffs' co-lead counsel states that FDA's low reported numbers of death from the contaminated food put them at a disadvantage and prompted them to undergo their own investigation into the number of deaths and illnesses of pets allegedly due to the contaminated pet food.

Plaintiffs' co-lead counsel also notes that the Settlement incorporated some "innovative" terms of settlement. For example, they state that claimants may receive up to $900 in economic damages without providing any supportive documentation. Also, they note that the Settlement allows for reimbursement of Healthy Screening claims, essentially check-ups to ensure the pet was not harmed by the Recalled Pet Food. Further, where a pet has died and the claimant elects to seek a recovery for the cost of the deceased pet and not the cost of a replacement pet, the Settlement allows the claimant to recover the fair market value of the deceased pet. And, finally, the settlement allows for the potential recovery of economic damages such as travel and transportation expenses, property damage and lost wages.

59

Thus, for the reasons expressed by the Court under its discussion of the Girsh factors, and the Gunter factors, as well as the additional considerations under Prudential, the award of attorneys' fees in this class action settlement is appropriate and plaintiffs' co-lead counsels' motion will be granted.

### C. Reimbursement of Expenses

Plaintiffs' co-lead counsel are seeking reimbursement of costs and expenses in an aggregate amount of $394,403.09. They state that these expenses were incurred by plaintiffs' Co-Lead Counsel and other plaintiffs' counsel on an ongoing basis for such items as photocopying of documents, mediation costs, court filing fees, hearing transcripts, expert fees, on-line research, messenger service, postage, express mail and next day delivery, long distance and facsimile expenses, transportation, travel and other incidental expenses directly related to the prosecution of this case.  In support of their request, counsel included a list of expenses. See Appendix of Attorney Declarations (Exhibits B through H) and a summary of the expenses (Exhibit A).  The Court finds that the reimbursement of these fees reasonably incurred during the course of this litigation is appropriate.

Thus, based on the above discussion and for the reasons expressed during the fairness hearing, and defendants having no objection to the request for attorneys' fees and costs, plaintiffs' motion for attorneys' fees and reimbursement of costs is approved.

### IX.   MOTION FOR ATTORNEYS' FEES FILED BY NEWMAN, CREED & ASSOCIATES

Newman, Creed & Associates ("NC&A") filed a separate motion for attorneys' fees on the ground that they were counsel for over 130 pet owners.  NC&A seek an award of attorneys' fees equal to $425,205.25 and reimbursement of $2,768.65 in expenses incurred in the prosecution of this litigation since March of 2007.  NC&A argues that of the early actions filed in New Jersey, the action filed by them was the only one to name Proctor & Gamble/IAMS Company as a defendant.  They argue that the naming of this defendant proved to be of tremendous value to the class as a whole because it permitted an emergency motion to be filed to limit inappropriate communications between the IAMS Company and putative class members.

NC&A also argue that they worked on issues that were not part of the stay such as issues pertaining to the preservation and destruction of evidence.  NC&A also state that they were a signatory to the mediation agreement, attended four mediation sessions and were asked by lead counsel to review motions for preservation of evidence, conduct an inspection of a facility in Watsontown, Pennsylvania, and attend a conference on issues pertaining to destruction of evidence.

NC&A states that they sent a letter to lead counsel on May 29, 2008 regarding attorneys' fees but received no direct response to their letter other than the letter sent to all counsel on June 20, 2008 announcing the Settlement and asking

that time and expense sheets be submitted to the Berger Montague firm.

Plaintiffs' co-lead counsel filed a motion to strike NC&A's motion on the ground that court-appointed lead counsel is the only plaintiffs' counsel empowered to file attorneys' fees applications in class actions on behalf of the class and all plaintiffs' class counsel.  In addition, co-lead counsel argue that not only does NC&A's motion violate the terms of the Settlement Agreement, the Court's preliminary approval Order, the Court's Order appointing co-lead counsel, and the law of this and all other Circuits, but that NC&A lacks standing to file a separate motion for attorneys' fees and costs.

