UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE PET FOOD PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1850 (All Cases) |
|  | Case No. 07-2867 (NLH) |
|  | The Honorable Noel L. Hillman |

## OPPOSITION OF MENU FOODS AND NESTLÉ PURINA TO MOTION TO DISMISS ORDER TO SHOW CAUSE FOR LACK OF PERSONAL JURISDICTION AND REQUEST TO OPT OUT LATE

Mary E. Gately
Cristen Sikes Rose
DLA PIPER U.S. LLP
500 8th Street, N.W.
Washington, D.C.  20004
Telephone:  (202) 799-4507
Telecopier:  (202) 799-5507
Email:  mary.gately@dlapiper.com

Liaison Counsel for Defendants
and Counsel for the Menu Foods Defendants

Craig A. Hoover
Robert C. Troyer
Miranda L. Berge
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:    (202) 637-5600
Facsimile:    (202) 637-5910

Liaison Counsel for Defendants and Counsel
for Nestlé Purina PetCare Company

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

The Mdl Settlement And Notice Plan ............................................................................... 4

This Court Rejected Challenges To The Notice Plan On Two Prio Occasions ............................ 7

The Pacquettes' Prosecution Of Released Claims ........................................................ 8

ARGUMENT ................................................................................................................... 11

I. THE NOTICE WAS CONSISTENT WITH RULE 23 AND DUE PROCESS
CONCERNS. ................................................................................................ 11

    A. There is No Merit to the Paquettes' Challenge to the Notice Previously
Approved by this Court, as the Plan Adequately and Constitutionally
Gave Individual Notice to All Those Settlement Class Members Who
Were Readily Identifiable Through Reasonable Efforts, and
Publication Notice to All Others ............................................................. 12

        1. The Notice Plan's Individual and Published Notice Satisfies
Due Process ................................................................................ 12

        2. Individual Notice to All Persons Who Contacted Defendants or
Submitted Claims Under Defendants' Historic Payment
Programs Is Not Required Under Rule 23 ............................................ 14

    B. Actual Notice to All Potential Class Members, Including The
Paquettes, Was Not Required, and With Due Diligence The Paquettes
Should Have Been Able To Discover The Existence of the MDL and
Settlement. ................................................................................................ 18

II. AN ORDER ENJOINING FURTHER VIOLATIONS OF THIS COURT'S
ORDERS IS APPROPRIATE ............................................................................. 20

III. THE PAQUETTES' REQUEST TO OPT OUT MORE THAN TEN
MONTHS AFTER THE DEADLINE SHOULD BE DENIED. ............................... 22

    A. The Paquettes Failed To Show Excusable Neglect ................................. 23

    B. The Paquettes Failed To Show That They Acted In Good Faith ............... 25

CONCLUSION ................................................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Carlough v. Amchem Prods., Inc., 158 F.R.D. 314 (E.D. Pa. 1993) .....................................13, 16

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974)............................................................... 12- 13

Fry v. Hayt, Hayt & Landau, 198 F.R.D. 461 (E.D. Pa. 2000).................................................... 18

Georgine v. Amchem Prods., Inc., Civ. A. No. 93-0215, 1995 WL 251402 (E.D. Pa. Apr. 26, 1995) ................................................................................................................................22, 24

In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig., 89 F. App'x 314 (3d Cir. 2003)................................................................................................. 18

In re Diet Drugs Prods. Liab. Litig., 92 F. App'x 890 (3d Cir. 2004)......................................... 24

In re Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534 (N.D. Ga. 1992) .......................... 14

In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389 (D.N.J. 2006).......................... 12

In re Gypsum Antitrust Case, 565 F.2d 1123 (9th Cir. 1977) ..................................................... 24

In re LG/Zenith Rear Projection Television Class Action Litig., Civ. Action No. 06-5609 (JLL), 2009 WL 455513 (D.N.J. Feb. 18, 2009).................................................................... 17

In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088 (5th Cir. 1977)................................. 16

In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283 (3d Cir. 1998) ...................... 12

In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216 (D.N.J. 2000)....18, 22, 24

In re Prudential Ins. Co. of Am. Sales Practices Litig., 232 F. App'x 161 (3d Cir. 2007)........... 21

In re Prudential Ins. Co. of Am. Sales Practices Litig., 261 F.3d 355 (3d Cir. 2001)................. 20

In re Prudential Sec. Inc. Ltd. P'ship Litig., 164 F.R.D. 362 (S.D.N.Y. 1996).......................... 24

In re Warfarin Sodium Antitrust Litig., 391 F.3d 516 (3d Cir. 2004)........................................ 17

Jones v. Chemetron Corp., 212 F.3d 199 (3d Cir. 2000)............................................................ 22

Klingensmith v. BP Prods. N. Am., Inc., No. 07-1065, 2008 WL 4360965 (W.D. Pa. Sept. 24, 2008) ................................................................................................................................ 17

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950).......................................... 13

**CASES Continued**

Report of the Conference for Dist. Judges, 63 F.R.D. 231 (1973)............................................. 24

Schroeder v. City of N.Y., 371 U.S. 208 (1962)........................................................ 13

Silber v. Mabon, 18 F.3d 1449 (9th Cir. 1994)...................................................18, 23

Skelton v. Gen. Motors Corp., Nos. 79 C 1243, 80 C 2151, 1987 WL 6281 (N.D. Ill. Feb. 3, 1987) ................................................................................................................ 14

US West, Inc. v. Bus. Disc. Plan, Inc., 196 F.R.D. 576 (D. Colo. 2000).................................... 18

Zimmer Paper Prods., Inc. v. Berger & Montague, P.C., 758 F.2d 86 (3d Cir. 1985)................ 12

**STATUTES**

28 U.S.C. § 1332 ..................................................................................................... 20

28 U.S.C. § 1651(a)................................................................................................. 21

**RULES**

Fed. R. Civ. P. 23 ...........................................................................................passim

**OTHER AUTHORITIES**

Manual for Complex Litigation § 21.311 (4th ed. 2009) ......................................... 17

# INTRODUCTION

Settlement Class Members[1] Paul and Ava Paquette repeatedly have violated this Court's Final Approval Order and flouted this Court's exclusive jurisdiction over the Settlement and Final Approval Order by litigating released claims against Nestlé Purina PetCare Company and Menu Foods in an action they filed in the Central District of California (the "California Action") in March 2009. Finding that the Paquettes "appeared to be in violation of the Final Approval Order," on June 8, 2009, this Court issued an Order to Show Cause [D.E. 346] which required the Paquettes to demonstrate within 14 days why they should not be held in contempt for refusing to discontinue prosecution of the California Action. [D.E. 272 & 273]. Just three days after being served with that Order, the Paquettes improperly filed a motion for relief in the Central District of California, asking that court to interpret the Final Approval Order, and find that the Notice Plan which has been approved on multiple occasions by this Court was inadequate, and that this Court accordingly lacked personal jurisdiction over them.[2] A week later, they filed the instant motion (which substantively is identical to the motion they filed in California federal court) in an apparent attempt to justify their multiple, knowing, and willful contraventions of this Court's orders related to its continuing and exclusive jurisdiction over the interpretation and enforcement of the Settlement and Final Approval Order.

