PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

Nos. 08-4741 & 08-4779

————————

IN RE: PET FOOD PRODUCTS LIABILITY LITIGATION

Jim W. Johnson and Dustin Turner,
Appellants at 08-4741

Margaret Picus and Daniel Kaffer,
Appellants at 08-4779

————————————————

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 07-cv-2867
(Honorable Noel L. Hillman)

————————

Argued February 22, 2010
Before:  SCIRICA, CHAGARES and WEIS, *Circuit Judges*.

(Filed December 16, 2010)

D. J. POWERS, ESQUIRE (ARGUED)
301 Park Lane
Austin, Texas 78704

ROBERT E. MARGULIES, ESQUIRE
Margulies Wind
Harborside Plaza 10
3 Second Street, Suite 1201
Jersey City, New Jersey 07311

JEFFREY L. WEINSTEIN, ESQUIRE
518 East Tyler Street
Athens, Texas 75751
    Attorneys for Appellants,
    Jim W. Johnson and Dustin Turner

KYLE R. NORDREHAUG, ESQUIRE (ARGUED)
Blumenthal & Nordrehaug
2255 Calle Clara
La Jolla, California 92037

DANIEL I. WARD, ESQUIRE
118 White Horse Road West
Voorhees, New Jersey 08043
    Attorneys for Appellants,
    Margaret Picus and Daniel Kaffer

2

KENNETH A. WEXLER, ESQUIRE (ARGUED)
Wexler Wallace
55 West Monroe Street
Chicago, Illinois 60603

JENIPHR BRECKENRIDGE, ESQUIRE
Hagens Berman Sobol Shapiro
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101

STUART A. DAVIDSON, ESQUIRE
Robbins Geller Rudman & Dowd
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432

RUSSELL D. PAUL, ESQUIRE
SHERRIE R. SAVETT, ESQUIRE
Berger & Montague
1622 Locust Street
Philadelphia, Pennsylvania 19103

LISA J. RODRIGUEZ, ESQUIRE
Trujillo, Rodriguez & Richards
258 Kings Highway East
Haddonfield, New Jersey 08033

3

MARK J. TAMBLYN, ESQUIRE
Wexler Wallace
455 Capitol Mall, Suite 231
Sacramento, California 95814
  Attorneys for Appellees,
   Pet Owner Class Plaintiffs

MARY E. GATELY, ESQUIRE (ARGUED)
CRISTEN S. ROSE, ESQUIRE
DLA Piper
500 8th Street, N.W.
Washington, D.C. 20004
  Attorneys for Appellee,
   Menu Foods Defendants

MARK C. GOODMAN, ESQUIRE
Squire, Sanders & Dempsey
One Maritime Plaza, Suite 300
San Francisco, California 94111

JOSEPH C. WEINSTEIN, ESQUIRE
Squire, Sanders & Dempsey
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114

4

EVAN S. NADEL, ESQUIRE
Greenberg Traurig
153 Townsend Street, 8th Floor
San Francisco, California 94107
  Attorneys for Appellees,
  PETCO Animal Supplies Stores, Inc.,
  PetSmart, Inc., Target Corporation, Wal-Mart Stores, Inc.

D. JEFFREY IRELAND, ESQUIRE
BRIAN D. WRIGHT, ESQUIRE
Faruki, Ireland & Cox
10 North Ludlow Street
500 Courthouse Plaza, S.W.
Dayton, Ohio 45402
  Attorneys for Appellee,
  The Iams Company

ANTHONY G. BRAZIL, ESQUIRE
Morris, Polich & Purdy
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
  Attorney for Appellee,
  ChemNutra, Inc.

RICHARD FAMA, ESQUIRE
RUSSELL G. WHEELER, ESQUIRE
Cozen & O'Connor
45 Broadway Atrium, Suite 1600
New York, New York 10006
      Attorneys for Appellee,
      Del Monte Foods Co.


CRAIG A. HOOVER, ESQUIRE
Hogan Lovells US
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C. 20009
      Attorney for Appellee,
      Nestlé Purina PetCare Company


JAMES D. ARDEN, ESQUIRE
Sidley Austin
787 Seventh Avenue
New York, New York 10019


STEVEN A. KARG, ESQUIRE
Norris, McLaughlin & Marcus
721 Route 202-206
P.O. Box 5933
Bridgewater, New Jersey 08807
      Attorneys for Appellee,
      Hill's Pet Nutrition, Inc.

6

GARY L. JUSTICE, ESQUIRE
GAIL E. LEES, ESQUIRE
LINDSAY R. PENNINGTON, ESQUIRE
WILLIAM E. WEGNER, ESQUIRE
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

MARK WHITBURN, ESQUIRE
Gibson, Dunn & Crutcher
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
  Attorneys for Appellee,
  Nutro Products, Inc.

GARY A. BRYANT, ESQUIRE
Willcox & Savage
1800 Bank of America Center
One Commercial Place
Norfolk, Virginia 23510
  Attorney for Appellee,
  Wilbur Ellis Company

THOMAS P. BRACAGLIA, ESQUIRE
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street
Philadelphia, Pennsylvania 19103
  Attorney for Appellee,
  Natural Balance Pet Foods, Inc.

---

OPINION OF THE COURT

---

SCIRICA, *Circuit Judge*.

This is an appeal from the approval of the settlement of a class action lawsuit stemming from the largest pet food recall to date. The class action was brought on behalf of consumers in the United States and Canada who purchased, used or obtained, or whose pets consumed, wet pet food that was allegedly contaminated with melamine and cyanuric acid. Plaintiffs alleged violations of state consumer protection and deceptive trade practices statutes, as well as state law claims for product liability, breach of warranty, and negligence. The District Court certified a settlement-only class and granted approval of a $24 million settlement. Appellants are members of the settlement class who objected to various aspects of class certification and the settlement.

We conclude that the class certification requirements of Federal Rule of Civil Procedure 23(a) and (b) are satisfied with respect to the settlement class and that the District Court's analysis of whether the settlement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e) was proper in all respects but one. Accordingly, we will vacate the court's order granting final approval of the settlement and remand for proceedings consistent with this opinion.

I.      BACKGROUND AND PROCEDURAL HISTORY

    A.      *The Recall*

8

In March 2007, defendant Menu Foods, an Ontario-based pet food manufacturer, announced a recall of dozens of brands of wet pet food after the food was linked to the deaths of several cats and dogs. The recall involved only wet pet food in cans and foil pouches manufactured between November 8, 2006, and March 6, 2007. Shortly thereafter, four other defendant pet food manufacturers initiated recalls of their pet food and treat products: Hill's Pet Nutrition and Nestle Purina Pet Care Company on March 30, 2007; Del Monte Pet Products on April 2, 2007; and Sunshine Mills, Inc., on April 5, 2007. The recall expanded through 2007, eventually covering approximately 180 brands of pet food and treats produced by twelve different manufacturers.

After the recall was initiated, it was discovered that wheat gluten and rice protein concentrate imported from China and supplied to multiple pet food manufacturers by defendants ChemNutra, Inc., and Wilbur Ellis appeared to have been contaminated. These pet food ingredients were adulterated with both melamine and cyanuric acid, the combination of which can lead to acute renal failure in small animals if ingested.[1]

---

[1]On February 6, 2008, after investigations by the Food and Drug Administration ("FDA") and the United States Attorney's Office, two Chinese nationals and the businesses they operated (Xuzhou Anying Biologic Technology Development Co., LTD, and Suzhou Textiles, Silk, Light Industrial Products, Arts and Crafts I/E Co., LTD), along with a U.S. company (defendant ChemNutra, Inc.) and its president and chief executive officer, were indicted by a federal grand jury. The indictments cited the defendants' roles in a scheme to import into the United States

Altogether, defendants recalled over 60 million cans and pouches of pet food products. The recall drew substantial media attention, as well as FDA review, congressional inquiry, and United States Attorney investigations.

B.    *The Class Actions and Consolidation*

Pet owners soon commenced over 100 putative class actions against Menu Foods and other pet food manufacturers, ingredient suppliers, distributors, repackagers, and retailers.[2] Plaintiffs brought claims on behalf of all persons who purchased, used or obtained, or whose pets consumed, any cat or dog food or treats that allegedly contained contaminated wheat gluten and/or rice protein concentrate. Each complaint alleged violations of state consumer protection and deceptive trade practices statutes, product liability, breach of warranty, and negligence.

The cases were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the United States

products claimed to be wheat gluten, which were contaminated with melamine and used to make pet food. U.S. Department of Health & Human Services, U.S. Food and Drug Administration, *Charges Filed in Contaminated Pet Food Scheme* (Feb. 19, 2008), http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm048139.htm (last visited Dec. 14, 2010).

[2]A complete list of defendants in this case can be found on the Pet Food Products Liability Settlement website, at www.petfoodsettlement.com.

District Court for the District of New Jersey.  *In re Pet Food Prods. Liab. Litig.*, 499 F. Supp. 2d 1346 (J.P.M.L. 2007). Counsel then engaged in motion practice involving notice to potential class members, negotiated to preserve evidence, and consulted with and deposed experts regarding the contaminated pet food.  In early September 2007, the parties commenced settlement negotiations, both independently and with a mediator. On September 26, 2007, the court stayed the litigation to facilitate formal mediation.  Settlement negotiations continued for seven months, involving cross-country and cross-border negotiations between the parties, including Canadian plaintiffs and their counsel.  There were more than ten days of formal mediation and many additional hours of in-person and telephonic negotiations with representatives of plaintiffs and over twenty defendants.

C.   *The Proposed Settlement*

The proposed settlement agreement reached by the parties provides for a $24 million cash fund.[3]  The settlement class includes "all persons and entities who purchased, used or obtained, or whose pets used or consumed Recalled Pet Foods Product(s)."  "Recalled Pet Foods Products" is defined as any

---

[3]The settlement defines "Settlement Fund" as "a fund of $24,000,000.00 (USD) funded by the Defendants as full compensation for all Released Claims, the costs of claims notice, administration, attorneys fees, costs, and expenses associated with this Settlement in both Canada and the United States.  The Settlement Fund is in addition to the Historic Payments [defined below]."

pet food product that was recalled on or after March 16, 2007, "because of allegedly contaminated wheat gluten and/or rice protein concentrate." The settlement provides recovery for class members of up to 100% of reasonable economic damages incurred. Reasonable economic damages supported by documentation will be paid in full, so long as all accepted claims do not exceed the available funds; if the total claims exceed the fund, distribution will be made on a pro rata basis.[4] In addition to or in lieu of payment for documented claims, class members may receive up to $900 for reasonable claims submitted without documentation.[5]

The settlement describes several, non-exclusive categories of economic damages that may be reimbursed, including Healthy Screening Claims,[6] Injury Claims,[7] Deceased

---

[4]Acceptable forms of documentation include veterinarian bills, veterinary records, statements from veterinarians, copies of product labels, cancelled checks, receipts, credit card receipts, and credit card statements.

