**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: PET FOOD PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1850 (All Cases)<br><br>Civil Action No. 07-2867 (NLH)<br><br>**OPINION** |

### BACKGROUND

The Pet Food Products Liability Litigation involves litigation brought on behalf of consumers in the United States and Canada who purchased, or whose pets consumed, pet food or treat products which were recalled because they allegedly contained contaminated wheat gluten or rice protein concentrate.[1] The parties entered into a settlement agreement which was preliminarily approved by this Court on May 30, 2008. On October 14, 2008, the Court held a fairness hearing and heard argument on plaintiffs' motion to approve the settlement and co-lead plaintiffs' counsels' motion for attorneys' fees. The Court also heard argument on a motion to intervene in the settlement. In the Court's November 18, 2008 Opinion, the Court granted the motion for Settlement and for attorneys' fees, and denied the motion to intervene.[2]

---

[1] Because the facts of this case have been extensively detailed in this Court's November 18, 2008 Opinion, as well as the Third Circuit Court of Appeal's December 16, 2010 Opinion, they will not be set forth again here.

[2] The Court also granted co-lead counsels' motion to strike the separate motion for attorneys' fees filed by the proposed

The proposed intervenors subsequently appealed to the Third Circuit Court of Appeals. In the Third Circuit's December 16, 2010 Opinion, this Court was affirmed in all respects except for one: "[T]o determine whether the $250,000 allocated to Purchase Claims was fair, reasonable and adequate."[3] (Third Cir. Op. at 55-56.)

Following the Third Circuit's mandate, entered on January 11, 2011, this Court issued a briefing schedule to allow the parties to provide supplemental information to support or contest the allocation to the product purchase claims. Briefs were submitted by plaintiffs and defendants, and a hearing was held on February 17, 2011, where counsel for plaintiffs and defendants appeared.[4] For the reasons expressed on the record and herein, the Court finds the $250,000 allocated to purchase claims to be fair, reasonable and adequate. Accordingly, the settlement, as set forth in the Court's prior Orders [Docket Nos. 272, 295, 373]

---

intervenors' counsel, Newman, Creed & Associates.

[3]The "Consumer Food Purchase Claims," abbreviated to "purchase claims" or "product purchase claims," concern one category of economic damages reimbursable by the settlement, and encompass the costs associated with the purchase of recalled pet food.

[4]Counsel for the proposed intervenors did not submit briefing or appear at the hearing. Counsel for plaintiffs and defendants represented on the record that they settled with the proposed intervenors' counsel for various reasons, with one reason being to prevent any additional barriers to the class members' long-awaited reimbursement for their claims. Counsel also represented on the record that none of the funds used to settle with the proposed intervenors came out of the award to the class.

is again approved in its entirety.

## DISCUSSION

In this $24 million settlement, $250,000 was allocated to claims seeking reimbursement of monies claimants paid to purchase pet food. In order to obtain reimbursement for product purchase claims, a claimant was not required to provide any documentation of that purchase, but instead could simply affirm, subject to penalty of perjury, that they purchased a recalled pet food. The settling parties agreed to this figure--and the opportunity for reimbursement for undocumented claims--largely based on the fact that: (1) the majority of class members with documentation for purchase claims had access to 100% recovery for their claims outside of the settlement through refund programs instituted by the manufacturers and retailers; (2) product purchase claimants faced a tough evidentiary burden of proof to be successful on their claims should they proceed through litigation; (3) a product purchase claimant could opt-out of the settlement if she determined her claim was worth more than what she could obtain in settlement; and (4) a greater allocation may have induced fraud. Thus, this portion of the settlement protected the interests of class members who did not save their tainted pet food or the documentation proving its purchase, while at the same time, it took into account the heavy burden product purchase claimants would have to bear in order to prove their case through litigation. It also acknowledged the real concern about potential fraud.

When the $250,000 figure, based upon all these considerations, was presented to this Court for approval, hard data to support the reasonableness and adequacy of the figure was lacking. This was partly because the process of administering the class claims had not formally begun. Moreover, the gaps in information were caused by the breadth of the product recall, which included, due to the abundance of caution on the part of the manufacturers, uncontaminated food. Gaps in hard data also were caused by the sweeping nature of how the retailers removed pet foods from the store shelves, accepted returns, and shipped the food back to the manufacturers. This returned product--which included contaminated and uncontaminated recalled pet food, pet food that was not recalled, and other non-pet food items--was so unorganized that it became a health hazard and ordered destroyed by the FDA.

During the time between this Court's approval of the settlement, oral argument before the Third Circuit on the proposed intervenors' appeal, and the issuance of the Third Circuit's decision, data was collected through the claims administration process. In their Opinion, the appeals judges recognized both that this Court did not have the benefit of the claims process when considering the fairness, adequacy and reasonableness of the $250,000 product purchase claim figure, and that, regardless of the claims process, hard data from the retailers and manufacturers may not exist. The Third Circuit, however, found that while agreeing that this Court "properly

4

determined that the fund was a fair and adequate settlement of all the claims advanced by plaintiffs in this case," and that "the District Court carefully examined each of the *Girsh* factors,"[5] the "parties did not focus on the Purchase Claims," and, therefore, the Third Circuit was "unable to determine whether the $250,000 allocation was a fair and adequate settlement of the Purchase Claims."  (Third Cir. Op. at 52.)  Accordingly, the Third Circuit admonished that the "settling parties should have provided the [district] court with more detailed information about why they settled on the $250,000 cap," and "should have provided information to determine the range of reasonableness of the $250,000 allocation 'in light of the best