After providing notice, the Court in its December 18, 2007 Order, appointed co-lead counsel to manage the plaintiffs' litigation in this MDL, including the allocation of attorneys' fees.  The December 18th Order specifically authorized co-lead counsel "to delegate specific tasks to other co-counsel or committees of counsel that interim co-lead counsel may establish as appropriate" and "to collect and monitor time and expenses incurred by other plaintiffs' counsel for the efficient management of the litigation."  NC&A did not object to this Order.

On May 30, 2008, the Court granted the parties' joint motion for preliminary approval of the Settlement and set a date to "determine whether Plaintiffs' Lead Counsel's application for attorneys' fees and reimbursement of expenses should be granted"

and instructed plaintiffs' co-lead counsel to be responsible for the timely filing of "any application for an award of attorneys' fees and reimbursement of costs."  Following this Order, on June 20, 2008, co-lead counsel states that they requested that all plaintiffs' counsel submit detailed time and expense information to Co-Lead Counsel.  They state that all plaintiffs' firms complied with co-lead counsels' request, except for NC&A.  Instead, NC&A sent a letter, written by Mr. Newman, inquiring as to the amount of fees and expenses from any award in the case that would be allocated to his firm and stated that they would file a separate application for fees and expenses unless they were told how fees and expenses would be allocated to NC&A.

During the fairness hearing held on October 14, 2008, the Court also heard oral argument on NC&A's motion for attorneys' fees.  For the reasons expressed by the Court during that hearing, and in this Opinion, NC&A's motion for attorneys' fees is not ripe for decision.  It is clear that by Order of this Court, plaintiffs' co-lead counsel was given the responsibility for filing an aggregate application for attorneys' fees on behalf of all plaintiffs' firms in this matter.  They also have the responsibility of reviewing the bills submitted to them and properly and reasonably allocating the appropriate fee and reimbursement to the specific plaintiffs' firms.  See In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, 2008 WL 63269, at *20-21 (E.D. Pa. Jan. 3, 2008) (stating that co-lead counsel directed case from beginning and are best able to assess weight

63

and merit of each counsel's contribution and allowing counsel to allocate fees conserves the time and resources of the courts).

NC&A has not yet responded to co-lead counsels' request for documentation.  Thus, their objection that they anticipate not being fairly compensated is premature.  As explained by the Court during the hearing, it not possible at this time for the Court to judge the relative worth that NC&A contributed to the litigation as compared to the other 54 law firms whose efforts also contributed to the Settlement without reviewing and assessing all the billed time of all the firms, a task the Court expressly ordered co-lead counsel to perform.  Although NC&A asks the Court to award it $425,205.25 in fees and reimbursement of $2,768.65 in expenses, there has been no rejection of their claim by co-lead counsel who will be reviewing their claim in combination with the claims of all the other plaintiffs' law firms.  This matter is not appropriate before the Court at this time because it pertains to a determination that the Court ordered co-lead counsel to perform and is therefore not ripe.[21] See Freeland v. Liberty Mut. Ins. Co., No. 07-6160 (MLC), 2008 WL 2625226, at *2 (D.N.J. June 27, 2008) ("A matter is not ripe for adjudication if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quoting Texas v. U.S., 523 U.S. 296, 300 (1998)).  Thus, NC&A

---

[21]   During the hearing, Co-lead counsel assured the Court that the allocations to the plaintiffs' firms, including NC&A, will be done fairly and reasonably and the Court has no evidence at this time to doubt that that will be the case.

motion for attorneys' fees is denied.

### IX.   CONCLUSION

The plaintiffs' class is certified for settlement purposes pursuant to Rule 23(a) and (b)(3).  The motion for approval of settlement is granted pursuant to Rule 23(e).  The motion to intervene is denied and the various objections to the settlement are overruled.  Plaintiffs' co-lead counsels' motion for attorneys' fees is granted.  The motion to strike Newman, Creed & Associates's separate motion for attorneys' fees is granted.


                                            __s/Noel L. Hillman__

At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.

Dated: November 18, 2008