But no matter the forum in which the Paquettes attempt to evade the impact of this Court's orders, there can be no question that the Notice Plan approved by this Court in its

---

[1] All capitalized terms herein shall have the definitions provided in the Settlement Agreement unless otherwise indicated.

[2] Nestlé Purina opposed that Motion because this Court, which retained continuing and exclusive jurisdiction over the interpretation and enforcement of the Settlement and Final Approval Order, is the only proper forum to decide these issues. See Declaration of Miranda Berge ("Berge Decl.") Ex. A.

Preliminary and Final Approval Orders (and affirmed several times since) was "the best notice practicable under the circumstances." The Claims Administrator successfully implemented this vast and extensive Notice Plan, which involved direct mailed notice to individuals who had been identified as likely Settlement Class Members because they had been previously paid under Defendants' Historic Payment Programs and other individuals, as well as broad published notice (and the concomitant publicity this case and settlement received) that reached millions more. As the Court already held, the Notice Plan complied with Rule 23 and relevant precedent regarding class action notice.

In fact, on several separate occasions, this Court already has considered – and rejected – other challenges to class notice made by other Settlement Class Members who, like the Paquettes, sought to evade this Court's jurisdiction and the impact of the Court's Final Approval Order. In each case, the Court flatly repudiated the notion that class notice was inadequate, and expressed understandable skepticism that responsible counsel could fail to learn of this extremely well-publicized settlement, notice of which was disseminated far and wide through the Court's approved Notice Plan. Although it is surprising that the Paquettes claim to have had no knowledge of this massive class action, there is little doubt that had they engaged in even a modest amount of research prior to filing a complaint in the Central District of California, they easily could have learned of the MDL and objected to the settlement, opted out, or submitted a timely claim for reimbursement. But neither the fact that the Paquettes may not have received actual notice nor their failure to conduct even the most basic research about their claims entitles them to flout this Court's Final Approval Order and Judgment.

Nevertheless, the Paquettes contend that the Notice Plan was inadequate and that it should have provided individual, mailed notice to the hundreds of thousands of people who, like

them, had contacted or submitted claims through Defendants' Historic Payment programs. The Paquettes' argument is without merit. The law only requires notice to persons whose status as class members can be ascertained through "reasonable effort" and suggests that notice plans that would notify a substantially overinclusive group of people does not constitute the "best notice practicable." Here, individual notice of every person who contacted or submitted claims under the Defendants' Historic Payment programs would have meant either that thousands upon thousands of persons who had been determined <u>not</u> to be likely class members (or for whom no such determination could be made) would have received notice and thereby been confused as to their rights – or that an inordinate amount of effort and delay would have been required in order to determine, person by person, who was a likely Settlement Class Member. That is not what the law requires.

Accordingly, the result here for the Paquettes should be no different than others who complained about notice and continued to pursue Released Claims in violation of the Court's Final Approval Order: their Motion should be denied and they should be ordered to dismiss the California Action. Further, the Paquettes are not entitled to relief from the Final Approval Order and Judgment, as they have made no showing sufficient to justify their failure to meet this Court's deadlines and repeatedly have flouted this Court's jurisdiction.

As indicated previously, Defendants conferred with Plaintiffs and they do not object to the Motion for an Order to Show Cause against the Paquettes. In addition, Plaintiffs affirmatively support Defendants' arguments concerning adequacy of notice in this Opposition.

# BACKGROUND

**The MDL Settlement and Notice Plan.**

On May 30, 2008, this Court granted preliminary approval to a landmark, cross-border settlement to resolve claims of Settlement Class Members in the United States and in Canada arising out of the pet food recall initiated in March 2007. This Court granted Final Approval of the Settlement on November 17, 2008. This Court has approved the form and manner of class notice, once in connection with preliminary approval, and once in connection with final approval. Both times, this Court found that the Notice Plan provided the "best notice practicable under the circumstances, constitute[d] sufficient notice to all persons entitled to notice, and satisf[ied] the constitutional due process requirements of notice." Prelim. Approval Order, ¶ 12; Op., pp. 6-7. In addition, this Court rejected challenges to the notice made by other Settlement Class Members who were prosecuting Released Claims in violation of the Final Approval Order, stating that:

> Valid, due and sufficient Notice of the Settlement that complied fully with the laws of the State of New Jersey, the Federal Rules of Civil Procedure, the United States Constitution, due process and other applicable law was provided to members of the Settlement Class.

Order Enjoining Settlement Class Members Slembecker and Dotoli (D.E. 338) ¶ 11.

The Notice Plan provided for both individual mailed notice and extensive publication notice. Individual notice was made to three categories of people: (1) all persons who were paid as part of a Historic Payment program;[3] (2) "all persons who completed and returned a claim form to Crawford & Company and whose names and addresses are in a readily accessible database maintained by Crawford & Company"; and (3) individuals who were the subject of the

---

[3] Historic Payments are "amounts already paid … in settlement or reimbursement of claims for certain injury, death or screening expenses associated with a pet's consumption of Recalled Pet Food Products . . . ." Settlement Agreement § I.Z. Accordingly, by definition, recipients of Historic Payments are Settlement Class Members.

Court's Order to Show Cause dated August 28, 2007. Preliminary Approval Order at 7. As the Paquettes acknowledge, they do not fall into any of these three categories. Accordingly, they were not entitled to receive Notice of the Settlement by mail.

The extensive plan for publication of the settlement approved by this Court – targeted to reach adults of all economic levels ages 18 and over who own or did own a dog or cat in 2007 – was developed and supported by established, experienced experts in class notice and media campaigns. Declaration of Alison Kauker in Support of Proposed Notice Plan ("Kauker Decl."), attached as Exhibit C to the Declaration of Edward J. Sincavage in Support of the Proposed Notice Plan ("Sincavage Notice Plan Decl.") ¶¶ 8-9 (D.E. 151-22). [4] Heffler Radetich & Saitta LLP developed the Notice Plan based on its extensive experience in implementing class action notification, research regarding the Pet Food Recall, the pet food industry, pet food purchaser, and pet owner demographics in the United States and Canada, and in consultation with Plaintiffs' Lead Counsel and SK Advertising LLC. Proposed Notice Plan, attached as Exhibit B to the Sincavage Notice Plan Decl. p. 3 [D.E. 151-22].