[5]If a class member fails to submit documentation, the Claims Administrator will evaluate the information provided and make a reasonable and good faith determination of the validity of the claim. All class members must sign a verification, under penalty of perjury, that the information submitted to the Claims Administrator is true and correct.

[6]"Healthy Screening Claims" are "claims for the costs incurred by a Settlement Class Member whose animal(s) used or consumed a Recalled Pet Food Product and who took his/her

12

Animal Claims,[8] Consumer Food Purchase Claims ("Purchase

---

animal(s) to a veterinarian for screening or testing because of the use or consumption of a Recalled Pet Food Product and the screening or testing proved negative."

[7]"Injury Claims" are "claims for damages allegedly incurred by Settlement Class Members whose pets used or consumed any Recalled Pet Food Product and were treated for symptoms or injuries of acute renal or kidney failure . . . related to the use or consumption of a Recalled Pet Food Product, but which pets did not die."  Class members with valid Injury Claims may receive a full or pro rata reimbursement of veterinary bills incurred after November 8, 2006, for all diagnostics and treatments stemming from a pet's consumption of recalled pet food.

[8]"Deceased Animal Claims" are "claims for damages by Settlement Class Members whose pets used or consumed a Recalled Pet Food Product and allegedly died as a result of acute kidney or renal failure . . . or as a result of treatment for acute kidney or renal failure . . . ."  Class members with valid Deceased Animal Claims may receive reimbursement for veterinary bills, necropsy, euthanasia, cremation, or burial/specialty services that occurred after November 8, 2006. These claimants may also receive reimbursement for either the cost or fair market value of the deceased pet, whichever is higher, or if the class member purchased a new pet before May 22, 2008, the reasonable cost of a new pet.

Claims"),[9] and claims for other economic damage (e.g., travel and transportation expenses, property damage – such as damage to carpets – and lost wages). The settlement caps payments for Healthy Screening Claims and Purchase Claims, as well as payments for all types of undocumented claims (which are capped at $900 per claimant, as described above). Payments for Healthy Screening Claims are limited to an aggregate maximum of $400,000 out of the $24 million fund, and payments for Purchase Claims are limited to an aggregate maximum of $250,000. To the extent that any of the amounts available to pay Healthy Screening Claims, Injury Claims, Deceased Animal Claims, Purchase Claims, or claims for other economic damage would be exhausted by payment of 100% of the claims made in that category, distribution to pet owners will be adjusted and paid on a pro rata basis. Any funds remaining after settlement administration and payment of all valid claims will be donated to animal welfare-related organizations in both the United States and Canada.

The settlement also includes an agreement for the future testing of pet food ingredients. Defendants that manufactured the recalled pet food products agreed to continue to administer

_____

[9]"Consumer Food Purchase Claims" are "claims solely for reimbursement of the costs associated with the purchase of a Recalled Pet Food Product by a Settlement Class Member who has not been reimbursed for such costs to date, including through return or exchange of the Recalled Pet Food Products. Consumer Food Purchase Claims do not include Injury Claims, Deceased Animal Claims, Healthy Screening Claims, or other claims for economic damage."

their internal quality assurance programs to regularly test shipments of raw wheat gluten and rice protein concentrate imported from China for the presence of melamine and cyanuric acid until May 30, 2009.

The $24 million cash fund is over and above the approximately $8 million already paid to pet owners by certain defendants or their insurers as a result of reimbursement claims programs ("Historic Payments"). "Historic Payments" are "those amounts already paid by certain of the Defendants, Released Entities and/or their insurers in settlement or reimbursement of claims for certain injury, death or screening expenses associated with a pet's consumption of Recalled Pet Food Products."

The settlement includes a release of claims. Class members agreed to release:

> all claims, demands, actions, suits, and/or causes of action that have been brought or could have been brought, are currently pending or were pending, or are ever brought in the future, by any Settlement Class Member against any Defendant or Released Entity, in any forum in Canada or the United States . . . whether known or unknown, asserted or unasserted, under or pursuant to any statute, regulation, common law or equity, that relate in any way, directly or indirectly, to facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in any claim raised (including, but not limited to, any

claim that was raised against any Released Entity)
in the Pet Food Recall Litigation.

In addition, the settlement provides for attorneys' fees.
It allows plaintiffs' lead counsel to apply to the court for
reimbursement of attorneys' fees in a total amount not to exceed
25% of the settlement fund ($6 million), plus reimbursement of
expenses incurred in the course of the litigation.   Similarly,
counsel for Canadian plaintiffs are permitted to apply to the
Canadian Courts for attorneys' fees in a total amount not to
exceed 6% of the settlement fund ($1.44 million), plus
reimbursement of expenses.   Any award of attorneys' fees and
litigation expenses is to be paid out of the settlement fund.

The settlement included an opt-out provision; class
members could opt out within  60 days from the date notice of
the settlement was disseminated.  Class members who chose to
make a claim for benefits were given 160 days from the date of
notice to file their claim forms.

Under the settlement's claims process, the Claims
Administrator reviews the claim form, any accompanying
documentation, and any explanations for damages that are not
supported by documentation.   After evaluation, the Claims
Administrator determines any amounts to be paid.  The Claims
Administrator has authority to contact the claimant and the
claimant's veterinarian to confirm information provided in the
claim form and to seek additional information, if necessary.  The
Claims Administrator may deny a claim based on fraud, bad
faith, unreasonable conduct or demand, or intentional or willful
misconduct by a class member.  The Claims Administrator has
complete and final authority to determine the amount to be paid

16

on each claim and its decision is final, binding, and not subject to appeal.

D.   *Procedural History*

On May 22, 2008, the settling parties filed a joint motion for preliminary certification of the settlement class, preliminary approval of the class action settlement, and approval of the proposed form of notice. A hearing on the motion was held on the same day. On May 30, 2008, the District Court entered an order preliminarily approving the proposed settlement class and the settlement. The court found that the "proposed settlement is fair, reasonable and adequate and that the proposed Settlement Class meets all of the applicable requirements under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure."

The Order also approved the plan for publishing class notice. Notice was published extensively in newspapers, magazines, and other periodicals throughout the United States and Canada.[10] In addition, a toll-free number and a settlement website were established, through which class members could

---

[10]As part of the media campaign, summary publications were published in consumer magazines (Parade, AARP, and People); pet magazines (Dog Fancy, Cat Fancy, AKC Family Dog, Bark, Best Friends, and Dog World); U.S. Veterinary Publications (DVM Magazine, Journal of the American Veterinary Medical Association, Trends Magazine, Veterinary Forum, Veterinary Medicine, Veterinary Practice News); the Canadian Veterinary Journal; and newspapers in major metropolitan areas (15 U.S. newspapers, including the New York Times and USA Today, and 15 Canadian newspapers).

obtain additional information and copies of settlement documents, including claim forms and a list of all recalled pet food products.  As of September 30, 2008, a total of 28,955 notices were sent by direct mail to  potential class members who had submitted claims or were paid as part of the Historic Payment programs.  Notice also was sent to the American Veterinarian Medical Association and the Canadian Veterinary Medical Association for further dissemination to their members and veterinarians.

On September 2, 2008, Jim Johnson and Dustin Turner filed objections to the proposed settlement.  On September 12, Margaret Picus and Daniel Kaffer filed objections, a motion to intervene, and a request for limited discovery.  On October 3, plaintiffs and defendants filed a motion for final approval and an opposition to the motion to intervene.  On October 14, the court held a fairness hearing and heard argument on the motion to approve the settlement, the motion to intervene, and co-lead plaintiffs' counsels' motion for attorneys' fees.[11]  The court

---

[11]As of the date of the fairness hearing, approximately 10,000 claims had been submitted.  The average claim was approximately $1,430, before review by the Claims Administrator.  Out of the 10,000 claims, approximately 6,000 included a Purchase Claim.  The average Purchase Claim was approximately $75, again before review by the Claims Administrator.  The claims period closed on November 24, 2008, approximately six weeks after the date of the fairness hearing.  At our direction, the settling parties provided us with updated claims information after oral argument.  According to the Claims Administrator, as of February 23, 2010, 24,344

heard oral argument from all parties who requested the opportunity to speak, including objectors.

In an order entered on November 17, 2008, and an accompanying 65-page opinion filed the following day, the court certified plaintiffs' class for settlement purposes under Rule 23(a) and (b)(3), granted the motion for approval of settlement under Rule 23(e), granted plaintiffs' motion for attorneys' fees, denied the motion to intervene, and overruled the various objections to the settlement.  *In re Pet Food Prods.*

---

timely claims were submitted, and 20,550 were deemed payable. *See* Letter from Edward J. Sincavage, CPA, Heffler, Radetich & Saitta LLP, to counsel for plaintiffs and defendants (Mar. 8, 2010) (on file with the Clerk's Office).  The average claim is approximately $1,283.00, for an estimated payable amount of $26,365,575.41.  *Id.*  Out of the 20,550 payable claims, 11,306 included a Purchase Claim.  *Id.*  The average Purchase Claim is approximately $52.84, for an estimated payable amount of $597,427.05.  *See id.*  Because the settlement caps Purchase Claims at $250,000, class members will receive a 41.85% recovery on Purchase Claims.  *Id.*  After deducting the amount of timely payable Purchase Claims of $597,427.05 from the amount of timely payable claims of $26,365,575.41, the Claims Administrator estimates that claims for economic losses other than Purchase Claims will be $25,768,148.36.  The Claims Administrator estimates that payments for these claims will be approximately 49% of the payable amounts (due to deductions from the settlement fund for attorneys' fees, expenses, notice costs, settlement administration costs, and the $250,000 allocation for Purchase Claims).  *Id.*

19

*Liab. Litig.*, MDL No. 1850, 2008 WL 4937632 (D.N.J. Nov. 18, 2008) ("Fairness Opinion").  On November 19, 2008, the court entered judgment, dismissing the case with prejudice.  The Johnson/Turner objectors and the Picus/Kaffer objectors filed timely notices of appeal.[12]

Objectors challenge both the class certification and the approval of the settlement.  Objectors assert an intra-class conflict between class members whose damages are limited to Purchase Claims[13] and those who assert claims for other economic damages for pets that became ill or died post consumption.  Additionally, the Johnson/Turner objectors contend differences in state laws create conflicts between class members.  Objectors contend both alleged conflicts preclude a finding of adequate representation and necessitate the creation of subclasses.  With regard to fairness, both objectors challenge the $250,000 allocation for Purchase Claims.  Finally, the Picus/Kaffer objectors challenge the denial of their motion for leave to intervene and motion for discovery, and the approval of the release.