---

[5] In Girsh v. Jepson, 521 F.2d 153, 156-57 (3d Cir. 1975), the Third Circuit articulated nine factors to consider to evaluate whether a proposed settlement is fair, reasonable and adequate.  They are:

  (1) The complexity, expense, and likely duration of the litigation;
  (2) The reaction of the class to the settlement;
  (3) The stage of the proceedings and the amount of discovery completed;
  (4) The risks of establishing liability;
  (5) The risks of establishing damages;
  (6) The risks of maintaining the class action through the trial;
  (7) The ability of the defendants to withstand a greater judgment;
  (8) The range of reasonableness of the settlement fund in light of the best possible recovery
  (9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

The Court considered all of these factors in the November 18, 2008 Opinion.  (See Op. at 28-42.)

possible recovery,' and 'in light of all the attendant risks of litigation.'"  (Id. (citations omitted.)

In the parties' most recent court filings, certifications have been submitted to provide to this Court all the data that is now available in order to satisfy their burden as directed by the Third Circuit.  The time period between this Court's Opinion confirming the settlement and the Third Circuit's decision on the appeal afforded the parties the ability to provide a detailed analysis of all the claims data submitted to the claims administrator, since the time for filing claims has now expired.  The time period between this Court's Opinion and the Third Circuit's decision did not, however, remedy the main problem with collecting hard data--namely, that estimations of recoverable damages for purchase claims based on sales information quantifying the amount of recalled pet food sold to consumers, and the amounts of refunds already paid to consumers, which the Third Circuit required to be considered "if available." (Third Cir. Op. at 65).  That information is simply not obtainable.  (Def.'s Brief, citing to numerous declarations, at 21-27).

Thus, this Court must analyze the reasonableness and adequacy of the $250,000 allocation based on the claims data.  What the data reveals is an affirmation of the settling parties' original analysis of the strength and scope of the purchase claimants' claims.  The claims data shows that out of the 24,365 timely payable claims received, 11,313 include payable purchase claims that total $573,441.66.  Of that 11,313, only 362 were for

6

product purchase claims only.[6] Eighty-four percent of these product purchase claims were submitted without documentation. The $250,000 allocation for product purchase claims will therefore reimburse product purchase claimants 43.6% of their payable purchase claims. (See Sincavage Decl., Docket No. 382-3.)

The Court finds that a 43.6% percent recovery for product purchase claims to be within the required "range of reasonableness" to confirm this settlement award. (Third Cir. Op. at 53, citing In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768, 806 (3d Cir. 1995)) First, when considering the proofs a product purchase claimant must establish in order to be successful on a breach of warranty, negligence, or unjust enrichment claim, which are the possible claims a product purchase claimant could assert, a compromise of 43.6% on that claim is extremely fair. In order to prove any of those claims, a product purchase claimant must show that he actually purchased a contaminated product.[7] See, e.g., O'Neil v. Simplicity, Inc., 553 F. Supp. 2d 1110, 1115-16 (D. Minn 2008); Theidemann v. Mercedes-Benz USA, LLC, 183 A.2d 783, 794 (N.J. 2005). Given that 84% of the product purchase claims were submitted without

---

[6]The remainder of the claimants also submitted claims for other economic damage, such as veterinarian bills.

[7]The fact that a claimant may have purchased pet food during the period of the recall, or that the claimant purchased a recalled product, is not enough. See, e.g., Feinstein v. Firestone and Rubber Co., 535 F. Supp. 595 (S.D.N.Y. 1982).

7

any documentation, there can be no question that those 84% would have recovered nothing if they opted out of the settlement and chosen to prosecute their claims independently. Moreover, even if a claimant retained his product, he would then have to prove contamination, as well as the injury that the contamination caused, both of which are daunting burdens. See id. Thus, a 43.6% recovery on a claim that presents a strong possibility of zero recovery if pursued independently is adequate, reasonable and fair.

Second, the $250,000 allocation is appropriate because the 43.6% recovery on product purchase claims aligns with the 49% recovery obtained by the claimants with claims for other or additional economic damages. (See Sincavage Decl. ¶ 11.) These figures show that the product purchase claimants are not being treated differently than their fellow class members in any statistically material way. Thus, the numbers demonstrate the similarity of the balance between the risk and recovery for all claims of the entire class.

Finally, the data proves that the $250,000 allocation is reasonable, adequate and fair because product purchase claims represent only 2.2% of the total value of all claims made, and 53% of all claimants did not submit a product purchase claim. Because the majority of claimants submitted claims for other economic damages, such as for veterinarian bills and the fair market value of a deceased pet, it can be reasonably surmised that these claimants already received compensation for their

product purchase claims out of the $8 million in historic payments by the manufacturers or retailers.

Consequently, when reviewing the data regarding the composition of the claims filed by the class, and when considering the high risk of the product purchase claims in comparison to the significant recovery, it is clear that the $250,000 allocation for product purchase claimants is fair, reasonable and adequate. As such, the product purchase claim portion of the settlement is confirmed, and along with the affirmance by the Third Circuit on the remainder of the settlement, the settlement is now reaffirmed in its entirety.

## **CONCLUSION**

For the reasons expressed above, the motion for Settlement Regarding Allocation for Purchase Claims is granted. An appropriate Order will be entered.

Date: April 5, 2011                     s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.