As routinely occurs in class action cases, the publication portion of the Notice Plan was targeted to reach Settlement Class Members whose identities were unknown. Proposed Notice Plan, attached as Exhibit B to Sincavage Notice Plan Decl. In the United States, Notice of the Settlement was published in the following:

---

[4]     Heffler Radetich & Saitta LLP has over 47 years of experience in the field of Class Notice and Claims Administration, has been appointed settlement administrator in over 500 class action settlements, and handled the notification programs in most of those cases. Sincavage Notice Plan Decl. ¶¶ 3-4. SK Advertising LLC is an advertising agency specializing in the design and implementation of media-based Notice Plans that target class members in class actions and in Chapter 11 and Chapter 13 bankruptcy cases, and has conducted media noticing programs in hundreds of class actions. Kauker Decl., attached as Exhibit C to Sincavage Notice Plan Decl. ¶¶ 1-2, 5.

Consumer Magazines: Parade Magazine (est. circulation 32,400,000); AARP Magazine (est. circulation 22,500,000); and People Magazine (est. circulation 3,750,548);

Pet Magazines: Dog Fancy (est. circulation 237,614); Cat Fancy (est. circulation 232,042); AKC Family Dog (est. circulation 171,500); Bark (est. circulation 75,000); Best Friends (est. circulation 201,029); and Dog World (est. circulation 37,561);

U.S. Veterinary Publications: DVM Magazine (est. circulation 171,595); Journal of American Veterinary Medical Association (est. circulation 71,871); Trends Magazine (est. circulation 32,000); Veterinary Forum (est. circulation 53,839); Veterinary Medicine (est. circulation 55,208); Veterinary Practice News (est. circulation 54,678); and

U.S. Newspapers: New York Times, USA Today, Burlington Free Press, Cincinnati Enquirer/Post, Columbus Dispatch, Des Moines Register, Detroit News & Free Press, Hartford Courant, Honolulu Advertiser, Indianapolis Star, Louisville Courier-Journal, Milwaukee Journal-Sentinel, Minneapolis Star-Tribune, Nashville Tennessean, & the Wilmington News Journal.

Id. at 5-6; Declaration of Edward J. Sincavage, CPA Regarding the Dissemination of U.S. Notice to the Class ("Sincavage Notice Dissemination Decl.") [D.E. 249-12], Exhibit B, p. 1 [D.E. 249-14]. In addition, notice was released to PR Newswire and advertised via Google AdWords. Id. A settlement website, www.petfoodsettlement.com, and a toll-free "800" telephone number also were established. Sincavage Notice Dissemination Decl. ¶¶ 11-12. Upon review of the Notice Plan, Alison Kauker of SK Advertising opined as follows:

> Based on the foregoing and my experience, it is my opinion that the Proposed [Notice] Plan presented, in addition to direct mail, will be a comprehensive, effective, and cost-efficient plan for communicating notice to the target audience. Based on my more than 25 years of experience in designing publication plans for hundreds of class action settlements, the Proposed [Notice] Plan presents a system for building awareness of the recall and claims process through publications, newswire releases, and internet advertising. I believe the Plan, in conjunction with the direct notice plan, can provide the best notice that is reasonable and practicable under the circumstances to reach potential class members.

Kauker Decl. ¶ 17; see also Sincavage Notice Plan Decl. ¶ 8 ("It is my opinion that the Notice Plan as outlined above and in Exhibit B is the best notice that is reasonable and practicable under

the circumstances to reach potential Settlement Class members"). This Court's website also includes a link to the Claim Administrator's website called "Pet Food Settlement."

Finally, in addition to the Approved Notice Plan, this case and the Settlement received extensive media attention. As this Court previously observed, "This case received broad publicity both in print and broadcast media. There were national news reports about the preliminary settlement. For example, on October 15, 2008 (under the headline "Judge OKs $24 million for cats, dogs sickened by pet food"), the Los Angeles Times carried an article stating that pet owners had until November 24, 2008, to file claims. Anyone who engaged in a minimum amount . . . [or] a relatively easy amount of research would have found the information about this settlement." September 17, 2008 Hrg. Tr. at 18:6-14. Menu Foods also issued press releases and updates regarding Preliminary and Final Approval of the Settlement, all of which provided contact information for the Claims Administrator, and all of which remain available on its website under a webpage titled "Recall Information." See Menu Foods website, "Recall Information," available at http://www.menufoods.com/recall/index. html.

**This Court Rejected Challenges to the Notice Plan on Two Prior Occasions**

This Court considered a challenge to notice filed in August 2008 by Robert M. Josephs, who sought relief from the opt out deadline. This Court rejected his challenge. Similarly, this Court considered and rejected challenges to the Notice Plan by two other Settlement Class Members, Lois Slembecker and Cynthia Dotoli in March-April 2009. In rejecting their challenges, this Court held that knowledge of this Settlement was so expansive that it was difficult to avoid learning of its existence:

> If you googled [co-Defendant/co-Released Entity] Iams, you would have found the existence of this case. We put it up on the Court website. It was in every major newspaper. It was on the nightly news. You have to have had your head in the sand not to know about this case.

Apr. 3, 2009 Hrg. Tr. at 9-10 (emphasis added).

**The Paquettes' Prosecution of Released Claims.**

Paul and Ava Paquette both are attorneys. The e-mail address of Mr. Paquette, who is proceeding pro se and representing his wife, indicates that he works for the Department of Water and Power of Los Angeles. According to documents Mr. Paquette has provided to this Court, it appears that Ms. Paquette works for Moxon & Kobrin, a law firm in Los Angeles. See Motion to Dismiss OSC for Lack of Personal Jurisdiction, Exhibit 2 (Moxon & Kobrin letterhead listing Ava Paquette as one of its attorneys).[5]

The Paquettes allege that, in March 2007, they contacted Nestlé Purina about the death of their pet. The Paquettes further state that shortly thereafter, on June 18, 2007, they sent correspondence to a claims administrator for Nestlé Purina, Sedgwick Claims Management Services. In this June 18, 2007 correspondence (attached as Exhibit 2 to the Paquettes' motion to this Court), the Paquettes threatened to file suit if they were not contacted within approximately one week. The Paquettes also attached to this letter "a copy of our contemplated suit," which indicated that they had retained counsel to represent them in connection with their claims. [6] After Nestle Purina's claims administrator, Sedgwick CMS, received this final communication from the Paquettes, the claims resolution process with the Paquettes was suspended.