"We review the decision of the District Court to certify

---

[12]The District Court had jurisdiction over the class action under 28 U.S.C. § 1332(d)(2)(A).  We have jurisdiction under 28 U.S.C. § 1291.

[13]As noted, Purchase Claims are "claims solely for reimbursement of the costs associated with the purchase of a Recalled Pet Food Product by a Settlement Class Member who has not been reimbursed for such costs to date, including through return or exchange of the Recalled Pet Food Products."

[a] class and approve [a] settlement under an abuse of discretion standard." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004). "An abuse of discretion may be found where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation marks omitted).

## II.    CLASS CERTIFICATION

In order to approve a class settlement agreement, a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.[14]   The Supreme

---

[14]The four threshold requirements of Rule 23(a) are (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition to the threshold requirements of Rule 23(a), parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule 23(b)(3), the provision at issue in this case, provides for so-called "opt-out" class actions suits. *See Amchem*, 521 U.S. at 615. Under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified:   (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"); and (2) class

Court has made clear that "[s]ettlement is relevant to a class certification." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997). Consequently, a district court "may take the proposed settlement into consideration when examining the question of certification." *In re Prudential Ins. Co.*, 148 F.3d 283, 308 (3d Cir. 1998). In *Amchem*, the Supreme Court explained:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem*, 521 U.S. at 620 (citations omitted). In *Prudential*, we noted *Amchem*'s particular emphasis on the Rule 23(a)(4) requirement that "'the representative parties will fairly and

---

resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement"). Fed. R. Civ. P. 23(b)(3).

22

adequately protect the interests of the class.'" *Prudential*, 148 F.3d at 308 (quoting Fed. R. Civ. P. 23(a)(4)). "Indeed, the key to *Amchem* appears to be the careful inquiry into adequacy of representation." *Id.*; *see Amchem*, 521 U.S. at 621 ("Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed.").

A.   *The District Court's Opinion*

The District Court determined that the settlement class should be certified for settlement purposes after concluding that the Rule 23 requirements were satisfied. The court found that the class, which includes "thousands of consumers that are geographically dispersed throughout the United States and Canada," met Rule 23(a)(1)'s numerosity requirement because "a class of this size makes joinder of all members impracticable." Fairness Opinion, 2008 WL 4937632, at *4. Second, the court found that Rule 23(a)(2)'s commonality prong was satisfied based on its finding that eight questions of law and fact were common to the class, including "[w]hether defendants intentionally, recklessly or negligently authorized injurious pet food to enter the market." *Id.* at *5. Third, the court determined the class met Rule 23(a)(3)'s typicality requirement because "the claims of the class representatives are aligned with those of the class members since the claims of the representatives arise out of the same conduct and core facts surrounding the Recall." *Id.* Fourth, the court determined the dual components of the adequacy of representation requirement of Rule 23(a)(4) were satisfied because (1) the named plaintiffs' interests were

23

"directly aligned with those of other members of the Class" as "the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent Class members to establish defendants' liability;" and (2) "plaintiffs have retained attorneys who are highly qualified, experienced and able to conduct this litigation." *Id.* at *6.

The District Court also concluded that the standards of Rule 23(b)(3) were met, finding the predominance requirement was satisfied because the "same set of core operative facts and theory of proximate cause apply to each member of the class." *Id.* The class actions concern consumers who purchased, used, or obtained recalled pet food products, and if "plaintiffs and potential class members were to bring individual actions, they would each be required to prove the same wrongdoing by defendants in order to establish liability." *Id.* The superiority requirement was satisfied because "absent class certification, the Court may be faced with litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts" and "the resolution of common issues alleged in one action will result in more efficient use of judicial resources and bring about a single outcome." *Id.*

No one has challenged the District Court's findings that the proposed class satisfied the numerosity, commonality, typicality, predominance, and superiority requirements, and we believe these findings were well within the court's sound discretion. Objectors argued below that the class does not satisfy the Rule 23(a) requirement of adequacy of representation because of intra-class conflicts of interest. The District Court noted the objection to the settlement "on the ground that

24

[objectors'] interests as 'mere purchasers,' [were] not adequately represented by the Class representatives," but rejected their argument because both groups shared the common interest of maximizing recovery for Purchase Claims:

> The Class representatives in this case were purchasers of pet food whose pets consumed the contaminated pet food. Co-lead counsel asserts that they were designated to represent the entire Settlement Class, including "mere purchasers." The Court does not find any conflict between the interests of the Proposed Intervenors and the Class representatives who purchased the Recalled Pet Food Products, as their interests in maximizing recovery of such damages for the purchase of such products are aligned with the interests of "mere purchasers" in maximizing recovery for such product purchase claims.

*Id.* at *8.

After reviewing objectors' arguments, and for the reasons we discuss, we hold that the District Court exercised sound discretion in certifying the settlement class.

B.   *Challenges to Adequacy of Representation*

A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Rule 23(a)'s adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to

25

represent." *Amchem*, 521 U.S. at 625.[15]  Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* at 625-26 (citation and internal quotation marks omitted).

"When appropriate, a class action may be divided into subclasses that are each treated as a class under [Rule 23]." Fed. R. Civ. P. 23(c)(5).  Subclasses are appropriate "'[w]here a class is found to include subclasses divergent in interest.'"  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (quoting Fed. R. Civ. P. 23(c) advisory committee's note); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (explaining that *Amchem* requires "a class divided between holders of present and future claims" to be "divi[ded] into homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel").  Accordingly, we have held that "[a] district court hearing a class action has the discretion to divide the class into subclasses and certify each subclass separately."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005).  Our standard of review is informed by the careful balancing of costs and benefits on the part of a district judge when deciding whether to certify a subclass:

> [T]he option to utilize subclasses "is designed to prevent conflicts of interest in class representation." [*Cendant Corp.*, 404 F.3d at 202].  Nonetheless, "[w]hile subclasses can be

_____

[15]The other component of the adequacy of representation inquiry—the qualifications of counsel to represent the class—is not at issue in this appeal.

useful in preventing conflicts of interest, they have their drawbacks." *Id.* (citing a secondary source for the proposition that subclassing can create a "Balkanization" of the class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money). Because "the decision whether to certify a subclass requires a balancing of costs and benefits that can best be performed by a district judge," we accord substantial deference to district courts with respect to their resolution of this issue. *Id.*; *see Alexander v. Gino's, Inc.*, 621 F.2d 71, 75 (3d Cir. 1980) (noting that "the district court has considerable discretion in utilizing subclasses" under Rule 23(c)). Thus, "[w]here the district court has declined to certify a subclass, we will ordinarily defer to its decision unless it constituted an abuse of discretion." [*Cendant Corp.*, 404 F.3d at 202].

*Ins. Brokerage*, 579 F.3d at 271.

Objectors maintain subclasses were necessary for a number of reasons, none of which lead us to conclude the District Court abused its discretion in declining to subdivide the class.  First, relying primarily on *Amchem*,[16] objectors contend

---

[16]The proposed class in *Amchem* encompassed, at minimum, hundreds of thousands of individuals who were, or may be in the future, injured by past exposure to asbestos products manufactured by one of more than 20 defendant companies.

subclasses and separate representation were required here because of conflicts of interest between class members with only Purchase Claims (of pet food) and class members with Injury Claims (those who assert claims for pets that became ill or died after consuming recalled pet food).[17]  We disagree.  All of the claims covered by the settlement are claims for economic damages, e.g., for the cost of recalled pet food, the cost of veterinary treatment, or the cost of a replacement pet. Furthermore, all class members here have present claims.

_____

*Amchem*, 521 U.S. at 597.  The class representatives in *Amchem*, some of whom had diverse medical conditions as a result of asbestos exposure and some of whom had not yet manifested any asbestos-related condition, "sought to act on behalf of a single giant class rather than on behalf of discrete subclasses." *Id.* at 626.  The Supreme Court found that in "significant respects, the interests of those within the single class [were] not aligned."  *Id.*  "Most saliently, for the currently injured, the critical goal [was] generous immediate payments.  That goal tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."  *Id.* Thus, the proposed class could not satisfy Rule 23(a)(4)'s adequacy of representation requirement.  *Id.* at 625.

[17]For ease of reference, throughout our discussion of the alleged conflict between class members with only Purchase Claims and class members with claims for other economic damages, we will use the term "Injury Claim" to mean any claim for economic damages for pets that became ill or died after consuming recalled pet food.  Class members with Injury Claims may also have Purchase Claims.

Objectors fault the District Court's reliance on the fact that class representatives have both Purchase Claims and Injury Claims. *See Amchem*, 521 U.S. at 627.[18] But objectors have not identified adverse interests that would require the establishment of subclasses. Nor are the other cases cited by objectors—*In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005), and *In re General Motors Corp.*, 55 F.3d 768 (3d Cir. 1995)—apposite.

In *Community Bank*, we determined that a settlement class was not properly certified because the district court did not engage in a proper Rule 23(a) and (b) analysis. Because it was possible that the class could be properly certified on remand, we examined some of the relevant factors to be considered,

---

[18]The Court in *Amchem* noted that when "adversity among subgroups" requires that subclasses be established, a court cannot approve a settlement without creating subclasses on the basis of the consent of the class representatives, who are members of the distinct groups. 521 U.S. at 627 (quoting *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (2nd Cir. 1993)). "The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *Id.* (quoting *Joint Eastern & Southern Dist. Asbestos Litig.*, 982 F.2d at 742-43).

29

including adequacy of representation.  The objectors alleged many class members had colorable Truth in Lending Act ("TILA") and Home Ownership and Equity Protection Act ("HOEPA") claims that had not been asserted by class counsel either in the complaint or during settlement negotiations. Because it appeared that the named plaintiffs had "no incentive to maximize such claims for the approximately 14,000 class members who may [have retained] this valuable cause of action," we noted that "[a]t the very least, consideration should have been given to the feasibility of dividing the class into sub-classes so that a court examining the proposed settlement could have judged the fairness of the settlement as it applied to similarly situated class members."  418 F.3d at 307.

Objectors contend the class representatives had no incentive to maximize the Purchase Claims because the value of the Injury Claims was much greater than the Purchase Claims. But unlike in *Community Bank* where the class representatives did not have TILA or HOEPA claims and the settlement failed to provide recovery for those claims, here, the class representatives all have Purchase Claims and the settlement allocates a portion of the recovery to those claims.