The Paquettes did not file the complaint attached to their correspondence in 2007 or 2008. Mr. Paquette apparently was aware of class action proceedings in 2007 relating to the pet food

---

[5]     Mr. Paquette signed this letter on Moxon & Kobrin letterhead, but his relationship with the Moxon & Kobrin firm is unknown.

[6]     A copy of their draft complaint is not included in Exhibit 2 to the Paquettes' Motion. A true and correct copy of that cover letter and draft complaint is attached as Exhibit B to the Declaration of Miranda Berge.

recalls in the Central District of California.  Berge Decl. ¶ 4.  The Paquettes did not opt out of the Settlement Class by this Court's August 15, 2008 deadline.  Not until March 2009 – approximately seven months after the opt out deadline and four months after this Court issued its Final Approval Order – did the Paquettes file the California Action.

As described more fully in Defendants' Motion for an Order to Show Cause to the Paquettes (which is incorporated by reference in this Opposition), when Defendants became aware of the Paquettes' California Action, counsel for Menu Foods contacted Mr. Paquette to request that his Complaint be dismissed immediately pursuant to this Court's Orders. Declaration of Cristen Sikes attached to Motion to Show Cause (hereinafter "Rose Decl."), Exhibit 3.  Mr. Paquette was informed of the release, injunction, and covenant not to sue in this Court's Final Approval Order, and was provided a copy of that Order.  Id.  Mr. Paquette also was provided a copy of an Order to Show Cause that this Court issued to Lois Slembecker and Cynthia Dotoli,  two Settlement Class Members who, like the Paquettes, did not opt out of the Settlement and were attempting to prosecute Released Claims, and this Court's subsequent Order enjoining those Settlement Class Members.  Rose Decl. Exs. 5-6.

Nonetheless, on May 15, 2009, Mr. Paquette caused the Complaint in the California Action to be served on Nestlé Purina and also proposed a pre-motion meet and confer with counsel to discuss his stated intention "to file a motion for relief from [this Court's Final Approval Order and Final Judgment] and to opt out of the class late in accordance with controlling Ninth Circuit authorities."  Rose Decl. Ex. 2.  During that call, Mr. Paquette advised counsel for Menu Foods and Nestlé Purina that he intended to file a motion with the U.S. District Court for the Central District of California where the California Action is pending, seeking relief from this Court's Final Approval Order and Final Judgment.  Rose Decl. ¶ 9.  Notwithstanding

being directed to the exclusive jurisdiction provisions within this Court's Orders related to the Settlement, Mr. Paquette indicated that he would file his motion with the U.S. District Court for the Central District of California after Nestlé Purina had responded to his Complaint in his California Action.  Id.  During that same call, Menu Foods and Nestlé Purina advised Mr. Paquette that they would seek enforcement of this Court's Orders in this Court.  Id.

On June 8, 2009, this Court entered an Order finding that "[i]t appear[s] that the Paquettes are in violation of the Courts' [Final Approval Order]."  The Order required the Paquettes to Show Cause why they should not be held in contempt for refusing to discontinue the prosecution of the California Action contrary to this Court's Final Approval Order.  Only three days after they were served with this Court's Order to Show Cause, the Paquettes moved in the U.S. District Court for the Central District of California for relief from this Court's Final Approval Order and Order to Show Cause.  In that motion, the Paquettes asked the U.S. District Court for the Central District of California to find that the Class Notice Plan approved by this Court was inadequate, to find that this Court lacks personal jurisdiction over the Paquettes for purposes of enforcing its Final Approval Order, and to allow the Paquettes to opt-out late from the Settlement.  Nestlé Purina filed an opposition to that motion on the ground that this Court had exclusive jurisdiction over the issues raised therein and moved to stay all proceedings in the California Action pending a ruling by this Court on the show cause motion.  The Paquettes' Motion for Relief is set for a hearing in the U.S. District Court for the Central District of California on Monday, July 6, 2009, and Nestlé Purina's response to Complaint is also due July 6. [7]

---

[7]     Menu Foods has not been served in the Paquettes' California Action.

**ARGUMENT**

I.    **THE NOTICE WAS CONSISTENT WITH RULE 23 AND DUE PROCESS CONCERNS.**

    A.    **There is No Merit to the Paquettes' Challenge to the Notice Previously Approved by this Court, as the Plan Adequately and Constitutionally Gave Individual Notice to All Those Settlement Class Members Who Were Readily Identifiable Through Reasonable Efforts, and Publication Notice to All Others.**

Despite the extensive notice provided by the Notice Plan and being aware of both this Court's Final Approval Order and Show Cause Order, the Paquettes nevertheless attempt to justify their repeated violations of those Orders by asserting that the notice plan failed to satisfy the requirements of due process or Federal Rule 23 because they were not provided with individual, mailed notice.  While they admit that they were not entitled to direct notice under the Notice Plan because they were not paid under Nestlé Purina's Historic Payment program, they claim that they should have been provided with such notice because they had previously submitted a claim under that program.  The Paquettes' belated challenge – coming more than six months after final approval of the Settlement – clearly lacks merit, as the Court has already found on multiple occasions that the Notice Plan, amply complied with due process and was "the best notice that is practicable under the circumstances."  See Prelim. Approval Order, ¶ 12; Op., pp. 6-7.  Moreover, contrary to the Paquettes' arguments, the Notice Plan's targeted individual notice to Settlement Class Members and extensive publication notice is fully consistent with relevant precedent regarding class notice, including the law relied upon by the Paquettes in their Motion to Dismiss.  As discussed below, the law only requires individual class notice for persons whose identity as class members is known or can be easily ascertained through reasonable effort. Thus, the fact that the Notice Plan directed individual notice to those persons who had been "paid" as part of defendants' Historic Payment Programs – as opposed to the thousands upon

thousands of people who had merely contacted or submitted a claim under such programs –
meant that individual notice was made to those persons whose identities as class members could
be determined through reasonable efforts (and not to those persons who had been determined not
to be class members or for whom no such determination could be made without unreasonable
effort).