Objectors' reliance on *General Motors* is likewise misplaced.  The plaintiffs in *General Motors* were purchasers of certain GM trucks that may have had a design defect in the location of the fuel tank.  The class consisted of individual owners of a single truck as well as "fleet owners," such as governmental agencies, who owned a number of trucks.  All of the class representatives were individual owners.  Objectors contended the disparity in settlement benefits enjoyed by the two different groups created an intra-class conflict that

30

precluded a finding of adequate representation.[19]  We agreed, focusing on the terms of the settlement, which evidenced "the disparity in the prospective value to the different sections of the class":

> The fleet owners will never enjoy the benefits of the settlement terms, such as the intra-household transfer option, intended specifically for the benefit of individual owners.  Thus, we must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit.  Not surprisingly, the settlement leaves fleet owners with significantly less value than individual owners.  At the very least, the class should have been divided into sub-classes so that a court examining the settlement could consider settlement impacts that would be uniform at least within the sub-classes.

---

[19]The settlement provided $1,000 coupons redeemable toward the purchase of any new GM truck within a 15-month period.  The certificates were transferable with the vehicle, and could be transferred to a class member's family member.  In lieu of a $1000 certificate, class members could request that a nontransferable $500 certificate be issued to any third party except a GM dealer or its affiliates.  The $500 certificate could only be used on more expensive truck models and was subject to the same 15-month redemption period as the $1000 certificates.  *Gen. Motors Corp.*, 55 F.3d at 780.

31

*Gen. Motors Corp.*, 55 F.3d at 801.

There is no analogous conflict in this case.  The remedial interests of class members with only Purchase Claims are represented by class representatives with Purchase Claims, and the settlement provides up to $250,000 for these claims. Moreover, class members with only Purchase Claims do not receive less value for identical claims asserted by other class members.

Objectors contend inadequate representation is demonstrated in the settlement's allocation terms, which designate the vast majority of the fund to Injury Claims, while Purchase Claims are capped at $250,000.[20]  But varied relief

---

[20]Objectors' concerns about the fairness of the settlement, i.e., that the $250,000 allocated to Purchase Claims is inadequate, seem to drive much of their argument that there was inadequate representation in this case. *See, e.g.*, Picus/Kaffer Br. at 26 ("By settling these claims of this unrepresented subclass for the grossly inadequate compensation of $250,000 . . . the current Settlement is unfair and inadequate to unrepresented class members like Appellants.").  We recognize that in some situations an unfair settlement may be the result of inadequate representation.  And when inadequate representation leads to an unfair settlement, the analyses of Rule 23(a)'s adequacy of representation requirement and Rule 23(e)'s requirement that the proposed settlement be "fair, reasonable and adequate" will be similar.  But in this case, even if the settlement is found to be unfair on remand, we do not believe any such finding would be the result of inadequate class

among class members with differing claims in class settlements is not unusual. *See Petrovic v. Amoco Oil Corp.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for various class members."); *see also Prudential*, 148 F.3d at 289-90 (holding the district court properly certified a national settlement class in a circumstance in which the class was comprised of policyholders who allegedly were the victims of several different types of fraudulent and misleading sales practices and the settlement created an alternative dispute resolution mechanism to determine the kind and amount of relief to be granted).[21] Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class. *See Ins. Brokerage,* 579 F.3d at 272.[22]

---

representation. For the reasons explained, we do not believe class members with only Purchase Claims have interests that diverge from class members with Injury Claims and Purchase Claims.

[21]*Cf.* Robert G. Bone, *Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness*, 83 B.U. L. Rev. 485, 550 & n.191 (2003) (noting that settlement value is affected by many different factors, including "severity of injury, applicable substantive law, risk-preferences, and so on" and that "wealth transfers [in the sense of settlement value] are endemic to damage class actions that settle for average amounts").

[22]*Cf.* Bone*, supra*, at 550 (noting that "[i]f a difference in settlement value were enough by itself to require the creation of

We addressed disparity in allocation in *Insurance Brokerage*, holding the district court did not abuse its discretion by failing to subdivide the class. The objectors argued before the district court that subclasses were needed to ensure adequate representation for different types of insurance policyholders and to ensure a fair allocation of the settlement fund.[23] We acknowledged that there was some appeal to the argument, "given that the Plan of Allocation divid[ed] the total settlement award on the basis of the type of insurance, thereby creating different groups for the purpose of reimbursement, and the groups [did] not have access to an equal percentage of the fund." *Id.* at 272. But we noted that "subclasses are only necessary when members of the class have divergent interests," and the district court had not found any divergent interests existed between the allocation groups. *Id.* We rejected objectors' argument that the fact that the fund was allocated so that a greater percentage of the settlement value was designated for certain class members demonstrated a conflict between groups.

---

subclasses, the number of subclasses would make many class actions impossible, and at least in mass tort cases, create another source of unfairness by leaving some litigants without any meaningful recovery at all").

[23]Objectors argued subclasses were required for "Excess Claimants" (policyholders who purchased additional insurance policies, in excess of their primary insurance coverage, from or through one of the defendants) and "Non-Excess Claimants" (policyholders who purchased a primary insurance policy from or through one of the defendants). *Ins. Brokerage*, 579 F.3d at 270 n.27.

34

We found that the difference in allocations was "simply a reflection of the extent of the injury that certain class members incurred and d[id] not clearly suggest that the class members had antagonistic interests." *Id.* We also found it important that many class members were members of both policyholder groups and would be entitled to recover damages for overpayment of premiums for both types of insurance. "This illustrate[d] that the Plan of Allocation did not create de facto subclasses among the class members but merely created a structure for ensuring that reimbursement [was] tied to the extent of damages incurred on certain policies of insurance." *Id.*

As in *Insurance Brokerage*, the District Court here did not find divergent interests between the allocation groups. The fact that the settlement fund allocates a larger percentage of the settlement to class members with Injury Claims does not demonstrate a conflict between groups. Instead, the different allocations reflect the relative value of the different claims.[24] Many class members are members of both allocation groups, and will be entitled to recover damages for both Purchase Claims and Injury Claims.

Objectors also point to an alleged disparity in the strength of the various claims. According to objectors, defendants have

---

[24]At the fairness hearing, the settling parties advised the court that the average Purchase Claim was approximately $75, while the average Injury Claim was approximately $1,500. No one challenges the settling parties' general representation that a claim for veterinary care, on average, will be more costly than a claim for the purchase price of recalled pet food.

35

no defense to the Purchase Claims, so that class members with Purchase Claims would automatically recover 100% of the value of the recalled pet food if the case were to proceed through litigation.   They note the settling parties themselves have characterized the Injury Claims as difficult to prove and fraught with causation problems.

As with differences in settlement value, alleged differences in the strength of the various claims asserted in this class action do not, by themselves, demonstrate conflicting or antagonistic interests within the class that would require subclasses.  Objectors have not convinced us that "the refund claims are as strong a claim as is imaginable."  The District Court made no findings on the merits of the Purchase Claims, and we are not in a position to do so here.  But we are skeptical of objectors' theory that because defendants initiated the recall, class members are automatically legally entitled to a 100% recovery of the money paid for recalled pet food.  As noted, several defendants initiated voluntary reimbursement programs immediately after the recall.  There may or may not be good business reasons to implement recalls and reimbursement programs but these programs do not establish strict liability or automatically provide for a 100% recovery.  The various authorities objectors cite (e.g., the Consumer Product Safety Act, 15 U.S.C. §§ 2051–2084) do not support their far-reaching assertion that "[a] consumer who does not use a recalled product is entitled to a refund, without any requirement of showing that the product is defective."  The fact that courts and various government agencies may order consumer recalls and refunds in certain circumstances does not mean that class members in this case—who assert only that defendants initiated a voluntary

36

recall and reimbursement program—have a fool-proof legal claim against defendants.

Objectors' assessment of the Purchase Claims, moreover, fails to take into account class members with undocumented claims. The settling parties, of course, were aware of the reimbursement programs and negotiated the settlement understanding that the vast majority of class members with documentation for the purchase of recalled pet food would pursue a remedy through the various reimbursement programs. The settling parties assumed—correctly, as it turned out—that the majority of class members asserting Purchase Claims through the settlement would do so without documentation. *See infra* Section III.B. While the settlement provides up to $900 in recovery for reasonable claims submitted without documentation, it is not the case that a class member with no documentation to support the cost of a purchase for a specific brand of recalled pet food, during a specific time period, has "as strong a claim as is imaginable."

But even assuming objectors' characterization of the Purchase Claims as "strong" and Injury Claims as "weak" carries some validity, objectors fail to articulate how differences in the relative strength of the different claims would lead to conflicts of interest in class representation. Objectors simply allege a "substantial conflict" required subclasses in this case. It appears to us objectors' focus on the relative strength of the claims, like their focus on the disparity of the allocation, is more appropriately addressed as a Rule 23(e) adequacy of allocation question, rather than a Rule 23(a) adequacy of representation question.

Objectors also assert a class conflict allegedly resulting from different factual bases for the various claims. According to objectors, the Purchase Claims are based on the fact that defendants recalled the pet food, while the Injury Claims are based on the fact that the food was contaminated. Whether the pet food was actually contaminated, they argue, is immaterial for the Purchase Claims. We disagree. But more importantly, objectors again fail to explain, and we cannot discern, any antagonistic interests between class members arising from the factual underpinnings of the various claims. We believe the District Court properly determined that all class members have claims arising out of the sale of potentially contaminated pet food. That some class members have additional claims arising out of the use of the recalled food does not create a conflict between class members.

Finally, the Johnson/Turner objectors assert that differences in state law create conflicts among class members that preclude a finding of adequate representation.[25] According to objectors, these differences necessitated creating subclasses to meet Rule 23(a)'s adequacy of representation requirement.

———————————

[25]Although normally differences in state law are raised as a challenge to Rule 23(b)(3)'s predominance requirement, Rule 23(a)(2)'s commonality of law or fact prerequisite, or both, *see, e.g.*, *Warfarin*, 391 F.3d at 529, objectors do not argue that variations in state laws "are so significant so as to defeat commonality and predominance," *id.* Instead, they argue the differences in state laws "go directly to the adequacy [of representation] issue." Here we address adequacy of representation under Rule 23(a)(4).