1.     **The Notice Plan's Individual and Published Notice Satisfies Due Process.**

Third Circuit law is clear that the Notice Plan's combination of targeted individual and
publication notice constitutes the best notice possible and satisfies Rule 23.  See Zimmer Paper
Prods., Inc. v. Berger & Montague, P.C., 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in
the usual situation first-class mail and publication in the press fully satisfy the notice requirement
of both Fed. R. Civ. P. 23 and the due process clause.") (citations omitted); In re Prudential Ins.
Co. Am. Sales Practice Litig., 148 F.3d 283, 327 (3d Cir. 1998) ("[T]he combination of
individual and publication notice, combined with the unsolicited news coverage the settlement
received, greatly increased the possibility that Prudential will ultimately compensate a greater
number of injured policyholders than would otherwise have been possible."); In re Elec. Carbon
Prods. Antitrust Litig., 447 F. Supp. 2d 389, 414 (D.N.J. 2006) (holding that "[t]he notice
provided was the best notice practicable under the circumstances and included individual notice
by first class mail to all members of the Settlement Class who could be identified through
reasonable effort, as well as notice" by publication, which together "fully complied in all
respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due
process").

Moreover, the law also is clear that individual notice need be provided only to individuals
whose identities as class members who can be ascertained through "reasonable effort."  Eisen v.

Carlisle & Jacquelin, 417 U.S. 156, 177 (1974). Indeed, each of the cases cited in the Paquettes'
brief, including Eisen, simply stand for the undisputed proposition that settling parties must
provide individual notice to persons whose status as class members was already established or
who could be deemed indisputably, readily, or "easily" identifiable as class members through
"reasonable effort." See id. at 175 (finding that defendants had a list of the universe of persons
who unquestionably qualified as class members, "the names and addresses of [whom] are easily
ascertainable" and requiring individual notice by mail to each) (emphasis added); Mullane v.
Cent. Hanover Bank & Trust Co., 339 U.S. 306, 318 (1950) (overruling, in non-class action
context, appellant's constitutional objections to published notice for unknown or conjectural
beneficiaries while requiring individual notice to those "known present beneficiaries of known
place of residence"); Schroeder v. City of N.Y., 371 U.S. 208, 212-13 (1962) (requiring, in non-
class action context, notification by mail to landowners of condemnation proceedings affecting
their property).

Thus, where the identity of settlement class members is not readily ascertained,
publication or hybrid publication/direct notice will suffice. For example, in Carlough v.
Amchem Products, Inc., 158 F.R.D. 314, 327 (E.D. Pa. 1993), the court approved of the
extensive notice plan to those class members who were readily identifiable through reasonable
efforts, but it rejected the objectors' wishes to notify additional potential class members by mail.
(The Paquettes cited a proceeding related to Carlough on their Motion to Dismiss.) The court in
Carlough distinguished Eisen on the grounds that it had no duty to notify a list that was
"substantially overinclusive" – i.e., that included both class members and others who were not
members. Id. The court noted that "[i]n striking the balance between protecting the rights of
absent class members and making Rule 23 workable, courts have held that it is not necessary to

send individual notices to an overinclusive group of people simply because that group contains some additional class members whose identifies [sic] are unknown." Id.  Accordingly, the court ruled that the existing direct mail notice provisions to readily identifiable class members were sufficient, "especially in light of the extensive, and probably more effective," publication notice plan.  Id. at 328; 8 see also Skelton v. Gen. Motors Corp., Nos. 79 C 1243, 80 C 2151, 1987 WL 6281, at *3 & n.3 (N.D. Ill. Feb. 3, 1987) (finding that notifying overinclusive list "could mislead many thousands of ineligible [persons] into thinking that they qualify to recover in this action" and would "generate considerable confusion and additional expense in administering the settlement"); In re Domestic Air Transp. Antitrust Litig., 141 F.R.D. 534, 546 (N.D. Ga. 1992) (holding that notification to overinclusive list would "most likely confuse the recipients and encourage claims by non-class members").

### 2. Individual Notice to All Persons Who Contacted Defendants or Submitted Claims Under Defendants' Historic Payment Programs Is Not Required Under Rule 23.

Under this precedent, the Paquettes' argument that class notice was insufficient because it did not provide individual notice to persons who, like them, had submitted claims but were not paid under Defendants' Historic Payment Programs is simply wrong.  That argument would have required that class notice be provided to a substantially overinclusive number of individuals, in addition to those whom Defendants or their claims administrators had already determined to be persons who purchased, or whose pets consumed, Recalled Pet Food Products and suffered damages thereby – i.e., likely Settlement Class Members.  Indeed, that group would have

---

8       While the notice plan in Carlough included direct mailed notice to certain groups of potential settlement class members (as well as the universe of identified settlement class members), the court made clear that such notice was not required in order to satisfy Rule 23.  158 F.R.D. at 324-28 (noting that a comparison of the individual notice campaign proposed with those approved in similar class actions "shows that the efforts here are more than adequate to meet the requirements of Rule 23(c)(2)") (citing cases).

included thousands upon thousands of individuals who either had been determined by Defendants or their claims administrators <u>not</u> to be likely persons who would have qualified as Settlement Class Members based on information provided – or for whom no such determination could have been made at all or without unreasonable effort.

As this Court is aware, in the wake of the recall, some Defendants established or supplemented existing customer care programs to manage the large volume of calls that they were receiving.  <u>See</u>, <u>e.g.</u> <u>Sokolwski v. Menu Foods</u>, Case No. 2007cv01709 (D.N.J.), Declaration of Marti Hissong [D.E. 13-2].  Defendants were receiving hundreds of thousands of contacts from consumers regarding the 2007 pet food recalls; over 210,000 customer contacts were fielded between March 2007 and June 2007 by co-Released Entity/co-Defendant Iams alone.  <u>Id.</u>

Individuals who contacted Defendants did so for a variety of reasons.  Persons who contacted Iams, for example, made a variety of requests within its customer care program, including (i) to ask questions about the recall and its scope, and whether it was limited to a particular type of food, (ii) to ask questions about whether certain products were safe, (iii) to seek reimbursement of product purchases in accordance with a money-back guarantee, regardless of whether the product was recalled and (iv) to seek reimbursement of or direct payment to veterinary clinics for veterinary expenses for pets allegedly harmed by pet food that may have been recalled.  <u>See</u> <u>id.</u> at ¶¶ 11-12. 9  In fact, at a hearing on June 27, 2007, the Court reviewed the nature of these substantive and non-substantive questions that consumers were posing to

_____

9    A claims administrator company called Crawford & Company also was retained on behalf of Menu Foods shortly after the announcement of the Recall to receive and adjust claims presented to Menu Foods.  <u>See</u> Mem. in Supp. of Joint Mot. for Prelim. Approval [D.E. No. 151] at 8.  However, this program was terminated, and Crawford & Company was directed to cease all communications with potential claimants following proceedings before this Court.  <u>Id.</u>

Iams, Menu Foods, and the other manufacturers. Thus, the questions, information, and requests directed to these claims and customer care programs were not limited to individuals with recall claims for reimbursement. Moreover, many claims submitted under Defendants' Historic Payment Programs did not result in payment for a variety of reasons – they may have been deemed meritless or unsupported by the records provided, or unsupported by any records or any other information, abandoned, or suspended due to attorney representation of the claimant. Thus, persons who contacted Defendants though their Historic Payment Programs went well beyond the members of the Settlement Class certified by this Court.