38

We disagree and find no merit in objectors' argument that state law differences created conflicts among class members that defeat adequacy of representation and preclude certification of a nationwide class. Objectors fail to explain how the differences in state laws have created conflicts of interest between the named plaintiffs and absent class members in the context of adequacy of representation in this settlement class. We agree with the District Court that "the representative plaintiffs' interests are directly aligned with those of other members of the Class." Fairness Opinion, 2008 WL 4937632, at *6. As the District Court determined, "the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent Class members to establish defendants' liability." *Id*.

In sum, objectors fail to articulate any conflict or adversity among class representatives and class members. It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest. We agree with the District Court's finding that the interests of class members with only Purchase Claims are aligned with the interests of class members with Injury Claims. The District Court exercised sound discretion by finding the adequacy of representation requirement was met, by declining to create subclasses, and by certifying the settlement class.[26]

---

[26]The Picus/Kaffer objectors challenge the District Court's order denying their motion for leave to intervene to provide separate representation for class members with only Purchase

III.     FAIRNESS OF THE PROPOSED SETTLEMENT

"Even if it has satisfied the requirements for certification

――――――――――――――――

Claims.  We review the denial of a motion to intervene as of right under Federal Rule of Civil Procedure 24(a)(2) for an abuse of discretion. *United States v. Alcan Aluminum*, 25 F.3d 1174, 1179 (3d Cir. 1994).  "However, our review is more stringent than the abuse of discretion review we apply to a denial of a motion for permissive intervention.  We will reverse only if we find the district court has applied an improper legal standard or reached a decision we are confident is incorrect." *Id.* (citations and internal quotation marks omitted).

A class member seeking intervention as a matter of right under Rule 24(a)(2) must establish "1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005) (citing *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)). "To overcome the presumption of adequate representation, the proposed intervenor must ordinarily demonstrate adversity of interest, collusion, or nonfeasance on the part of a party to the suit." *Cmty. Bank*, 418 F.3d at 315.  As explained above, the District Court properly determined that absent class members' interests were adequately represented by plaintiffs. Accordingly, objectors were not entitled to intervene as a matter of right.

40

under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." *Prudential*, 148 F.3d at 316 (internal quotation marks omitted) (citing *Gen. Motors Corp*., 55 F.3d at 785); *see also* Fed. R. Civ. P. 23(e)(2). Under Rule 23(e), trial judges bear the important responsibility of protecting absent class members, "which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims." *Gen. Motors Corp*., 55 F.3d at 805; *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("The purpose of Rule 23(e) is to protect the unnamed members of the class.") (citing *Warfarin*, 391 F.3d at 534). We have stressed the importance of Rule 23(e), noting that "a district court acts as a fiduciary, guarding the claims and rights of the absent class members." *Ehrheart*, 609 F.3d at 593; *accord Warfarin*, 391 F.3d at 534; *Gen. Motors Corp*., 55 F.3d at 785; *see also Amchem*, 521 U.S. at 623 (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise" (internal quotation marks omitted)).

We ask district courts to apply an even more rigorous, "heightened standard" in cases "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 534. We have explained that this "heightened standard is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has

protected the interests of all class members." *Prudential*, 148 F.3d at 317 (internal quotation marks omitted).

In *Girsh v. Jepson*, we articulated nine factors to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and alterations omitted).  The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement.  *Gen. Motors Corp.*, 55 F.3d at 785.  The district court's findings under the *Girsh* test are factual, and will be upheld unless they are clearly erroneous.  *Id.* at 786.

In *Prudential*, we held because of a "sea-change in the nature of class actions" after *Girsh* was decided thirty-five years ago, it may be helpful to expand the *Girsh* factors to include, when appropriate, the following non-exclusive factors:

42

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323.

The district court must make findings as to each of the nine *Girsh* factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e). The factors we identified in *Prudential* are illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms.

Because district courts must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate, the court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms.

43

*Cf. Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (cautioning against "paint[ing] with too broad a brush [and] substituting intuition for . . . evidence and careful analysis"). When the parties have not supplied the information needed for the court to determine whether the settlement is fair, reasonable, and adequate, the court may affirmatively seek out such information. *See id.* at 285 (noting that courts may require the parties to present evidence to enable the court to make findings regarding the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if not presently settled).

We reaffirm the "overriding public interest in settling class action litigation." *Warfarin*, 391 F.3d at 535; *see also Ehrheart*, 609 F.3d at 595 (noting the "especially strong" presumption in favor of voluntary settlements in "'class actions . . . where substantial judicial resources can be conserved by avoiding formal litigation'" (quoting *Gen. Motors Corp.*, 55 F.3d at 784)). But cognizant that Rule 23(e) places a duty on district courts to safeguard the interests of class members, we believe courts may find it necessary to drill down into the case and into the agreement to make an independent, "scrupulous" analysis of the settlement terms. *Prudential*, 148 F.3d at 317.

A.     *The District Court's Opinion*

The District Court determined that the settlement was fair, reasonable, and adequate under Rule 23(e) after considering the nine *Girsh* factors. The court's analysis focused primarily on the Injury Claims and did not specifically reference the Purchase Claims. With regard to the complexity, expense, and likely duration of the litigation, the court focused on (1) the

scope and breadth of the litigation, which stemmed from a massive pet food recall, involved over 60 million containers of more than 90 brands of pet food, and resulted in approximately 115 nationwide class action lawsuits; (2) the complex medical and toxicological issues involving the combined impact of melamine and cyanuric acid on small animal renal systems, which likely would have required multiple experts, at an "enormous cost," who would be delving "into somewhat new territory involving the effects of these toxins on cats and dogs"; (3) the likelihood that discovery would be "extensive and require significant resources"; and (4) counsels' representation that pursuing the actions "through pretrial motion practice, formal discovery and trial would involve potentially several additional years to this litigation and could deprive pet owners of relief."  Fairness Opinion, 2008 WL 4937632, at *12-13.

The court determined that the reaction of the overwhelming majority of the class had been positive, thereby satisfying the second *Girsh* factor (as of the date of the fairness hearing, over 9,357 claims had been received, with 89 exclusion requests from U.S. residents, 25 from Canadian residents, and 28 objections).  *Id.* at *13.  With regard to the third factor, the court found that adequate informal discovery was conducted as well as some formal discovery, such that counsel were able to gain an appreciation of the merits of the case as well as the legal theories and risks.  *Id.* at *14.

The court determined the fourth and fifth *Girsh* factors were satisfied, as there was risk to plaintiffs in establishing causation, liability, and damages if the case proceeded to trial. *Id.* at *15.  With regard to causation, the court focused first on plaintiffs' representations of toxicity.  Plaintiffs stated that

45

although research on the toxicity of melamine and cyanuric acid "demonstrated a strong relationship to acute renal failure," few studies had been conducted, and the studies that were conducted were inconclusive with respect to how many pets became ill or died as a result of eating recalled pet food. *Id.* The court also credited plaintiffs' representations that causation would be a "major battleground" between experts, and would involve issues individual to each pet, such as age and health at the time allegedly contaminated food was consumed. *Id.* Liability would be "hotly contested because the adulteration of wheat gluten and rice protein concentrate . . . was a criminal act by Chinese companies." *Id.* Further, "as the product moved through the manufacturing and distribution process . . . varying degrees of liability would exist between manufacturers, private labelers and entities that were strictly retailers." *Id.* With regard to damages, the court cited plaintiffs' admission they did not know how many pets became ill or died as a result of consuming recalled pet food, thus creating uncertainty on the possible ultimate damages. *Id.*

The sixth factor, the risks of maintaining a class through trial, weighed in favor of settlement, because "given the potential differences as to the health of the pet and the size of the pet, there exist[ed] more than a slight risk of modification or decertification" if the case proceeded to trial. *Id.* at *16. With regard to defendants' ability to withstand greater judgment and enforceability of judgment, the court "acknowledg[ed] the fact that Menu Foods [the major defendant in this litigation] ha[d] incurred substantial cost in recalling the contaminated pet food, costs incurred outside of th[e] litigation yet nonetheless factored into the financial viability of Menu Foods' ability to pay the

46

settlement.   The amount of settlement, coupled with the expectation that some pet owners w[ould] be able to recover most if not all of their costs, weigh[ed] in favor of settlement." *Id.* (citing *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 462-63 (D.N.J. 2008)).

Finally, the court determined the eighth and ninth *Girsh* factors, the range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, weighed in favor of settlement:

> In this case, plaintiffs state that the Settlement allows Class Members to have the potential to obtain up to 100% of their economic damages after submitting a valid claim while avoiding the risk of litigation.  Plaintiffs argue that since the Class Members could potentially recover up to 100% of their economic damages, it is preferable to the very real possibility of a smaller recovery or no recovery at all.  Plaintiffs also state that the proposed Settlement represents a significant recovery in light of the attendant risks of litigation of proving causation, damages and liability.

> The Court finds that the range of reasonableness under the eighth and ninth *Girsh* factors weigh[s] in favor of settlement.   Although some Class Members may not be reimbursed fully for their economic damages depending upon whether the fund can support the number of claims ultimately

47

submitted, it does have the potential to allow most Class Members to be reimbursed fully. The Court also notes that by settling, the Class Members will receive money now at present value, rather than later, assuming they would be successful in litigation.

Id. at *17 (citing *Gen. Motors Corp.*, 55 F.3d at 806).

Objectors contend the District Court erred in finding the settlement fair, reasonable, and adequate. After reviewing the parties' arguments and conducting our own review of the record, we find the District Court lacked the information necessary to evaluate the value and allocation of the Purchase Claims and so we will vacate and remand on this one issue. In all other respects we will affirm.

B.    *The $250,000 Cap on Purchase Claims*

At the final fairness hearing, objectors argued that the $250,000 allocated for Purchase Claims was inadequate and rendered the settlement unfair and unreasonable. Objectors pointed out that no sales information for the recalled food had been presented to the court and that there was no information in the record that would allow the court to evaluate whether $250,000 was a reasonable settlement for the Purchase Claims. Faced with objections to the allocation, the settling parties explained to the court how they arrived at the $250,000 allocation.[27]    First, counsel contended that everyone at the

---

[27]In their memorandum of law in support of their joint motion for preliminary approval of the settlement, the settling parties did not discuss the merits of the Purchase Claims, how the

48

negotiating table believed the "vast majority" of people who wanted refunds for the purchase of recalled pet food had already returned the food to retailers or called the toll-free numbers of manufacturers and received a refund.[28]   Second, counsel

_____

parties' valued the Purchase Claims, or why the parties capped the Purchase Claims at $250,000. Similarly, at the preliminary fairness hearing, the settling parties offered no analysis of the merits or value of the Purchase Claims and did not explain why the Purchase Claims were capped at $250,000 out of a $24 million settlement. The discussion at the preliminary fairness hearing focused almost exclusively on the Injury Claims.