Accordingly, under these circumstances, a notice plan which provided for individual mailed notice to every single person who merely left their names and addresses with or submitted claims to Defendants would have been substantially overinclusive and inefficient. Moreover, in order to identify additional potential class members beyond those who had been paid under Defendants' Historic Payment Programs, an inordinate amount of effort – as well as a substantial delay in distributing Notice and Settlement Funds to bona fide Settlement Class Members – would have been required to examine all of the records submitted by claimants to determine who likely was a Settlement Class Member and who likely was not.

Such an enormous undertaking was simply not required. See In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1098-99 (5th Cir. 1977) (noting that the word "reasonable" in the "reasonable effort" requirement of Rule 23(c)(2) could not be ignored because "[i]n every case, reasonableness is a function of anticipated results, costs, and amount involved"); Carlough, 158 F.R.D. at 327 (citing cases for the proposition that "courts have refused to order identification efforts that would require impractical and extended searches or would be unduly time-consuming or expensive") (internal quotations and citations omitted).

In addition, class notice consistent with due process was given to all other potential class members who were not identifiable through reasonable effort, as the Notice Plan provided for an extensive publication notice campaign through national and industry-tailored newspapers and magazines.  See Apr. 3, 2009 Hrg. Tr. at 10 (noting that the "carefully thought out" publication notice was "proposed to this Court, considered by this Court," and targeted to both general circulation and industry-specific newspapers).  Such notice fully accords with Third Circuit precedent.  See In re LG/Zenith Rear Projection Television Class Action Litig., Civ. Action No. 06-5609 (JLL), 2009 WL 455513, at *2 (D.N.J. Feb. 18, 2009) ("Publication notice is considered a sufficient means to reach class members whose identities and addresses are not known.") Indeed, publication notice alone has regularly been found sufficient where individual class members were not readily identifiable through reasonable efforts.  See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536-37 (3d Cir. 2004) (holding that "even in the absence of any individual notice via direct mail in this matter," district court acted within its discretion in determining that "reasonable effort" was made to provide "the best notice practicable under the circumstances"); Klingensmith v. BP Prods. N. Am., Inc., No. 07-1065, 2008 WL 4360965, at *5-6  (W.D. Pa. Sept. 24, 2008) (holding that proposed notice by publication rather than individual notice "complies with Rule 23(c)(2) and Rule 23(e)" where no single repository of names and addresses of each potential class member exists). [10]

---

[10]     Notice by publication may be especially appropriate where, as here, no sales records are kept of those people who purchased the Recalled Pet Food Products (and thus are Settlement Class Members).  See Manual for Complex Litigation § 21.311 (4th ed. 2009) (noting that "if no records were kept of sales of an allegedly defective product from retailers to consumers, publication notice may be necessary").

In sum, this dual-pronged notice approach, involving both extensive publication and individual notice by first-class mail, is constitutional and satisfies the Federal Rules. <u>See</u> <u>Zimmer</u>, 758 F.2d at 90.

**B.**     **Actual Notice to All Potential Class Members, Including The Paquettes, Was Not Required, and With Due Diligence The Paquettes Should Have Been Able To Discover The Existence of the MDL and Settlement.**

As explained, the Notice Plan provided broad-based, constitutional notice across the United States, in accordance with the U.S. Constitution and the Federal Rules – whether or not the Paquettes received actual notice themselves. Indeed, the law is clear that Rule 23 does not require actual notice to every absent class member before a notice program satisfies constitutional standards. <u>See, e.g.</u>, <u>Fry v. Hayt, Hayt & Landau</u>, 198 F.R.D. 461, 474 (E.D. Pa. 2000) ("Due process does not require that every class member receive actual notice, and, therefore, failure to receive notice is not fatal to the plan.") (citing, in part, <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 177 F.R.D. 216, 233 (D.N.J. 2000)); <u>see also</u> <u>US West, Inc. v. Bus. Disc. Plan, Inc.</u>, 196 F.R.D. 576, 582-83 (D. Colo. 2000) (citing <u>Silber v. Mabon</u>, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (holding that Rule 23(c)(2) was satisfied despite some absent class members not receiving actual notice).

Regardless, the Paquettes' claim of insufficient notice rings hollow here, when even a modicum of research as to the Defendants, the pet food recall, or the Paquettes' potential claims would have revealed the existence of this class action and settlement. <u>See</u> <u>In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.</u>, 89 F. App'x 314, 316 n.3 (3d Cir. 2003) (agreeing with the district court's findings that given the extensive publicity surrounding the settlement, it was unlikely that neither plaintiff nor her attorney had received any notice of it). For example, in rejecting the Motion for Declaratory Judgment by Settlement Class

Member Robert M. Josephs,[11] who sought to opt out of the Settlement after the deadline to do so, the Court noted that:

> Anyone who engaged in a minimum amount, and not trying to be critical of you, Mr. Josephs, it seems that you are fighting hard for your case, and I'm not suggesting that you had actual knowledge, but is seems to me that a <u>relatively easy amount of research would have found information about this settlement</u> . . . And, under the circumstances feel that it's equitable for him to be in the same position as other class members whose time to opt out has expired and who had not received actual notice, but rather the notice to the world that was carefully thought out, proposed by the plaintiffs and defendants and previously approved by the Court.

Sept. 17, 2008 Hrg. Tr. at 18:3-14; 19:19-20:2; <u>see also</u> Apr. 3, 2009 Hrg. Tr. at 10 ("You have to have had your head in the sand not to know about this case").

Because the Notice Plan provided pursuant to the Preliminary Approval Order was reasonable and adequate, this Court held that Mr. Josephs was enjoined from proceeding against a Released Entity, even though Mr. Josephs received no actual notice. Order dated Sept. 18, 2008 [D.E. 233]. Likewise, on even more similar facts, the Court recently enjoined Lois Slembecker and Cynthia Dotoli, who both claimed they had not received notice, from prosecuting rival actions in the Southern District of New York and in New Jersey state court, respectively. These individuals had challenged the Court's notice program, but the Court held in no uncertain terms that the notice program satisfied due process and Federal Rule of Civil Procedure 23. <u>See</u> Apr. 3, 2009 Hrg. Tr. at 10.