[28]At oral argument on appeal, the settling parties revealed for the first time (as far as we can tell) more detailed information about why they agreed upon a $250,000 cap on the Purchase Claims. Plaintiffs' counsel explained that the settling parties knew that class members with documentation for Purchase Claims had access to 100% recovery for their claims outside of the settlement. The purpose of the $250,000 allocation, they said, was to protect class members who lacked documentation (that is, class members who had not retained their sales receipts). Counsel also defended the figure, arguing that a higher amount might induce fraudulent requests.

According to the Claims Administrator, 11,306 timely, payable Purchase Claims have been made, for a total of $597,427.05.  *See* Letter from Edward J. Sincavage, CPA, Heffler, Radetich & Saitta LLP, to counsel for plaintiffs and defendants (Mar. 8, 2010) (on file with the Clerk's Office). Of the 11,306 Purchase Claims, 1,655 were submitted with complete documentation.  *Id.*  Because the total amount

believed that the "vast majority" of the 60 million units of recalled pet food was never sold to consumers. It was on the retail shelves at the time the recall was announced and then was removed from the shelves and put into storage. In response to the court's inquiry into whether the settling parties knew what percentage of the recalled pet food was actually sold at retail, counsel explained that the parties had "not been able to get [their] hands around that" because of the unorganized way in which some of the recalled food was returned.[29]

The court also inquired into whether any of the $8 million in Historic Payments had gone to claimants seeking a refund for recalled pet food. Counsel explained that some portion, "but not very much," of the $8 million was compensation for recalled food. Counsel for Petco, Wal-Mart, and Petsmart explained that when a consumer submitted a veterinary claim, a refund for recalled food, if due, would also be paid to resolve the claim on a global basis. But, according to counsel, the $8 million excludes any refunds paid to consumers who simply brought recalled products back to the store from which they made their purchase. These amounts "have not been calculated as part of this proceeding."

---

allocated for Purchase Claims is $250,000, payments for Purchase Claims will be approximately 41.85% of the payable amounts. *Id.* Thus, as the settlement currently stands, 1,655 class members with full documentation to support their Purchase Claims will receive approximately a 41.85% recovery on these claims.

[29]*See* discussion *infra* note 31.

50

The District Court determined that because the recall involved a defined number of products manufactured over only a short time period (approximately four months) and because "many purchasers of Recalled Pet Food Products ha[d] already [been] compensated outside of the Settlement," the $250,000 allocation was fair and adequate:

> The Recall involves a defined number of products manufactured over only a few months [between November 8, 2006, and March 6, 2007]. The Settlement Agreement applies only to products recalled in or after March 2007. More importantly, it was represented to the Court during the fairness hearing by co-lead counsel and defense counsel—and it makes common sense—that manufacturers and retailers have already provided compensation to purchasers of recalled products through the Historical Payments or through point of sale refunds or [as] a result of the Recall. Therefore, many purchasers of Recalled Pet Food Products have already [been] compensated outside of the Settlement. Therefore, the $250,000 amount allocated is adequate for payment for "Consumer Food Purchase Claims" defined as "claims solely for reimbursement of the costs associated with the purchase of a Recalled Pet Food Product by a Settlement Class Member who has not been reimbursed for such costs to date, including through return or exchange of the Recalled Pet Food Products."

51

Fairness Opinion, 2008 WL 4937632, at *8.

We see no error in the District Court's common sense finding that many purchasers of recalled pet food were compensated for refunds outside of the settlement. But the fact that many consumers had already received refunds did not necessarily answer whether the $250,000 allocation was a fair and adequate settlement of the Purchase Claims.

No one has challenged the adequacy of the $24 million settlement fund, and we do not doubt the able District Court properly determined that the fund was a fair and adequate settlement of all the claims advanced by plaintiffs in this case. The District Court carefully examined each of the *Girsh* factors. But the parties did not focus on the Purchase Claims. We are unable to determine whether the $250,000 allocation was a fair and adequate settlement of the Purchase Claims given the risks of establishing liability and damages and the likely return to the class of continued litigation. Under this set of facts—where funds available for some claims are capped while others are not—the settling parties should have provided the court with more detailed information about why they settled on the $250,000 cap.

The settling parties also should have provided information to determine the range of reasonableness of the $250,000 allocation "in light of the best possible recovery," *Prudential*, 148 F.3d at 322, and "in light of all the attendant risks of litigation," *Girsh*, 521 F.2d at 157 (quoting *City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). We have explained that "in cases primarily seeking monetary relief," district courts should compare "the present value of the damages

52

plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement." *Gen. Motors Corp.*, 55 F.3d at 806 (quoting Manual for Complex Litigation (Second) § 30.44, at 252 (1985)); *Prudential*, 148 F.3d at 322. "This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside." *Gen. Motors Corp.*, 55 F.3d at 806. Precise value determinations are not required. *Cf. Warfarin*, 391 F.3d at 538 (finding no error in the district court's analysis of the final two *Girsh* factors where the plaintiffs' expert "estimated recoverable damages to be as low as $7.1 million and as high as $133.8 million," and the district court described the methodology utilized by the expert to arrive at the figures and concluded the estimate was reasonable).[30]

Here, the settling parties failed to provide the District Court with estimations of recoverable damages for the Purchase Claims including sales information quantifying the amount of

---

[30]We note that in some cases, "the traditional calculus suggested by the Manual for Complex Litigation . . . and adopted by [us] cannot be applied." *Prudential*, 148 F.3d at 323. In *Prudential*, calculating the value of the best possible recovery would have been "exceedingly speculative" and both the structure of the settlement and the uncapped benefit fund made it "difficult to determine accurately the actual value of the settlement." *Id.* at 322-23. In such cases, district courts may not be able to reduce the final *Girsh* factors "to a concrete formula." *Id.* at 322. This may or may not be the case here.

recalled pet food sold to consumers and the amount of refunds already paid to consumers.[31]   If available, this information

[31]There appears to be disagreement or confusion among the parties with respect to the availability of sales information for the recalled pet food.  At the fairness hearing, counsel for defendant Proctor & Gamble explained that defendants had been unable to determine what percentage of the recalled pet food (60 million containers) was actually sold at retail, due to the manner in which some of the product was returned.  From what we can discern from the record, it appears that after the recall was announced, large quantities of recalled pet food were returned to some defendants, and some amount of the returned product was returned as "Unorganized Inventory," consisting of boxes and barrels full of a combination of recalled pet food, non-recalled pet food, and other items that were inadvertently swept off store shelves.

According to defendants, "[t]he circumstances under which the Unorganized Inventory was returned to Defendants prevented each manufacturing Defendant from determining the amount of product sold and returned, and the amount of product simply returned from store shelves."  At oral argument, plaintiffs' counsel argued that sales information could have been obtained through discovery.  Objectors contend the settling defendants knew how much recalled product was sold, but intentionally failed to inform the District Court of the information.  The District Court noted at the fairness hearing that information on refunds could have been obtained.

From our review of the record, it appears that some defendants have compiled the amount of returned "organized" pet food.  For example, the Director of Quality Assurance of

would have enabled the court to make the required value comparisons and generate a range of reasonableness to determine the adequacy of the settlement amount. *Cf. Warfarin*, 391 F.3d at 538 (settlement fund represented 33% of available damages); *Cendant*, 264 F.3d at 241 (settlement represented 36-37% of damages).

The settling parties contend they provided substantial support for the adequacy of the $250,000 allocation by citing the limited time period of the recall—November 8, 2006, through March 6, 2007—and the significant refunds and compensation provided for the purchase of recalled pet food outside of the settlement through point-of-sale refunds, refunds offered by manufacturers, and the Historic Payments.  As noted, however, this information was insufficient.

In sum, we find the District Court lacked the information

---

defendant Del Monte Foods Company testified that "[t]he majority of the recalled pet treats and food held by Del Monte are inventoried by product-type or SKU and date of manufacture . . . . These units (pet treats or food packaged for retail sale) are stored in cases and stacked on full or partial pallets. . . . As such, there are records and documents that show whether this product ever left Del Monte's warehouses, or was delivered to a retailer or distributor and returned."   And as of December 2007, defendant Menu Foods was storing "approximately 2,123,974 cases of Organized Product, amounting to approximately 51,000,000 individual units of Organized Product, [and] approximately 647,917 cases of Unorganized Materials, [amounting to approximately 15,550,008 individual units of Unorganized Materials]."

55

necessary to determine whether the $250,000 allocated to Purchase Claims was fair, reasonable, and adequate. Accordingly, we will remand for further Rule 23(e) proceedings only on the allocation for Purchase Claims.  On remand, the settling parties should either produce the relevant information or demonstrate that it is unavailable or that producing it would be unfeasible.

C.    *The Release*

The Picus/Kaffer objectors challenge the District Court's order approving the settlement's release.  Under the terms of the release, "Settlement Class Members" release all claims that have been brought or could have been brought against defendants that relate in any way to "matters referenced in any claim raised . . . in the Pet Food Recall Litigation."   "Settlement Class Member[s]" are all individuals "who purchased, used or obtained, or whose pets used or consumed Recalled Pet Food Product(s)" who have not opted out.   "Recalled Pet Food Products" are defined as any pet food product that was recalled on or after March 16, 2007, "because of allegedly contaminated wheat gluten and/or rice protein concentrate."   Thus, by its terms, the release does not apply to claims relating to pet food that was not recalled after March 16, 2007, because of allegedly contaminated wheat gluten and/or rice protein concentrate.  In other words, the release does not apply to non-contaminated pet food, whether or not recalled by defendants or others.

The Picus/Kaffer objectors have asserted claims in non-MDL pet food lawsuits alleging that they purchased pet food

that was falsely labeled as "Made in the USA."[32]   Objectors

---

[32]On April 30, 2007, Margaret Picus filed a class action in Nevada state court (which was removed to the United States District Court for the District of Nevada), alleging a scheme among several defendants to sell "Ol' Roy" brand pet food products to consumers as "Made in the USA," when some ingredients were manufactured outside of the United States. *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 654 (D. Nev. 2009).   On March 16, 2009, the *Picus* court granted the defendants' motion to deny class certification for litigation purposes, holding that individual issues would predominate at trial and that a class action was not the superior method of adjudication.  *See id.* at 660.