As in these matters involving Mr. Josephs, Ms. Slembecker, and Ms. Dotoli, the fact that the Paquettes did not receive actual notice of the settlement does not relieve them of its finality, and they should thus be in the same position as those class members (and all others) who missed the deadline to opt out. Mr. Paquette, who is a lawyer, threatened to file a lawsuit "if I do not

---

[11] Interested Party's Motion for Declaratory Judgment and Relief from Stay ("Motion for Declaratory Judgment") [D.E. 188]; Order [D.E. 209].

hear from [Sedgwick]" within a week.  See Berge Decl. Ex. B.  Mr. Paquette made that threat on

June 18, 2007; and yet he waited nearly two years before making any effort to communicate with

Purina.  This delay is in spite of the fact that he even acknowledged to Defendants' counsel that

<u>he actually was aware of the various class action lawsuits pending in the Central District of

California as of mid-2007</u>.  Berge Decl. ¶ 4.  Had he or the attorney appearing on that Complaint

done even a modest amount of research then or in the interim period between sending the letter

and filing the California Action, the Paquettes would have been aware of the MDL and the

Settlement.  The Paquettes apparently chose not to perform their due diligence and thus claim to

have been unaware of the MDL or the Settlement, but that is no reason to second-guess the

constitutionality of the Notice Program.

## II.     AN ORDER ENJOINING FURTHER VIOLATIONS OF THIS COURT'S ORDERS IS APPROPRIATE.

This Court has jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C.

§ 1332, and it has jurisdiction over all parties, including the Paquettes.  Final Approval Order,

¶ A.  In the Final Approval Order and Judgment, this Court dismissed all claims against Menu

Foods and Nestlé Purina (among others) with prejudice, and expressly retained jurisdiction over

this action and all Settlement Class Members "for purposes of supervising, administering,

implementing, enforcing and interpreting the Settlement . . . and over enforcement of the Final

Approval Order and [Final] Judgment, including but not limited to the injunction [prohibiting

Settlement Class Members from prosecuting Released Claims against Released Entities]

described in Paragraph 9."  <u>Id.</u> ¶ 22.  Such express retention of continuing and exclusive

jurisdiction is constitutional and fully comports with Third Circuit law.  <u>In re Prudential Ins. Co.

of Am. Sales Practices Litig.</u>, 261 F.3d 355, 368-69 (3d Cir. 2001) (approving of district court's

retention of continuing and exclusive jurisdiction over the enforcement and interpretation of

class action settlement and related orders).  Moreover, this Court may properly exercise its continuing jurisdiction by enforcing its Final Approval Order and Judgment and enjoin Settlement Class Members — like the Paquettes — from prosecuting Released Claims in other jurisdictions.  See In re Prudential Ins. Co. of Am. Sales Practices Litig., 232 F. App'x 161, 165 (3d Cir. 2007); 28 U.S.C. § 1651(a) (authorizing federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

The Paquettes did not opt out of the Settlement, and they do not dispute that their claims are Released Claims against Released Entities.  Thus, the Paquettes are bound by this Court's Final Approval Order and Judgment, including paragraph 9.  They are knowingly and willfully violating this Order by refusing to dismiss the California Action and seeking relief from this Court's Orders before the Central District of California.  Just as in the case of Ms. Slembecker and Ms. Dotoli, who also prosecuted a separate action despite knowing that the Pet Food Settlement "could implicate their proceedings," they did not come to this Court directly for relief.  See Apr. 3, 2009 Hrg. Tr. at 11 (noting that the Court "had to come to you . . . [and] track you down and bring you here to ask you why you're continuing to proceed in a Court in which a fair construction of my order would lead a reasonable attorney to know that you were acting in actual contempt of my order"); see also id. at 12 (observing that attorney had 15 months to research client's claims and where they could be asserted, and yet she "waited until literally the day that the claims period expired, after extensive hearings in this Court, carefully calculated notice and broad publicity").

Under these circumstances, there is little doubt that by actively seeking to prosecute their action in the Central District of California, the Paquettes are flouting and disobeying this Court's

"exclusive and continuing jurisdiction" over the pet food litigation and Settlement Class

Members related to the interpretation and enforcement of the Settlement, Final Approval Order,

and Judgment. Final Approval Order, ¶ 22. Accordingly, Menu Foods and Nestlé Purina request

that this Court enjoin the Paquettes from pursuing their pending litigation elsewhere in violation

of this Court's Orders.

## III. THE PAQUETTES' REQUEST TO OPT OUT MORE THAN TEN MONTHS AFTER THE DEADLINE SHOULD BE DENIED.

In order to obtain relief from the opt-out deadline, the Paquettes bear the burden of

establishing that their failure to meet that deadline constituted excusable neglect and that they

have acted in good faith. Jones v. Chemetron Corp., 212 F.3d 199, 205 (3d Cir. 2000); see also

In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. at 237 ("To establish

excusable neglect, a movant must show both good faith and a reasonable basis for not acting

within the specified period.") (citation omitted); Georgine v. Amchem Prods., Inc., Civ. A. No.

93-0215, 1995 WL 251402, at *4, *13 (E.D. Pa. Apr. 26, 1995) ("The Supreme Court has stated

that the determination of whether a party's neglect of a deadline is excusable is an equitable one,

taking account of all relevant circumstances surrounding the party's lapse.").

The Paquettes were on notice of their potential claims by as early as June 2007. They

were also aware of recall-related class action lawsuits pending in the Central District of

California around that time. See Berge Decl. ¶ 4. Yet they waited nearly two years (ten months

after the opt-out deadline) to file the California Action. Their only explanation for such neglect

– their erroneous arguments that the Notice Plan repeatedly approved by this Court was

inadequate – comes nowhere close to satisfying their burden of establishing excusable neglect.

In addition, the Paquettes do not warrant relief because they have knowingly and repeatedly

violated this Court's Orders.

**A.     The Paquettes Failed To Show Excusable Neglect.**

The only excuse the Paquettes offer for missing the opt-out deadline is their claim that they did not receive individual notice of the Settlement.  As this Court previously held, and for the reasons already stated, notice to the Settlement Class was consistent with due process and Federal Rule of Civil Procedure 23.  Accordingly, the fact that the Paquettes may not have received individual or actual notice cannot serve as the basis for permitting them to opt out over 10 months after the deadline passed.  See In re Prudential Ins. Co. of Am Sales Practices Litig., 177 F.R.D. at 238 (denying a request to be relieved of the opt-out deadline "where movants allege that they did not receive notice, received notice late, or that Prudential mailed notice to the wrong address").