In May 2007, Robert Kennedy filed a complaint in California state court (which was removed to the United States District Court for the Southern District of California) alleging several defendants engaged in a scheme through which four varieties of Natural Balance pet food were sold to consumers with the label "Made in the USA" when the products actually were manufactured either in whole or in part in China.  *See Kennedy v. Natural Balance Pet Foods, Inc.*, No. 07-cv-1082 H, 2007 WL 2300746, at *1 (S.D. Cal. Aug. 8, 2007).  Objector Daniel Kaffer was a member of the putative class in *Kennedy*. On June 12, 2008, after the District Court in this case issued its order granting preliminary certification of the settlement class and preliminary approval of the settlement, the *Kennedy* court denied plaintiff's motion for class certification.  The *Kennedy* court determined the plaintiff and all the putative class members were included in the settlement class identified by the settlement in this case because the products specified in the complaint were

argued below that the release was overbroad because it improperly released their mislabeling claims without consideration.  After questioning the parties at the fairness hearing, the District Court disagreed.  The court determined that to the extent individuals purchased "Recalled Pet Food Products," their "Made in the USA" claims for those specific purchases would be released by the proposed settlement.  *See* Fairness Opinion, 2008 WL 4937632, at *8.  But claims for purchases of pet food that was not recalled after March 16, 2007, because of allegedly contaminated wheat gluten and/or rice protein concentrate were "outside the scope of the Settlement Agreement."  *Id.*  The court explained that Picus's and Kaffer's claims were based on their alleged purchase of mislabeled products over a period of more than four years,

among the "Recalled Pet Food Products" defined in the settlement.  Although plaintiff Kennedy had opted out of this case, the *Kennedy* court denied his motion for class certification, in part, because "every member of [the] putative class appear[ed] to be subject to the MDL court's preliminary approval order enjoining other actions related to the recalled products."  The court also denied the motion because individual issues under state law predominated over common issues.

On January 6, 2010, the United States Court of Appeals for the Ninth Circuit affirmed the denial of the motion for class certification, but did not base its decision on the settlement in this case.  *See Kennedy v. Natural Balance Pet Foods, Inc.*, 361 F. App'x 785 (9th Cir. 2010); *see also* Defs.' Rule 28(j) Letter (filed 1/14/10).  Instead, the court affirmed on the ground plaintiff failed to satisfy the predominance requirement of Rule 23(b)(3).  *See Kennedy*, 361 F. App'x at 785.

58

beginning in April 2003, and their lawsuits asserted claims for various pet food products and varieties that were outside the scope of the pet food recalls. The court found that "[t]o the extent these claims relate to products other than the Recalled Pet Food Products, they are not the subject of this Pet Food Recall MDL. Therefore, [Picus's and Kaffer's] claims in the state actions are not released by the Settlement . . . ." *Id.*

Objectors contend the release should not have been approved because: (1) the *Kennedy* court construed the release as barring claims for non-contaminated pet food purchases; (2) defendant Natural Balance argued before the *Kennedy* court that the release barred claims for non-contaminated pet food purchases; and (3) the list of recalled pet food products attached to the Final Approval Order includes a few non-contaminated Natural Balance dog food products.

Objectors' arguments lack merit. The settling parties agree that the release does not encompass claims relating to non-contaminated pet food products, including any mislabeling claims asserted in the *Picus* and *Kennedy* actions that are based on non-contaminated pet food. The fact that the district court in the *Kennedy* action may have misconstrued the release as barring claims for non-contaminated pet food purchases is not a reason to invalidate the release. The *Kennedy* court interpreted the release before the final fairness hearing in this case and before the District Court determined the scope of the release in its opinion. More importantly, the Ninth Circuit affirmed the decision to deny class certification in *Kennedy* without reference to this case. *See Kennedy*, 361 F. App'x at 785.

Additionally, the fact that—prior to the fairness hearing

and final approval of the settlement—one defendant argued for a different interpretation of the release does not render the release invalid. There presently is no dispute between objectors and the settling parties regarding the scope of the release. All parties agree that the District Court properly determined that to the extent the "Made in the USA" claims relate to products other than "Recalled Pet Food Products," they are not the subject of this action and are therefore not released. Finally, the fact that the list of "Recalled Pet Food Products" attached to the Final Approval Order inadvertently includes a few non-contaminated Natural Balance dog food products does not invalidate the release. As defendants note, the list of recalled pet foods is not determinative and has no independent significance—it must be read in conjunction with the terms of the release, which does not apply to claims relating to non-contaminated pet food.[33]

_____

[33]The Picus/Kaffer objectors also contend the District Court erred by failing to grant their request for limited discovery to establish the alleged insufficiency of the settlement. In *Girsh*, we reversed the district court's final approval of a class action settlement, finding, among other things, that an objector "was entitled to at least a reasonable opportunity to discovery against" the settling parties because he had not been "afforded an adequate opportunity to test by discovery the strengths and weaknesses of the proposed settlement." *Girsh*, 521 F.2d at 157. We later explained in *Community Bank* that our finding regarding objector discovery in *Girsh* "was predicated on the total inadequacy of the record upon which the settlement was approved," as well as the fact that the objector was denied meaningful participation at the fairness hearing. *Cmty. Bank*, 418 F.3d at 316. We concluded, therefore, that "*Girsh* cannot

D.    *Attorneys' Fees*

Appellants do not challenge the award of attorneys' fees. Because no one (no class member as objector) raised this issue on appeal, there has been no briefing on the matter.  In its Note to the 2003 amendments to Rule 23, the Advisory Committee on Civil Rules directed the district courts to rigorously scrutinize the award of attorneys' fees.  *See* Fed. R. Civ. P. 23(h)(4)

--------------------------------------------------

stand for the proposition that, as a general matter, objectors have an absolute right to discovery."  *Id.*  "On the other hand, we [have] recognized that discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors."  *Id.*; *see also Prudential*, 148 F.3d at 325 (holding the district court acted well within its discretion in denying an objector's request for discovery where the objector was able to present his arguments to the court during the fairness hearing and where the court found the objector "had ample opportunity to avail himself of the substantial discovery provided to Lead Counsel but failed to do so, and that additional discovery was unnecessary because [the objector] focused primarily on legal issues").  Here, because we will remand for further proceedings on the fairness of the $250,000 allocation, we need not reach this issue.  On remand, objectors may renew their request for limited discovery, which the court may grant or deny in its discretion.  *See Cmty. Bank*, 418 F.3d at 316 ("The District Court has discretion to employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement." (internal quotation marks omitted)).

61

advisory committee's note ("Whether or not there are formal objections, the court must determine whether a fee award is justified . . . ."). In this respect we do not disagree with the concurrence. Nor do we conclude the question of attorneys' fees cannot be considered on appeal *sua sponte*, depending on the facts and circumstances of each case. Nevertheless, in this case, we believe the district court made an extensive inquiry into and discharged adequately its responsibility to assess the reasonableness of attorneys' fees.

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the certification of the proposed class for settlement and the denial of the motion for leave to intervene. We will vacate the approval of the settlement and remand for further Rule 23(e) proceedings on the allocation for Purchase Claims.

<u>In re: Pet Food Products Liab. Litig.</u>, Nos. 08-4741 & 08-4779

<u>WEIS, J., Concurring and Dissenting.</u>

I am pleased to join the majority opinion but write separately on two issues. There is no discussion in that opinion of the size of the attorneys' fees included in the settlement: 31% of the $24 million settlement ($7.44 million). To my mind, the record does not demonstrate adequate support for the amount awarded and, because we are directing a remand, I would include the fee award as an additional issue to be resolved.

Moreover, I am not persuaded that application of the *cy pres* doctrine is appropriate in the class action setting. I would hold that any funds remaining at the conclusion of the claims process should be distributed to class members where possible or should be escheated to the government.

The petition for legal fees here presents an all-too-familiar scenario. Plaintiffs' lawyers submitted their justification for a substantial fee, emphasizing the risks of an unsuccessful outcome for class members and attributing the negotiated settlement to exceptional skill and dedication. Defendants remained silent on the issue, likely because, as we have observed on a number of occasions, they were interested primarily in "buying peace." <u>See, e.g.</u>, <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 819-20 (3d Cir. 1995) ("<u>G.M. Trucks</u>") ("[T]his court has recognized that 'a defendant is interested only in

1

disposing of the total claim asserted against it; . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.'" (quoting <u>Prandini v. Nat'l Tea Co.</u>, 557 F.2d 1015, 1020 (3d Cir. 1977))).

Recognizing the parties' disincentives to invoke judicial scrutiny of fee awards, as well as the potential for a "misalignment of the attorneys' and the class's interests," <u>id.</u> at 821, we have held that "a thorough judicial review of fee applications is required in all class action settlements," <u>id.</u> at 819. The purpose of this robust and exacting review is to detect not only "actual abuse" caused by attorney-class conflict, but also "potential public misunderstandings [that such conflict] may cultivate." <u>Id.</u> at 820 (quoting <u>In re Agent Orange Prod. Liab. Litig.</u>, 818 F.2d 216, 225 (2d Cir. 1987)).

Given the plaintiffs' desire to enforce the judgment and the defendants' longing to be done with this litigation, it is not surprising that no party to this appeal has challenged the attorneys' fee award. Nevertheless, that does not, in my opinion, relieve this Court of the responsibility it has assumed to ensure that the award is reasonable.

## I.

The Notice of Appeal cites the judgment enforcing the settlement agreement, a component of which included the fee award. Accordingly, our jurisdiction over that matter is not in question. The issue here is whether *sua sponte* review of the reasonableness of the attorneys' fee award is appropriate in these circumstances where the matter has not been briefed.

2

The courts' general policy, born in part of historically self-imposed limitations and as a means of coping with overburdened dockets, is to deny review of issues not briefed on appeal.  See, e.g., Pfeifer v. Jones & Laughlin Steel Corp., 678 F.2d 453, 456-58 (3d Cir. 1982), vacated on other grounds, 462 U.S. 523 (1983) (failure to object in district court to measure of damages barred appellate review of that issue).  Pfeifer, however, did not purport to make this policy absolute.

Nor has the Supreme Court definitively resolved the issue of reviewability.  In Singleton v. Wulff, 428 U.S. 106, 121 (1976), the Court said, "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.  We announce no general rule."