Curiously, the Paquettes rely on Silber v. Mabon, 18 F.3d 1449 (9th Cir. 1994), in support of their argument that they should be permitted to opt out of the settlement over ten months after the deadline passed because they did not receive individual notice of the Settlement.  However, in Silber, the Ninth Circuit found that the due process rights of the movant were not violated even though that movant did not receive actual notice of the settlement and the opt-out deadline.  See id. at 1451.  The Ninth Circuit remanded the case to the District Court because it found the record insufficient to determine whether the District Court abused its discretion when it denied the movant's request to opt out after the deadline.  See id. at 1455. [12]  In any event, the movant in Silber sought relief from the opt-out deadline less than a month after that deadline passed, and prior to the final approval hearing and final approval order for that settlement.  See id. at 1452.  In contrast, the Paquettes seek relief from the opt-out deadline ten months after it expired and seven months after this Court issued the Final Approval Order.

_____

[12]     The District Court's docket does not reveal the disposition of this issue on remand.

In addition, the interests in finality of this Court, Defendants and other Settlement Class Members strongly counsel against re-opening the opt-out period.  See Georgine v. Amchem Prods., Inc., 1995 WL 251402, at *13 ("The opt-out deadline in this case was a means for defining the limits of the class and for establishing a boundary for the finality of the judgment"). There must be an end to the litigation, and all similarly situated Settlement Class Members must be treated the same.  See In re Gypsum Antitrust Case, 565 F.2d 1123, 1128 (9th Cir. 1977) (finding that in review of late claims, district judge cannot act arbitrarily).  Excusing one Settlement Class Member from the opt-out deadline could open the gates to others who believe they too have a meritorious excuse for missing a deadline.  See id. at 1127 (affirming district court's exercise of discretion to deny late-filed claim, noting that "[t]here is no question that in the distribution of a large class action settlement fund, 'a cutoff date is essential and at some point the matter must be terminated'") (quoting Report of the Conference for Dist. Judges, 63 F.R.D. 231, 262 (1973)).  Continually revisiting lapsed deadlines could also discourage defendants from settlements.  See In re Diet Drugs Prods. Liab. Litig., 92 F. App'x 890, 894 (3d Cir. 2004) (affirming district court's ruling that "the potential prejudice of allowing an exception to the initial opt out deadline could extend beyond this case and have detrimental effects on the settlement and the MDL"); In re Prudential Ins. Co. of Am Sales Practices Litig., 177 F.R.D. at 235 ("The impetus for defendants to settle class action suits is the finality of the litigation."); In re Prudential Sec. Inc. Ltd. P'ship Litig., 164 F.R.D. 362, 371-72 (S.D.N.Y. 1996) ("Defendants would be loath to offer substantial sums of money in compromise settlements of class actions unless they can rely on the notice provisions of Rule 23 to bind class members.").  To permit the Paquettes to opt out of the Settlement some ten months after the deadline – and nearly two years after first learning that they had a potential claim – would be detrimental to the orderly

administration of this case.  It also would deny Defendants the certainty to which they are entitled to rely under this Court's Orders, and which they have, in fact, relied upon.

**B.     The Paquettes Failed To Show That They Acted In Good Faith.**

This Court also has the discretion to deny the Paquettes' request to be permitted to opt out of the Settlement ten months after the deadline due to their lack of good faith and continued efforts to flout this Court's jurisdiction over them.  As previously stated, although the Paquettes acknowledge that they learned of this Court's Orders no later than March 4, 2009, they did not come to this Court for relief at that time.  Instead, they chose to serve Nestlé Purina on March 15, and Defendants were forced to file a motion for an Order to Show Cause to bring the Paquettes to this Court.  Then, in response to this Court's Order to Show Cause, the Paquettes sought again to flout this Court's exclusive jurisdiction by seeking relief from this Court's Orders in front of the Central District of California.  Indeed, the Paquettes' first response to the Order to Show Cause – the instant request for relief – did not come until 11 days <u>after</u> they filed their motion in California.  The Paquettes' tactics to evade this Court's Orders has needlessly multiplied proceedings, unjustifiably wasted judicial resources in two federal courts, and has caused the Defendants to incur attorneys fees and costs to enforce this Court's Orders on an expedited basis.  Accordingly, these circumstances further justify deny the Paquettes' request to be excused from failing to comply with the opt-out deadline.

**CONCLUSION**

For the foregoing reasons, Menu Foods and Nestlé Purina respectfully request that this Court find that the efforts of the Paquettes violate this Court's Final Approval Order and Judgment. Menu Foods and Nestlé Purina further respectfully request that this Court enjoin the Paquettes from further violations by requiring that they dismiss their action in the United States District Court for the Central District of California prior to July 6, 2009, and certify to this Court that they have done so, or hold them in contempt if they fail to take this action. Finally, Menu Foods and Nestlé Purina respectfully request that this Court deny the requests of the Paquettes that they be excused from meeting the opt-out deadline and that they be permitted to opt out of the Settlement.

Dated June 26, 2009

Respectfully submitted,                         Respectfully submitted,


/s/ Mary E. Gately                              /s Craig A. Hoover
Mary E. Gately                                  Craig A. Hoover
Cristen Sikes Rose                              Robert C. Troyer
DLA PIPER U.S. LLP                              Miranda L. Berge
500 8th Street, N.W.                            Hogan & Hartson LLP
Washington, D.C. 20004                          555 Thirteenth Street, NW
Telephone: (202) 799-4507                       Washington, D.C. 20004
Telecopier: (202) 799-5507                      Telephone:    (202) 637-5600
Email: mary.gately@dlapiper.com                 Facsimile:    (202) 637-5910

Liaison Counsel for Defendants                  Liaison Counsel for Defendants and Counsel for
and Attorneys for the Menu Foods                Nestlé Purina PetCare Company
Defendants

## CERTIFICATE OF SERVICE

I certify that on the 26th day of June, I caused the foregoing to be filed

electronically with the Clerk of Courts using the CM/ECF system, which will send notification

of such filing to CM/ECF participants, and to be served via Federal Express upon the following:

Paul N. Paquette
2016 Canyon Road
Arcadia, CA 91006

/s/ Mary E. Gately
Mary E. Gately