A noteworthy case in this field is Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), whose landmark holding -- that in diversity cases, substantive state law, not federal common law, controls -- addressed an issue never raised by the parties.[1]

---

[1] See Albert Tate, Sua Sponte Consideration on Appeal, 9 Trial Judges J. 68 (1970), as reprinted in Robert Leflar, Appellate Judicial Opinions 126, 127 (1974).  As Justice Tate explained, "[a] strong majority felt that the new principle announced was the correct law. . . . To fail to apply the right principle now, approving by inference the wrong or former one . . . might cause injustice not only to present litigants, but

*Sua sponte* determination of an issue may be especially appropriate where the matter involves more than just the individuals, and addresses a matter of concern to the courts and the judicial system.  It is also proper where such determination will neither require nor result in much great additional work for the court or the parties.[2]

As lawyers and courts make more frequent use of, and grow increasingly reliant on, the conveniences offered by class actions (and particularly settlement class actions), it becomes ever more incumbent on the appellate courts to ensure that resort to these forms of mass litigation leads to outcomes that reflect positively on the courts and the judicial system.  Cf. G.M. Trucks, 55 F.3d at 820 (court must "be alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding").  Vigorous review of attorneys' fee awards by the appellate courts, to certify that such awards are

---

also to numerous others erroneously relying upon th[at] principle."  Id.

[2] The scope of appellate review in this area has been the subject of spirited academic discussion.  See Robert J. Martineau, Considering New Issues on Appeal: The General Rule and the Gorilla Rule, 40 Vand. L. Rev. 1023 (1987); Rhett R. Dennerline, Pushing Aside the General Rule in Order to Raise New Issues on Appeal, 64 Ind. L. J. 985 (1989); Allan D. Vestal, *Sua Sponte* Consideration in Appellate Review, 27 Fordham L. Rev. 477 (1959), as reprinted in Robert Leflar, Appellate Judicial Opinions 129, 130 (1974); B.E. Watkins, Manual of Appellate Court Opinions 154 (1977).

4

neither incongruous with the work performed nor excessive in light of the results obtained for class members, will reinforce the public's confidence in the judicial system.

I do not part ways with the result in the <u>Pfeifer</u> case, because here there are two critical differences.  First, on the issue of attorneys' fees, the class was not independently represented in the district court or before this panel.  Unlike other items in the settlement agreement, where the self-interests of both plaintiffs and defendants were in play, no such constraints dominated the determination of a reasonable fee award.

Second, we have adopted a policy of closely monitoring fees in class actions.  <u>See</u> <u>In re Cendant Corp.</u> <u>PRIDES Litig.</u>, 243 F.3d 722, 731 (3d Cir. 2001) (granting standing to a non-intervening class member seeking to challenge fee award on appeal because "reviewing courts retain an interest -- a most special and predominant interest -- in the fairness of class action settlements and attorneys' fee awards").  Failing to raise reasonableness *sua sponte* would undermine that commitment.  <u>See</u> <u>id</u>. at 729-30 ("it would be preposterous to hold that, even where a district court awarded a fee of 75% of the recovery to class counsel, we would have no power to review such an inappropriate and outrageous award in the absence of an objector").

Furthermore, because this case will be remanded to the trial court on other issues, remand for determination of the propriety of the fee award would not create much additional work for the trial court or class counsel.

In view of the circumstances here, I have no reservations about discussing the fee award even though the parties have not briefed that matter.   The class action judgment as a whole is before the panel, and this Court has assumed the responsibility of monitoring fee awards.   The parties may not thwart that policy by failing to brief the issue. Accord G.M. Trucks, 55 F.3d at 801 ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed").

## II.

The literature and court opinions discussing fees in class actions are voluminous and need not be examined at length here.[3]   Suffice it to say that, whether on its face a fee of 31% -- or approximately $7.5 million -- of a recovery of $24 million is reasonable requires more information than the record discloses.

---

[3] For a small example of appropriate scholarly commentary, see Dennis E. Curtis & Judith Resnick, Contingency Fees in Mass Torts: Access, Risk, and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients, 47 DePaul L. Rev. 425 (1998); John C. Coffee, Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is not Working, 42 Md. L. Rev. 215 (1983); John C. Coffee, Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986).

In reviewing an award of attorneys' fees, we apply an abuse of discretion standard.  See In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005). However, we require district courts "to clearly set forth their reasoning for fee awards so that we will have a sufficient basis to review" them.  Id. at 301; see also Cendant PRIDES Litig., 243 F.2d at 728 (district court must perform "extensive analysis and inquiry before determining the amount of fees" so court of appeals can exercise its "independent interest in monitoring . . . awards").  Cf. Perdue v. Kenny A., ___ U.S. ___, 130 S. Ct. 1662, 1676 (2010) (in analogous statutory fee-shifting case, remanding for re-calculation of attorneys' fees where district court's methodology prevented appellate courts from exercising "meaningful appellate review").

There appears to be a perception in many district courts that the twenty-five percent "benchmark" is an appropriate place to begin the fee analysis for most common fund purposes.  Too often that is the end of the discussion, rather than a beginning point for determining whether a particular fee is reasonable.  In Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2001), the Court of Appeals noted the prevalence of routine fee awards during the 1970's as being in the 20-30 percent area.  That range, however, was later considered "to yield too little for the client-class," id. at 48, and other methodologies to calculate fees were adopted, id.

This Court is presented with a record that essentially adopts plaintiff's counsel's petition without adequate explication.  The District Court carefully noted that its consideration of the award was based upon what the class attorneys put forth.  I do not impugn the integrity and

diligence of counsel by requesting more information on the subject.

Counsel's efforts appear to have been expended in three general areas:  intensive negotiations and mediations sessions with defense counsel; inspection of large quantities of recalled goods to arrive at a stipulation for preservation of evidence; and motions in the District Court to restrict communications by a few defendants with punitive class members.

An advocate for the reasonableness of the $7.5 million fee might wish to know approximately how many lawyers for the class actually participated in the negotiations with defense counsel and at the mediation sessions.  The plaintiffs' petition refers to one meeting when sixty lawyers appeared for the defendants.  It seems unlikely that this was typical of the mediation or bargaining sessions, although it points out the difficulty in working out a settlement with a large, unorganized group.  But, for purposes of review, it would be helpful to know, at least in general terms, what amount of legal talent was needed -- and how many lawyers actually were present -- at the negotiation and mediation sessions.

Plaintiffs' counsel commendably notes their obligation to avoid duplication in the division of legal work. Yet, apart from this general acknowledgement, the petition is vague in demonstrating the efficient use of the personnel available.

8

For example, counsel discussed in general terms proper efforts to delegate various tasks among the many lawyers. However, there remains the possibility that, in light of the large number of consolidated class actions -- and the lawyers involved with each such action -- much time was devoted to task assignment and coordination among the many law firms. An appropriate inquiry would be whether that organizational activity was a necessary and limited legal function, and thus a reasonable expenditure that benefitted the class as a whole.

The difficulty in proving liability in the underlying suit is another factor to be considered in justifying the size of a fee. When defendants' culpability is clear, less is required of plaintiffs' counsel than when responsibility is sharply contested. In this connection, the amount of spade work done by government agencies bears on the reasonableness of the fee.

Both the Federal Drug Administration and the Justice Department investigated the tainted products at issue here. Although no enforcement was undertaken by the FDA, indictments were issued against some of the defendants. Plaintiffs do not adequately discuss the benefits that the class derived from the government's action but merely point out that it did not solve all of the liability problems. Counsel should not charge the class for acquiring evidence of culpability by piggy-backing on the criminal and agency proceedings. Although the liability here may well not have been foolproof, seeking recovery for loss caused by a recalled contaminated product is hardly an insurmountable task. A demonstration of the benefits derived by the class from the

9

government's investigation would be of assistance for purposes of our review.

Generally, we allow lead counsel to distribute the total fee award to other participating lawyers. However, no explanation here has been given for the difference in fees requested for the American lawyers (25%), and the Canadian lawyers (6%). There may well be sound reasons for asking approval of this allocation. However, the Court should have been given the basis for that sharp difference in distribution and been permitted to review its reasonableness.

Plaintiffs' counsel asserted that, prior to MDL consolidation, some defendants had contacted putative members of the class, attempting to secure information about the potential value of their claims and, in some instances, directly or indirectly attempting to settle claims. Counsel brought this to the attention of the District Court and, with entry of a consent order, resolved the matter amicably. To what extent those proceedings were helpful to the class -- as contrasted to the interests of class counsel -- is not discussed in the record, nor is the relative amount of the total fee award attributed to this issue analyzed.

In another phase of the case, counsel inspected the recalled food at several warehouses, leading to agreements allowing defendants to dispose of most of this contaminated material, leaving enough for evidentiary purposes if necessary at a trial. On the surface, this appears to be a straightforward task, not requiring extensive activity by highly experienced lawyers. There may be justifiable reasons for the fee charged to that work, but the lack of record information forecloses a robust review.

10

It may be that, on remand, plaintiffs' counsel could develop an adequate record to demonstrate the reasonableness of the $7.44 million fee. At this stage, however, I believe that further explanation is warranted before this Court puts its imprimatur on the award.

### III.

The settlement agreement also provides that any funds remaining after administration of the settlement and payment of all valid claims will be distributed to animal welfare-related organizations in the United States and Canada. The size of this charitable gift is immeasurable at this point and may indeed be insignificant at the conclusion of all proceedings. However, I do not believe that application of the *cy pres* doctrine is appropriate in litigation of this nature.

*Cy pres* was historically used in testamentary trusts where it was not possible to distribute funds in precise accordance with the testator's wishes. In such cases, the money was distributed in a manner that came as close as possible (in Norman French, "*cy pres comme possible*") to the testator's original intent. That doctrine is well established in the law.

Applying *cy pres* to the class action before us, however, is quite another matter. Certainly, this law suit is not charitable. There are no individuals whose wishes need be considered and there is no intent to benefit charitable purposes that can be attributed to the class members or the lawyers who established the fund.

Traditionally, unclaimed monetary awards have escheated to the state. The application of that rule seems reasonable and in accordance with general legal and equitable principles. Here, the parties benefitted by the action of the state in providing a forum to resolve their differences and, in that light, repayment to the government to defray some of the costs of the court system would be in the nature of a user fee.

We deal here with charitable contributions to which members of the class never voiced any interest or approval and a procedure subject to criticism as an inappropriate judicial function.[4]

I would require the District Court to reconsider the disposition of any funds remaining at the conclusion of this litigation. Distribution to the class members who have not received complete compensation should be considered first. If such payments are not feasible or are unduly difficult, the fund should escheat to the government.

_____

[4] See Adam Liptak, Doling Out Other People's Money, N.Y. Times, Nov. 26, 2007, at A14; Editorial, When Judges Get Generous: A Better Way to Donate Surpluses from Class-Action Awards, Wash. Post, Dec. 17, 2007. Cf. Am. Law Inst., Principles of the Law: Aggregate Litigation, § 3.07, at 218-19 (2010) (rejecting "the position . . . that a cy pres remedy is preferable to further distributions to class members" and recommending that courts make numerous inquiries as to the viability of additional payments to the class before consideration of the cy pres remedy).